1  BUCHALTER
   A Professional Corporation
2  CECILIA MILLER (SBN: 211111)
   ZHASMINA Y. KOLAROVA (SBN: 328751)
3  MARISSA MARXEN GIACOMELLI (SBN: 300095)
   655 West Broadway, Suite 1600
4  San Diego, California  92101
   Telephone:        619.219.5335
5  Facsimile:        619.219.5344
   Email:  cmiller@buchalter.com
6          zkolarova@buchalter.com

7  Attorneys for Plaintiffs,
   BANK OF SOUTHERN CALIFORNIA, N.A., SOUTHERN CALIFORNIA
8  BANCORP

9              UNITED STATES DISTRICT COURT

10            SOUTHERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12  BANK OF SOUTHERN CALIFORNIA, N.A., a California corporation; 13  SOUTHERN CALIFORNIA BANCORP, a California corporation 14          Plaintiffs, 15      vs. 16  EVEREST NATIONAL INSURANCE 17  COMPANY, a Delaware corporation 18          Defendants. | Case No.: 3:22-cv-000737-GPC-RBB _____ **FIRST AMENDED COMPLAINT for:** **(1) BREACH OF CONTRACT;** **(2) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (BAD FAITH); and** **(3) DECLARATORY RELIEF (DUTY TO REIMBURSE & DUTY TO INDEMNIFY)** **JURY TRIAL DEMANDED** |

19
20
21
22
23
24
25
26
27
28

Plaintiffs BANK OF SOUTHERN CALIFORNIA, N.A. and SOUTHERN CALIFORNIA BANCORP (collectively, "Plaintiffs") allege as follows:

## SUMMARY OF ACTION

1.     This is an insurance coverage dispute in which the defendant insurer denied its coverage obligations owed to its insureds in connection with an underlying lawsuit.  Plaintiffs bring the instant action to obtain judicial declarations of coverage and recover damages incurred as a proximate result of the insurer's breaches of its coverage obligations.

## THE PARTIES

2.     Plaintiff BANK OF SOUTHERN CALIFORNIA, N.A. (the "Bank") is a corporation duly organized and existing under and by virtue of the laws of the State of California and doing business within the State of California.

3.     Plaintiff SOUTHERN CALIFORNIA BANCORP (the "Holding Company") is a corporation duly organized and existing under and by virtue of the laws of the State of California and doing business within the State of California.

4.     Plaintiffs are informed and believe, and on that basis allege, that Defendant EVEREST NATIONAL INSURANCE COMPANY ("Everest" or "Defendant") is a corporation organized and existing under and by virtue of the laws of the State of Delaware, doing business within the State of California, and maintaining its principal place of business in New Jersey.  *See also* Notice of Removal, ECF No. 1 ("NOR") at 4, ¶ 12.

## JURISDICTION AND VENUE

5.     Jurisdiction is proper pursuant to Article III, section 2 of the United States Constitution and sections 1331, 1332(a)(1), and 1332(c)(1) of Title 28 because this case involves a dispute involving more than **$75,000.00** between citizens of different states.  U.S. Const., Art. III, § 2; *see also* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); 28 U.S.C. § 1332(a)(1) ("The

district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between …. Citizens of different States."); 28 U.S.C. § 1332(c)(1) (stating "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business"); 28 U.S.C. § 1441(a) (providing that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by … the defendants, to the district court … embracing the place where such action is pending"); *see also* Notice of Removal, ECF No. 1 at 3, ¶¶ 8, 9 (alleging that jurisdiction is appropriate pursuant to 28 U.S.C. §§ 1332(a),(c)(1) and 1441(a)).

6. Venue is proper pursuant to section 1391 of Title 28 because Defendant does business within the County of San Diego, and "a substantial part of the events or omissions giving rise to the claim occurred" in San Diego, and Everest is subject to personal jurisdiction in this District. *See* 28 U.S.C. § 1391(b)(2) and (3) (providing that venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred" or "any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action"); *see also* NOR at 4, ¶ 15.

## GENERAL ALLEGATIONS

7. This is an insurance coverage dispute arising from Everest's failure to comply with its coverage obligations in connection with covered claims.

8. The Bank is a banking institution transacting business in San Diego County.

9. The Holding Company is a holding company transacting business in San Diego County.

10. The Holding Company purchased insurance from Everest including for its subsidiary corporation, the Bank.

11.   ABA Insurance Service, Inc. ("ABA") is the third-party claims administrator for Everest with respect to Plaintiffs' claim for insurance coverage. ABA is administering the claim for insurance coverage at issue in this matter on behalf of Everest.  Each of ABA's alleged acts with respect to the subject claim were on behalf of Everest and are attributable to Everest.

12.   David I. Rainer ("Mr. Rainer") is an employee and officer of the Bank and is alleged to have been acting within that capacity at all times relevant to the matters at issue here.

13.   Richard Hernandez ("Mr. Hernandez") is an employee and officer of the Bank and is alleged to have been acting within that capacity at all times relevant to the matters at issue here.

14.   Diana Remington Smithson ("Ms. Smithson") is an employee and officer of the Bank and is alleged to have been acting within that capacity at all times relevant to the matters at issue here.

15.   Mr. Rainer, Mr. Hernandez, and Ms. Smithson (the "Individual Insureds") were named as defendants in an underlying lawsuit filed by PacWest Bancorp alleging breach of contract and negligence, among other causes of action, as described in more detail below.

16.   Plaintiffs timely tendered the lawsuit to their Directors and Officers Liability ("D&O") insurer, Everest, which wrongfully denied coverage.

17.   Plaintiffs bring this action to redress Defendant's failures to comply with their coverage obligations in connection with covered claims for which they were provided timely notice.

**A.   The Insurance Policy**

18.   On or about July 1, 2018, and in exchange for substantial premiums paid to it, Everest issued a "Director and Officers Liability Policy" to the Bank bearing Policy No. 8100002727-181 (the "Policy") to Plaintiffs.  The Policy had a policy period of July 1, 2018 through July 1, 2021.  The Policy provides aggregate policy

BUCHALTER
A PROFESSIONAL CORPORATION
SAN DIEGO

B3767.0002 BN 72506642v2

FIRST AMENDED COMPLAINT

limits of $11,000,000.  The Policy provides a limit of $5,000,000 for Directors and Officers Liability Coverage, including Insured Persons Liability (Coverage A) and Company Indemnification (Coverage B).  Coverage B of the Directors and Officers Liability Coverage is subject to a $50,000 retention.  The Policy also provides a separate limit of $4,000,000 for Broad Form Company Liability Coverage ("BFCL").  The BFCL coverage is subject to a $50,000 retention.  A copy of the Policy as provided to Plaintiffs is attached as Exhibit "A" hereto and is incorporated by reference.  Under the Policy, the Bank is expressly identified as the "Named Insured" and Mr. Rainer, Mr. Hernandez, and Ms. Smithson are "Insureds" by virtue of their roles and positions with the Bank with respect to the conduct alleged in the underlying litigation. The Policy, as is common, offers what is known as A-Side Coverage and B-Side Coverage.   As to this Coverage B, the Policy obligates Defendant to pay all damages resulting from Claims made during the Policy Period or Discovery Period:

### Section 1. Company Indemnification Coverage

> **The Insurer will pay *on behalf of the* Company, Loss resulting from Claims first made during the Policy Period** or the Discovery Period against the Company **for which the Company has agreed** to or is legally permitted or required by law **to indemnify the Insured Persons**.

*See* Exhibit A, the Policy, at 1, § I(B) (emphasis added).

Consequently, because the Bank has agreed to indemnify the Individual Insureds, who are Insured Persons under the Policy, Everest must pay any Loss, including Defense Costs arising from the Bank indemnifying the Individual Insureds, arising out of the claim submitted by the Bank during the Policy Period.

19.    As to the BFCL Coverage, the Policy obligates Defendant to pay all damages and defense costs for a claim for a covered wrongful act, up to the applicable policy limit:

/ / /

**Section 1. Broad Form Company Liability Insuring Agreement**

> The Insurer will pay **on behalf of** the Company, Loss resulting from Claims first made during the Policy Period or the Discovery Period against the Company for which the Company is legally obligated to pay for Wrongful Acts.

*See* Exhibit A at 1, § I (emphasis added).

20.    As to the BFCL Coverage, the BFCL Agreement provides that "[f]or purposes of the coverage afforded by this Insuring Agreement, all of the terms and conditions set forth in the Policy, and any amendments thereto, shall apply" except as expressly noted therein.  Exhibit A at 1, § II.

21.    The Policy provides that "[i]t shall be the duty of the Insured and not the duty of the Insurer to defend Claims."  Exhibit A at 11, § VII(A)(1).  It elaborates that "[t]he Insured shall only retain counsel that is mutually agreed upon with the Insurer, consent for which shall not be unreasonably withheld." *Id.*

22.    The Policy further obligates Everest as the insurer to **advance** (not just reimburse after the fact) defense costs to Plaintiffs for covered claims:

**Section VIII. Defense and Settlement**

> B. (1) … **the Insurer, if requested by the Insured, shall advance covered Defense Costs <u>on a current basis</u>**, except when advancement of Defense Costs is prohibited by law or by regulation.  The insured shall repay any advanced Defense Costs to the Insurer in the event it is established that the Insurer has no liability under this Policy for such Defense Costs.

Exhibit A at 11, § VIII, B.1 (emphasis added).

**B.    <u>Relevant Policy Definitions</u>**

23.    The D&O Liability Policy defines "claim" to require a written demand, charge, complaint, or other notice to an Insured.  "Claim" is further defined to include, *inter alia*:

> 1. [a] written or oral demand for monetary damages or non-monetary relief;

BUCHALTER
A PROFESSIONAL CORPORATION
SAN DIEGO

B3767.0002 BN 72506642v2

2.  [a] civil proceeding commenced by the service of a complaint or similar pleading;

Exhibit A at 3, § IV.

24.     Subject to certain exceptions, the Policy defines "**Loss**" to include "defense costs" and "any amount which the Insured is legally obligated to pay resulting from a Claim, including damages, judgments, settlements, and pre- and post-judgment interest."  Exhibit A at 4-5, § IV.  "Loss" also includes "punitive or exemplary damages, and the multiple portion of any multiplied damage award where insurable by law."  *Id.*

25.     "**Defense Costs**" are defined to encompass any "reasonable and necessary legal fees and expenses incurred in defending or investigating any Claim and the cost of appeal, attachment or similar bonds."  Exhibit A at 3, § IV].)

26.     "Insured Person" is defined as, *inter alia*, "**any** past, present, or **future** director, member of the board of trustees, officer, **Employee**, honorary or advisory director, or honorary or advisory member of the board of trustees of the Company."  Exhibit A at 4, § IV.

27.     "**Policy Period**" is defined to mean "the period from the inception date set forth in Item 2 of the Declarations to the expiration date set forth in Item 2 of the Declarations or any earlier termination date." Exhibit A at 5, § IV.

28.     In pertinent part, the Policy insures against claims for the following "Wrongful Acts," which it defines as any "actual or alleged error, omission, misstatement, misleading statement, neglect, or breach of duty by" any of the following:

1.  any Insured Person in the discharge of their duties while acting solely in the capacity as such;

2.  any Insured Person while acting solely in the capacity as director, officer, or member of the board of trustees of a not-for-profit entity pursuant to Section II (B); or

3.  the Company or any person or entity for which the Company is legally responsible, but only to the extent

BUCHALTER
A PROFESSIONAL CORPORATION
SAN DIEGO

B3767.0002 BN 72506642v2

that coverage is granted to the Company by Insuring Agreement made a part of this Policy.

Exhibit A at 6, § IV.

29.     The Policy is written on a "claims made and reported" basis, providing coverage for a claim made against an Insured and reported to Defendant within the policy period (i.e., July 1, 2018 through July 1, 2021).  *See* Exhibit A at 5 (setting out the "General Terms and Conditions" of the Policy).

**C.     The *PacWest* Action**

30.     On or about December 1, 2020, PacWest Bancorp filed a complaint against Mr. Rainer, in a lawsuit captioned *PacWest Bancorp., et al. v. David I Rainer, et al.* in the Superior Court of the State of California, County of Los Angeles, Central District bearing Case No. 20STCV46002, alleging, among other things, breach of contract and breach of the implied covenant of good faith and fair dealing (the "*PacWest* Action").

31.     On April 9, 2021, PacWest Bancorp filed a First Amended Complaint (the "FAC") in the *PacWest* Action, joining the Bank and Holding Company, as defendants in the case.

32.     On October 21, 2021, PacWest Bancorp filed a Second Amended Complaint (the "SAC") in the *PacWest* litigation, naming Mr. Hernandez and Ms. Smithson as defendants.  A true and correct copy of the *PacWest* Action SAC is attached hereto and incorporated herein as **Exhibit** "**B**."

33.     The SAC in the *PacWest* Action pleaded the following causes of action against Mr. Rainer, Mr. Hernandez, and Ms. Smithson:  (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) intentional interference with prospective economic advantage; (4) breach of fiduciary duty; and (5) common law unfair competition and violation of section 17200 of California's Business and Professions Code.

/ / /

34.     The SAC in the *PacWest* Action pleaded the following causes of action against the Bank and the Holding Company:  (1) intentional interference with prospective economic advantage; (2) negligent interference with prospective economic advantage; (3) intentional interference with contractual relations; (4) inducing breach of contract; (5) aiding and abetting breach of fiduciary duty; and (6) common law unfair competition and violation of section 17200 of California's Business and Professions Code.

35.     The allegations of the SAC in the *PacWest* Action against Mr. Rainer, Mr. Hernandez, and Ms. Smithson assert wrongful acts committed by those Individual Insureds in the discharge of their duties while acting solely in the capacity of the Bank.

36.     The allegations in the SAC in the *PacWest* action, against both Mr. Hernandez and Ms. Smithson, include, *inter alia*, allegations that they both participated in Mr. Rainer's scheme "before and after their resignations" from PacWest.  SAC, Exhibit B at 3, ¶ 3.

37.     In the SAC, PacWest also alleges that Mr. Hernandez was "the point person" at Bank.  SAC, Exhibit B at 11, ¶ 70.

38.     In its SAC, PacWest further alleges that within weeks of joining the Bank, Ms. Smithson also solicited a number of PacWest bank clients to transfer their business to the Bank.  SAC, Exhibit B at 11, ¶ 72.

39.     The allegations of the SAC in the *PacWest* Action against the Bank and the Holding Company assert wrongful acts for which both, as insureds, are legally obligated to pay.

40.     In the SAC, PacWest's allegations in the seventh, eight, and ninth causes of action for intentional and negligent interference with prospective economic advantage assert, *inter alia*, that the Bank "improperly used confidential and proprietary information belonging to PacWest."  SAC, Exhibit B at 38, ¶¶ 150, 163.

/ / /

41.     In addition, PacWest's fifteenth cause of action is premised on the allegation that the Bank aided and abetted Mr. Rainer, Mr. Hernandez, and Ms. Smithson in "breaching [their] fiduciary duty owed to [PacWest] with respect to [PacWest's] confidential information."  SAC, Exhibit B at 53-55, ¶¶ 219, 222, 225.

42.     The Bank and the Holding Company disputed the veracity and viability of the causes of action asserted in the SAC and filed a demurrer as to them.

43.     On April 1, 2022, PacWest Bancorp filed a Third Amended Complaint (the "<u>TAC</u>").  The TAC named all the same defendants as the SAC but modified the causes of action asserted.  A true and accurate copy of the TAC, which is the operative pleading in the *PacWest* Action, is attached hereto and incorporated herein as **Exhibit "C."**

44.     The TAC in the *PacWest* Action pleads the following causes of action against Mr. Rainer, Mr. Hernandez, and Ms. Smithson: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) intentional interference with prospective economic advantage; (4) violation of California Uniform Trade Secrets Acts—Civil Code section 3426; (5) breach of fiduciary duty; and (6) common law unfair competition and violation of section 17200 of California's Business and Professions Code.

45.     The TAC in the *PacWest* Action pleads the following causes of action against the Bank and the Holding Company: (1) intentional interference with prospective economic advantage; (2) negligent interference with prospective economic advantage; (3) violation of California Uniform Trade Secrets Acts – Civil Code Section 3426; (4) intentional interference with contractual relations; (5) inducing breach of contract; (6) aiding and abetting breach of fiduciary duty; and (7) common law unfair competition and violation of section 17200 of California's Business and Professions Code.

46.     The allegations of the TAC in the *PacWest* Action against Mr. Rainer, Mr. Hernandez, and Mr. Smithson assert wrongful acts committed by those

BUCHALTER
A PROFESSIONAL CORPORATION
SAN DIEGO

B3767.0002 BN 72506642v2

Individual Insureds in the discharge of their duties while acting solely in the capacity of the Bank.

47.     The allegations in the TAC in the *PacWest* action, against both Mr. Hernandez and Ms. Smithson, include allegations, *inter alia*, that they both participated in Mr. Rainer's scheme "before and after their resignations" from PacWest.  TAC, Exhibit C at 3, ¶ 3.

48.     In the TAC, PacWest also alleges that Mr. Hernandez was "the point person" at the Bank.  TAC, Exhibit C at 11, ¶ 72.

49.     In the TAC, PacWest further alleges that within weeks of joining the Bank, Ms. Smithson also solicited a number of PacWest bank clients to transfer their business to the Bank.  TAC, Exhibit C at 11-12, ¶ 74.

50.     The allegations of the TAC in the *PacWest* Action against the Bank and the Holding Company assert wrongful acts for which both, as insureds, are legally obligated to pay.

51.     In the TAC, PacWest's eight cause of action for negligent interference with prospective economic advantage alleges that the Bank and Holding Company "illegally induced" (1) "Rainer to breach his Agreement…" and (2) "Hernandez and Smithson to breach their Stock Award Agreements" for their own benefits.  TAC, Exhibit C at 33-34, ¶¶ 141, 143.

52.     In addition, PacWest's fifteenth cause of action is premised on the allegation that the Bank aided and abetted Mr. Rainer, Mr. Hernandez, and Ms. Smithson in "breaching [their] fiduciary duty owed to [PacWest] with respect to [PacWest's] confidential information."  TAC, Exhibit C at 43-44, ¶¶ 198, 200, 202.

53.     The Bank and the Holding Company dispute the veracity and viability of the causes of action asserted in the TAC.

54.     In or around December 2020, Mr. Rainer, Mr. Hernandez, and Ms. Smithson retained defense counsel at Kendall Brill & Kelly LLP ("KBK") to defend against the allegations of the *PacWest* Action.

### D.     Everest Wrongfully Denies Coverage

55.     In or around June of 2021, Plaintiffs timely tendered the *PacWest* Action to Everest consistent with the reporting requirements of the Policy.

56.     On June 17, 2021, Terence Cawley, of ABA, and expressly acting on behalf of Everest as claims administrator with respect to the Claim, acknowledged receipt of the Claim.

57.     In the June 17, 2021 correspondence, Everest acknowledged that the *PacWest* Action asserted wrongful acts by the Bank within the scope of coverage of the Policy. Mr. Cawley, on behalf of Everest, agreed to reimburse the Bank's defense costs and consented to Plaintiffs' retention of Jenner & Block as their defense counsel. Mr. Cawley represented, however, that "a definitive coverage analysis is not possible until the allegations set forth in the Claim have been fully resolved."

58.     On or about July 2, 2021, the Bank requested defense and indemnity from Everest for the defense fees and costs it was incurring in funding the defense of Mr. Rainer in the *PacWest* Action.

59.     On September 10, 2021, Everest's Claims Administrator, ABA issued a denial of coverage for Mr. Rainer's defense in the *PacWest* Action on the stated basis that the "the breaches and tortious conduct alleged to have been committed by Mr. Rainer were not committed in the discharge of his duties while acting 'solely in the capacity' of an Insured Person of Bank of Southern California." Moreover, in the same letter, Everest, through ABA, took an unreasonable position that Mr. Rainer "allegedly committed the conduct complained of *prior* to even joining the Bank as Chairman of the Board." The pleadings filed in the *PacWest* Action, including the operative TAC, directly contradict Everest's position. For instance, PacWest alleges that the "mass exodus" of PacWest personnel and client accounts took place *after* Mr. Rainer joined the Board of the Bank.

60.     Through counsel, on October 5, 2021, Plaintiffs sent a letter to ABA, citing legal authorities contradicting Defendant's unreasonable denial of coverage

owed for Mr. Rainer's defense and asked Everest to reconsider its erroneous position. Through counsel, Plaintiffs also requested that Defendant provide a response to the letter by October 19, 2021.

61.    Through counsel, on October 26, 2021, or within five (5) days of the filing of the SAC in the *PacWest* Action, Plaintiffs sent another letter to Everest tendering their request for defense and indemnity of their Chief Banking Officer, Richard Hernandez, and one of its Executive Vice Presidents, Diana Remington Smithson, under the Policy.  Plaintiffs asked Defendant to respond by November 10, 2021.

62.    By correspondence dated December 10, 2021, Terry Cawley, on behalf of Everest, wrote Plaintiffs and provided an "amended and revised preliminary coverage analysis" of the Claim.  Once again, Everest contended that "[a] definitive coverage analysis is not possible until the allegations set forth in the Claim have been fully resolved."  In the December 10, 2021 correspondence Everest reaffirmed that the claims against the Bank "are covered."

63.    By correspondence dated December 16, 2021, Everest reaffirmed its denial of coverage for defense fees and costs incurred by the Bank in the defense of Mr. Rainer.  Among other unreasonable bases for the denial, Everest contended that (1) "Mr. Rainer has not requested that Everest 'defend or indemnify' him for this action or any other action" and (2) "the denial of coverage for Mr. Rainer ***does not depend upon*** a linchpin that 'all' of the alleged conduct took place before Mr. Rainer joined" the Bank.

64.    On December 30, 2021, Everest, through its claims administrator ABA, responded to Plaintiffs' letter dated October 26, 2021 by denying any coverage obligation owed to the Bank for the defense and indemnity of Mr. Hernandez and Ms. Smithson in the *PacWest* Action.  Among other unreasonable bases for the denial, Everest concluded there was no coverage owed to Ms. Smithson and Mr. Hernandez because the allegations of wrongful conduct "relate prominently to

1  conduct allegedly engaged in" while the respective employees were still employed
2  by PacWest.

3      65.   The parties exchanged several more communications in which Plaintiffs
4  sought reconsideration of the denial of any coverage owed to the Bank for the defense
5  and indemnity of the Individual Insureds, but Defendant continues to maintain its
6  erroneous position and denied coverage for the defense of the Individual Insureds in
7  the *PacWest* Action.

8      66.   By letter dated February 11, 2022, coverage counsel to the Bank wrote
9  Terry Cawley of ABA, as Claims Administrator on behalf of Everest, and sought
10 reconsideration of the denial of coverage owed to the Individual Insureds.  In the
11 February 11, 2022 letter, Plaintiffs also requested that Everest obtain policy limits
12 settlement authority in advance of a mediation in the *PacWest* Action scheduled for
13 February 25, 2022.  The February 11, 2022 correspondence asked Everest to respond
14 by February 21, 2022.

15     67.   Everest did not respond to Plaintiffs' policy limits demand until
16 February 24, 2022, when Everest verbally advised it would not authorize policy
17 limits.  Instead, Everest maintained it would contribute only a small percentage
18 toward any settlement that might be reached at the February 25 mediation and was
19 looking to Plaintiffs to fund the majority of any settlement.

20     68.   On the morning of the February 25, 2022 mediation, Terry Cawley, on
21 behalf of ABA as the Claims Administrator for Everest, wrote to Plaintiffs' coverage
22 counsel in response to the February 11, 2022 policy limits demand.  Mr. Cawley
23 expressed disagreement with Plaintiffs' position but declined to "try to in this letter
24 to address each point."  Everest reserved the right to "respond more thoroughly and
25 more formally to [the February 11] letter."

26     69.   The parties were unable to reach a settlement at the February 25, 2022
27 mediation.

28 / / /

70. Plaintiffs agreed to defend and indemnify Mr. Rainer, Mr. Hernandez, and Ms. Smithson in the *PacWest* Action because the allegations include conduct committed by those Individual Insureds while acting solely in the capacity of employees of the Bank.

71. To date, the Bank has paid in excess of **$1,000,000.00** in defense fees and costs incurred through the KBK law firm toward the defense of the Individual Insureds in the *PacWest* Action.

72. Following the unsuccessful mediation in February of 2022, the parties to the *PacWest* Action continued to informally discuss settlement. In August of 2022 the Parties to the *PacWest* Action reached a resolution of that lawsuit, which includes a monetary payment by the Bank for a full release of all claims without any admissions or findings of liability. Everest provided consent to the Bank settling the *PacWest* Action but declined to fund the monetary payment. Accordingly, the Bank has incurred liability for the payment without, to date, contribution or assistance from Everest.

73. Notwithstanding applicable case law cited to Defendant refuting their positions, Defendant steadfastly refuses to reverse its erroneous denial of a defense and coverage owed for the Individual Insureds' defense. In doing so, Defendant deprived the Bank (its Insured) of a defense when it needed it most—in the face of an aggressive lawsuit against its Board members it believes to be unmeritorious and without the benefit of an insurer-provided defense required under the Policy—one of the principal benefits a policyholder reasonably expects to receive when purchasing a liability policy.

74. Defendant knows there are no applicable legal authorities supporting its position, and that its coverage denial is contrary to settled California and Federal authority. In so doing, Defendant is not acting carelessly or ignorantly; rather, it is choosing as a company policy and procedure to act in blatant violation of California law and contrary to its obligations under its own Policy. As a corporate philosophy

BUCHALTER
A PROFESSIONAL CORPORATION
SAN DIEGO

B3767.0002 BN 72506642v2

and policy, Defendant has also knowingly chosen to ignore settled law to increase profits and avoid expending money to reimburse its policyholders.

75.    In so denying, Defendant proffered unreasonable interpretations of the Policy that disregard both the actual language of the Policy as well as the reasonable expectations of the Insureds, in contravention of controlling California law governing the interpretation of insurance policies.  Defendant refuses to address these concerns, and instead, reiterates its denial without elaboration or explanation.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract against Defendant)

76.    Plaintiffs re-allege and incorporate by reference the above and below allegations as if fully set forth herein.

77.    In consideration of significant premiums paid, Defendant issued the Policy, *supra*, which was a "Director and Officers Liability Policy" to Plaintiffs bearing Policy No. 8100002727-181 with a policy period of July 1, 2018 through July 1, 2021.  *See* Exhibit A.  Plaintiffs are insureds under the Policy as are the Individual Insureds.

78.    Under the Policy, Defendant must (1) pay on behalf of Mr. Rainer, Mr. Hernandez, and Ms. Smithson any losses as well as (2) reimburse and pay, on behalf of the Bank, all defense fees, costs, and liabilities incurred in the *PacWest* Action, including for indemnifying Mr. Rainer, Mr. Hernandez, and Ms. Smithson, upon exhaustion of the applicable deductible, up to the applicable Policy liability limits.

79.    The allegations of the *PacWest* Action fall within the scope of the terms and coverage provisions of the Policy.  Accordingly, Defendant has a contemporaneous duty to reimburse Plaintiffs for costs incurred as a result of allegations against the Individual Insureds in the *PacWest* Action.

80.    Defendant repeatedly denied its obligations to reimburse Plaintiffs for the defense fees and costs incurred by the Bank for defending the Individual Insureds in the *PacWest* Action.  As a result, Plaintiffs were forced to, and continue to, pay

for defense counsel, despite reasonably expecting Defendant would provide this benefit in exchange for significant premiums paid. *See*, *e.g.*, *Montrose Chem. Corp. of Cal. v. Super. Crt.*, 6 Cal.4th 287 295-96 (1993) ("The insured's desire to secure the right to call on the insurer's superior resources for the defense of third party claims is, in all likelihood, typically as significant a motive for the purchase of insurance as is the wish to obtain indemnity for possible liability.").

81.   Defendant has denied its obligation to reimburse Plaintiffs in the *PacWest* Action under the Policy. *See*, *e.g.*, *Pan Pac. Retail Properties, Inc. v. Gulf Ins. Co.*, 471 F.3d 961, 970 (9th Cir. 2006) (applying California law) ("D & O policies … "require the carrier to reimburse the insured for defense costs as an ingredient of 'loss,' a defined term under the policy"). Plaintiffs reasonably expected Defendant would reimburse the defense fees and costs incurred by Mr. Rainer, Mr. Hernandez, and Ms. Smithson in the *PacWest* Action in exchange for significant premiums paid. *See Montrose*, 6 Cal.4th at 295-96; *see also Cal. Ins. Guarantee Assn. v. Wood*, 217 Cal. App. 3d 944, 948 (1990) (noting if courts allowed insurers to wait until the final adjudication to accept coverage, such a policy "would not only frustrate the insured's reasonable expectation that the insurer will defend, but also create a peculiar form of coverage restricted to only those cases which the insurer decides are brought on meritorious legal and factual grounds").

82.   Defendant has repudiated and breached its contractual obligation under the Policy to contemporaneously reimburse Plaintiffs for all expenses and defense costs incurred as a result of the *PacWest* Action by failing to make payments toward defense fees and costs incurred by Plaintiffs in the defense of Mr. Rainer, Mr. Hernandez, and Ms. Smithson.

83.   Defendant's refusal to provide Plaintiffs with contemporaneous reimbursement denies Plaintiffs the benefits contracted for under the Policy because Plaintiffs are deprived of the insurer-funded reimbursement owed by Defendant during the pendency of the *PacWest* Action. *See Mirpad, LLC v. Cal. Ins. Guarantee*

*Assn.*, 132 Cal. App. 4th 1058, 1068 (2005) ("[A] defense is excused only when 'the third party complaint can *by no conceivable theory raise a single issue* which could bring it within the policy coverage.'") (quoting *Montrose*, 6 Cal. 4th at 289).   In August of 2022, Plaintiffs reached a resolution of the *PacWest* Action, and as of the date of this pleading, Plaintiffs will be funding the monetary component of that settlement without any contribution or assistance from Everest.  Plaintiffs' payment toward the *PacWest* Action settlement constitutes a covered "Loss" under the Policy incurred by Plaintiffs and owed by Everest.  By failing to agree to fully reimburse this covered "Loss," Everest has further breached its coverage obligations under the Policy, including its duty to indemnify.

84.    Plaintiffs have performed all covenants, conditions, and promises required on their part to be performed in accordance with the Policy, except to the extent that such performance was prevented or excused from performing.

85.    Accordingly, as a proximate result of Defendant's breach of its contractual obligations under the Policy, Plaintiffs have suffered damages—namely, a covered loss, including attorneys' fees and costs, which Plaintiffs have incurred, and will continue to incur to obtain the reimbursement owed under the Policy, plus interest thereon, the exact amount of which has yet to be ascertained.

86.    Plaintiffs are insured by Defendant under a specifically enforceable contract sufficiently certain in its terms, i.e., the Policy.  *See generally* Policy, Exhibit "A."

87.    At all pertinent times, Plaintiffs performed under the Policy by paying the required premiums with respect to the Policy, and the Policy was in full force and effect.  Thus, Defendant received adequate consideration for the Policy.

88.    The provisions of the Policy requiring Defendant to provide an immediate and contemporaneous reimbursement and indemnify Plaintiffs are just and reasonable.

/ / /

89. Since tender, Plaintiffs repeatedly demanded Defendant provide contemporaneous reimbursement for the fees and costs incurred by Plaintiffs in the defense of the Individual Insureds in the *PacWest* Action consistent with the provisions of the Policy. Yet, Defendant has refused, thereby necessitating Plaintiffs to provide a defense for their officers and employees in the *PacWest* Action at their own expense to protect the interests of those officers and employees in that litigation.

90. Defendant has breached its contractual obligations to Plaintiffs under the Policy by (1) failing to provide any reimbursement of the fees and costs incurred in the defense of Mr. Rainer, Mr. Hernandez, and Ms. Smithson in the *PacWest* Action, and (2) failing to fully reimburse the settlement of the *PacWest* Action.

91. If Defendant does not provide Plaintiffs with timely reimbursement of the defense fees and costs as incurred in the defense of Mr. Rainer, Mr. Hernandez, and Ms. Smithson, as well as reimbursement of the settlement payment, Plaintiffs will be irreparably harmed. Therefore, Plaintiffs have no adequate remedy at law in that they will be deprived of the benefits Defendant promised to provide by accepting the significant premiums under the Policy—i.e., the contemporaneous reimbursement of settlement payments, defense fees, and costs incurred in the *PacWest* Action.

92. The fees and costs incurred by Plaintiffs in defense of Mr. Rainer, Mr. Hernandez, and Ms. Smithson in the *PacWest* Action exceed **$1,000,000.00**, exclusive of interest accruing thereon. The Bank has also incurred a monetary payment to resolve the *PacWest* Action. As a result of Defendant's continuing refusal to reimburse these substantial payments, fees, and costs, Plaintiffs have been forced to independently and exclusively shoulder these liabilities, resulting in financial hardship.

/ / /

/ / /

/ / /

**SECOND CLAIM FOR RELIEF**

**(Breach of the Implied Covenant of Good Faith and**

**Fair Dealing (Bad Faith) against Defendant)**

93.     Plaintiffs re-allege and incorporate by reference the above and below allegations as if fully set forth herein.

94.     In consideration of significant premiums paid, Defendant issued the Policy, *supra*, which was a D&O policy to Plaintiffs bearing Policy No. 8100002727-181 with a policy period of July 1, 2018 through July 1, 2021, and under which Plaintiffs are insureds.  *See* Exhibit A.

95.     The allegations of the *PacWest* Action potentially fall within the scope of the terms and coverage provisions of the Policy.  Accordingly, Defendant has a contemporaneous duty to reimburse Plaintiffs for the costs incurred as a result of the allegations in and during the pendency of the *PacWest* Action.

96.     Defendant has breached its duties of good faith and fair dealing owed to Plaintiffs under the Policy by, *inter alia*:

(a)     unreasonably failing to provide Plaintiffs with contemporaneous reimbursement in the *PacWest* Action, despite repeated demands, at a time when Defendant knew Plaintiffs were entitled to such a reimbursement under the terms of the Policy and California insurance jurisprudence;

(b)     engaging in unreasonable interpretations of the Policy provisions and California jurisprudence for the purpose of avoiding its reimbursement obligations, *see Mirpad*, 132 Cal. App. 4th at 1068 ("[A] defense is excused only when 'the third party complaint can *by no conceivable theory raise a single issue* which could bring it within the policy coverage.'") (quoting *Montrose*, 6 Cal. 4th at 289);

(c)     failing to reasonably and thoroughly investigate all bases for coverage under the Policy including, *inter alia*, by unreasonably interpreting the Policy's "Loss," "Wrongful Act," and "Insured Person" definitions;

(d)     expressly misrepresenting to Plaintiffs pertinent Policy terms and provisions in violation of California Insurance Code section 790.03(h)(1);

(e)     unreasonably and prematurely applying exclusions, which may only be applied under the Policy following a final judgment or adjudication, in order to avoid its coverage obligations, *compare* Policy at 7, Section V ("The **Insurer** shall not be liable to make any payment for **Loss**, <u>other than **Defense Costs**</u>, in connection with any **Claim** arising out [this exclusion], provided a ***final judgment*** or … ***adjudication* establishes such** [conduct as falling within the exclusion]") *with Axis Reinsurance Co. v. Telekenex, Inc.*, 913 F. Supp. 2d 793, 800-02 (N.D. Cal. 2012) (applying California law) (unlawful advantage exclusion could not apply in the absence of a "judgment or final adjudication");

(f)     applying unreasonable interpretations to the terms of the Policy, including the "Wrongful Act" and "Insured Person" definitions, as compared to the allegations of the *PacWest* Action;

(g)     failing to acknowledge and act reasonably promptly upon communications with respect to Plaintiffs' claims arising under the Policy;

(h)     failing to engage in good faith in settlement discussions with the third party claimant in the underlying *PacWest* Action, including by insisting the Insureds bear the vast majority of any settlement contribution;

(i)     on information and belief, failing to adopt and implement reasonable standards for the prompt investigation and processing of Plaintiffs' claim;

(j)     engaging in inadequate and tardy investigations of Plaintiffs' claims; and

(k)     placing its own interests in minimizing its coverage obligations ahead of the interests of its insured (the Bank).

97.     In declining to fulfill its coverage obligation to Plaintiffs under the Policy, Defendant has acted unreasonably, in bad faith, and with the knowledge there was no reasonable basis for its conduct.

BUCHALTER
A PROFESSIONAL CORPORATION
SAN DIEGO

B3767.0002 BN 72506642v2

98.    As a proximate result of the aforementioned wrongful conduct of Defendant, Plaintiffs have sustained damages and out-of-pocket expenses, including, but not limited to, attorneys' fees attributable to Plaintiffs' efforts to obtain the coverage owed under the Policy and California law.

99.    Defendant has tortiously withheld from the Insured benefits due under the Policy, and consistent with the holding of *Brandt v. Super. Crt.* 37 Cal.3d 813 (1985), Plaintiffs are therefore entitled to recoup reasonable attorneys' fees expended to recover such benefits.

100.   Plaintiffs have performed all covenants, conditions, and promises required on their part to be performed in accordance with the Policy, except to the extent that such performance was prevented or excused from performing.

101.   Defendant's conduct described herein was done with a conscious disregard of Plaintiffs' rights and with the intent to vex, injure, or annoy Plaintiffs, such as to constitute oppression, fraud, or malice, entitling Plaintiffs to punitive damages in an amount appropriate to punish or set an example of Defendant.

### THIRD CLAIM FOR RELIEF

**(Declaratory Relief against Defendant—Duty to Defend & Duty to Indemnify)**

102.   Plaintiffs re-allege and incorporate by reference the above and below allegations as if fully set forth herein.

103.   By virtue of Defendant's repeated denials of any coverage obligations owed to Plaintiffs with respect to the defense of Mr. Rainer, Mr. Hernandez, and Ms. Smithson in the *PacWest* Action and the settlement payment to resolve the *PacWest* Action, an actual and justifiable controversy exists between Plaintiffs, on the one hand, and Defendant, on the other hand, regarding Defendant's duty to provide reimbursement under the Policy of the defense fees and costs incurred by Mr. Rainer, Mr. Hernandez, and Ms. Smithson as Plaintiffs' officers and employees named as defendants in the *PacWest* Action as well as the settlement payment to be made by the Bank to resolve the *PacWest* Action.

104.   Under the Policy, Defendant is obligated to reimburse Plaintiffs and pay in full on behalf of Plaintiffs all defense fees, costs, and liabilities incurred, and to be incurred, in the *PacWest* Action.   The allegations of the *PacWest* Action against Plaintiffs' directors and officers fall within the scope of the terms and coverage provisions of the Policy and are covered by the D&O grant of coverage in the Policy. Accordingly, Defendant had and continues to have a contemporaneous duty to reimburse Plaintiffs for the fees and costs incurred, and to be incurred, by Mr. Rainer, Mr. Hernandez, and Ms. Smithson to defend against the allegations and claims asserted in the *PacWest* Action as well as the settlement payment to be made by the Bank to resolve the *PacWest* Action.

105. Plaintiffs regularly advised Defendant that its failure to contemporaneously reimburse them for costs incurred in the *PacWest* Action was contrary to its obligations under the Policy and California law, including as recently as <u>August 23, 2022</u>.

106.   Plaintiffs and those acting on their behalf took reasonable and appropriate responsive actions and have incurred fees, costs, expenses, and liabilities in defense of their directors and officers in the *PacWest* Action, which are at least $1,000,000.00 as of the filing of this amended complaint.

107.   Plaintiffs and those acting on their behalf took reasonable and appropriate responsive actions to mitigate damages and reach a resolution of the *PacWest* Action.   Plaintiffs will incur a settlement payment to fully and finally resolve the *PacWest* Action absent immediate contribution and reimbursement by Everest.

108.   Plaintiffs respectfully request a judicial determination and declaration that Defendant was and is obligated under the Policy to contemporaneously reimburse Plaintiffs for the fees and costs incurred by Mr. Rainer, Mr. Hernandez, and Ms. Smithson in defense of the *PacWest* Action as well as the settlement payment to be made by the Bank to resolve the *PacWest* Action.   A judicial declaration of

Defendant's duty to reimburse Plaintiffs in the *PacWest* Action for all such "Loss" is necessary and appropriate at this time because Plaintiffs have unreimbursed costs and expenses incurred in defense of their directors and officers in the *PacWest* Action and will soon pay in full the settlement payment to resolve that lawsuit.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment against Defendant as follows:

1.  As to the First Claim for Relief for Breach of Contract, Plaintiffs seek:

    a.  actual damages, according to proof;

    b.  consequential damages, according to proof;

    c.  special damages, according to proof; and

    d.  specific performance in the form of immediate fulfillment of Defendant's reimbursement duties owed to Plaintiffs in the underlying *PacWest* Action, including immediate payment of all unreimbursed defense fees and costs incurred to date paid by Plaintiffs in defense of and to indemnify Mr. Rainer, Mr. Hernandez, and Ms. Smithson as well as reimbursement of the settlement payment to be made by the Bank to resolve the *PacWest* Action.

2.  As to the Second Claim for Relief for Bad Faith, Plaintiffs pray for

    a.  actual damages, according to proof;

    b.  consequential damages, according to proof;

    c.  special damages, according to proof;

    d.  punitive and/or exemplary damages in an amount sufficient to punish Defendant for its wrongful conduct;

    e.  Plaintiffs' reasonable attorneys' fees incurred to establish coverage owed under the Policy; and

    f.  specific performance in the form of immediate fulfillment of Defendant's reimbursement duties owed to Plaintiffs in the

underlying *PacWest* Action, including immediate payment of all unreimbursed defense fees and costs incurred to date paid by Plaintiffs in defense of and to indemnify Mr. Rainer, Mr. Hernandez, and Ms. Smithson as well as reimbursement of the settlement payment to be made by the Bank to resolve the *PacWest* Action.

3.     As to the Third Claim for Relief for Declaratory Relief, Plaintiffs seek judicial declarations that

    a.     the allegations of the *PacWest* Action asserted against Mr. Rainer, Mr. Hernandez, and Ms. Smithson are expressly covered by the Policy;

    b.     Plaintiffs (as insureds) have satisfied the applicable deductible for the *PacWest* Action claim under the Policy;

    c.     Defendant owes Plaintiffs (as Insureds) a contemporaneous duty to reimburse Plaintiffs  for the costs and expenses incurred as a result of the defense of Mr. Rainer, Mr. Hernandez, and Ms. Smithson in the *PacWest* Action;

    d.     Defendant is obligated to reimburse Plaintiffs (as Insureds) for all defense fees and costs incurred in defending Mr. Rainer, Mr. Hernandez, and Ms. Smithson in the *PacWest* Action in excess of the applicable deductible;

    e.     Defendant is obligated to reimburse Plaintiffs for all payments made to resolve the *PacWest* Action

4.     As to all Claims for Relief, Plaintiffs request the following:

    a.     actual damages, according to proof;

    b.     consequential damages, according to proof;

    c.     interest at the maximum legally permissible rate from the date of the initial breaches;

1        d.    costs of suit; and

2        e.    such other and further relief as the Court deems just and proper.

3                     **<u>DEMAND FOR JURY TRIAL</u>**

4      Plaintiffs hereby demand a trial by jury on all issues so triable.

5

6  DATED: August 30, 2022         BUCHALTER
                                A Professional Corporation

7

8

9                           By:   __s/*Cecilia O. Miller*_____
                                Cecilia O. Miller

10                               Zhasmina Y. Kolarova
                              Marissa M. Giacomelli

11                               Attorneys for Plaintiffs,
                   BANK OF SOUTHERN CALIFORNIA,

12                    N.A. and SOUTHERN CALIFORNIA
                              BANCORP

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

EDEC 40 105 (07 09)

# EVEREST NATIONAL INSURANCE COMPANY
(A Stock Insurance Company, herein called the **Insurer**)

## DIRECTORS & OFFICERS LIABILITY POLICY
### Declarations Page

**Policy Number:**  8100002727-181

**IMPORTANT NOTICE:**   This is a claims-made policy. **Defense Costs** are included within the Limit of Liability. Amounts incurred as **Defense Costs** will reduce the Limit of Liability available to pay judgments or settlements.  Please read this **Policy** carefully.

**Item 1.**   **Named Insured(s):**  Bank of Southern California

**Principal Office:**   12265 El Camino Real, Suite 100, San Diego, CA 92130

**Item 2.**   **Policy Period:**   From 12:01 a.m.  07/01/2018  To 12:01 a.m.  07/01/2021
(Local time at the address shown in Item 1)

**Item 3.**   **Total Policy Limit:**  The Total Policy Limit for each **Policy Year** during the **Policy Period** for all Insuring Agreements, regardless of whether such Insuring Agreement is provided as a sublimit or separate limit, shall not exceed $11,000,000.

**Item 4.**   **Discovery Period:**   If the eligibility requirements are met and the Discovery Period is properly exercised, the **Insured** shall pay 100% of the annual premium set forth in Item 11(a).  The length of the Discovery Period shall be 365 days.

**Item 5.**   **Notices:**  All notices required to be given to the **Insurer** under this **Policy** shall be addressed to ABA Insurance Services Inc., 3401 Tuttle Road, Suite 300, Shaker Heights, Ohio 44122. Telephone: 800-274-5222.

**Item 6.**   **Defense Option:** It shall be the duty of the **Insured** and not the duty of the **Insurer** to defend **Claims** unless the "Insurer's Duty to Defend" is designated "yes" below:

| Insuring Agreement | Insurer's Duty To Defend |
|---|---|
| D&O Liability | No |
| Securities Liability | No |
| Broad Form Company Liability | No |
| Fiduciary Liability | No |
| Employment Practices Liability | No |

**Item 7.**   **Coverage(s) Provided:** It is understood and agreed that coverage will not be provided under any Insuring Agreement unless a Limit of Liability, Retention, and premium for such Insuring Agreement are set forth below:

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 27**

| Insuring Agreement | Item 8. "X" Indicates Separate Limit | Item 9. Limit of Liability | Item 10. Retention | Item 11. (a) Annual Premium | Item 11. (b) Actual Premium |
|---|---|---|---|---|---|
| **Directors & Officers Liability Coverage** | | | | | |
| (A) Insured Persons Liability & | | | (A) $0 | | |
| (B) Company Indemnification | | $5,000,000 | (B) $50,000 | $15,138 | $40,873 |
| | | | | | |
| **Additional Liability Coverages** | | | | | |
| Securities Liability | | $5,000,000 | $50,000 | $1,816 | $4,903 |
| Broad Form Company Liability (BFCL) | X | $4,000,000 | $50,000 | $10,218 | $27,589 |
| Fiduciary Liability | | $2,000,000 | $5,000 | $741 | $2,001 |
| Employment Practices Liability | X | $2,000,000 | $50,000 | $5,354 | $14,456 |

**Item 12.**   **IRA/Keogh Liability Retention:** If the **Insured** is legally obligated to pay for **Wrongful Acts** while acting solely in the capacity as administrator, custodian or trustee under any individual retirement account (IRA) or H.R. 10 Plan (Keogh Plan) the Retention for such IRA/Keogh **Claim** shall be $5,000. This Retention shall only apply to the extent any such **Claim** involves an IRA or Keogh Plan not in the custody or control of any Trust Department or Trust **Subsidiary** of the **Company.**

**Item 13.**   **Prior/Pending Litigation Dates:**

| Insuring Agreement | Prior/Pending Litigation Date |
|---|---|
| D&O Liability | 06/01/2001 |
| Securities Liability | 06/01/2001 |
| Broad Form Company Liability | 06/01/2005 |
| Fiduciary Liability | 06/01/2005 |
| Employment Practices Liability | 06/01/2005 |

**Item 14.**   **Endorsements:**   This **Policy** is subject to the terms of the following Endorsements attached hereto and incorporated herein by reference at the effective date of this **Policy** and to all other Endorsements attached hereto after the effective date of this **Policy**: EEO 40 610 (07 09), EEO 40 014 (05 16), EEO 40 016 (05 16), EEO 40 508 (07 09), EEO 40 513 (07 09), EEO 40 520 (07 09), EEO 40 533 (07 09), EEO 40 535 (07 09), EEO 40 542 (07 09), EEO 40 569 (07 09), EEO 40 613 (07 09), EEO 40 614 (07 09), EEO 40 619 (07 09), EEO 40 623 (07 09), EEO 40 629 (07 09), EEO 40 917 (07 09), EEO 40 918 (07 09), EEO 40 962 (07 09), EEO 40 963 (07 09), EEO 40 978 (03 11), EEO 40 988 (02 13), EEO 40 991 (02 13), EEO 41 151 CA (12 10), EN IL PV 1 (01 07)

These Declarations, along with the completed and signed **Application**, including attachments, the **Policy** and all Endorsements hereto, shall constitute the contract between the **Insured** and **Everest National Insurance Company**, 477 Martinsville Road, Liberty Corner, NJ 07938.

Date: July 9, 2018

*John N. Well*

Company Officer or Authorized Representative

**EXHIBIT A - 28**

EEO 40 610 (07 09)

# EVEREST NATIONAL INSURANCE COMPANY
### (A Stock Insurance Company, herein called the **Insurer**)

# DIRECTORS & OFFICERS LIABILITY POLICY

Policy Number:  8100002727-181

**IMPORTANT NOTICE: This is a claims-made policy. Defense Costs are included within the Limit of Liability. Amounts incurred as Defense Costs will reduce the Limit of Liability available to pay judgments or settlements.  Please read this Policy carefully.**

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that coverage will be provided subject to all of the terms, conditions and limitations of this **Policy**, as follows:

---

## SECTION I - INSURING AGREEMENTS

---

It is understood and agreed that coverage will not be provided under any Insuring Agreement unless a Limit of Liability, Retention and premium for such Insuring Agreement are set forth in the Declarations.

A.    **INSURED PERSONS LIABILITY COVERAGE -** The **Insurer** will pay on behalf of the **Insured Persons**, **Loss** resulting from **Claims** first made during the **Policy Period** or the Discovery Period against the **Insured Persons** for **Wrongful Acts** for which the **Insured Persons** are legally obligated to pay, except for **Loss** the **Company** pays as indemnification.

B.    **COMPANY INDEMNIFICATION COVERAGE -** The **Insurer** will pay on behalf of the **Company**, **Loss** resulting from **Claims** first made during the **Policy Period** or the Discovery Period against the **Insured Persons** for **Wrongful Acts** for which the **Company** has agreed to or is legally permitted or required by law to indemnify the **Insured Persons**.

---

## SECTION II - ADDITIONAL COVERAGES

---

A.    **ESTATES, HEIRS AND MARITAL ESTATE LIABILITY -** This **Policy** shall cover **Loss** resulting from **Claims** for **Wrongful Acts** of an **Insured Person** made against:

(1)    the estates, heirs, legal representatives or assigns of any **Insured Persons** who are deceased, incompetent, insolvent or bankrupt, provided that such **Claims** would have been covered by this **Policy** in the absence of such death, incompetency, insolvency or bankruptcy; and

(2)    the lawful spouse or **Domestic Partner** of an **Insured Person** solely by reason of such person's status as a spouse or **Domestic Partner**, or such spouse or **Domestic Partner's** ownership interest in property which the claimant seeks as recovery for an alleged **Wrongful Act** of such **Insured Person**.

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 29**

The coverage provided by this Subsection shall not apply with respect to any loss arising from any act or omission by an **Insured Person's** estate, heirs, legal representatives, assigns, spouse or **Domestic Partner.**

B.   **NOT-FOR-PROFIT DIRECTORSHIPS** - This **Policy** shall cover **Loss** resulting from **Claims** for **Wrongful Acts** committed by **Insured Persons** while serving on the board of directors, board of trustees, or as officers of any not-for-profit entity at the direction of the **Company**; provided, however, that this coverage shall be excess over any other insurance or indemnification provided to the **Insured Persons**.

---

### SECTION III - DISCOVERY PERIOD

---

A.   If the **Company** or the **Insurer** cancels or nonrenews this **Policy** or any Insuring Agreement, or if the **Policy** converts subject to Section XII (C)(1)(b), the **Insured** shall have the right to purchase an optional extended reporting period (herein called the Discovery Period) for the period set forth in Item 4 of the Declarations. It is understood that if the **Insurer** cancels this **Policy** due to nonpayment of premium, the **Insured** shall not be entitled to the Discovery Period.

B.   The Discovery Period is not an extension of coverage, but rather an extended reporting period for **Claims** first made during the Discovery Period resulting from **Wrongful Acts** that occurred prior to the effective date of cancellation, nonrenewal or conversion and otherwise covered under this **Policy**. Notice of facts and circumstances that may give rise to a **Claim**, pursuant to Section X (B), must be given during the **Policy Period** and shall not be effective if given during the Discovery Period.

C.   If the **Insured** elects to purchase the Discovery Period, the premium will be calculated by multiplying the annual premium set forth in Item 11(a) of the Declarations by the percentage set forth in Item 4 of the Declarations. The Discovery Period is noncancellable and the entire premium shall be deemed fully earned at its commencement.

D.   The **Insureds'** right to purchase the Discovery Period shall lapse unless the **Insurer** receives written notice of the **Insureds'** election and full payment of the additional premium due within sixty (60) days after the effective date of such cancellation, nonrenewal or conversion.

E.   The Limit of Liability with respect to **Claims** made during the Discovery Period shall be part of and not in addition to the Limit of Liability set forth in Item 9 of the Declarations, for each respective Insuring Agreement, for all **Claims** made during the immediately preceding **Policy Year**. Any **Claim** made during the Discovery Period shall be deemed to be made during the **Policy Year** immediately preceding the Discovery Period.

F.   The offer by the **Insurer** and acceptance by the **Insured** of continued coverage under terms, conditions, Limits of Liability, Retentions, or premiums different from those applicable to the expiring **Policy** shall not constitute a refusal to renew and shall not entitle any **Insured** to exercise the Discovery Period.

---

### SECTION IV - DEFINITIONS

---

**Application** means:

(1)   the application signed for the procurement of this **Policy** and any materials submitted to the **Insurer** in support of the procurement of this **Policy** or any **Policy** for which this **Policy** is a direct or indirect renewal

or replacement; and

(2)  any publicly available information published or filed by or with a recognized source, agency or institution regarding the **Insured** in the three (3) years preceding the **Policy's** inception, and any amendments thereto, whether or not submitted with any signed application.

The Application is deemed to be attached to and incorporated into this **Policy**, as if physically attached.

**Brokerage/Advisory Services** means the purchase or sale of mutual funds, annuities, variable annuities, or life, accident or health insurance or securities as defined in Section 202(18) of the Investment Advisers Act of 1940, as amended, to be transacted through an **Employee** or a third party service provider pursuant to a contract between the **Company** and the service provider. In connection with the foregoing activities, Brokerage/Advisory Services also includes the provision of:

(1)  economic advice, financial advice or investment advisory services; and

(2)  financial planning advice including without limitation any of the following activities in conjunction therewith: the preparation of financial plans or personal financial statements, and the giving of advice with regard to insurance, savings, investments, retirement planning or taxes.

Brokerage/Advisory Services shall not include rendering advice with regard to the FDIC-insured component of any deposit account or the sale of credit life or disability insurance incidental to the issuance of a loan.

**Claim**, either in singular or plural, means any of the following instituted against an **Insured Person** or against the **Company**, but only to the extent coverage is granted to the **Company**:

(1)  a written or oral demand for monetary damages or non-monetary relief;

(2)  a civil proceeding commenced by the service of a complaint or similar pleading;

(3)  a criminal proceeding commenced by a return of an indictment;

(4)  an arbitration or mediation proceeding in which monetary damages are sought;

(5)  a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document; or

(6)  a written request to toll or waive a statute of limitations, relating to a potential **Claim** described in Subsections (1) through (5) above,

for a **Wrongful Act** including any appeal from such proceeding.

**Company** means the entity or entities set forth in Item 1 of the Declarations, any **Subsidiary** created or acquired as of the inception date set forth in Item 2 of the Declarations, and, subject to Section XI (B), any bank **Subsidiary** created or acquired during the **Policy Period**.

**Defense Costs** means reasonable and necessary legal fees and expenses incurred in defending or investigating any **Claim** and the cost of appeal, attachment or similar bonds.  **Defense Costs** shall not include salaries, wages, overhead, or benefit expenses incurred by the **Insured**.

**Domestic Partner** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Company**.

**ERISA** means the Employment Retirement Income Security Act of 1974, as amended.

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**Employee**, either in singular or plural, means any natural person, other than an Independent Contractor, who is a past, present or future employee of the **Company** including any part-time, seasonal or temporary employee, acting in their capacity as such.  The term Employee shall also include **Leased Employees**.

**Financial Impairment** means the status of the **Company** resulting from:

(1)     the appointment by any state or federal official, regulatory agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage, or liquidate the **Company** or any **Subsidiary**; or

(2)     the **Company** or any **Subsidiary** becoming a debtor in possession.

**Insured**, either in singular or plural, means the **Insured Persons** or the **Company**, if coverage for the **Company** is set forth by Insuring Agreement made part of this **Policy**.

**Insured Person**, either in singular or plural, means any past, present or future director, member of the board of trustees, officer, **Employee**, honorary or advisory director, or honorary or advisory member of the board of trustees of the **Company**.

**Insurance Services** means any of the following services performed by an **Insured** as insurance agent, insurance broker, insurance consultant or insurance managing general agent:

(1)     sale and placement of insurance;

(2)     identification, analysis and evaluation of a client's insurance needs, including work performed for prospective clients;

(3)     appraisal of property and inspections for insurance purposes;

(4)     adjustment of claims on behalf of insurance companies, including loss payments; or

(5)     arrangement of premium financing for clients.

**Interrelated Wrongful Acts** means **Wrongful Acts** which have as a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events or transactions.

**Leased Employee** means any natural person, other than a director or officer, **Employee** or Independent Contractor, who is leased to the **Company** to perform work for the **Company** and for whom the **Company** controls the means and manner of the work performed; provided that:

(1)     any coverage afforded under this **Policy** for such **Leased Employee** only applies to the extent that the **Company** indemnifies such **Leased Employee**; and

(2)     any such coverage shall be specifically excess of any other indemnity and insurance otherwise available to such **Leased Employee**.

**Loss** means **Defense Costs** and any amount which the **Insured** is legally obligated to pay resulting from a **Claim**, including damages, judgments, settlements,  and pre- and post-judgment interest.  **Loss** shall also include punitive or exemplary damages and the multiple portion of any multiplied damage award where insurable by law.  **Loss** shall not include:

(1)     taxes;

(2)   criminal or civil fines or penalties imposed by law;

(3)   any unpaid, unrecoverable or outstanding loan, lease or extension of credit to any customer or any forgiveness of debt;

(4)   costs to comply with any non-monetary or injunctive relief of any kind or any agreement to provide such relief, including but not limited to any damages, costs or expenses incurred in making an accommodation for any disabled person pursuant to the Americans with Disabilities Act or any similar federal, state or local laws, or in complying with any other federal, state or local laws of any kind;

(5)   any amounts the **Company** is obligated to pay pursuant to any express written or oral contract or agreement existing prior to the date the **Claim** was made;

(6)   the depreciation (or failure to appreciate) in value of any investment product, including but not limited to securities, commodities, currencies, options or futures due to market fluctuation unrelated to any **Wrongful Act**;

(7)   any restitution, disgorgement, or payment of similar payments including but not limited to the return of fees, commissions or charges for the **Company's** services; or

(8)   any matters which are uninsurable under the law pursuant to which this **Policy** shall be construed.

**Loss Information** means information on open, closed and potential **Claims**, including date, description, and payment amounts, if any.

**Named Insured** means the first named entity set forth in Item 1 of the Declarations.

**Policy** means collectively, the Declarations, the **Application**, this policy form and any Endorsements attached hereto.

**Policy Period** means the period from the inception date set forth in Item 2 of the Declarations to the expiration date set forth in Item 2 of the Declarations or any earlier termination date.

**Policy Year** means the period of one year following the effective date and hour of this **Policy** or any anniversary thereof, or if the time between the effective date and termination of the **Policy Period** is less than one year, such lesser period.  Any extension of the **Policy Period** shall not result in an increase or reinstatement of the Limit of Liability. If the **Policy Period** is extended beyond its original expiration date, the period of the extension shall be a part of the Policy Year, which would have ended on the original expiration date.

**Pollutants** include but are not limited to any solid, liquid, gaseous or thermal organism, irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, hazardous substances, nuclear materials, and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

**Subsidiary** means:

(1)   any entity in which the **Company** owns, directly or through one or more subsidiaries, more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of directors;

(2)   any limited liability company in which the **Company**, or one or more of its subsidiaries, has the right to appoint or designate fifty percent (50%) or more  of such limited liability company's managers; or

(3)     any joint venture in which the **Company**, or one or more of its subsidiaries, has the right to elect, appoint or designate more than fifty percent (50%) of such entity's directors, trustees or other equivalent executives.

**Trust Services** means any of the following services performed by the **Insured** through a Trust Company or a Trust Department or Trust **Subsidiary** of the **Company**:

(1)     administrator, custodian or trustee under any individual retirement account (IRA) or H.R. 10 Plan (Keogh Plan);

(2)     executor, administrator or personal representative of estates, administrator of guardianships, trustee under personal or corporate trust agreements, or conservator of any person;

(3)     trustee under a pension, profit sharing, health and welfare or any other employee benefit plan or trust, other than an employee benefit plan or trust sponsored or established by the **Company** for its own **Employees**;

(4)     custodian, depository or managing agent for securities or real property, manager of any personal property owned by others, attorney-in-fact, interest or dividend disbursing agent, transfer or paying agent, redemption or subscriptions agent, fiscal agent, tax withholding agent, registrar of securities, agent for voting securities, sinking fund agent, escrow agent or trustee under a corporate bond indenture; or

(5)     trustee exercising any other trust or fiduciary powers permitted by law.

**Wrongful Act**, either in singular or plural, means any actual or alleged error, omission, misstatement, misleading statement, neglect or breach of duty by:

(1)     any **Insured Person** in the discharge of their duties while acting solely in the capacity as such;

(2)     any **Insured Person** while acting solely in the capacity as director, officer, or member of the board of trustees of a not-for-profit entity pursuant to Section II (B); or

(3)     the **Company** or any person or entity for which the **Company** is legally responsible, but only to the extent that coverage is granted to the **Company** by Insuring Agreement made a part of this **Policy**.

---

### SECTION V - EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS

---

The following Exclusions are applicable to all **Insureds** under all Insuring Agreements made a part of this **Policy**.

**Bodily/Personal Injury and Property Damage Exclusion -** The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** for actual or alleged bodily injury, sickness, disease, or death of any person, damage to or destruction of any tangible or intangible property including loss of use thereof, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, abuse of process, assault, battery, mental anguish, emotional distress, loss of consortium, invasion of privacy, defamation, false light, libel, or slander.

**Brokerage/Advisory Services Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the rendering or failing to render **Brokerage/Advisory Services**, however, if this **Policy** includes the Broad Form Company Liability Endorsement, this Exclusion shall not apply and the Limit of Liability for all **Insureds** for all covered **Loss** resulting from such **Claims** shall be the Limit of Liability for the Broad Form Company Liability Insuring Agreement.

**Collusion Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** by any security holder of the **Company**, whether directly or derivatively, unless such security holder bringing such **Claim** is acting independently of, and totally without the solicitation, assistance, participation, or intervention of any **Insured** or any affiliate of the **Company**.

**Employment Practices Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving:

(1)    wrongful termination, employment-related discrimination or harassment;

(2)    employment-related misrepresentation or retaliation, humiliation, wrongful failure to employ or promote, wrongful deprivation of career opportunity, wrongful demotion, negligent evaluation, negligent hiring, negligent retention, wrongful discipline; or

(3)    any other violation of any statutory or common law relating to employment.

**ERISA Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving any pension, profit sharing or employee benefit program established in whole or in part for the benefit of **Employees** of the **Company**, including without limitation, any violation of **ERISA** or similar provisions of any federal, state or local statutory law, common law or administrative law.

**Foreclosed Property Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the ownership, operation, management or control of any entity or property acquired by the **Company** as security or collateral for any loan, lease or extension of credit. This Exclusion shall not apply to **Claims** resulting from **Wrongful Acts** in connection with the foreclosure process or the ownership, operation, management or control of any one to four family residential property.

**Fraud/Violation of Law Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss**, other than **Defense Costs**, in connection with any **Claim** arising out of or in any way involving any fraudulent, dishonest or criminal act or any willful violation of any civil or criminal statute, regulation or law by the **Insured**, provided a final judgment or final adjudication establishes such fraudulent, dishonest, or criminal act or such willful violation of statute, regulation or law.

**Illegal Profit/Payment Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss**, other than **Defense Costs**, in connection with any **Claim** arising out of or in any way involving:

(1)    any **Insured** gaining, in fact, any profit, remuneration, or financial advantage to which the **Insured** was not legally entitled;

(2)    payment by the **Company** of inadequate or excessive consideration in connection with its purchase of **Company** securities; or

(3)    conflicts of interest, engaging in self-dealing, or acting in bad faith.

**Insurance Services Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the rendering or failing to render **Insurance Services** (other than **Insurance Services** relating to credit life or disability insurance incidental to the issuance of a loan); however, if this **Policy** includes the Broad Form Company Liability Endorsement, this Exclusion shall not apply and the Limit of Liability for all **Insureds** for all covered **Loss** resulting from such **Claims** shall be the Limit of Liability for the Broad Form Company Liability Insuring Agreement.

**Insured vs. Insured Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** by, on behalf of, or at the behest of the **Company**, any affiliate of the **Company** or any **Insured Person** in any capacity except where such **Claim** is brought and maintained:

(1)   in the form of a cross-claim or third-party claim for contribution or indemnity which is part of and results directly from a **Claim** which is not otherwise excluded by the terms of the **Policy**;

(2)   by an **Insured Person** solely as a customer of the **Company**; provided such **Claim** is brought independently of, and totally without the solicitation, assistance,  participation, or intervention of any other **Insured**; or

(3)   by a security holder of the **Company** as a derivative action on behalf of the **Company** or such affiliate; provided such **Claim** is brought independently of, and totally without the solicitation, assistance, participation, or intervention of any **Insured** or any affiliate of the **Company**.

**Internet/Electronic Services Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving:

(1)   Internet banking or electronic banking;

(2)   website development, software development or network security services to third parties; or

(3)   hosting services or services as an Internet Service Provider, Internet Access Provider, Application Service Provider or provider of like services.

**Pollution Exclusion -** The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving:

(1)   the actual, alleged or threatened discharge, disposal, migration, dispersal, release or escape of **Pollutants**; or

(2)   any direction, order or request to test for, monitor, remediate, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or to pay for or contribute to the costs of undertaking such actions,

including **Claims** alleging damage to the **Company** or its security holders.

**Prior Notice Exclusion -** The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving any **Wrongful Act** or any **Wrongful Act** which is part of any **Interrelated Wrongful Acts**, or any fact, circumstance or situation, which has been the subject of any notice given to any carrier other than the **Insurer** under any similar insurance policy providing protection for any **Insured**.

**Prior and Pending Litigation Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving any litigation against any **Insured** initiated prior to the respective date set forth in Item 13 of the Declarations, or arising out of or in any way involving the same or substantially the same fact, circumstance or situation underlying or alleged in such prior litigation.

**Short-Swing Profit Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving an accounting of profits made from the purchase and sale or sale and purchase of **Company** securities by the **Insured Persons** within the meaning of Section 16(b) of the Securities Exchange Act of 1934, as amended, or similar provisions of any state statutory law or common law.

**Subsidiary Wrongful Acts Exclusion -** The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** against any **Subsidiary** or its **Insured Persons** acting in the capacity of director, member of the board of trustees, officer or **Employee** of such **Subsidiary** for any **Wrongful Act** or **Interrelated Wrongful Acts** actually or allegedly committed in whole or in part at any time when the entity was not a **Subsidiary** except as provided in Section XII (C)(3).

**Trust Services Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the rendering or failing to render **Trust Services**.

---

### SECTION  VI - LIMIT OF LIABILITY, RETENTION AND INDEMNIFICATION

---

A.   **LIMIT OF LIABILITY**

(1)   The **Insurer's** maximum Limit of Liability under this **Policy** for all Insuring Agreements combined shall not exceed the Total Policy Limit set forth in Item 3 of the Declarations regardless of whether such Insuring Agreement is provided as a sublimit or a separate limit.  Amounts incurred as **Defense Costs** will reduce and shall be part of and not in addition to the Limit of Liability.

(2)   Unless otherwise specified in Item 8 of the Declarations, the **Insurer's** maximum Limit of Liability for each Insuring Agreement for all **Loss** resulting from all **Claims** first made for each **Policy Year** during the **Policy Period** shall be a part of and not in addition to the D&O Limit of Liability set forth in Item 9 of the Declarations.

(3)   If a **Claim** against the **Company** is subject to more than one Insuring Agreement, the **Insurer's** maximum Limit of Liability for such **Claim** shall not exceed the highest Limit of Liability provided by any Insuring Agreement providing coverage to the **Company**; provided, however, that this provision shall not apply where a separate Limit of Liability is set forth in Item 8 of the Declarations.

B.   **RETENTION AND INDEMNIFICATION**

(1)   Covered **Defense Costs** will be applied against the Retention.  The **Insurer** shall only pay for covered **Loss**, including covered **Defense Costs**, in excess of the applicable Retention for each **Claim** as set forth in Item 10 of the Declarations. No Retention shall apply to **Loss** incurred by the **Insured Persons** for which the **Company** is:

(a)   not permitted or required by law to advance **Defense Costs** or indemnify the **Insured Persons**; or

(b)   permitted or required to advance **Defense Costs** or indemnify the **Insured Persons** but does not do so by reason of **Financial Impairment**.

(2)   If the **Company** is legally permitted or required to advance **Defense Costs** or indemnify the **Insured Persons** for **Loss**, regardless of whether actual indemnification or advancement is granted, the Retention applicable to Insuring Agreement B (Company Indemnification Coverage) shall apply to such **Loss**, unless the **Company**, solely by reason of its **Financial Impairment**, does not make indemnification or advancement.

(3)   One Retention shall apply to covered **Loss** resulting from each **Claim**. If **Loss** from a **Claim** is covered under more than one Insuring Agreement, the applicable Retention shall be applied separately to the part of the **Loss** covered by each Insuring Agreement, and the highest Retention shall be applicable to the **Claim**. If a single Retention applies to multiple **Insureds**, the Retention shall be prorated among the applicable **Insureds**.  The total Retention shall in no event exceed the largest of such applicable Retentions set forth in Item 10 of the Declarations.

(4)   Except for the payment of **Defense Costs**, the **Insurer** shall pay or reimburse one hundred percent (100%) of covered **Loss**, in excess of the applicable Retention, upon final disposition of the **Claim**.

C.   **SINGLE CLAIM - Claims** based upon or arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** committed by one or more **Insureds** shall be considered a single **Claim**, and only one Retention and Limit of Liability shall apply to such single **Claim**. Each such single **Claim** shall be deemed to be first made on the date the earliest of such **Claims** was first made, regardless of whether such date is before or during the **Policy Period**.

---

### SECTION VII - NON-EROSION OF INSURING AGREEMENT A AND ORDER OF PAYMENTS

A.   **NON-EROSION OF INSURING AGREEMENT A**

(1)   If the Limit of Liability for any Insuring Agreement extending coverage to the **Company** is a sublimit of the D&O Policy, the Limit of Liability applicable to Insuring Agreement A (Insured Persons Liability Coverage) shall not be reduced by the payment of **Loss** resulting from **Claims** covered by such Insuring Agreement.  If a separate Limit of Liability is set forth in Item 8 of the Declarations this provision shall not apply.

(2)   If the Retention applicable to Insuring Agreement B (Company Indemnification Coverage) applies to **Loss** pursuant to Section VI (B)(2), regardless of whether actual indemnification is granted, such **Loss** shall be deemed to be paid under Insuring Agreement B (Company Indemnification Coverage).

B.   **ORDER OF PAYMENTS** - In the event one or more **Claims** result in a potential or actual **Loss** which, in aggregate, in the **Insurer's** judgment could reasonably exceed the Total Policy Limit set forth in Item 3 of the Declarations, then:

(1)   the **Insurer** shall pay first for such **Loss** for which coverage is provided under Insuring Agreement A (Insured Persons Liability Coverage); then

(2)   with respect to whatever remaining amount of the Limit of Liability is available after payment of such **Loss**, the **Insurer** shall pay such **Loss** for which coverage is provided under Insuring Agreement B (Company Indemnification Coverage); then

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

(3)     pay such **Loss** for which coverage is provided to the **Company** under any Insuring Agreement extending coverage to the **Company**.

The **Financial Impairment** of the **Company** or any **Insured Person** shall not relieve the **Insurer** of any of its obligations to prioritize payment of covered **Loss** under this **Policy** pursuant to this Subsection.

---

## SECTION VIII - DEFENSE AND SETTLEMENT

A.   **NO DUTY TO DEFEND**

(1)     Amounts incurred as **Defense Costs** will reduce and shall be part of and not in addition to the applicable Limit of Liability. It shall be the duty of the **Insured** and not the duty of the **Insurer** to defend **Claims**.  The **Insured** shall only retain counsel that is mutually agreed upon with the **Insurer**, consent for which shall not be unreasonably withheld.

(2)     The **Insured** shall not incur **Defense Costs**, admit liability for, settle, or offer to settle any **Claim** without the **Insurer's** prior written consent, which shall not be unreasonably withheld. The **Insurer** shall be entitled to full information and all particulars it may request in order to reach a decision as to such consent.

(3)     The **Insurer** shall have the right but not the duty to associate with the **Insured** in the settlement and defense of any **Claim** that appears reasonably likely to involve the **Insurer**. Such association shall include, but not be limited to, participation in the formation of litigation strategy, review of pleadings and other pertinent papers prior to filing, and participation in the settlement negotiations.

B.   **ADVANCEMENT OF DEFENSE COSTS**

(1)     Subject to Section IX, the **Insurer**, if requested by the **Insured**, shall advance covered **Defense Costs** on a current basis, except when advancement of **Defense Costs** is prohibited by law or regulation.  The **Insured** shall repay any advanced **Defense Costs** to the **Insurer** in the event it is established that the **Insurer** has no liability under this **Policy** for such **Defense Costs**.

(2)     Prior to advancing or indemnifying **Defense Costs**, the **Insurer** shall be entitled to sufficient information and documentation as to the amount and purpose of any **Defense Costs** to enable it to evaluate the reasonableness and necessity of such **Defense Costs** and to verify that such **Defense Costs** were actually incurred.

C.   **DUTY TO COOPERATE -** The **Insured** shall promptly furnish the **Insurer** with all information reasonably requested by the **Insurer** including, but not limited to, copies of reports, investigations, pleadings and other papers. As a condition precedent to coverage under this **Policy**, the **Insured** shall provide the **Insurer** with such information, assistance and cooperation as the **Insurer** may reasonably request.

---

## SECTION IX - ALLOCATION AND ARBITRATION

A.   **ALLOCATION**

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 39**

(1)   If in any **Claim** the **Insureds** are jointly and severally liable with others (including the **Company** even if no coverage is extended for such **Claim** against the **Company**) for **Loss**, then:

   (a)   100% of all **Loss**, other than **Defense Costs**, incurred jointly by the **Insured Persons** and the **Company** shall be treated as **Loss** incurred solely by the **Insured Persons**; and

   (b)   all other **Loss** shall be allocated between the **Insured Persons** and others based on the relative legal exposures of the parties to such **Claims**.

(2)   If in any **Claim** the **Insureds** incur an amount consisting of both covered and uncovered **Loss** because the **Claim** includes both covered and uncovered matters, then the amount shall be allocated between covered **Loss** and uncovered loss based on the relative legal exposures of the **Insureds** to the covered and uncovered matters.

B.   **ARBITRATION** - The **Insurer** and the **Insured** agree to use their best efforts to reach a proper allocation of **Defense Costs**. If the **Insured** and the **Insurer** cannot agree on an allocation:

(1)   no presumption as to allocation shall exist in any arbitration, suit or other proceeding;

(2)   the **Insurer** shall advance on a current basis **Defense Costs** which the **Insurer** believes to be covered under this **Policy** until a different allocation is negotiated, arbitrated or judicially determined; and

(3)   the **Insurer**, if requested by the **Insured**, shall submit the allocation dispute to binding arbitration. The rules of the American Arbitration Association shall apply except with respect to the selection of the arbitration panel.  The arbitration panel shall consist of one arbitrator selected by the **Insured**, one arbitrator selected by the **Insurer**, and a third independent arbitrator selected by the first two arbitrators.  In any such arbitration, each party will bear its own legal fees and expenses.

Any negotiated, arbitrated or judicially determined allocation of **Defense Costs** will be applied retroactively to all **Defense Costs**, notwithstanding any prior advancement to the contrary.  Any allocation or advancement of **Defense Costs** shall not apply to or create any presumption with respect to the allocation of other **Loss** arising from such **Claim** or any other **Claim**.

---

## SECTION  X - NOTICE OF CLAIMS AND POTENTIAL CLAIMS

A.   The **Insured**, as a condition precedent to any rights under this **Policy**, shall give the **Insurer** written notice, as soon as practicable, of any **Claim** first made during the **Policy Period** or the Discovery Period, but in no event later than sixty (60) days after the **Claim** is first made.

B.   If during the **Policy Period**, the **Insured** first becomes aware of circumstances which may give rise to a **Claim**, and gives written notice to the **Insurer** of the circumstances and reasons for anticipating a **Claim**, then any **Claim** subsequently made based upon such circumstances shall be deemed to have been first made during the **Policy Year** in which notice was first given to the **Insurer**.  As a condition precedent to any coverage hereunder for such **Claims**, such notice must be specific and contain full particulars as to the names, dates, and persons involved in the underlying facts potentially giving rise to the **Claim**, as well as the identity of the potential plaintiffs and the causes of action to be asserted.

C.   All notices required to be given to the **Insurer** under this **Policy** shall be given to the **Insurer** at the address set forth in Item 5 of the Declarations.

**EXHIBIT A - 40**

---

### SECTION XI - MERGERS, ACQUISITIONS AND CHANGES IN BUSINESS ACTIVITIES

---

A.   If during the **Policy Period**, the **Company**:

(1)   acquires, merges with or creates any non-bank entity;

(2)   acquires or merges with another entity or creates or acquires a **Subsidiary**, whose assets equal or exceed twenty-five percent (25%) of the **Company's** total assets at the time of the transaction;

(3)   creates or acquires a financial services holding company or converts from a bank holding company to a financial services holding company;

(4)   converts from a mutual company to a stock company; or

(5)   changes or converts its corporate structure from a C-corporation to an S-corporation;

then no coverage shall be afforded under this **Policy** for any **Loss** incurred by the **Company**, such entity, **Subsidiary**, or its **Insured Persons** resulting from any **Claim** arising out of or in any way involving any transaction or event, prior to:

(a)   the **Company** providing written notice and any requested information regarding the transaction to the **Insurer** as soon as practicable;

(b)   the **Insurer**, at its sole discretion, agreeing in writing to provide such coverage; and

(c)   the **Company** accepting any special terms, conditions and/or Exclusions and paying any additional premium required by the **Insurer**.

However, with respect to (A)(2) above, this provision shall not apply until ninety (90) days after the merger, acquisition or creation.

B.   If during the **Policy Period**, the **Company** creates or acquires a bank or bank **Subsidiary**, whose assets are less than twenty-five percent (25%) of the **Company's** total assets at the time of the transaction, the **Insurer** agrees to provide automatic coverage for such bank, bank **Subsidiary** and its **Insured Persons** for the remainder of the **Policy Period**.

C.   Any coverage otherwise afforded under this **Policy** for a **Loss** in any way involving the **Company**, any **Subsidiary**, or any acquired, merged or created entity or its **Insured Persons** shall not apply to any **Claim** arising out of or directly or indirectly resulting from:

(1)   any **Wrongful Act** or any fact, circumstance or situation committed or allegedly committed prior to the effective date of such acquisition, merger or creation; or

(2)   any other **Wrongful Act**, which, together with a **Wrongful Act** committed or allegedly committed prior to effective date of such acquisition, merger or creation constitute **Interrelated Wrongful Acts**.

---

### SECTION XII - CANCELLATION / NONRENEWAL / CONVERSION

---

A.   **NAMED INSURED CANCELLATION -** The **Named Insured** may cancel this **Policy** or any Insuring Agreement by providing written notice to the **Insurer**. If the **Named Insured** cancels this **Policy**, the **Insurer** shall only return ninety percent (90%) of the unearned premium. For multi-year **Policies**, the **Insurer** shall only return ninety percent (90%) of the unearned premium if the cancellation occurs before the first anniversary. If the cancellation occurs after the first anniversary, unearned premium will be returned on a prorata basis as soon as practicable.

B.   **INSURER CANCELLATION OR NONRENEWAL**

(1)   **NONRENEWAL** - The **Insurer** shall not be required to renew this **Policy** or any Insuring Agreement upon expiration of the **Policy Period**. This **Policy** or any Insuring Agreement may be nonrenewed by the **Insurer** by giving to the **Named Insured** written notice stating when, not less than sixty (60) days thereafter, such action shall become effective and the reason(s) therefore.

(2)   **CANCELLATION**

(a)   This **Policy** or any Insuring Agreement may be cancelled by the **Insurer** by giving to the **Named Insured** written notice stating when such action shall become effective and the reason(s) therefore.

(b)   The **Insurer** shall provide not less than twenty (20) days notice of its intent to cancel for nonpayment of premium or sixty (60) days notice of its intent to cancel for any other reason.

(c)   If the **Insurer** cancels this **Policy** or any Insuring Agreement, the **Insurer** shall return one hundred percent (100%) of the unearned premium. The return of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

(3)   **NOTICE -** All notices pursuant to Section XII (B) will be mailed to the **Named Insured** by certified mail at the address set forth in Item 1 of the Declarations. The mailing of such notice as aforesaid shall be sufficient proof of notice, and this **Policy** shall terminate at the date and hour specified in such notice.

C.   **CONVERSION**

(1)   Upon the occurrence of any of the following events, this **Policy** shall continue in full force and effect with respect to **Claims** for **Wrongful Acts** committed or allegedly committed before such event, but coverage shall cease with respect to **Claims** for such **Wrongful Acts** committed or allegedly committed after such event (herein called the Conversion Period):

(a)   **Financial Impairment** of the **Company** or any **Subsidiary** comprising more than fifty percent (50%) of the **Company's** total assets;

(b)   acquisition of the **Company** by another entity or the merger or consolidation of the **Company** into another entity such that the **Company** is not the surviving entity or acquisition of substantially all of the assets of the **Company** by another entity; or

(c)   the **Company** or any **Subsidiary** ceasing to engage actively in its primary business.

(2)      Pursuant to Subsection C (1) above, this **Policy** may not be cancelled and the entire premium shall be deemed fully earned. The occurrence of any of the foregoing events shall not affect the **Insured's** right to purchase the Discovery Period pursuant to Section III. If the Discovery Period is elected, it will run concurrently with the Conversion Period.

(3)      In the event of **Financial Impairment** or sale of a **Subsidiary** comprising less than fifty percent (50%) of the **Company's** total assets, this conversion provision shall apply only to the **Subsidiary** and its **Insured Persons** and the **Policy** shall continue in full force with respect to all other **Insureds**.

---

## SECTION XIII - REPRESENTATIONS AND SEVERABILITY

A.    **REPRESENTATIONS -** It is agreed and represented that the particulars and statements contained in the **Application** are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy**. By acceptance of this **Policy**, the **Insured** agrees that:

(1)      such **Application** shall be construed as a separate **Application** for coverage by each **Insured Person**;

(2)      this **Policy** shall not be deemed to be a series of individual insurance contracts with the **Company** and each of the **Insured Persons**; and

(3)      the statements in the **Application** are their representations, that they are material to the acceptance of the risk or hazard assumed by the **Insurer** under this **Policy**, and that this **Policy** is issued in reliance upon the truth of such representations.

B.    **SEVERABILITY -** The **Insureds** agree that in the event the **Application** contains misrepresentations made with the actual intent to deceive, no coverage will be provided for any **Claim** under this **Policy** with respect to:

(1)      any **Insured Person** who knew of any fact, circumstance or situation that was not truthfully disclosed in the **Application**;

(2)      the **Company**, to the extent the **Company** indemnifies the **Insured Person** reflected in Subpart (1) above; or

(3)      the **Company**, to the extent coverage is granted to the **Company** by any Insuring Agreement made a part of this **Policy**, if any past, present, or future chief financial officer, in-house counsel, chief executive officer, President or Chairman of the Board of the **Company**, or any person holding any equivalent position within the **Company** (regardless of title), knew of any fact, circumstance or situation that was not truthfully disclosed in the **Application**.

The foregoing conditions shall apply whether or not the **Insured Person** actually knew if the misrepresentation or untruthful disclosure was made in the **Application** for coverage.

C.    **SEVERABILITY OF EXCLUSIONS -** With respect to the Exclusions herein, in order to determine if coverage is available:

(1)      no **Wrongful Act**, fact pertaining to, or knowledge possessed by any **Insured Person** will be imputed to any other **Insured Person**; and

(2)     all facts pertaining to and knowledge possessed by any past, present, or future chief financial officer, in-house counsel, chief executive officer, President or Chairman of the Board of the **Company**, or any person holding any equivalent position within the **Company** (regardless of title), shall be imputed to the **Company** with respect to the Fraud/Violation of Law and Illegal Profit/Payment Exclusions.

---

## SECTION XIV - GENERAL TERMS AND CONDITIONS

---

A.     **SUBROGATION -** In the event of any payment under this **Policy**, the **Insurer** shall be subrogated to the extent of such payment to all the **Insured Persons'** and the **Company's** rights to recovery therefore, and the **Insured** shall execute all papers required and shall do everything that may be necessary to secure the **Insurer's** rights, including the execution of such documents as may be necessary to enable the **Insurer** effectively to bring suit in the name of the **Insured Persons** or the **Company**.

B.     **ASSIGNMENT AND ACCEPTANCE -** By acceptance of this **Policy**, the **Insured** and the **Insurer** agree that this **Policy**, the **Application**, and any written Endorsements attached thereto constitute the entire agreement between the parties. Assignment of interest under this **Policy** shall not bind the **Insurer** until its consent is endorsed hereon.

C.     **CONFORMITY TO STATUTE -** Any terms of this **Policy** which are in conflict with the terms of any applicable laws governing this **Policy** are hereby amended to conform to such laws.

D.     **AUTHORIZATION -** By acceptance of this **Policy**, the **Insureds** agree that the **Named Insured** will act on behalf of all **Insureds** for all purposes under this **Policy** including, but not limited to, giving and receiving of all notices and correspondence, cancellation, nonrenewal or termination of this **Policy**, payment of premiums, the negotiation and acceptance of Endorsements, and receipt of any return premiums that may be due under this **Policy**.

E.     **CHANGES** - Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the **Insurer** shall not effect a waiver or a change in any part of this **Policy** or estop the **Insurer** from asserting any right under the terms of this **Policy**, nor shall the terms, conditions and limitations of this **Policy** be waived or changed, except by written Endorsement issued to form a part of this **Policy**.

F.     **ACTION AGAINST THE INSURER** - No action shall be taken against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this **Policy**, and until the **Insured's** obligation to pay is finally determined, either by adjudication or by written agreement of the **Insureds**, the claimant, and the **Insurer**.

No person or organization shall have any right under this **Policy** to join the **Insurer** as a party to any **Claim** against the **Insured** nor shall the **Insurer** be impleaded by the **Insureds** or their legal representatives in any such **Claim**.

G.     **OTHER INSURANCE OR INDEMNIFICATION** - This **Policy** shall not be subject to the terms of any other insurance. All **Loss**, including **Defense Costs**, payable under this **Policy** shall be excess to:

(1)     any other existing insurance regardless of whether collectable, including but not limited to, any insurance under which there is a duty to defend, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided by this **Policy**; and

(2)     indemnification to which an **Insured** is entitled from any entity other than the **Company**.

H.     <u>**LOSS INFORMATION**</u> - The **Insurer** will provide **Loss Information** to the **Company** within ten (10) days of the **Company's** request or, if required by statute, at the same time as any notice of cancellation or nonrenewal of this **Policy**.

I.     <u>**INSOLVENCY/BANKRUPTCY**</u> - The **Financial Impairment** of the **Insured** or of the estate of such **Insured** shall not release the **Insurer** from its obligations nor deprive the **Insurer** of its rights under this **Policy**.

J.     <u>**HEADINGS AND SUB-HEADINGS**</u> - The descriptions in the headings and sub-headings of this **Policy** are solely for convenience and form no part of the terms and conditions of coverage.


IN WITNESS WHEREOF, the **Insurer** has caused this **Policy** to be signed by its President and Secretary and countersigned, if required, on the Declarations Page by a duly authorized agent of the **Insurer**.


Sanjoy Mukherjee
Secretary

Jonathan Zaffino
President

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 45**

**This Page Intentionally Left Blank**

EXHIBIT A - 46

EEO 40 014 (05 16)

# EVEREST NATIONAL INSURANCE COMPANY

## Modified Internet/Electronic Banking Services Exclusion

Policy Number:  8100002727-181

In consideration of the premium paid and in reliance upon all statements made and the information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree the **Policy** is modified as follows:

1.   Section V, entitled "Exclusions Applicable to all Insuring Agreements", is amended to delete the **Internet/Electronic Services Exclusion** and replace it with the following:

   **Cyber Cover Exclusion** − The Insurer shall not be liable to make any payment for Loss in connection with any Claim arising out of or in any way involving:

   (1)   **Cyber Banking Services**;

   (2)   **Electronic Funds Transfer Acts**;

   (3)   **Privacy and Security Acts**;

   (4)   **Cyber Publishing and Social Networking Activities**; or

   (5)   an **Insured**'s development of websites or software, an **Insured**'s provision of hosting or network security services, or an **Insured** acting as an internet service provider, internet access provider, application service provider, or provider of like services to third parties.

   However, this exclusion shall not apply to a **Claim** brought and maintained by a security holder of the **Company** as a derivative action on behalf of the **Company** or such affiliate; provided such **Claim** is brought independently of, and totally without the solicitation, assistance, participation, or intervention of any Insured or any affiliate of the **Company**;

2.   For the purposes of the above exclusion, Section IV, entitled Definitions, is amended to add the following:

   **Computer Programs** mean a set of related electronic instructions that direct the operations and functions of a computer or devices connected to it and that enable the computer or devices to receive, process, store, or send **Electronic Data**.

   **Computer System** means:

   (1)   computers with related peripheral components, including storage components;

   (2)   systems and networks;

   (3)   internet or mobile applications and software;

   (4)   terminal devices;

   (5)   websites; and

   (6)   tablets and smart phones;

   by which **Electronic Data** is electronically collected, transmitted, processed, stored, or retrieved.

**EXHIBIT A - 47**

**Confidential Information** means:

(1)      any nonpublic personal information that allows an individual to be distinctively identified, including a social security number, driver's license, or state identification number;

(2)      a **Customer**'s credit or debit card numbers, PINs, passwords or other account numbers; and

(3)      any financial or commercial information that is subject to the terms of a confidentiality agreement agreed to by the **Insured**.

**Customer** means any natural person or entity that receives professional services directly from the **Company**.

**Cyber Banking Services** mean any service rendered by the **Insured** through the transmission or storage of **Electronic Data** to or from a **Computer System**.

**Cyber Publishing and Social Networking Activities** mean the electronic display or electronic dissemination of information through any website or social networking account.

**Electronic Data** means facts or information converted to a form usable in a **Computer System** by **Computer Programs** and stored on magnetic tapes or disks, optical storage disks, or other bulk media.

**Electronic Funds Transfer Acts** mean the transfer of funds from a **Customer**'s account through a **Computer System**.

**Privacy and Security Acts** mean the management, oversight, or preservation of **Confidential Information** or the security of a **Computer System**.

**Electronic Data** means facts or information converted to a form usable in a **Computer System** by **Computer Programs** and stored on magnetic tapes or disks, optical storage disks, or other bulk media.

This Endorsement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

EEO 40 016 (05 16)

# EVEREST NATIONAL INSURANCE COMPANY

## Insolvency Modification

Policy Number:  8100002727-181

In consideration of the premium paid and in reliance upon all statements made and the information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that coverage will be provided subject to all of the terms, conditions and limitations of this Endorsement as follows:

1.  Section V of the **Policy**, entitled "Exclusions Applicable to all Insuring Agreements", is amended to add the following:

    **Insolvency Exclusion**-  The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the insolvency, conservatorship, receivership, liquidation of, bankruptcy of or suspension of payment by any person or entity; provided, however, this Exclusion shall not apply to:

    (1)  the insolvency, conservatorship, receivership, liquidation of, bankruptcy of or suspension of payment by the **Company**;

    (2)  the **Insured's** investment on behalf of a customer in the stock of any such entity or entities;

    (3)  the **Insured's** extension of credit, an agreement or refusal to extend credit, the servicing of any loan, lease or extension of credit (not including financing for investment banking, or leveraged or management buy-outs), or the collection or restructuring of any extension of credit;

    (4)  the Employment Practices Liability Insuring Agreement, if so attached to this **Policy**; and

    (5)  the Fiduciary Liability Insuring Agreement, if so attached to this **Policy**..

This Endorsement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

Copyright, Everest Reinsurance Company, 2016
FDIC No. 57044

**EXHIBIT A - 49**

This Page Intentionally Left Blank

**EXHIBIT A - 50**

EEO 40 508 (07 09)

## EVEREST NATIONAL INSURANCE COMPANY

## Multiple Year Policy Endorsement

Policy Number:  8100002727-181

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that the **Policy** is amended as follows:

1.  The **Company** must give the **Insurer** written notice, as soon as practicable, if any of the following occur during the **Policy Period**:

    a)  a **Change of Control**;

    b)  the **Company's** tangible equity capital falls below six percent (6%) of tangible assets;

    c)  the **Company's** non-performing assets (loans greater than ninety (90) days past due, non-accruals, and Other Real Estate Owned) are greater than thirty percent (30%) of risk based capital;

    d)  the receipt by the **Company** of any regulatory order from, or the entry by the **Company** into any agreement or memorandum of understanding with, any regulatory agency or authority having jurisdiction over it, including any written warning or criticism by such regulatory agency or authority in connection with any actual or alleged violation by the **Company** of any provision of a federal or state statute; or

    e)  Other Conditions:  The **Insurer** has paid a loss, claim or damage payment in excess of $25,000; or The **Company's** annual asset growth rate exceeds 25%.

2.  Section IV, entitled "Definitions", is amended to add the following:

    <u>Change of Control</u> means a change in:

    (1)  the power to determine the management or policy of the **Company** by virtue of voting stock or voting rights ownership (including rights with respect to withdrawal accounts); or

    (2)  ownership of voting stock or voting rights which results in direct or indirect ownership by a stockholder or an affiliated group of stockholders of ten percent (10%) or more of the outstanding voting stock or voting rights of the **Company**.

3.  If during any **Policy Year** any of the transactions or events described in Number 1 above have occurred, then effective as of the end of the **Policy Year** in which such transaction or event occurs, the **Insurer** will be entitled to impose such additional terms, conditions and limitations of coverage and to charge such additional premium as the **Insurer**, in its sole discretion, may require.  If the **Company** declines to accept any additional terms, conditions or limitations of coverage or to pay any additional premium which the **Insurer** requires pursuant to this Endorsement, then this **Policy** will be deemed to have been cancelled by the **Company** effective as of the end of the **Policy Year** in which such transaction or event occurred.

4.  If the **Company** cancels the **Policy** in accordance with this Endorsement, the **Insurer** will return the unearned premium which will be computed on a pro-rata basis.

EXHIBIT A - 51

5.   Nothing herein shall affect the **Insurer's** right to cancel or nonrenew the **Policy** in accordance with Section XII (B), entitled "Insurer Cancellation or Nonrenewal".

This Endorsement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

**EXHIBIT A - 52**

EEO 40 513 (07 09)

## EVEREST NATIONAL INSURANCE COMPANY

### Investigative Cost Coverage

Policy Number:  8100002727-181

In consideration of the premium paid and in reliance upon all statements made and the information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that the **Policy** is amended as follows:

1.  Section II, entitled "Additional Coverages", is amended to add the following:

    <u>**INVESTIGATIVE COST COVERAGE**</u> - The **Insurer** will indemnify the **Company** for reasonable costs, charges, fees (including attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, trustees, members of the Board of Trustees, management committee members, officers or **Employees** of the **Company**) incurred by the **Company** in connection with the **Company's** investigation or evaluation of any written demand first made upon the Board of Directors or Board of Trustees of the **Company** during the **Policy Period** or Discovery Period (if applicable), by one or more security holders of the **Company**, without the solicitation, assistance or active participation of any **Insured Person**, to bring a civil proceeding in a court of law on behalf of the **Company** against any **Insured Person** for a covered **Wrongful Act**.

2.  Section VI, entitled "Limit of Liability, Retention and Indemnification", is amended to add the following Subsection:

    The Limit of Liability for coverage afforded under this Endorsement shall be $100,000.   The Limit of Liability under this Endorsement constitutes a sublimit and therefore shall be part of, and not in addition to the Broad Form Company Liability Insuring Agreement Limit of Liability or the Securities Liability Insuring Agreement  Limit of Liability (as applicable) as set forth in Item 9 of the Declarations.

    For purposes of the coverage afforded by this Endorsement only, no Retention shall apply to this extension of coverage.

This Endorsement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

**EXHIBIT A - 53**

This Page Intentionally Left Blank

**EXHIBIT A - 54**

EEO 40 520 (07 09)

## EVEREST NATIONAL INSURANCE COMPANY

## Employment Practices Liability Modification
## Third Party Extension

Policy Number:  8100002727-181

In consideration of the premium paid and in reliance upon all statements made in the Declarations and **Application**, the **Insurer**, the **Insured Persons** and the **Company** agree that the Employment Practices Liability Insuring Agreement is amended to delete the definition of **Harassment** and replace as follows:

**<u>Harassment</u>** means:

(1)    unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature when:

    (a)    submission to such conduct is made either explicitly or implicitly a term and condition of an individual's employment;

    (b)    submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual;

    (c)    such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment;

    (d)    the allegation of harassment is brought by any customer(s), client(s), or other individual(s), class of individuals or group, and whether direct, indirect, intentional or unintentional; or

(2)    workplace harassment of a non-sexual nature as a consequence of race, color, creed, national origin, sex, sexual orientation or preference, religion, age, gender, disability or handicap, pregnancy, or any other legally protected status, which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.


This Endorsement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 55**

This Page Intentionally Left Blank

EXHIBIT A - 56

EEO 40 533 (07 09)

# EVEREST NATIONAL INSURANCE COMPANY

## Notice of Claims and Potential Claims
### Notification to Executive Officer

Policy Number:  8100002727-181

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that the **Policy** is amended as follows:

1.  Section X, entitled "Notice of Claims and Potential Claims", is amended to delete and replace Subsections (A) and (B) as follows:

    A.  The **Insured**, as a condition precedent to any rights under this **Policy**, shall give the **Insurer** written notice, as soon as practicable, of any **Claim** first made and brought to the attention of an **Executive Officer** during the **Policy Period** or the Discovery Period, but in no event later than sixty (60) days after the **Claim** is made.

    B.  If during the **Policy Period**, the **Executive Officer** first becomes aware of circumstances which may give rise to a **Claim**, and gives written notice to the **Insurer** of the circumstances and reasons for anticipating a **Claim**, then any **Claim** subsequently arising from such circumstances shall be deemed to have been first made during the **Policy Year** in which such notice was first given to the **Insurer**.  As a condition precedent to any coverage hereunder for such **Claims**, such notice must be specific and contain full particulars as to the names, dates, and persons involved in the underlying facts potentially giving rise to the **Claim**, as well as the identity of the potential plaintiffs and the causes of action to be asserted.

    All other provisions of Section X shall remain unchanged.

2.  For the purpose of this  Endorsement, Section IV, entitled "Definitions", is amended to add the following:

    **Executive Officer** means the Chairman of the Board, Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Director, In-house Counsel, Controller, Internal Auditor, Risk Manager, Senior Loan Officer or President, of the **Company** or any person holding any equivalent position within the **Company**.

This Endorsement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 57**

This Page Intentionally Left Blank

EXHIBIT A - 58

EEO 40 535 (07 09)

## EVEREST NATIONAL INSURANCE COMPANY

### Non-Cancellation Endorsement

Policy Number: 8100002727-181

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that Section XII (B)(2) of the **Policy**, entitled "Cancellation", is modified to add the following:

(d)     This **Policy** may not be cancelled from 07/01/2018 to 07/01/2019 except for failure to pay a premium when due.  If the **Insurer** cancels this **Policy** for nonpayment of premium, the **Insurer** shall provide not less than twenty (20) days notice of its intent to cancel.

All other provisions of Section XII (B)(2) shall remain unchanged.

This Endorsement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 59**

This Page Intentionally Left Blank

EEO 40 542 (07 09)

## EVEREST NATIONAL INSURANCE COMPANY

## Change of Control
## Notification Requirement

Policy Number:  8100002727-181

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that the **Policy** is amended as follows:

1.      Section XIV, entitled "General Terms and Conditions", is amended to add the following Subsection:

<u>**CHANGE OF CONTROL**</u> - It is understood and agreed that the **Company** will notify the **Insurer** upon the **Company's** obtaining knowledge of any **Change of Control** after the effective date of this **Policy**. Written notice shall be provided to the **Insurer** together with such information as the **Insurer** may request at the address set forth in Item 5 of the Declarations.  Such notice and other information shall be provided as soon as practicable, but in no event later than thirty (30) days from the effective date of such **Change of Control**.

The **Insurer**, at its sole discretion, may make any premium adjustment or coverage revision as it determines appropriate in the event of a **Change of Control**.

2.      Section IV, entitled "Definitions", is amended to add the following:

<u>**Change of Control**</u> means a change in:

(1)      the power to determine the management or policy of the **Company** by virtue of voting stock or voting rights ownership (including rights with respect to withdrawal accounts); or

(2)      ownership of voting stock or voting rights which results in direct or indirect ownership by a stockholder or an affiliated group of stockholders of ten percent (10%) or more of the outstanding voting stock or voting rights of the **Company**.

This Endorsement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

**EXHIBIT A - 61**

This Page Intentionally Left Blank

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 62**

EEO 40 569 (07 09)

## EVEREST NATIONAL INSURANCE COMPANY

## Pollution Exclusion Modification
## To Provide "A" Side Coverage

Policy Number:  8100002727-181

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that the "Pollution Exclusion" is deleted and replaced as follows:

**Pollution Exclusion -** Except for **Claims** that are applicable to Insuring Agreement A, the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving:

(1)     the actual, alleged or threatened discharge, disposal, migration, dispersal, release or escape of **Pollutants**; or

(2)     any direction, order or request to test for, monitor, remediate, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or to pay for or contribute to the costs of undertaking such actions.

This Endorsement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 63**

This Page Intentionally Left Blank

**EXHIBIT A - 64**

EEO 40 613 (07 09)

## EVEREST NATIONAL INSURANCE COMPANY

## EMPLOYMENT PRACTICES LIABILITY INSURING AGREEMENT

Policy Number: 8100002727-181

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that coverage will be provided subject to all of the terms, conditions and limitations of this Insuring Agreement, as follows:

1.   The attached **Policy** is amended by adding an additional Insuring Agreement as follows:

### EMPLOYMENT PRACTICES LIABILITY INSURING AGREEMENT

The **Insurer** will pay on behalf of the **Insured**, **Loss** resulting from **Claims** first made during the **Policy Period** or Discovery Period against the **Insured** for which the **Insured** is legally obligated to pay for **Wrongful Employment Acts**.

2.   For the purpose of the coverage afforded by this Insuring Agreement, all of the terms and conditions set forth in the **Policy** and any amendments thereto shall apply except:

A.   Section II (B), entitled "Not-for-Profit Directorships", is deleted.

B.   The definitions of **Interrelated Wrongful Acts** and **Wrongful Act** and all references used throughout the **Policy** are deleted and replaced as follows:

**Interrelated Wrongful Employment Acts** means **Wrongful Employment Acts** which have as a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events or transactions.

**Wrongful Employment Act**, either in singular or plural, means any actual or alleged act, error or omission by the **Insured** that constitutes or causes:

(1)   **Wrongful Termination**, **Discrimination** or **Harassment**;

(2)   employment-related misrepresentation or retaliation; employment-related libel, slander, humiliation, defamation, or invasion of privacy; wrongful failure to employ or promote; wrongful deprivation of career opportunity; wrongful demotion; negligent evaluation; negligent hiring; negligent retention; wrongful discipline; or

(3)   any violation of any statutory or common law relating to employment other than those statutes or regulations set forth in the Violation of Employment Law Exclusion.

C.   Section IV, entitled "Definitions", is further amended to add the following sentence to the end of the definition of **Claim**:

**Claim** shall not include a labor or grievance arbitration pursuant to a collective bargaining agreement.

D.   Section IV, entitled "Definitions", is further amended to delete and replace the definition of **Loss** as follows:

**EXHIBIT A - 65**

**Loss** means **Defense Costs** and any amount which the **Insured** is legally obligated to pay resulting from a **Claim**, including damages, judgments, settlements, pre- and post-judgment interest, punitive or exemplary damages and the multiple portion of any multiplied damage award where insurable by law. **Loss** shall not include:

(1)  criminal or civil fines or penalties imposed by law, and liquidated damages under the Age Discrimination in Employment Act;

(2)  the payment of insurance plan benefits the claimant may have been entitled to as an **Insured Person**, including but not limited to benefits payable pursuant to **ERISA** or Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), as amended;

(3)  costs to comply with any non-monetary or injunctive relief of any kind or any agreement to provide such relief, including but not limited to any damages, costs or expenses incurred in making an accommodation for any disabled person pursuant to the Americans with Disabilities Act or any similar federal, state or local laws, or in complying with any other federal, state or local laws of any kind;

(4)  other than **Defense Costs**, front pay, future damages or other future economic relief or the equivalent thereof which compensates the claimant for damages beyond the date of settlement or adjudication, where the **Company** has the option pursuant to a settlement or adjudication to reinstate the claimant, but fails to reinstate the claimant;

(5)  other than **Defense Costs**, compensation earned by the claimant while employed by the **Company** but not paid by the **Company** for reasons other than **Wrongful Employment Acts**, or damages determined to be owed under an express written contract of employment or an express written obligation to make payments in the event of termination of employment; or

(6)  any matters which are uninsurable under the law pursuant to which this Insuring Agreement shall be construed.

E.   Section IV, entitled "Definitions", is further amended to add the following:

**Discrimination** means the termination of employment, the failure or refusal to hire or promote, the demotion of, or the employment-related defamation of any individual because of race, color, creed, national origin, sex, sexual orientation or preference, religion, age, gender, disability or handicap, pregnancy, or any other legally protected status.

**Harassment** means:

(1)  unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature when:  (a) submission to such conduct is made either explicitly or implicitly a term and condition of an individual's employment; (b) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or (c) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment; or

(2)  workplace harassment of a non-sexual nature as a consequence of race, color, creed, national origin, sex, sexual orientation or preference, religion, age, gender, disability or handicap, pregnancy, or any other legally protected status, which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**Wrongful Termination** means termination of an employment relationship in a manner which is against the law or in breach of an oral and/or implied agreement to continue employment, including constructive and retaliatory discharge.

F.   Section V, entitled "Exclusions Applicable to all Insuring Agreements", is amended to delete all Exclusions and add the following:

**Bodily/Personal Injury and Property Damage Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** for actual or alleged bodily injury (other than emotional distress or mental anguish), sickness, disease, or death of any person, damage to or destruction of any tangible or intangible property including loss of use thereof, wrongful entry, eviction, false arrest, false imprisonment or malicious prosecution.

**Prior Notice Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving any **Wrongful Employment Act** or any **Wrongful Employment Act** which is part of any **Interrelated Wrongful Employment Acts**, or any fact, circumstance or situation, which has been the subject of any notice given to any carrier other than the **Insurer** under any similar insurance policy providing protection for any **Insured**.

**Prior and Pending Litigation Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving any litigation against any **Insured** initiated prior to the respective date set forth in Item 13 of the Declarations, or arising out of or in any way involving the same or substantially the same fact, circumstance or situation underlying or alleged in such prior litigation.

**Subsidiary Wrongful Employment Acts Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** against any **Subsidiary** or its **Insured Persons** acting in the capacity of director, member of the board of trustees, officer or employee of such **Subsidiary** for any **Wrongful Employment Act** or **Interrelated Wrongful Employment Acts** actually or allegedly committed in whole or in part at any time when the entity was not a **Subsidiary** except as provided in Section XII (C)(3).

**Violation of Employment Law Exclusion -** The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving an actual or alleged violation of the responsibilities, obligations or duties imposed by **ERISA**, Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), as amended, any Worker's Compensation, Unemployment Insurance, or disability benefits law, the Fair Labor Standards Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Occupational Safety and Health Act, or any rules or regulations promulgated under any of the above statutes, or similar provisions of any federal, state or local statutory, administrative or common law.

G.   Subsection (2) of Section VIII (A) of the **Policy**, entitled "No Duty To Defend", is deleted and replaced as follows:

(2)   The **Insured** shall not incur **Defense Costs**, admit liability for, settle, or offer to settle any **Claim** without the **Insurer's** prior written consent, which shall not be unreasonably withheld. The **Insurer** shall be entitled to full information and all particulars it may request in order to reach a decision as to such consent.  If the **Insured** receives a settlement offer that the **Insurer** deems reasonable and the **Insured** withholds consent to such settlement, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed:

(a)   the amount for which the **Claim** could have been settled for; plus
(b)   **Defense Costs** accrued as of the date such settlement was proposed; plus

(c)    fifty percent (50%) of the covered **Loss**, including **Defense Costs** incurred after the date such settlement was proposed, in excess of the amount for which the **Claim** could have been settled.

Notwithstanding the foregoing, if the proposed settlement amount does not exceed the applicable Retention set forth in the Declarations, Subpart (c) above shall not apply and the **Insurer's** liability for all **Loss** arising from such **Claim** shall not exceed the amount for which the **Claim** could have been settled plus **Defense Costs** incurred as of the date such settlement was proposed.

Any amounts paid by the **Insurer** under Subparts (a), (b), or (c) above shall be part of and not in addition to the applicable Limit of Liability set forth in Item 9 of the Declarations.

H.    Section XI, entitled "Mergers, Acquisitions and Changes in Business Activities", is deleted and replaced as follows:

## SECTION XI - MERGERS AND ACQUISITIONS

A.    Except as provided by Subsection (B) below, if during the **Policy Period**, the **Company** adds additional **Employees** through acquisition, merger with another entity or through the creation or acquisition of a **Subsidiary**, then no coverage shall be afforded under this **Policy** for any **Loss** incurred by the **Company**, such entity, **Subsidiary**, or its **Insured Persons** resulting from any **Claim** first made, prior to:

(1)    the **Company** providing written notice of such transaction, including any requested information regarding the transaction, to the **Insurer** as soon as practicable;

(2)    the **Insurer**, at its sole discretion, agreeing in writing to provide such coverage; and

(3)    the **Company** accepting any special terms, conditions and/or Exclusions and paying any additional premium required by the **Insurer**.

However, this provision shall not apply until ninety (90) days after the acquisition, merger or creation.

B.    If during the **Policy Period**, the **Company** creates or acquires a bank or bank **Subsidiary** whose assets are less than twenty-five percent (25%) of the **Company's** total assets at the time of the transaction, the **Insurer** agrees to provide automatic coverage for such bank, bank **Subsidiary** and its **Insured Persons** for the remainder of the **Policy Period**.

C.    Any coverage afforded under this **Policy** for a **Loss** in any way involving the **Company**, **Subsidiary**, or any acquired, merged or created entity or its **Insured Persons** shall not apply to any **Claim** arising out of or directly or indirectly resulting from:

(1)    any **Wrongful Employment Act** or any fact, circumstance or situation committed or allegedly committed prior to the effective date of such acquisition, merger or creation; or

(2)    any other **Wrongful Employment Act**, which, together with **Wrongful Employment Acts** committed or allegedly committed prior to effective date of such acquisition, merger or creation constitute **Interrelated Wrongful Employment Acts**.

3.    This Insuring Agreement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

EEO 40 614 (07 09)

# EVEREST NATIONAL INSURANCE COMPANY

# FIDUCIARY LIABILITY INSURING AGREEMENT

Policy Number:  8100002727-181

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that coverage will be provided subject to all of the terms, conditions and limitations of this Insuring Agreement, as follows:

1.   The attached **Policy** is amended by adding the following Insuring Agreements:

## FIDUCIARY LIABILITY INSURING AGREEMENT

The **Insurer** will pay on behalf of the **Insured**, **Loss** resulting from **Claims** first made during the **Policy Period** or the Discovery Period against the **Insured** for which the **Insured** is legally obligated to pay for **Wrongful Acts** resulting from the **Administration** of any **Employee Benefit Plan** or the violation of any of the responsibilities, obligations or duties imposed by **ERISA**, and any regulations applicable thereto, or any common law or statutory law relating to any **Employee Benefit Plan**.

## VOLUNTARY CORRECTION PROGRAM INSURING AGREEMENT

The **Insurer** will pay on behalf of the **Insured**, **Voluntary Correction Fees** and **Defense Costs** with respect to a **Voluntary Correction Program Notice** first given to the **Insurer** during the **Policy Period** or the Discovery Period, provided:

(a)   the **Voluntary Correction Program Fees** and **Defense Costs** are incurred after such **Voluntary Correction Program Notice** is first given to the **Insurer**; and

(b)   the **Insurer's** maximum Limit of Liability for all **Voluntary Correction Program Fees** and **Defense Costs** with respect to all **Voluntary Correction Program Notices** shall be $100,000, which amount will be included within and not in addition to the Fiduciary Liability Insuring Agreement Limit of Liability set forth in Item 9 of the Declarations. For purposes of the coverage afforded by this Insuring Agreement only, no Retention shall apply.

2.   For the purpose of the coverage afforded by this Insuring Agreement, all of the terms and conditions set forth in the **Policy** and any amendments thereto shall apply except:

A.   Section II (B), entitled "Not-for-Profit Directorships", is deleted.

B.   Section IV, entitled "Definitions", is amended to add the following:

**Administration** means counseling **Employees** with respect to, interpreting, handling records in connection with, or effecting enrollment or cancellation of **Employees** under any **Employee Benefit Plan**.

**Employee Benefit Plan** means any **Employee Welfare Benefit Plan** or any **Employee Pension Benefit Plan** operated solely by the **Company** or jointly by the **Company** and a labor organization for the benefit of the **Employees** of the **Company**.

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 69**

**Employee Pension Benefit Plan** means any plan, fund, or program established or maintained by the **Company** for its **Employees**, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund or program provides retirement income to **Employees** or results in a deferral of income by **Employees** for periods extending to the termination of employment or beyond.

**Employee Welfare Benefit Plan** means any plan, fund, or program established or maintained by the **Company** for its **Employees** for the purpose of providing benefits for its participants or their beneficiaries, through the purchase of insurance or otherwise, including:

(1)  medical, surgical, or hospital care or benefits; benefits in the event of sickness, accident, disability, death or unemployment; vacation benefits, apprenticeship or other training programs; day care centers; scholarship funds; prepaid legal services; or

(2)  any benefit described in Section 186(c) of **ERISA**.

**Voluntary Correction Program** means the Voluntary Correction Program, as described in the Employee Plans Compliance Resolutions System ("EPCRS"), IRS Rev. Proc. 2006-27, as amended, or the Voluntary Compliance Resolution Program, the Walk-In Closing Agreement Program, the Tax Sheltered Annuity Voluntary Correction Program ("TVC"), or any similar voluntary settlement program.

**Voluntary Correction Program Fees** means fees, fines, penalties or sanctions paid by an **Insured** to a governmental authority pursuant to a **Voluntary Correction Program** for the actual or alleged inadvertent non-compliance by an **Employee Benefit Plan** with any statute, rule or regulation.  Voluntary Correction Plan Fees shall not include:

(1)  any costs to correct the non-compliance, or any other charges, expenses, taxes or damages; or

(2)  any fees, fines, penalties or sanctions relating to an **Employee Benefit Plan** which, as of the earlier inception of this **Policy** or the inception of the first **Policy** of which this **Policy** is a renewal or replacement, any **Insured Person** knew to be actually or allegedly non-compliant.

**Voluntary Correction Program Notice** means prior written notice to the **Insurer** by the **Insured** of the **Insured's** intent to enter into a **Voluntary Correction Program.**

C.    Section IV, entitled "Definitions", is further amended to delete and replace the definition of **Insured** and **Loss** as follows:

**Insured**, either in singular or plural, means the **Insured Persons**, the **Company**, any **Employee Benefit Plan** existing before the **Policy Period**, any **Employee Benefit Plan** created during the **Policy Period**, and any **Employee Benefit Plan** acquired during the **Policy Period** pursuant to Section XI.

**Loss** means **Defense Costs** and any amount which the **Insured** is legally obligated to pay resulting from a **Claim**, including damages, judgments, settlements, pre- and post-judgment interest, punitive or exemplary damages and the multiple portion of any multiplied damage award where insurable by law. **Loss** shall not include:

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

(1)     taxes, criminal or civil fines or penalties imposed by law; provided that this exception to the definition of **Loss** shall not apply to any **Voluntary Correction Fees** or to the five percent (5%) or less, or the twenty percent (20%) or less, civil penalties imposed under Section 502 (i) or (l), respectively, of **ERISA**;

(2)     any unpaid, unrecoverable or outstanding loan, lease or extension of credit to any customer or any forgiveness of debt;

(3)     costs to comply with any non-monetary or injunctive relief of any kind or any agreement to provide such relief, including but not limited to any damages, costs or expenses incurred in complying with any other federal, state or local laws of any kind;

(4)     any restitution, disgorgement, or payment of similar sums including but not limited to the return of fees, commissions or charges for the **Company's** services; or

(5)     any matters which are uninsurable under the law pursuant to which this Insuring Agreement shall be construed.

D.     All of the exclusions set forth in Section V, entitled "Exclusions Applicable to all Insuring Agreements", shall apply except the "ERISA Exclusion" and the "Insured vs. Insured Exclusion" which are deleted.

E.     Section V, entitled "Exclusions Applicable to all Insuring Agreements", is further amended to add the following:

**Bonding/Insurance Company Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** that is brought directly or indirectly by or for the benefit of any insurance carrier or bond carrier of the **Company**, or any affiliate of the **Company**, regardless in whose name such **Claim** is actually made.

**Contract Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the assumption of any liability to defend, indemnify, or hold harmless any person or entity, other than an **Insured Person**, under any written contract or agreement unless such liability: (1) would be imposed regardless of the existence of such contract or agreement; or (2) was assumed in accordance with or under the agreement or declaration of trust pursuant to which the **Plan** was established.

**Failure to Collect Contribution/Benefits Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss**, other than **Defense Costs**, in connection with any **Claim** for:

(1)     the failure to collect contributions owed to an **Employee Benefit Plan** or other **Employee** Program unless such failure is due to the negligence of the **Insured**;

(2)     the return or reversion to an employee of any contribution or asset; or

(3)     benefits paid or payable to a participant or beneficiary of any **Employee Benefit Plan** or other **Employee** Programs, or benefits which would be payable to such a participant or beneficiary if the **Employee Benefit Plan** or other **Employee** program complied with applicable law.

**Violation of Employment Law Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving an actual or alleged violation of the responsibilities, obligations or duties imposed by any Worker's Compensation, Unemployment Insurance, Social Security or disability benefits law, the Fair Labor Standards Act, National Labor Relations Act, Worker Adjustment and Retraining Notification Act, Occupational Safety and Health Act, any rules or regulations promulgated under any of the above statutes, or similar provisions of any federal, state or local statutory, administrative or common law.

F.   Section VI (A), entitled "Limit of Liability", is amended to add the following Subsection:

(4)   The **Insurer** agrees to provide, without additional charge, a one-time reinstatement of the Limit of Liability under this Insuring Agreement to the extent such Limit of Liability is diminished by paid **Loss** resulting from paid **Claims** under this Insuring Agreement. Should a **Claim** exhaust the Limit of Liability under this Insuring Agreement, the Limit of Liability will only be reinstated for subsequent **Claims**.  This reinstatement shall not serve to increase the Limit of Liability for any single **Claim**.

3.   This Insuring Agreement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 72**

EEO 40 619 (07 09)

# EVEREST NATIONAL INSURANCE COMPANY

## SECURITIES LIABILITY INSURING AGREEMENT

Policy Number:  8100002727-181

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that coverage will be provided subject to all of the terms, conditions and limitations of this Insuring Agreement, as follows:

1.    The attached **Policy** is amended by adding an additional Insuring Agreement as follows:

## SECURITIES LIABILITY INSURING AGREEMENT

The **Insurer** will pay on behalf of the **Company**, **Loss** resulting from **Claims** first made during the **Policy Period** or the Discovery Period against the **Company** for which the **Company** is legally obligated to pay for **Wrongful Acts** which in whole or in part is based upon, arises from, or is in consequence of the purchase or sale of, or offer to purchase or sell, any securities issued by the **Company**.

2.    For the purpose of the coverage afforded by this Insuring Agreement, all of the terms and conditions set forth in the **Policy** and any amendments thereto shall apply except:

A.    Section II, entitled "Additional Coverages", is deleted in its entirety.

B.    All of the Exclusions set forth in Section V, entitled "Exclusions Applicable to all Insuring Agreements", shall apply and the following are added:

**Contract Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim**:

(1)    arising out of or in any way involving the assumption of any liability to defend, indemnify, or hold harmless any person or entity, other than an **Insured Person**, under any written contract or agreement, unless such liability would be imposed regardless of the existence of such contract or agreement; or

(2)    for the intentional breach, in fact, of any express written or oral contract or amounts the **Company** is obligated to pay pursuant to any express written or oral contract. If it is established in fact that such **Claim** involves an intentional breach of contract, the **Insured** agrees to reimburse **Defense Costs**.

**Fee Dispute Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving disputes over fees, commissions, or charges for the **Company's** services.

**Investment Banking/Securities Underwriting Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving:

(1)    underwriting, syndicating or promoting any security (except loan syndications or equity or debt securities issued by the **Company**);

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 73**

(2)    rendering of advice or recommendations regarding any actual or attempted or threatened merger, acquisition, divestiture, tender offer, proxy contest, leveraged buy-out, going private transaction, bankruptcy, reorganization, restructuring, recapitalization, spin-off, offering of securities, dissolution or sale of all or substantially all of the assets or stock of an entity;

(3)    rendering of any fairness opinion;

(4)    proprietary trading;

(5)    any acquisition or sale of securities of the **Company** for its own account; or

(6)    any other investment banking activity,

including any disclosure requirements in connection with any of the foregoing activities.

**Receivership Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the **Company's** function or activity as receiver, trustee in bankruptcy, or assignee for the benefit of creditors.

C.    In the event that a **Claim** is covered under this Insuring Agreement, the **Insurer** shall not be liable for payment of **Loss** in connection with such **Claim** under the Broad Form Company Liability Insuring Agreement (if applicable).

3.    This Insuring Agreement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 74**

EEO 40 623 (07 09)

# EVEREST NATIONAL INSURANCE COMPANY

# BROAD FORM COMPANY LIABILITY INSURING AGREEMENT

Policy Number: 8100002727-181

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that coverage will be provided subject to all of the terms, conditions and limitations of this Insuring Agreement, as follows:

1.   The attached **Policy** is amended by adding an additional Insuring Agreement as follows:

## BROAD FORM COMPANY LIABILITY INSURING AGREEMENT

The **Insurer** will pay on behalf of the **Company**, **Loss** resulting from **Claims** first made during the **Policy Period** or Discovery Period against the **Company** for which the **Company** is legally obligated to pay for **Wrongful Acts**.

2.   For the purpose of the coverage afforded by this Insuring Agreement, all of the terms and conditions set forth in the **Policy** and any amendments thereto shall apply except:

A.   Section II, entitled "Additional Coverages", is deleted in its entirety.

B.   All of the definitions set forth in Section IV, entitled "Definitions", shall apply and the following is added:

**Professional Services** means only those services performed or required to be performed by an **Insured** for or on behalf of a customer of the **Company**:

(1)   for a fee, commission or other monetary compensation;

(2)   where a fee, commission or other monetary compensation would usually be received by the **Insured** but for business or other reasons is waived by the **Insured**; or

(3)   for other remuneration which inures to the benefit of the **Insured**.

Professional Services shall not include **Wrongful Acts** relating to an extension of credit, an agreement or refusal to extend credit, loan servicing, or the collection or restructuring of any extension of credit.

C.   All of the exclusions set forth in Section V, entitled "Exclusions Applicable to all Insuring Agreements", shall apply and the following are added:

**Bonding/Insurance Company Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** that is brought directly or indirectly by or for the benefit of any insurance carrier or bond carrier of the **Company**, or any affiliate of the **Company**, regardless in whose name such **Claim** is actually made; provided, however, that this exclusion shall not apply to any **Claim** brought by the security holders of the **Company** in connection with securities issued by the **Company**.

**Contract Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim**:

EXHIBIT A - 75

(1)     arising out of or in any way involving the assumption of any liability to defend, indemnify, or hold harmless any person or entity, other than an **Insured Person**, under any written contract or agreement, unless such liability would be imposed regardless of the existence of such contract or agreement; or

(2)     for the intentional breach, in fact, of any express written or oral contract or amounts the **Company** is obligated to pay pursuant to any express written or oral contract.  If it is established in fact that such **Claim** involves an intentional breach of contract, the **Insured** agrees to reimburse **Defense Costs**.

**Fee Dispute Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving disputes over fees, commissions, or charges for the **Company's** services.

**Insolvency Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the:

(1)     **Financial Impairment** of the **Company** or any **Subsidiary**, but only to the extent such **Claim** involves a **Wrongful Act** solely in connection with an extension of credit, an agreement or refusal to extend credit, loan servicing, or the collection, or restructuring of any extension of credit; or

(2)     bankruptcy of or suspension of payment by any bank, banking firm, broker or dealer in securities or commodities or any other financial institution to the extent such **Claim** alleges a **Wrongful Act** solely in connection with **Professional Services** offered by the **Company**; provided, however, that this Exclusion shall not apply with respect to the **Insured's** investment on behalf of a customer in the stock of any such entities.

**Investment Banking/Securities Underwriting Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving:

(1)     underwriting, syndicating or promoting any security (except loan syndications or equity or debt securities issued by the  **Company**);

(2)     rendering of advice or recommendations regarding any actual or attempted or threatened merger, acquisition, divestiture, tender offer, proxy contest, leveraged buy-out, going private transaction, bankruptcy, reorganization, restructuring, recapitalization, spin-off, offering of securities, dissolution or sale of all or substantially all of the assets or stock of an entity;

(3)     rendering of any fairness opinion;

(4)     proprietary trading;

(5)     any acquisition or sale of securities of the **Company** for its own account; or

(6)     any other investment banking activity,

including any disclosure requirements in connection with any of the foregoing activities.

**Legal Lending Limit Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving any extension of credit which was, at the time of its making, in excess of the legal lending limit of the **Company**.

**Mechanical Malfunction Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the mechanical or electronic failure, breakdown or malfunction of any machine or system of machines.

**Notary Services Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the notarization or certification of a signature of a person unless that person or someone claiming to be that person physically appeared before the **Insured** at the time of notarization or certification.

**Receivership Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the **Company's** function or activity as receiver, trustee in bankruptcy, or assignee for the benefit of creditors.

**Safe Deposit Operation Exclusion** - The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving safe deposit box operations of the **Company**.

D.   Section VI (A), entitled "Limit of Liability", is amended to add the following Subsection:

(4)   The **Insurer** agrees to provide, without additional charge, a one-time reinstatement of the Limit of Liability under this Insuring Agreement to the extent such Limit of Liability is diminished by paid **Loss** resulting from **Claims** for **Wrongful Acts** by the **Company** while acting solely in the capacity as administrator, custodian or trustee under any individual retirement account (IRA) or H.R. 10 Plan (Keogh Plan). Should a **Claim** exhaust the Limit of Liability pursuant to this Subsection, the Limit of Liability will only be reinstated for subsequent **Claims**. This reinstatement shall not serve to increase the Limit of Liability for any single **Claim**.

3.   This Insuring Agreement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

This Page Intentionally Left Blank

**EXHIBIT A - 78**

EEO 40 629 (07 09)

# EVEREST NATIONAL INSURANCE COMPANY

## Policyholder Disclosure
## Notice of Terrorism Insurance Coverage

Policy Number:  8100002727-181

Coverage for acts of terrorism is included in your policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended, that you have a right to purchase insurance coverage for losses resulting from acts of terrorism, as defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury—in concurrence with the Secretary of State, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The portion of your annual premium that is attributable to coverage for acts of  terrorism is $0.00, and does not include any charges for the portion of losses covered by the United States government under the Act.

I ACKNOWLEDGE THAT I HAVE BEEN NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE ACT, AS AMENDED, ANY LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM  UNDER MY POLICY COVERAGE MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT, MAY BE SUBJECT TO A $100 BILLION CAP THAT MAY REDUCE MY COVERAGE AND I HAVE BEEN NOTIFIED OF THE PORTION OF MY PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

_____

Policyholder/Applicant's Signature

_____

Print Name

_____

Date

EEO 40 629 (07 09)

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

Page 1 of 2

**EXHIBIT A - 79**

This Page Intentionally Left Blank

**EXHIBIT A - 80**

EEO 40 917 (07 09)

# EVEREST NATIONAL INSURANCE COMPANY

## Insured vs. Insured Exclusion Modification
## Former Insured Person, "Whistle Blower" Coverage
## and FDIC/Regulatory Extension

Policy Number:  8100002727-181

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that the **Policy** is amended as follows:

The "Insured vs. Insured Exclusion" is amended to delete and replace Subsection (3) and add Subsections (4) and (5) as follows:

(3)    by a security holder of the **Company** as a derivative action on behalf of the **Company** or such affiliate; provided such **Claim** is brought independently of, and totally without the solicitation, assistance, participation, or intervention of any **Insured** or any affiliate of the **Company** unless such participation arises solely out of the activities for which Section 806 of the Sarbanes-Oxley Act of 2002, or similar "whistle blower" protection provision of an applicable federal, state, or local securities law affords protection to such **Insured**;

(4)    by an **Insured Person** who has not been an **Employee**, director, officer, member of the board of trustees, honorary or advisory director or advisory member of the board of trustees of the **Company** for four (4) years prior to the inception date of the **Policy**; or

(5)    by the FDIC or other governmental authority regulating the **Company** or any other party acting as receiver, conservator, liquidator, rehabilitator of the **Company** or acting in a similar capacity.

All other provisions of the "Insured vs. Insured Exclusion" shall remain unchanged.

This Endorsement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

**EXHIBIT A - 81**

This Page Intentionally Left Blank

**EXHIBIT A - 82**

EEO 40 918 (07 09)

## EVEREST NATIONAL INSURANCE COMPANY

## Fiduciary Liability Modification
## HIPPA Civil Money Penalties Coverage

Policy Number:  8100002727-181

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that the Fiduciary Liability Insuring Agreement is amended as follows:

1.   Subsection (1) of the definition of **Loss** is amended as follows:

    (1)   taxes, criminal or civil fines or penalties imposed by law; provided that this exception to the definition of **Loss** shall not apply to:

        (i)   any **Voluntary Correction Fees**;

        (ii)   the five percent (5%) or less, or the twenty percent (20%) or less, civil penalties imposed under Section 502 (i) or (l), respectively, of **ERISA**; and

        (iii)   **HIPPA Civil Money Penalties**;

    All other provisions of the definition of **Loss** shall remain unchanged.

2.   Number 2 (B) is amended to add the following definition:

    **HIPPA Civil Money Penalties** means any civil money penalties imposed upon an **Insured** for such **Insured's** violation of the privacy provisions of the Health Insurance Portability and Accountability Act of 1996, as amended.

3.   Section VI (A) of the **Policy**, entitled "Limit of Liability", is amended to add the following:

    The Limit of Liability for all **Loss**, in connection with **HIPPA Civil Money Penalty Claims** described above will be $100,000 which amount will be included within, and not in addition to, the Fiduciary Limit of Liability set forth in Item 9 of the Declarations.

4.   Section VI (B) of the **Policy**, entitled "Retention and Indemnification", is amended to add the following:

    The retention applicable to **Claims** for **HIPPA Civil Money Penalties** shall be $0.

This Endorsement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 83**

This Page Intentionally Left Blank

**EXHIBIT A - 84**

EEO 40 962 (07 09)

## EVEREST NATIONAL INSURANCE COMPANY

### Fiduciary Liability Modification
### Delete One Time Reinstatement

Policy Number:  8100002727-181

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that the Fiduciary Liability Insuring Agreement is modified is follows:

Number 2(F) is deleted in its entirety.

This Endorsement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of **Policy** other than as above stated.

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 85**

This Page Intentionally Left Blank

**EXHIBIT A - 86**

EEO 40 963 (07 09)

# EVEREST NATIONAL INSURANCE COMPANY

## "A Side" Coverage Endorsement

Policy Number:  8100002727-181

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that the **Policy** is amended as follows:

The **Insurer** shall pay up to $1,000,000 on behalf of the **Insured Persons** for **Loss** for which the **Insured Persons** are not indemnified by the **Company** and which the **Insured Persons** become legally obligated to pay on account of any **Claim** first made against them, individually or otherwise, during the **Policy Period**, the Automatic Discovery Period (if applicable), or, if exercised, the Optional Discovery Period, for a **Wrongful Act** taking place before or during the **Policy Period**.

This extension of coverage shall be in addition to and excess of the  D&O Limit of Liability set forth in Item 9 of the Declarations, and no Retention shall apply to this extension of coverage.

The D&O Limit of Liability must be completely exhausted by payment of **Loss** before the **Insurer** shall have any obligation to make any payment for **Loss** under this extension of coverage.

This extension of coverage shall be specifically excess of any insurance available to the **Insured Persons** that is specifically excess of this **Policy** or Insuring Agreement and such excess insurance must be completely exhausted by payment of loss, damages, defense costs, claim expenses or other sums covered thereunder before the **Insurer** shall have any obligation to make any payment for **Loss** under this extension of coverage.

This Endorsement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 87**

This Page Intentionally Left Blank

**EXHIBIT A - 88**

EEO 40 978 (03 11)

# EVEREST NATIONAL INSURANCE COMPANY

## Modification to Mergers, Acquisitions and Changes in Business Activities

Policy Number:  8100002727-181

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that Section XI of the **Policy**, entitled "Mergers, Acquisitions and Changes in Business Activities", is deleted and replaced as follows:

---

| SECTION XI - MERGERS, ACQUISITIONS AND CHANGES IN BUSINESS ACTIVITIES |
|---|

A.   If during the **Policy Period**, the **Company**:

    (1)   acquires, merges with or creates any non-bank entity;

    (2)   acquires assets through merger, acquisition or creation of a **Subsidiary** and the resulting assets equal or exceed 25%  of the **Company's** total assets at the time of the transaction;

    (3)   creates or acquires a financial services holding company or converts from a bank holding company to a financial services holding company;

    (4)   converts from a mutual company to a stock company;

    (5)   changes or converts its corporate structure from a C-corporation to an S-corporation; or

    (6)   acquires assets resulting from any FDIC or other federal/state regulatory assisted merger or acquisition of assets (whether or not in fact indemnified).

then no coverage shall be afforded under this **Policy** for any **Loss** incurred by the **Company**, such entity, **Subsidiary**, or its **Insured Persons** resulting from any **Claim** arising out of or in any way involving any such transaction or event, prior to:

    (a)   the **Company** providing written notice and any requested information regarding the transaction to the **Insurer** as soon as practicable;

    (b)   the **Insurer**, at its sole discretion, agreeing in writing to provide such coverage; and

    (c)   the **Company** accepting any special terms, conditions and/or Exclusions and paying any additional premium required by the **Insurer**.

However, with respect to (A)(2) above, this provision shall not apply until ninety (90) days after the merger, acquisition or creation.

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

Page 1 of 2

**EXHIBIT A - 89**

B.   If during the **Policy Period**, the **Company** acquires assets or creates or acquires a bank or bank **Subsidiary** and either transaction results in an increase in assets of less than 25% of the **Company's** total assets at the time of the transaction, the **Insurer** agrees to provide automatic coverage for such bank, bank **Subsidiary** and its **Insured Persons** for the remainder of the **Policy Period**.

C.   Any coverage otherwise afforded under this **Policy** for a **Loss** in any way involving the **Company**, any **Subsidiary**, any acquired, merged or created entity or its **Insured Persons**, or any merged or acquired assets, shall not apply to any **Claim** arising out of or directly or indirectly resulting from:

   (1)   any **Wrongful Act** or any fact, circumstance or situation committed or allegedly committed prior to the effective date of such acquisition, merger or creation; or

   (2)   any other **Wrongful Act**, which, together with a **Wrongful Act** committed or allegedly committed prior to effective date of such acquisition, merger or creation constitute **Interrelated Wrongful Acts**.


This Endorsement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

EEO 40 988 (02 13)

## EVEREST NATIONAL INSURANCE COMPANY

## Broad Form Company Liability Modification
## Insolvency Exclusion

Policy Number:  8100002727-181

In consideration of the premium paid and in reliance upon all statements made and the information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that the Broad Form Company Liability Insuring Agreement is modified as follows:

Part 2.  Section C.  **Insolvency Exclusion**- is deleted and replaced in its entirety with the following:

    **Insolvency Exclusion**-  The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the :

    (1)  **Financial Impairment** of the **Company** or any **Subsidiary**, but only to the extent such **Claim** involves a **Wrongful Act** in connection with an extension of credit, an agreement of refusal to extend credit, loan servicing, or the collection, or restructuring of any extension of credit; or

    (2)  insolvency, conservatorship, receivership, liquidation of, bankruptcy of or suspension of payment by any bank, banking firm, investment company, investment bank, insurance or reinsurance entity, broker or dealer in securities or commodities or any other financial institution or organization of similar nature; provided, however, this Exclusion shall not apply to the **Insured's** investment on behalf of a customer in the stock of any such entities.

This Endorsement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 91**

This Page Intentionally Left Blank

**EXHIBIT A - 92**

EEO 40 991 (02 13)

# EVEREST NATIONAL INSURANCE COMPANY

## Broad Form Company Liability Modification
## Intellectual Property Exclusion

Policy Number:  8100002727-181

In consideration of the premium paid and in reliance upon all statements made and the information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that the Broad Form Company Liability Insuring Agreement is amended to add the following Exclusion:

**<u>Intellectual Property Exclusion</u>** − The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving any actual or alleged right under the law of intellectual property, whether founded in state or federal law, and including but not limited to infringement of trademark, copyright, patent, trade name, trade dress, trade secret, service mark, service name, or the actual or alleged misappropriation or conversion of expression, ideas, processes, or uses.

This Endorsement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 93**

This Page Intentionally Left Blank

**EXHIBIT A - 94**

EEO 41 151 CA (12 10)

## EVEREST NATIONAL INSURANCE COMPANY

## CALIFORNIA AMENDATORY ENDORSEMENT

Policy Number:  8100002727-181

In consideration of the premium paid and in reliance upon all statements made and information contained in the Declarations and **Application**, the **Insurer** and the **Insured** agree that the **Policy** is amended as follows:

1.    The definition of **Loss** is amended as follows:

Notwithstanding any other provision, the definition of **Loss** shall not include punitive or exemplary damages or the multiple portion of any multiplied damage award.  The remainder of the definition of **Loss** shall remain unchanged.

2.    Section XII (B)(2), entitled "Cancellation", Subsection (a) is deleted and replaced as follows:

(a)    This **Policy** or any Insuring Agreement may be cancelled by the **Insurer** by giving to the **Named Insured** written notice stating when such action shall become effective and the reason(s) therefore.  The **Insurer** shall only cancel this **Policy** or an Insuring Agreement for the following reasons:

(i)    nonpayment of premium;

(ii)    discovery of fraud or material misrepresentation by: (1) the **Company** or an **Insured Person** in the obtaining of this insurance; or (2) the **Company** or an **Insured Person** in pursuing a **Claim** under this **Policy**;

(iii)    a judgement by a court or an administrative tribunal that the **Company** or an **Insured Person** has violated a California or Federal Law, having as one of its necessary elements an act which materially increases any of the risks insured against;

(iv)    discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by the **Company** or any **Insured Person**, which materially increase any of the risks insured against;

(v)    failure by the **Company** to implement reasonable loss control requirements, agreed to by the **Company** as a condition of **Policy** issuance, or which were conditions precedent to the **Insurer's** use of a particular rate or rating plan, if that failure materially increases any of the risks insured against;

(vi)    a determination by the Commissioner of Insurance that the loss of, or changes in, reinsurance by the **Insurer** would threaten financial integrity or solvency, or that continuation of the **Policy** coverage would place the **Insurer** in violation of California law or the laws of the state where the **Insurer** is domiciled; or

(vii)    a change by the **Company** in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the **Policy**.

**EXHIBIT A - 95**

All other provisions in Section XII (B)(2) shall remain unchanged.


This Endorsement shall be effective as of 12:01 a.m. on 07/01/2018.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the **Policy** other than as above stated.

The regulatory requirements of this Amendatory Endorsement shall take precedence over any provisions of the **Policy** or any endorsement to the **Policy**, whenever added, that are inconsistent with or contrary to the provisions of this Amendatory Endorsement, unless such **Policy** or endorsement provisions comply with the applicable insurance laws of the state.

# EVEREST NATIONAL INSURANCE COMPANY

## EVEREST PRIVACY NOTICE

Policy Number:  8100002727-181

## YOUR CONFIDENTIALITY

This Privacy Notice applies to policyholders of the following companies: Everest National Insurance Company, Everest Indemnity Insurance Company, Everest Reinsurance Company and Everest Security Insurance Company ("Everest").  Everest respects your right to privacy and understands the importance of keeping the nonpublic personal information about you secure. We maintain certain policies to protect the confidentiality and security of your nonpublic personal information and have appropriate physical, electronic and procedural safeguards and security standards at our facilities to prevent access to your information by unauthorized third parties.

## CATEGORIES OF GATHERED INFORMATION

Everest, through its agents and service providers, collects information about you in order to serve you properly. We collect information that is necessary or relevant to our business.  Much of this information is obtained directly from you.  The categories of personal information that may be collected by Everest includes, but is not limited to, the following:

I.   The information contained in your completed application for coverage.
II.  We may need information from your motor vehicle records.
III. For property coverage, we may inspect your property and verify information about its value and risk.
IV.  We may review insurance claims information, loss information reports, and we may also obtain medical or financial information to adjust claims.
V.   We may obtain additional information from third parties such as other insurance companies, independent claims adjusters, governmental agencies, and courts.

Information that has been collected about you may be retained in both our records and your agent's files.  We review it in evaluating your request for coverage, determining your rates, servicing your insurance policy, and adjusting claims.

## DISCLOSURES PERMITTED BY LAW

We do not disclose your personal non-public information except as otherwise permitted by law.  By law we are permitted to share personal information about you without your prior permission under certain circumstances and to certain persons, companies, organizations and entities such as:

- Your agent or broker;
- Parties who perform a business, professional or insurance function for our company, including affiliated companies, agents, service providers and reinsurers;
- Independent claims adjusters, appraisers, investigators, auditors, accountants and attorneys who need the information to investigate, defend or settle a claim involving your insurance;
- Businesses that help us with data processing or marketing;
- Other insurance companies, or agents as reasonably necessary in connection with any application, insurance policy or claim involving you;
- Insurance regulatory agencies in connection with the regulation of our business;

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 97**

- Law enforcement or other governmental authorities to protect our legal interests or in cases of suspected fraud or illegal activities;
- Authorized persons as ordered by subpoena, warrant or other court order or as required by law.

## YOUR RIGHT TO KNOW

The following access to records will be provided to you if required by law as well as if we have provided you with insurance issued in the following states: Arizona, California, Connecticut, Georgia, Hawaii, Illinois, Kansas, Maine, Massachusetts, Minnesota, Montana, Nevada, New Jersey, North Carolina, Ohio, Oregon and Virginia.

You have the right to access certain types of information we keep in our files about you and to receive a copy of such information.

Within thirty (30) business days of receipt of your request, we will inform you in writing of the nature and substance of locatable, retrievable and available recorded personal information about you in our files. We will also identify any persons or organizations to which we have disclosed or normally would disclose this information within the past two (2) years.  In addition, you will be given the name and address of any consumer credit reporting agency that prepared a report about you so that you can contact them for a copy.

You may review the identified information contained in our files in person or receive a copy of such information by mail at a reasonable charge.

After you have reviewed the personal information about you in our file, you can contact us if you believe it should be corrected, amended or deleted.  We will consider your request and within thirty (30) business days make your requested changes or advise you that we did not make your requested changes and the reason.

If we do not make your requested changes, you have the right to insert in our file a concise statement containing why you believe certain information contained in our file should be corrected, amended or deleted and what you believe is the correct, relevant or fair information.

We will notify and provide those persons or organizations designated by you to whom we have disclosed such information the change(s) made on your statement.  Subsequent disclosures we make will also include your statement.

To request the personal information about you contained in our file(s), please send a written request, setting forth your name, address, policy number, day and evening phone number, and a description of the information you would like to receive, to:

**EVEREST**
**ATTENTION: PRIVACY ACCESS REQUEST/COMPLIANCE DEPARTMENT**
**477 MARTINSVILLE ROAD, P.O. BOX 830**
**LIBERTY CORNER, N.J. 07938-0830**

Copyright, Everest Reinsurance Company, 2009
FDIC No. 57044

**EXHIBIT A - 98**

# EXHIBIT B

1   **BAUTE CROCHETIERE & HARTLEY** LLP
    MARK D. BAUTE (State Bar No. 127329)
2   mbaute@bautelaw.com
    DAVID P. CROCHETIERE (State Bar No. 115582)
3   dcrochetiere@bautelaw.com
    BRYAN D. ROTH (State Bar No. 299906)
4   broth@bautelaw.com
    777 South Figueroa Street, Suite 3800
5   Los Angeles, California 90017
    Telephone: (213) 630-5000
6   Facsimile: (213) 683-1225

7   Attorneys for Plaintiff/Cross-Defendant
    PACWEST BANCORP, Plaintiff PACIFIC
8   WESTERN BANK and Cross-Defendant
    JOHN M. EGGEMEYER

**FILED**
Superior Court of California
County of Los Angeles

**10/21/2021**

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ Deputy
         E. Avena

Electronically Received 10/21/2021 02:46 PM

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

9   
10   ### SUPERIOR COURT OF THE STATE OF CALIFORNIA
11   ### COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| 12  PACWEST BANCORP, a Delaware corporation; PACIFIC WESTERN BANK, a California State Chartered Bank, | Case No. 20STCV46002 |
| 13 | Assigned for All Purposes to: |
| 14        Plaintiffs, | Hon. Richard J. Burdge, Jr., Dept. 37 |
| 15   v. | **PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES:** |
| 16  DAVID I. RAINER, an Individual; BANK OF SOUTHERN CALIFORNIA, N.A., a United | **1.  BREACH OF CONTRACT;** |
| 17  States Corporation; SOUTHERN CALIFORNIA BANCORP, a United States | **2.  BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING;** |
| 18  Corporation; RICHARD HERNANDEZ, an Individual; DIANA REMINGTON | **3.  INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** |
| 19  SMITHSON, an Individual; and DOES 1-20, Inclusive, | **4.  INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** |
| 20        Defendants. | **5.  NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;** |
| 21 | **6.  INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;** |
| 22  DAVID I. RAINER, an individual, | **7.  INDUCING BREACH OF CONTRACT;** |
| 23        Cross-Complainant, | **8.  BREACH OF FIDUCIARY DUTY;** |
| 24   v. | **9.  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY; AND** |
| 25  PACWEST BANCORP, a Delaware corporation; JOHN M. EGGEMEYER, an | **10. COMMON LAW UNFAIR COMPETITION AND VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE (§ 17200 ET SEQ.)** |
| 26  individual; and DOES 1-20, inclusive, | **DEMAND FOR JURY TRIAL** |
| 27        Cross-Defendants. | FAC Filed:    April 9, 2021 |
| 28 | FACC Filed:  May 6, 2021 |
| | Trial Date:   November 15, 2022 |

332718.3

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT B - 100**

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1    Plaintiffs PACWEST BANCORP ("PacWest") and PACIFIC WESTERN BANK

2    ("PacWest Bank") (collectively "Plaintiffs") complain and allege against Defendants DAVID I.

3    RAINER, BANK OF SOUTHERN CALIFORNIA, N.A., SOUTHERN CALIFORNIA

4    BANCORP, RICHARD HERNANDEZ and DIANA REMINGTON SMITHSON (collectively,

5    "Defendants") as follows:

6    **INTRODUCTION**

7    1.    This complaint arises out of the systematic and illegal raiding of the employees and

8    clients of PacWest Bank, a wholly owned subsidiary of PacWest, orchestrated by David I. Rainer

9    ("Rainer"). Rainer is a former executive of CU Bancorp ("CUB"), which was acquired by

10   PacWest in 2017. Rainer was aided and abetted in this wholesale assault on PacWest Bank by his

11   new employer and direct competitor of PacWest Bank, Bank of Southern California, N.A. ("SoCal

12   Bank") and its holding company, Southern California Bancorp ("SoCal Bancorp"); a former

13   PacWest Bank Executive Vice President,[1] Richard Hernandez aka Rich Hernandez

14   ("Hernandez"); and Diana Remington Smithson aka Danni Remington ("Smithson"), a former

15   Senior Vice President, Regional Manager, who joined Rainer at SoCal Bank.  To date, as a result

16   of the illegal raiding plan orchestrated by Rainer, implemented by Hernandez and Smithson, and

17   actively supported by SoCal Bank and SoCal Bancorp, 30 PacWest Bank employees, including

18   key executives and client relationship personnel, have left PacWest Bank to join Rainer,

19   Hernandez and Smithson at SoCal Bank, bringing with them millions of dollars in client deposits

20   and loans.

21   2.    Rainer's behavior, and his violations of both the law and industry norms, is made

22   all the more appalling because during the very time that Rainer was planning and executing this

23   illegal raiding, he was every month accepting money from PacWest to serve as a consultant to and

24

25   ---

     [1]    Following the sad and unexpected passing of Casey "Joe" Cecala, the President of PacWest
26   Bank's Los Angeles Region, Hernandez was offered the late Mr. Cecala's position starting
     November 1, 2020. At one point Hernandez held himself out as having served as "Regional
27   President" for PacWest Bank.  He did not.  Not one day.  Hernandez's last day worked with
     PacWest was October 23, 2020.  In the weeks and months prior to his separation date, and
28   afterward as alleged herein, he instead engaged in wrongful acts against PacWest.

332718.3                                          2

"ambassador" for the very bank he was plotting to raid. As part of CUB's merger with PacWest in April 2017, Rainer and PacWest entered into a consulting agreement, which was later amended and restated on May 25, 2017 (the "Agreement"). In exchange for an annual fee of $550,000, paid monthly, Rainer agreed to serve as consultant to PacWest and its subsidiaries, including PacWest Bank. For the first three years of the Agreement (referred to as the "Restricted Period") Rainer was prohibited from soliciting any employee of PacWest or any of its subsidiaries to resign or to apply for or accept employment with any competitive enterprise. Rainer was separately required, from the effective date of the Agreement through May 2022 to, among other things, foster and grow PacWest's business, attract and retain new clients, and help preserve business and employee relationships and retain key personnel.

3.     Both Hernandez and Smithson, before and at the time they left PacWest Bank, and during the period they participated in Rainer's, SoCal Bank's and SoCal Bancorp's illegal raiding plan, were subject to the restrictive covenants contained in the Stock Incentive Plan Stock Award Agreements each signed in 2019 and 2020 ("Stock Award Agreements"). These covenants required that during their employment, and for a six month period following the termination of their employment for any reason, Hernandez and Smithson would not take any action directly or indirectly to 1) cause any employees of PacWest or its affiliates to resign or apply or accept employment with any other business or enterprise, or 2) cause any customer or prospective customer of PacWest or its affiliates to become a customer of or transact any business with a competitive business, or reduce or refrain from doing any business with PacWest or its affiliates. The active participation of Hernandez and Smithson in Rainer's scheme before and after their resignations, and their direct solicitation of PacWest Bank's employees and customers following their resignations from PacWest Bank, was in direct violation of their Stock Award Agreements.

4.     On November 5, 2020, while still bound by the terms of the Agreement and while still receiving $45,833 a month for providing consulting services to PacWest and its subsidiaries, including PacWest Bank, Rainer and SoCal Bank announced that Rainer had taken a position as Executive Chairman of the Board of Directors of SoCal Bank, a PacWest Bank competitor. Four days later, on November 9, a flurry of numerous PacWest Bank employees tendered their

3

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT B - 102**

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

resignations, which resignations PacWest has learned were coordinated behind the scenes by Hernandez. Hernandez started work at SoCal Bank that same day. This marked the beginning of a mass exodus of PacWest Bank personnel, and in some instances, their corresponding client accounts. These departing employees were the very PacWest Bank executives, managers and employees, and client relationships, Rainer was contractually bound to help PacWest preserve.

5.     Rainer planned to breach the Agreement well in advance, keeping his plan secret so as to continue to unjustly receive compensation under the Agreement for as long as possible. Rainer waited until the Restricted Period in the Agreement expired on October 20, 2020 to publicly announce his new position at SoCal Bank, so to allow the resignations of the PacWest Bank employees he, Hernandez, SoCal Bank and SoCal Bancorp had solicited behind the scenes to formally begin. Rainer began this recruiting process months before November 5, 2020, with the assistance and knowledge of his soon-to-be employers, SoCal Bank, and SoCal Bancorp. In August 2020, while Rainer was still within the Restricted Period in the Agreement, he laid out his plan dubbed "Project Slingshot", in detail to the Boards of Directors SoCal Bank and SoCal Bancorp. At the same time, he demanded that "as a condition to the implementation of the Plan" SoCal Bank indemnify and hold him harmless from any and all actions that PacWest may take relating to the Agreement. The necessary Board approvals having already been obtained, Rainer advised the Boards of SoCal Bank and SoCal Bancorp that he anticipated SoCal Bank would have in place a set of "Definitive Documents" that would provide for him and "my management candidates to be hired and the Bank and Company boards to be reconstituted, as provided herein, on or about October 21, 2020." This was literally the day after the expiration of the Restricted Period under the Agreement.

6.     Rainer's breach of the Agreement disentitles him to any of the fees he previously received under the Agreement. Rainer should be required to return the ill-gotten compensation he received as PacWest's "ambassador" while actively causing harm to PacWest. Hernandez and Smithson are liable for their brazen disregard of their obligations under the Stock Award Agreements while accepting the benefits, for breach of the fiduciary duties they owed PacWest Bank as a Regional Vice President and Senior Vice President, Regional Manager, and for their

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

active participation in Rainer's scheme. SoCal Bank and SoCal Bancorp are liable for their own role in Rainer's scheme, and for conspiring with Rainer and aiding and abetting Rainer's, Hernandez' and Smithson's various breaches of their fiduciary duties owed to PacWest, their inducement of Rainer, Hernandez and Smithson to breach their contracts, their intentional and negligent interference with prospective economic advantage and contractual relations, and for unfair competition.

## THE PARTIES, JURISDICTION AND VENUE

7.  Plaintiff PacWest is a corporation organized and existing under the laws of Delaware with its principal place of business in Los Angeles County, California. It is the holding company for PacWest Bank.

8.  Plaintiff PacWest Bank is a California state-chartered bank organized and existing under the laws of California, with its principal place of business in Los Angeles County, California.

9.  Defendant Rainer is an individual with his residence and principal place of business in Los Angeles County, California.

10.  Defendant SoCal Bank is a corporation organized and existing under the laws of the United States with its principal place of business in San Diego, California.

11.  Defendant SoCal Bancorp is a corporation organized and existing under the laws of California with its principal place of business in San Diego, California.

12.  Defendant Hernandez is an individual with his residence and principal place of business in Los Angeles County, California.

13.  Defendant Smithson is an individual with her residence and principal place of business in Orange County, California.

14.  The actions giving rise to this complaint took place within the County of Los Angeles, California. The Agreement and Stock Award Agreements at issue were entered into, performed and breached within the County of Los Angeles, California.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

15.     Plaintiffs are unaware of the true names and capacities of the defendants sued herein under the fictitious names DOE 1 – DOE 20, inclusive. Plaintiffs will seek leave to amend to state the true names and capacities of such defendants when such information is ascertained.

16.     Plaintiffs are informed and believe, and thereon allege, that, at all times relevant, each of the defendants was and is the agent, servant and employee of each of the other defendants, and all of the things alleged to have been done by each defendant were done in the capacity of and as agent of the other defendants.

**GENERAL ALLEGATIONS**

17.     PacWest Bank operates a regional banking business with 72 full-service branches in California. PacWest Bank provides commercial banking services, including real estate, construction, and commercial loans to small and medium-sized businesses.

18.     CUB was founded in 2005 in Los Angeles, California. Prior to the merger between PacWest and CUB, Rainer was the Chairman and Chief Executive Officer of CUB. He accumulated 275,000 shares of CUB stock.

19.     In or about the beginning of 2017, PacWest's Chief Executive Officer and Director, Matthew P. Wagner ("Wagner"), learned of Rainer's alleged desire to retire from the banking industry with one final cash out liquidity event through the sale or merger of CUB.

20.     Initially, Wagner was not interested in a PacWest merger or acquisition of CUB. Wagner was familiar with Rainer's history of raiding key personnel from his former employers after he left, including Rainer poaching employees from an Encino-based bank called California United Bank in the late 1990s when Wagner hired Rainer to run the Santa Monica branch of Western Bancorp, where Wagner was the President and CEO.

21.     However, in their initial meeting, and in their subsequent conversations, Rainer reassured Wagner that he had no intention of starting or joining a competing bank, that he and his entire team were nearing retirement and that they wanted to land at PacWest Bank as their final destination in the banking industry. Rainer also represented to Wagner that the biggest reason for his cashing out and his planned retirement was that he needed to step away from his professional life to focus on his family. As a result, PacWest began negotiations with Rainer and CUB.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

**EXHIBIT B - 105**

22.     On October 20, 2017, PacWest merged with CUB. Rainer was to receive a payment in the amount of $4,748,247.00.

23.     PacWest and Rainer agreed to a five-year payment structure, with a three non-compete period (the "Restricted Period") and a five-year consulting period.

24.     On April 5, 2017, Rainer signed a consulting agreement. The consulting agreement was amended and restated on May 25, 2017 as the Agreement. By its terms, Rainer was to provide the specific consulting services set out in Exhibit A of the Agreement for 65 months from the effective date, or roughly through October 2022.

25.     Payments to Rainer under the Agreement were contingent on his cooperation and compliance with the terms of the Agreement.

26.     Exhibit A to the Agreement, which has seven enumerated executory sections, states that Rainer was bound to do the following:

1)   Assist with transition issues relating to the merger. Such activities may include attending meetings, presentations and communications.

2)   Provide strategic advice and counsel to [PacWest] on matters for which you have personal knowledge. Such guidance may include specific account and client history, new market development, portfolio retention strategies and broadening financial services.

3)   Facilitate customer outreach, including brokering introductions and fostering business relationships between legacy clients and the acquiring organization.

4)   Act as an ambassador to [PacWest] and be available to meet with, and be involved with, clients and counterparties, at the request of [PacWest], where [PacWest] believes your personal knowledge, attendance and participation could be beneficial.

5)   Preserve business and employee relationships to mitigate disruption and anxiety associated with the transaction and change. This includes promoting continuity and retaining key personnel.

6)   Perform new business development opportunities to attract and retain new clients. As a leader in the industry, help promote the reputation of [PacWest] to key merchant bank markets.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

7

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT B - 106**

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

7)  Perform such other services as the parties may mutually agree upon from time to time during the term of the agreement.

27.     In exchange for performing the above services, PacWest paid Rainer a yearly consulting fee of $550,000, to be paid in roughly equal installments on a monthly basis.

28.     Up until November 5, 2020 Rainer regularly reported on his consulting work under the Agreement in monthly statements.

29.     On November 5, 2020, Rainer was named Executive Chairman of the board of directors of SoCal Bank.

30.     Almost immediately after the November 5, 2020 announcement, a number of key personnel resigned from their positions at PacWest Bank. Plaintiffs now know that Hernandez, behind the scenes and with the knowledge and aid of his new employer SoCal Bank, was directly involved with facilitating and coordinating these departures. Thereafter the number has grown to 30 employees. Plaintiffs are informed and believe that each of the following PacWest Bank employees accepted positions at SoCal Bank:

31.     Andrea Cunha left her position as a Loan Processor at PacWest Bank and joined SoCal Bank.

32.     Rodrigo Perez left his position as a Branch Operations Manager at PacWest Bank and joined SoCal Bank.

33.     Mouzone Boulden left her position as a Senior Financial Services Representative at PacWest Bank and joined SoCal Bank.

34.     Jonathan Schumacher left his position as a Branch Operations Specialist at PacWest Bank and joined SoCal Bank.

35.     Linda Aghajanian left her position as a Real Estate Collateral Analyst at PacWest Bank and joined SoCal Bank.

36.     Olivia Aceves left her position as a Loan Processor at PacWest Bank and joined SoCal Bank.

37.     Gladys Gonzalez left her position as a Senior Loan Processor at PacWest Bank and joined SoCal Bank.

38.     Stephanie Johnson left her position as a Senior Loan Processor at PacWest Bank and joined SoCal Bank.

39.     Sean Walden left his position as a Vice President, Portfolio Manager at PacWest Bank and joined SoCal Bank.

40.     Laurie Kasper left her position as a Vice President, Relationship Manager at PacWest Bank and joined SoCal Bank.

41.     Robel Neway left his position as a Vice President, Relationship Manager at PacWest Bank and joined SoCal Bank.

42.     Greg Spencer left his position as a Vice President, Relationship Manager at PacWest Bank and joined SoCal Bank.

43.     Megan Newville left her position as an Assistant Vice President, Portfolio Manager at PacWest Bank and joined SoCal Bank.

44.     Smithson left her position as a Senior Vice President, Regional Manager at PacWest Bank and joined SoCal Bank.

45.     Claudia Castillo left her position as an Assistant Vice President, Senior Loan Processor at PacWest Bank and joined SoCal Bank.

46.     Maureen Boggs left her position as a Senior Vice President, Relationship Manager at PacWest Bank and joined SoCal Bank.

47.     Richard Bontempi left his position as a Senior Vice President, Relationship Manager at PacWest Bank and joined SoCal Bank.

48.     Shelley Gibson left her position as a Senior Vice President, Relationship Manager at PacWest Bank and joined SoCal Bank

49.     Jonathan Perez left his position as a Senior Vice President, Relationship Manager at PacWest Bank and joined SoCal Bank.

50.     Daniel Quick left his position as a Senior Vice President, Relationship Manager at PacWest Bank and joined SoCal Bank.

51.     Don Williams left his position as a Senior Vice President, Real Estate at PacWest Bank and joined SoCal Bank.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

52.     William Sloan left his position as an Executive Vice President, Regional Manager at PacWest Bank and joined SoCal Bank.

53.     Hernandez left his position as a Regional Vice President at PacWest Bank and joined SoCal Bank.

54.     Jordan Cole left his position as a Senior Financial Services Representative at PacWest Bank and joined SoCal Bank.

55.     Andranik Dertsakyan left his position at PacWest Bank and joined SoCal Bank.

56.     Marvin Contreras left his position as a Senior Teller at PacWest Bank and joined SoCal Bank.

57.     Kevin Guardado left his position as a Credit Analyst at PacWest Bank and joined SoCal Bank.

58.     Michelle Henry left her position as a Vice President, Portfolio Manager at PacWest Bank and joined SoCal Bank.

59.     Erez Hahn left his position at PacWest Bank and joined SoCal Bank.

60.     Aroutian "Eric" Kirakosian left his position as an Assistant Branch Manager at PacWest Bank and joined SoCal Bank.

61.     In addition to the above listed employees who left PacWest Bank, other current PacWest Bank employees were solicited by Rainer and/or other representatives of SoCal Bank and declined an offer to join SoCal Bank.

62.     Stephen Cobb, a Senior Utility Representative for a PacWest Bank region, was solicited to join SoCal Bank.

63.     Ashley Duran, a Branch Operations Manager for PacWest Bank, was solicited to join SoCal Bank.

64.     Steve Corona, an Executive Vice President Regional Manager for PacWest Bank, was solicited to join SoCal Bank.

65.     Arthur Bergman, a Senior Vice President Regional Manager for PacWest Bank, was solicited to join SoCal Bank.

10

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT B - 109**

66.     Brian Ishida, an Executive Vice President Regional Manager for PacWest Bank, was solicited to join SoCal Bank.

67.     Kim Defenderfer, an Executive Vice President for PacWest Bank, was solicited to join SoCal Bank.

68.     Morgan Ritzer, an Assistant Branch Operations Manager for PacWest Bank, was solicited to join SoCal Bank.

69.     Matt Giroux, a Branch Operations Manager for PacWest Bank, was solicited to join SoCal Bank.

70.     Hernandez was actively involved in recruiting PacWest Bank employees to join SoCal Bank. Among other things, Hernandez in many cases was the point person at SoCal Bank that PacWest Bank employees were told to call, on Hernandez' private cell phone number, after they had been solicited by other employees to move to SoCal Bank. Hernandez arranged for offer letters from SoCal Bank for these PacWest Bank employees. He instructed the departing PacWest Bank employees to all tender their resignations on a date selected by Hernandez, which they did.

71.     Hernandez, before and at the time he left PacWest Bank and during the period he participated in Rainer's and SoCal Bank's illegal raiding plan, was subject to the restrictive covenants contained in the Stock Award Agreements.

72.     Smithson was actively involved in recruiting PacWest Bank employees to join SoCal Bank and in soliciting PacWest Bank clients to transfer their business to SoCal Bank. Among other things, Smithson successfully solicited former PacWest Bank employee Stephanie Johnson to leave PacWest Bank and join SoCal Bank, and along with Johnson solicited PacWest Bank employee Morgan Ritzer to leave PacWest Bank to join SoCal Bank. Ritzer declined. Within weeks of joining SoCal Bank Smithson also solicited a number of PacWest Bank clients to transfer their business to SoCal Bank, and encouraged Johnson to do the same, coordinating with Johnson which PacWest Bank clients to contact.

73.     Smithson, before and at the time she left PacWest Bank and during the period she participated in Rainer's and SoCal Bank's illegal raiding plan, was subject to the restrictive covenants contained in the Stock Award Agreements.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

74.     For months prior to the public announcement of his position at SoCal Bank, Rainer, with the assistance and knowledge of SoCal Bancorp and SoCal Bank, had been communicating with PacWest Bank executives, managers and employees in an attempt to get them to resign their positions with PacWest Bank and take positions at SoCal Bank. On August 18, 2020 while Rainer was still within the Restricted Period in the Agreement, Rainer sent a letter, characterized as a Letter of Interest ("LOI"), to the Boards of Directors SoCal Bank and SoCal Bancorp in which he described a "new strategic plan", dubbed "Project Slingshot", he was proposing for SoCal Bank. Rainer told the Boards that "[A]s an integral part of the Plan, a number of those highly skilled former CUB professionals *will be joining* the BSC management team and the Boards of the Bank and the Company." (emphasis added). Rainer specifically brought his Agreement with PacWest to attention to the Boards of SoCal Bank and SoCal Bancorp and informed them that "… as a condition to the implementation of the Plan, BSC will indemnify and hold me harmless from any and all actions that PacWest may take relating to the consulting agreement, including but not limited to guaranteeing the payment to me of the Retainer and paying all reasonable costs and expenses incurred by me to defend any claims that PacWest may make relating to the consulting agreement." The "Retainer" referred to be Rainer is the amount PacWest was to pay Rainer under the Agreement for his promised services to, among other things, foster and grow PacWest's business, attract and retain new clients, and help preserve business and employee relationships and retain key personnel.

75.     Rainer made clear in the LOI that, as of August 18, 2020, he already had recruited and had in place candidates for the positions of Chief Credit Officer, Chief Operating Officer, Director of Operations and Chief Risk Officer. He told the Boards that he could not include their names in the LOI "[t]o protect their privacy and current employment positions." In the LOI Rainer also told the Boards of SoCal Bank and SoCal Bancorp that he anticipated that SoCal Bank would have in place, with the necessary Board approval having already been obtained, a set of "Definitive Documents" that would provide for him and "my management candidates to be hired and the Bank and Company boards to be reconstituted, as provided herein, on or about October 21,

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

2020," literally the day after the expiration of his three year non-compete period under the Agreement.

76.      In August 2020, and perhaps earlier, while Rainer was still within the Restricted Period in the Agreement, Rainer also presented SoCal Bank with a deck of slides labelled "strictly private and confidential" for the "Project Slingshot" plan which, the presentation stated, was designed to "attract key high-level executives and top business development officers" to SoCal Bank. Rainer boasted in the materials of his "proven ability to attract top talent in the market" and told the Board of Directors of SoCal Bank his plan would involve Bank of SoCal hiring 60 new employees "at the end of 2020 and beginning of 2021." The Project Slingshot materials identified "a series of meetings with BCAL's [SoCal Bank] CEO and President" in which Rainer discussed his plan prior to the creation of the August 2020 presentation.

77.      In addition to raiding key employees, Rainer, Hernandez, Smithson and/or SoCal Bank and SoCal Bancorp, have solicited numerous clients of PacWest Bank to transfer deposits to SoCal Bank and/or pay off mortgages and commercial loans held by PacWest Bank in order to take the business to SoCal Bank.

78.      Since November 5, 2020, over $65 million in client deposits associated with the personnel who resigned have been transferred out of PacWest Bank.

79.      Since November 5, 2020, over $114 million in mortgages and/or commercial loans that were former CUB notes have been paid off.

**FIRST CAUSE OF ACTION**

**FOR BREACH OF WRITTEN CONTRACT**

**(Plaintiffs PacWest and PacWest Bank Against Defendants Rainer and Does 1-20)**

80.      Plaintiffs re-allege and hereby incorporate paragraphs 1 through 78 of this complaint as if fully set forth herein.

81.      The Agreement between PacWest and Rainer is a valid, enforceable contract (the Agreement is attached hereto as Exhibit 1.)

82.     The Agreement was made expressly for the benefit of PacWest Bank as a third party beneficiary in that the client and employee relationships which Rainer was obligated to foster, promote and preserve were the business and employee relationships of PacWest Bank.

83.     Rainer wrongfully violated Agreement in at least the following ways:

(a)     on information and belief, soliciting employees of PacWest Bank during the Restricted Period, including but not limited to Hernandez, to apply for or accept employment at SoCal Bank, which under the terms of the Agreement was a "Competitive Enterprise."

(b)     by inducing, during or after the Restricted Period, at least 30 PacWest Bank employees, including a number of executive relationship managers, portfolio managers, regional managers and loan processors, to leave their positions at PacWest Bank and to take positions at a competing bank, SoCal Bank, actions which were intended to and did have a significant detrimental effect on PacWest's business;

(c)     on information and belief, by disclosing to SoCal Bank and SoCal Bancorp confidential and proprietary information he learned through his consulting relationship with PacWest or obtained from the PacWest Bank employees he induced to resign and by intentionally and improperly using that confidential and proprietary information to solicit existing or potential PacWest Bank clients to terminate their relationships with PacWest Bank and enter into business relationships with SoCal Bank;

(d)     by willfully failing to perform his assigned duties under the Agreement; and

(e)     by purposefully creating an environment of anxiety and destabilization at PacWest Bank regarding the recent resignations and loss of client relationships.

84.     PacWest performed all of its obligations under the Agreement other than those obligations that were excused due to Rainer's breach, and all of the conditions required for Rainer's performance have occurred.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

85.     As a direct and proximate result of Rainer's breaches, Plaintiffs have suffered damages, in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the Defendants' actions, but believe that thus far Rainer, and Does 1-20, have solicited and induced at least 30 PacWest Bank employees to resign and take positions at SoCal Bank, and further have solicited and induced numerous clients to transfer their business from PacWest Bank to SoCal Bank. Furthermore, Plaintiffs are informed and believe, and thereon allege, that Rainer unjustly received prior consulting fees while in breach of the Agreement and should therefore be required to return the ill-gotten compensation.

## SECOND CAUSE OF ACTION

## FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

**(Plaintiffs PacWest and PacWest Bank Against Defendants Rainer and Does 1-20)**

86.     Plaintiffs re-allege and hereby incorporate paragraphs 1 through 85 of this complaint as if fully set forth herein.

87.     The law imposes an obligation on Rainer to act in good faith towards PacWest, and to refrain from actions which deprive PacWest of the benefits of the Agreement.

88.     The Agreement was made expressly for the benefit of PacWest Bank as a third-party beneficiary in that the client and employee relationships which Rainer was obligated to foster, promote and preserve were the business and employee relationships of PacWest Bank. Accordingly, the law imposes an obligation on Rainer to act in good faith towards PacWest Bank, and to refrain from actions which deprive PacWest Bank of the benefits of the Agreement.

89.     Rainer breached the implied covenant of good faith and fair dealing, and unfairly interfered with Plaintiffs' rights to receive the benefits of the Agreement, which included, among other things, Rainer's assistance in retaining key personnel and client relationships, in at least the following ways:

(a)     by not faithfully and diligently performing the services he agreed to perform during the period of the consulting arrangement;

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

15

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT B - 114**

(b) by competing and/or preparing to compete with PacWest Bank during the Restricted Period of the Consulting Agreement and therefore not devoting his full attention and loyalty to PacWest Bank;

(c) by engaging the help of other former PacWest Bank executives, including, but not limited to, Hernandez and Smithson, to induce and solicit PacWest customers and employees to leave PacWest Bank and join SoCal Bank on Rainer's behalf and/or on behalf of Rainer's new employer, SoCal Bank; and

(d) by failing to disclose to PacWest Bank that he would be taking a position at a competing bank at the conclusion of the Restricted Period and by pretending that he intended to continue to act as a consultant/ambassador for PacWest Bank while simultaneously using confidential and proprietary information entrusted to him to sabotage the value/goodwill of PacWest.

90. As a direct and proximate result of Rainer's breaches, Plaintiffs have suffered damages, in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the Defendants' actions, but believe that thus far Rainer, and Does 1-20, have solicited and induced at least 30 PacWest Bank employees to resign and take positions at SoCal Bank. Furthermore, Plaintiffs are informed and believe, and thereon allege, that Rainer unjustly received prior consulting fees while in breach of the Agreement and should therefore be required to return the ill-gotten compensation.

## THIRD CAUSE OF ACTION

### FOR BREACH OF WRITTEN CONTRACT

**(Plaintiffs PacWest and PacWest Bank Against Defendants Hernandez and Does 1-20)**

91. Plaintiffs re-allege and hereby incorporate paragraphs 1 through 90 of this complaint as if fully set forth herein.

92. The Stock Award Agreements were made expressly for the benefit of PacWest Bank as a third party beneficiary in that the client and employee relationships which were protected by the Restrictive Covenants the business and employee relationships of PacWest Bank.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

93.     The Stock Award Agreements between PacWest and Hernandez are valid, enforceable contracts (the Hernandez Stock Award Agreements are attached hereto as Exhibits 2 and 3).

94.     Hernandez, before and at the time he left PacWest Bank and during the period he participated in Rainer's and SoCal Bank's illegal raiding plan, was subject to the Restrictive Covenants contained in the Stock Award Agreements. In the Stock Award Agreements Hernandez agreed, as set forth in the Annex A Restrictive Covenants, that in exchange for being granted a number of shares in PacWest:

(a)     that during his employment, and for a six month period following the termination of his employment for any reason, Hernandez would not, "take any action, directly or indirectly (without prior written consent of the Company), that causes or could reasonably be expected to cause any person who is then an employee of the Company [defined as PacWest] or its Affiliates to resign from the Company or its Affiliates or to apply for or accept employment with any other business or enterprise."

(b)     that during his employment, and for a six month period following the termination of his employment for any reason, Hernandez would not "in any manner, directly or indirectly (without prior written consent of the Company): (1) take any action that causes or could reasonably be expected to cause any customer or prospective customer of the Company or its Affiliates to whom [Hernandez] provided services or with whom [Hernandez] otherwise had contact to become a customer of or transact any business with a Competitive Business or reduce or refrain from doing any business with the Company or its Affiliates, (2) transact business with any customer or prospective customer that would cause you to be a Competitive Business, or (3) interfere with or damage any relationship between the Company and a customer or prospective customer."

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

(c)   that "[d]uring [his] employment and thereafter, [Hernandez] shall hold in a fiduciary capacity for the benefit of [PacWest] all trade secrets and Confidential Information relating to [PacWest] and its businesses and investments, which will have been obtained by you during your employment with [PacWest] and which are not generally available public knowledge (other than by acts by you in violation of this Agreement)."

(d)   that the covenants contained in Annex A "are reasonable and necessary to protect the confidentiality of the customer lists, the terms, conditions and nature of customer relationships, and other trade secrets and Confidential Information concerning the Company and its Affiliates, acquired by [Hernandez] and to avoid actual or apparent conflicts of interest."

(e)   that "a breach of the covenants contained in Sections 1 through 3 of this Annex A will result in injury to the Company and its Affiliates for which there is no adequate remedy at law and that it will not be possible to measure damages for such injuries precisely."

95.   Annex A to the Stock Award Agreements defined a "Competitive Business" as "any business enterprise that either (i) engages in any activity that competes with the business of the Company or its Affiliates or (ii) holds a 5% or greater equity, voting or profit participation interest in any enterprise that engages in such a competitive activity." Under this definition each of SoCal Bank and SoCal Bancorp is a "Competitive Business".

96.   Annex A to the Stock Award Agreements defined "Confidential Information" as "any information concerning the business or affairs of the Company or any of its Affiliates which is not generally known to the public and includes, but is not limited to, any file, document, book, account, list (including without limitation customer lists), process, patent, specification, drawing, design, computer program or file, computer disk, method of operation, recommendation, report, plan, survey, data, manual, strategy, financial data, client information or data (including the terms and conditions of any business relationships between clients and the Company or its Affiliates), or contract which comes to [Hernandez'] knowledge in the course of [Hernandez'] employment or

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1  which is generated by [Hernandez] in the course of performing [Hernandez'] obligations to the

2  Company whether alone or with others."

3      97.    The Agreement was made expressly for the benefit of PacWest Bank as a third

4  party beneficiary in that the client and employee relationships with which Hernandez agreed he

5  would not interfere were the business and employee relationships of PacWest Bank.

6      98.    Hernandez breached the Stock Award Agreements in at least the following ways:

7          (a)    by actively participating in the inducement of at least 30 PacWest Bank

8                  employees, including a number of executive relationship managers,

9                  portfolio managers, regional managers and loan processors, to leave their

10                 positions at PacWest Bank and to take positions at a competing bank, SoCal

11                 Bank, actions which were intended to and did have a significant detrimental

12                 effect on PacWest's business. Hernandez, among other things, acted as the

13                 point person for PacWest employees who were solicited by SoCal Bank,

14                 obtained offers from SoCal Bank for these employees, discussed

15                 employment terms with them and coordinated the dates of the resignations

16                 of these employees;

17         (b)    on information and belief, by taking actions that have caused or could

18                 reasonably be expected to cause customers or prospective customers of

19                 PacWest Bank to whom he provided services or with whom he had contact

20                 to become customers of SoCal Bank, or reduce or refrain from doing

21                 business with PacWest Bank, and/or by interfering with or damaging

22                 relationships between PacWest Bank and a customer or prospective

23                 customer;

24         (c)    on information and belief, by intentionally and improperly using

25                 confidential and proprietary information he learned through his employment

26                 with PacWest or obtained from the PacWest Bank employees he induced to

27                 resign, including but not limited to salary, benefits and bonus information or

28                 data, and the terms and conditions of the employment relationships between

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

19

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT B - 118**

PacWest Bank and its employees and the history of job performance, career goals and aspirations of those employees, to solicit PacWest Bank employees to resign from PacWest Bank and join SoCal Bank. Hernandez was able, as a result of the confidential and proprietary information he possessed, to provide SoCal Bank with a selective list of PacWest Bank's employees who, in his judgment, possessed both the ability and personal characteristics desirable in an employee, together with the salary PacWest Bank was paying the employee and a suggestion as to the salary SoCal Bank should offer to be successful in recruitment;

(d)     on information and belief, by actively competing against PacWest by intentionally and improperly using confidential and proprietary information he learned through his employment with PacWest or obtained from the PacWest Bank employees he induced to resign, including but not limited to client information or data, including the terms and conditions of the business relationships between clients and PacWest Bank and the clients' needs and preferences, to solicit existing or potential PacWest Bank clients to terminate their relationships with PacWest Bank and enter into business relationships with SoCal Bank.

99.     PacWest performed all of its obligations under the Agreement other than those obligations that were excused due to Hernandez' breach, and all of the conditions required for Hernandez' performance have occurred.

100.    As a direct and proximate result of Hernandez' breaches, Plaintiffs have suffered damages, in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the Defendants' actions, but believe that thus far Rainer, Hernandez, and Does 1-20, have solicited and induced at least 30 PacWest Bank employees to resign and take positions at SoCal Bank, and further have solicited and induced numerous clients to transfer their business from PacWest Bank to SoCal Bank.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

**FOURTH CAUSE OF ACTION**

**FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**(Plaintiffs PacWest and PacWest Bank Against Defendants Hernandez and Does 1-20)**

101.    Plaintiffs re-allege and hereby incorporate paragraphs 1 through 100 of this complaint as if fully set forth herein.

102.    The law imposes an obligation on Hernandez to act in good faith towards PacWest, and to refrain from actions which deprive PacWest of the benefits of the Stock Award Agreements.

103.    The Stock Award Agreements were made expressly for the benefit of PacWest Bank as a third-party beneficiary in that the client and employee relationships with which Hernandez agreed he would not interfere were the business and employee relationships of PacWest Bank. Accordingly, the law imposes an obligation on Hernandez to act in good faith towards PacWest Bank, and to refrain from actions which deprive PacWest Bank of the benefits of the Stock Award Agreements.

104.    Hernandez breached the implied covenant of good faith and fair dealing, and unfairly interfered with Plaintiffs' rights to receive the benefits of the Stock Award Agreements, which included, among other things, Hernandez' agreement to protect the confidentiality of the employee salary and bonus information, the identity of key employees, including relationship managers, customer lists, the terms, conditions and nature of customer relationships, and other Confidential Information concerning PacWest and PacWest Bank acquired by him and avoid actual or apparent conflicts of interest, in at least the following ways:

(a)    by actively participating in the inducement of at least 30 PacWest Bank employees, including a number of executive relationship managers, portfolio managers, regional managers and loan processors, to leave their positions at PacWest Bank and to take positions at a competing bank, SoCal Bank, actions which were intended to and did have a significant detrimental effect on PacWest's business. Hernandez, among other things, acted as the point person for PacWest employees who were solicited by SoCal Bank,

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1    obtained offers from SoCal Bank for these employees, discussed

2    employment terms with them and coordinated the dates of the resignations

3    of these employees;

4    (b)    on information and belief, by taking actions that have caused or could

5    reasonably be expected to cause customers or prospective customers of

6    PacWest Bank to whom he provided services or with whom he had contact

7    to become customers of SoCal Bank, or reduce or refrain from doing

8    business with PacWest Bank, and/or by interfering with or damaging

9    relationships between PacWest Bank and a customer or prospective

10    customer;

11    (c)    on information and belief, by intentionally and improperly using

12    confidential and proprietary information he learned through his employment

13    with PacWest or obtained from the PacWest Bank employees he induced to

14    resign, including but not limited to salary, benefits and bonus information or

15    data, and the terms and conditions of the employment relationships between

16    PacWest Bank and its employees and the history of job performance, career

17    goals and aspirations of those employees, to solicit PacWest Bank

18    employees to resign from PacWest Bank and join SoCal Bank. Hernandez

19    was able as a result of the confidential and proprietary information he

20    possessed, to provide SoCal bank with a selective list of PacWest Bank's

21    employees who, in his judgment, possessed both the ability and personal

22    characteristics desirable in an employee, together with the salary PacWest

23    Bank was paying the employee and a suggestion as to the salary SoCal

24    Bank should offer to be successful in recruitment;

25    (d)    on information and belief, by actively competing against PacWest by

26    intentionally and improperly using confidential and proprietary information

27    he learned through his employment with PacWest or obtained from the

28    PacWest Bank employees he induced to resign, including but not limited to

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

client information or data, including the terms and conditions of the business relationships between clients and PacWest Bank, to solicit existing or potential PacWest Bank clients to terminate their relationships with PacWest Bank and enter into business relationships with SoCal Bank.

105.    As a direct and proximate result of Hernandez' breaches, Plaintiffs have suffered damages, in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the Defendants' actions, but believe that thus far Rainer, Hernandez and Does 1-20, have solicited and induced at least 30 PacWest Bank employees to resign and take positions at SoCal Bank.

### FIFTH CAUSE OF ACTION

### FOR BREACH OF WRITTEN CONTRACT

**(Plaintiffs PacWest and PacWest Bank Against Defendants Smithson and Does 1-20)**

106.    Plaintiffs re-allege and hereby incorporate paragraphs 1 through 105 of this complaint as if fully set forth herein.

107.    The Stock Award Agreements were made expressly for the benefit of PacWest Bank as a third party beneficiary in that the client and employee relationships which were protected by the Restrictive Covenants the business and employee relationships of PacWest Bank.

108.    The Stock Award Agreements between PacWest and Smithson are valid, enforceable contracts (the Smithson Stock Award Agreements are attached hereto as Exhibits 4 and 5.)

109.    Smithson, before and at the time she left PacWest Bank and during the period she participated in Rainer's and SoCal Bank's illegal raiding plan, was subject to the Restrictive Covenants contained in the Stock Award Agreements. In the Stock Award Agreements Smithson agreed as set forth in the Annex A Restrictive Covenants, that in exchange for being granted a number of shares in PacWest:

(a)    that during her employment, and for a six month period following the termination of her employment for any reason, Smithson would not, "take any action, directly or indirectly (without prior written consent of the Company), that causes or could reasonably be expected to cause any person

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT B - 122**

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

who is then an employee of the Company [defined as PacWest] or its Affiliates to resign from the Company or its Affiliates or to apply for or accept employment with any other business or enterprise."

(b)   that during her employment, and for a six month period following the termination of her employment for any reason, Smithson would not "in any manner, directly or indirectly (without prior written consent of the Company): (1) take any action that causes or could reasonably be expected to cause any customer or prospective customer of the Company or its Affiliates to whom [Smithson] provided services or with whom [Smithson] otherwise had contact to become a customer of or transact any business with a Competitive Business or reduce or refrain from doing any business with the Company or its Affiliates, (2) transact business with any customer or prospective customer that would cause you to be a Competitive Business, or (3) interfere with or damage any relationship between the Company and a customer or prospective customer."

(c)   That "[d]uring your employment and thereafter, [Smithson] shall hold in a fiduciary capacity for the benefit of [PacWest] all trade secrets and Confidential Information relating to [PacWest] and its businesses and investments, which will have been obtained by you during your employment with [PacWest] and which are not generally available public knowledge (other than by acts by you in violation of this Agreement)."

(d)   that the covenants contained in Annex A "are reasonable and necessary to protect the confidentiality of the customer lists, the terms, conditions and nature of customer relationships, and other trade secrets and Confidential Information concerning the Company and its Affiliates, acquired by [Smithson] and to avoid actual or apparent conflicts of interest."

(e)   that "a breach of the covenants contained in Sections 1 through 3 of this Annex A will result in injury to the Company and its Affiliates for which

1    there is no adequate remedy at law and that it will not be possible to

2    measure damages for such injuries precisely."

3    110.    Annex A to the Stock Award Agreements defined a "Competitive Business" as

4    "any business enterprise that either (i) engages in any activity that competes with the business of

5    the Company or its Affiliates or (ii) holds a 5% or greater equity, voting or profit participation

6    interest in any enterprise that engages in such a competitive activity." Under this definition each of

7    SoCal Bank and SoCal Bancorp is a "Competitive Business".

8    111.    Annex A to the Stock Award Agreements defined "Confidential Information" as

9    "any information concerning the business or affairs of the Company or any of its Affiliates which

10   is not generally known to the public and includes, but is not limited to, any file, document, book,

11   account, list (including without limitation customer lists), process, patent, specification, drawing,

12   design, computer program or file, computer disk, method of operation, recommendation, report,

13   plan, survey, data, manual, strategy, financial data, client information or data (including the terms

14   and conditions of any business relationships between clients and the Company or its Affiliates), or

15   contract which comes to [Smithson's] knowledge in the course of [Smithson's] employment or

16   which is generated by [Smithson] in the course of performing [Smithson's] obligations to the

17   Company whether alone or with others."

18   112.    The Agreement was made expressly for the benefit of PacWest Bank as a third

19   party beneficiary in that the client and employee relationships with which Smithson agreed she

20   would not interfere were the business and employee relationships of PacWest Bank.

21   113.    Smithson breached the Stock Award Agreements in at least the following ways:

22        (a)     by actively participating in the inducement of at least 30 PacWest Bank

23                employees, including a number of executive relationship managers,

24                portfolio managers, regional managers and loan processors, to leave their

25                positions at PacWest Bank and to take positions at a competing bank, SoCal

26                Bank, actions which were intended to and did have a significant detrimental

27                effect on PacWest's business. Smithson, among other things, successfully

28                solicited former PacWest Bank employee Stephanie Johnson to leave

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

**EXHIBIT B - 124**

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1    PacWest Bank and join SoCal Bank, and solicited Morgan Ritzer, an

2    Assistant Branch Operations Manager for PacWest Bank, to do the same.

3    (b)   By taking actions that have caused or could reasonably be expected to cause

4    customers or prospective customers of PacWest Bank to whom she

5    provided services or with whom she had contact to become customers of

6    SoCal Bank, or reduce or refrain from doing business with PacWest Bank,

7    and/or by interfering with or damaging relationships between PacWest

8    Bank and a customer or prospective customer;

9    (c)   on information and belief, by intentionally and improperly using

10    confidential and proprietary information she learned through her

11    employment with PacWest or obtained from the PacWest Bank employees

12    she induced to resign, including but not limited to salary, benefits and bonus

13    information or data, and the terms and conditions of the employment

14    relationships between PacWest Bank and its employees and the history of

15    job performance, career goals and aspirations of those employees, to solicit

16    PacWest Bank employees to resign from PacWest Bank and join SoCal

17    Bank. Smithson was able, as a result of the confidential and proprietary

18    information she possessed, to identify for SoCal Bank the PacWest Bank's

19    employees who, in her judgment, possessed both the ability and personal

20    characteristics desirable in an employee, together with the salary PacWest

21    Bank was paying the employee and a suggestion as to the salary SoCal

22    Bank should offer to be successful in recruitment;

23    (d)   on information and belief, by actively competing against PacWest by

24    intentionally and improperly using confidential and proprietary information

25    she learned through her employment with PacWest or obtained from the

26    PacWest Bank employees she induced to resign, including but not limited to

27    client information or data, including the terms and conditions of the

28    business relationships between clients and PacWest Bank and the clients'

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

needs and preferences, to solicit existing or potential PacWest Bank clients to terminate their relationships with PacWest Bank and enter into business relationships with SoCal Bank.

114. PacWest performed all of its obligations under the Agreement other than those obligations that were excused due to Smithson's breach, and all of the conditions required for Smithson's performance have occurred.

115. As a direct and proximate result of Smithson's breaches, Plaintiffs have suffered damages, in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the Defendants' actions, but believe that thus far Rainer, Hernandez, Smithson and Does 1-20, have solicited and induced at least 30 PacWest Bank employees to resign and take positions at SoCal Bank, and further have solicited and induced numerous clients to transfer their business from PacWest Bank to SoCal Bank.

## SIXTH CAUSE OF ACTION

### FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Plaintiffs PacWest and PacWest Bank Against Defendants Smithson and Does 1-20)

116. Plaintiffs re-allege and hereby incorporate paragraphs 1 through 114 of this complaint as if fully set forth herein.

117. The law imposes an obligation on Smithson to act in good faith towards PacWest, and to refrain from actions which deprive PacWest of the benefits of the Stock Award Agreements.

118. The Stock Award Agreements were made expressly for the benefit of PacWest Bank as a third-party beneficiary in that the client and employee relationships with which Smithson agreed she would not interfere were the business and employee relationships of PacWest Bank. Accordingly, the law imposes an obligation on Smithson to act in good faith towards PacWest Bank, and to refrain from actions which deprive PacWest Bank of the benefits of the Stock Award Agreements.

119. Smithson breached the implied covenant of good faith and fair dealing, and unfairly interfered with Plaintiffs' rights to receive the benefits of the Stock Award Agreements, which

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1   included, among other things, Smithson's agreement to protect the confidentiality of the employee

2   salary and bonus information, the identity of key employees, including relationship managers,

3   customer lists, the terms, conditions and nature of customer relationships, and other Confidential

4   Information concerning PacWest and PacWest Bank acquired by her and avoid actual or apparent

5   conflicts of interest, in at least the following ways:

6        (a)    by actively participating in the inducement of at least 30 PacWest Bank

7                employees, including a number of executive relationship managers,

8                portfolio managers, regional managers and loan processors, to leave their

9                positions at PacWest Bank and to take positions at a competing bank, SoCal

10               Bank, actions which were intended to and did have a significant detrimental

11               effect on PacWest's business. Smithson, among other things, successfully

12               solicited former PacWest Bank employee Stephanie Johnson to leave

13               PacWest Bank and join SoCal Bank, and solicited Morgan Ritzer, an

14               Assistant Branch Operations Manager for PacWest Bank, to do the same.

15       (b)    by taking actions that have caused or could reasonably be expected to cause

16               customers or prospective customers of PacWest Bank to whom she

17               provided services or with whom she had contact to become customers of

18               SoCal Bank, or reduce or refrain from doing business with PacWest Bank,

19               and/or by interfering with or damaging relationships between PacWest

20               Bank and a customer or prospective customer;

21       (c)    on information and belief, by intentionally and improperly using

22               confidential and proprietary information she learned through her

23               employment with PacWest or obtained from the PacWest Bank employees

24               she induced to resign, including but not limited to salary, benefits and bonus

25               information or data, and the terms and conditions of the employment

26               relationships between PacWest Bank and its employees and the history of

27               job performance, career goals and aspirations of those employees, to solicit

28               PacWest Bank employees to resign from PacWest Bank and join SoCal

Bank. Smithson was able, as a result of the confidential and proprietary information she possessed, to identify for SoCal Bank the PacWest Bank's employees who, in her judgment, possessed both the ability and personal characteristics desirable in an employee, together with the salary PacWest Bank was paying the employee and a suggestion as to the salary SoCal Bank should offer to be successful in recruitment;

(d)    on information and belief, by actively competing against PacWest by intentionally and improperly using confidential and proprietary information she learned through her employment with PacWest or obtained from the PacWest Bank employees she induced to resign, including but not limited to client information or data, including the terms and conditions of the business relationships between clients and PacWest Bank, to solicit existing or potential PacWest Bank clients to terminate their relationships with PacWest Bank and enter into business relationships with SoCal Bank.

120.    As a direct and proximate result of Smithson's breaches, Plaintiffs have suffered damages, in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the Defendants' actions, but believe that thus far Rainer, Hernandez, Smithson and Does 1-20, solicited and induced at least 30 PacWest Bank employees to resign and take positions at SoCal Bank.

## SEVENTH CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

**(Plaintiff PacWest Bank Against Defendants Rainer, Hernandez, Smithson, SoCal Bank, SoCal Bancorp and Does 1-20)**

121.    Plaintiffs re-allege and hereby incorporate paragraphs 1 through 120 of this complaint as if fully set forth herein.

122.    Each of the employees listed above who were solicited by Rainer, Hernandez and Smithson to leave PacWest Bank and join SoCal Bank ("Raided Employees") had an economic

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1  relationship with PacWest Bank that probably would have resulted in a future economic benefit to

2  PacWest Bank.

3      123.    Rainer, as a result of information Rainer learned through his consulting relationship

4  with PacWest or obtained from the PacWest Bank employees he induced to resign, and Hernandez

5  and Smithson as a result of information they learned as a result of Hernandez' position as a

6  Regional Vice President with PacWest Bank, Smithson's position as  Senior Vice President,

7  Regional Manager with PacWest Bank, or obtained from the PacWest Bank employees they

8  induced to resign, knew of the economic relationships the Raided Employees had with PacWest

9  Bank.

10     124.    Rainer, Hernandez and Smithson engaged in intentional acts designed to induce a

11 breach or disruption of the economic relationship between each of the Raided Employees and

12 PacWest Bank, or, alternatively, Rainer, Hernandez and Smithson knew that a breach or disruption

13 of the economic relationship between each of the Raided Employees and PacWest Bank was

14 certain or substantially certain to occur as a result of their actions.

15     125.    As a result of Rainer's acts, there was an actual breach or disruption of the

16 economic relationship each of the Raided Employees had with PacWest Bank. The breach or

17 disruption of the economic relationship each of the Raided Employees had with PacWest Bank has

18 resulted in injury and damage to PacWest Bank, in that PacWest Bank has lost the services and

19 skill of the Raided Employees, and in many cases the benefit of the advantageous business

20 relationships these Raided Employees had with both actual and potential clients. Additionally, the

21 speed and number of disruptions and lost employees has created chaos within PacWest Bank, and

22 has led to a loss of business opportunities and employee morale.

23     126.    In engaging in his acts of intentional interference with prospective economic

24 advantage, Rainer breached his obligations under the Agreement, breached his fiduciary duty to

25 PacWest, and further improperly used confidential and proprietary information belonging to

26 PacWest and PacWest Bank. In particular, Rainer intentionally and improperly used confidential

27 and proprietary information he learned through his relationship with PacWest or obtained from the

28 PacWest Bank employees he induced to resign, including but not limited to salary, benefits and

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1  bonus information or data, and the terms and conditions of the employment relationships between

2  PacWest Bank and its employees and the history of job performance, career goals and aspirations

3  of those employees, to solicit PacWest Bank employees to resign from PacWest Bank and join

4  SoCal Bank. Rainer was able as a result of the confidential and proprietary information he

5  possessed, to provide SoCal bank with a selective list of PacWest Bank's employees who, in his

6  judgment, possessed both the ability and personal characteristics desirable in an employee,

7  together with the salary PacWest Bank was paying the employee and a suggestion as to the salary

8  SoCal Bank should offer to be successful in recruitment.

9      127.   As a result of Hernandez' acts, there was an actual breach or disruption of the

10 economic relationship each of the Raided Employees had with PacWest Bank. The breach or

11 disruption of the economic relationship each of the Raided Employees had with PacWest Bank has

12 resulted in injury and damage to PacWest Bank, in that PacWest Bank has lost the services and

13 skill of the Raided Employees, and in many cases the benefit of the advantageous business

14 relationships these Raided Employees had with both actual and potential clients. Additionally, the

15 speed and number of disruptions and lost employees has created chaos within PacWest Bank, and

16 has led to a loss of business opportunities and employee morale.

17     128.   In engaging in his acts of intentional interference with prospective economic

18 advantage, Hernandez breached his obligations under the Stock Award Agreements, breached his

19 fiduciary duty to PacWest, and further improperly used confidential and proprietary information

20 belonging to PacWest and PacWest Bank. In particular, Hernandez intentionally and improperly

21 used confidential and proprietary information he learned through his employment as a Regional

22 Vice President with PacWest Bank or obtained from the PacWest Bank employees he induced to

23 resign, including but not limited to salary, benefits and bonus information or data, and the terms

24 and conditions of the employment relationships between PacWest Bank and its employees and the

25 history of job performance, career goals and aspirations of those employees, to solicit PacWest

26 Bank employees to resign from PacWest Bank and join SoCal Bank. Hernandez was able as a

27 result of the confidential and proprietary information he possessed, to provide SoCal bank with a

28 selective list of PacWest Bank's employees who, in his judgment, possessed both the ability and

personal characteristics desirable in an employee, together with the salary PacWest Bank was paying the employee and a suggestion as to the salary SoCal Bank should offer to be successful in recruitment.

129.     As a result of Smithson's acts, there was an actual breach or disruption of the economic relationship each of the Raided Employees had with PacWest Bank. The breach or disruption of the economic relationship each of the Raided Employees had with PacWest Bank has resulted in injury and damage to PacWest Bank, in that PacWest Bank has lost the services and skill of the Raided Employees, and in many cases the benefit of the advantageous business relationships these Raided Employees had with both actual and potential clients. Additionally, the speed and number of disruptions and lost employees has created chaos within PacWest Bank, and has led to a loss of business opportunities and employee morale.

130.     In engaging in her acts of intentional interference with prospective economic advantage, Smithson breached her obligations under the Stock Award Agreements, breached her fiduciary duty to PacWest, and further improperly used confidential and proprietary information belonging to PacWest and PacWest Bank. In particular, Smithson intentionally and improperly used confidential and proprietary information she learned through her employment as a Senior Vice President, Regional Manager with PacWest Bank or obtained from the PacWest Bank employees she induced to resign, including but not limited to salary, benefits and bonus information or data, and the terms and conditions of the employment relationships between PacWest Bank and its employees and the history of job performance, career goals and aspirations of those employees, to solicit PacWest Bank employees to resign from PacWest Bank and join SoCal Bank. Smithson was able as a result of the confidential and proprietary information she possessed, to identify for SoCal Bank PacWest Bank's employees who, in her judgment, possessed both the ability and personal characteristics desirable in an employee, together with the salary PacWest Bank was paying the employee and a suggestion as to the salary SoCal Bank should offer to be successful in recruitment.

131.     SoCal Bank and SoCal Bancorp aided and abetted Rainer's acts of intentional interference with economic advantage. Specifically, SoCal Bank and SoCal Bancorp knew that

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1    Rainer, who it was hiring as the Executive Chairman of its board of directors of SoCal Bank, was

2    engaging in, or intended to engage in, his acts of intentional interference with the economic

3    relationships between the Raided Employees and PacWest Bank for the benefit of SoCal Bank and

4    SoCal Bancorp.

5           132.    Rainer's August 18, 2020 LOI, sent to the Boards of Directors of SoCal Bank and

6    SoCal Bancorp while Rainer was still within the Restricted Period in the Agreement, described a

7    "new strategic plan" under which a number of highly skilled former CUB professionals *will be*

8    *joining* the BSC management team and the Boards of the Bank and the Company." (Emphasis

9    added). The overwhelming majority of the Raided Employees Rainer and Hernandez solicited,

10   including Hernandez and Bill Sloan, an Executive Vice President, Regional Manager at PacWest

11   Bank, were former CUB professionals. Rainer made clear in the LOI that, as of August 18, 2020,

12   he already had recruited and had in place candidates for several management team positions. He

13   told the Boards in August 2020 that he could not include their names in the LOI "[t]o protect their

14   privacy and current employment positions." After he gave notice Hernandez was announced as

15   part of Bank of SoCal's management team. In the LOI Rainer also told the Boards of SoCal Bank

16   and SoCal Bancorp that he anticipated that SoCal Bank would have in place, with the necessary

17   Board approval having already been obtained, a set of "Definitive Documents" that would provide

18   for him and "my management candidates to be hired and the Bank and Company boards to be

19   reconstituted, as provided herein, on or about October 21, 2020," literally the day after the

20   expiration of Restricted Period under the Agreement.

21          133.    Rainer specifically brought his Agreement with PacWest to the attention of the

22   Boards of SoCal Bank and SoCal Bancorp and informed them that "… as a condition to the

23   implementation of the Plan, BSC will indemnify and hold me harmless from any and all actions

24   that PacWest may take relating to the consulting agreement, including but not limited to

25   guaranteeing the payment to me of the Retainer and paying all reasonable costs and expenses

26   incurred by me to defend any claims that PacWest may make relating to the consulting

27   agreement." The "Retainer" referred to be Rainer is the amount PacWest was to pay Rainer under

28   the Agreement for his promised services to, among other things, foster and grow PacWest's

business, attract and retain new clients, and help preserve business and employee relationships and retain key personnel.

134.    In August 2020, and perhaps earlier, while Rainer was still within the period of the three year non-compete restriction in the Agreement, Rainer also presented SoCal Bank with a "strictly private and confidential" plan called "Project Slingshot" designed to "attract key high-level executives and top business development officers" to SoCal Bank. Rainer boasted in the materials of his "proven ability to attract top talent in the market" and told the Board of Directors of SoCal Bank his plan would involve Bank of SoCal hiring 60 new employees "at the end of 2020 and beginning of 2021." The Project Slingshot materials identified "a series of meetings with BCAL's [SoCal Bank] CEO and President" in which Rainer discussed his plan prior to the creation of the August 2020 presentation.

135.    SoCal Bank and SoCal Bancorp aided and abetted Hernandez' acts of intentional interference with economic advantage. Specifically, SoCal Bank and SoCal Bancorp knew that Hernandez, who they were hiring as SoCal Bank's Chief Banking Officer, was engaging in, or intended to engage in, his acts of intentional interference with the economic relationships between the Raided Employees and PacWest Bank for the benefit of SoCal Bank and SoCal Bancorp.

136.    Hernandez was actively involved in recruiting PacWest Bank employees to join SoCal Bank. Among other things, Hernandez in many cases was the person at SoCal Bank PacWest Bank employees were told to call, on Hernandez' private cell phone number, after they had been solicited by other employees to move to SoCal Bank. Hernandez served as SoCal Bank's conduit in contacting PacWest Bank employees and providing offer letters from SoCal Bank for these employees. After Hernandez spoke with the targeted employees Bank of SoCal employees would furnish the employees with the details on how to apply, many of which were hired within hours of applying and without job interviews. Hernandez coordinated with Bank of SoCal a simultaneous start date for the many of the Raided Employees.

137.    On information and belief Bank of SoCal was aware of the restrictive covenants in Hernandez' Stock Award Agreements and nonetheless encouraged him to engage in his illegal

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

**EXHIBIT B - 133**

1  raiding activities in breach of those agreements, providing him with financial incentives to do so

2  and indemnifying him against possible claims by PacWest.

3       138.    SoCal Bank and SoCal Bancorp aided and abetted Smithson's acts of intentional

4  interference with economic advantage. Specifically, SoCal Bank and SoCal Bancorp knew that

5  Smithson, who they were hiring as SoCal Bank's Executive Vice President, Regional Manager,

6  was engaging in, or intended to engage in, her acts of intentional interference with the economic

7  relationships between the Raided Employees and PacWest Bank for the benefit of SoCal Bank and

8  SoCal Bancorp.

9       139.    Smithson was actively involved in recruiting PacWest Bank employees to join

10  SoCal Bank. Among other things, Smithson successfully solicited former PacWest Bank employee

11  Stephanie Johnson to leave PacWest Bank and join SoCal Bank, and along with Johnson solicited

12  PacWest Bank employee Morgan Ritzer to leave PacWest Bank and join SoCal Bank. Ritzer

13  declined. Within weeks of joining SoCal Bank Smithson also solicited a number of PacWest Bank

14  clients to transfer their business to SoCal Bank, and encouraged Johnson to do the same,

15  coordinating with Johnson which PacWest Bank clients to contact.

16       140.    On information and belief Bank of SoCal was aware of the restrictive covenants in

17  Smithson's Stock Award Agreements and nonetheless encouraged her to engage in her illegal

18  raiding activities in breach of those agreements, providing her with financial incentives to do so

19  and indemnifying her against possible claims by PacWest.

20       141.    The conduct of SoCal Bank and SoCal Bancorp was a substantial factor in causing

21  the harm to PacWest Bank caused by Rainer's, Hernandez' and Smithson's acts of intentional

22  interference with the economic relationships between the Raided Employees and PacWest Bank.

23  Without the active participation of SoCal Bank and SoCal Bancorp, Rainer, Hernandez and

24  Smithson would not have been able to offer job positions at SoCal Bank to the Raided Employees,

25  and without the financial incentives and indemnifications offered by SoCal Bank and SoCal

26  Bancorp to Rainer, Hernandez and Smithson they would not have been willing and able to engage

27  in the illegal acts of intentional interference.

28

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES**

142.    SoCal Bank and SoCal Bancorp and Rainer, Hernandez and Smithson engaged in a conspiracy to induce a breach or disruption of the economic relationship between each of the Raided Employees and PacWest Bank. SoCal Bank and SoCal Bancorp were aware that Rainer, Hernandez and Smithson planned and intended to engage in these tortious activities and agreed with Rainer, Hernandez and Smithson to engage in a systematic plan to raid PacWest Bank's employees and clients.  SoCal Bank and SoCal Bancorp were aware of Rainer's obligations under the Agreement, agreed to fully indemnify him for any claims PacWest might make based on his actions in breach of his obligations under the Agreement, thereby giving Rainer a "green light" to engage in whatever breach of contract or tortious activity he chose to engage in for his and SoCal Bank's benefit. SoCal Bank and SoCal Bancorp agreed with Rainer to delay the announcement of his hiring and the beginning of the resignations of the Raided Employees until after October 20, 2020, and to proceed with the plan regardless of his obligations under the Agreement. On information and belief SoCal Bank and SoCal Bancorp were aware of Hernandez' and Smithson's obligations under the Stock Award Agreements, and despite the Restrictive Covenants gave Hernandez and Smithson a "green light" to engage in whatever breach of contract or tortious activity they chose to engage in for their and SoCal Bank's benefit.

143.    As a direct and proximate result of the acts of intentional interference with prospective economic advantage by Rainer, Hernandez, Smithson, and SoCal Bank and SoCal Bancorp, PacWest Bank has suffered damages, in an amount to be proven at trial. PacWest Bank is not aware of the full extent of the Defendants' actions but believes that additional PacWest Bank employees may have been, or will in the future be, solicited by Rainer, Hernandez, SoCal Bank, SoCal Bancorp and Does 1-20, to resign and take positions at SoCal Bank. In addition, in engaging in the conduct described above, Rainer, Hernandez, Smithson and SoCal Bank and SoCal Bancorp acted with oppression, fraud or malice, thus entitling Plaintiffs to an award of punitive damages.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

**EIGHTH CAUSE OF ACTION**

**INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

**(Plaintiff PacWest Bank Against Defendants SoCal Bank and SoCal Bancorp**

**and Does 1-20)**

144.    Plaintiffs re-allege and hereby incorporate paragraphs 1 through 143 of this complaint as if fully set forth herein.

145.    Each of the Raided Employees had an economic relationship with PacWest Bank that probably would have resulted in economic benefit to PacWest Bank.

146.    SoCal Bank and SoCal Bancorp, through their agents Rainer, Hernandez and Smithson, and through information provided by the Raided Employees they had already hired, knew of the economic relationships the Raided Employees had with PacWest Bank.

147.    SoCal Bank and SoCal Bancorp, through their agents Rainer, Hernandez and Smithson, and on information and belief, through other employees including Raided Employees they had already contacted or hired, engaged in intentional acts designed to induce a breach or disruption of the economic relationship between each of the Raided Employees and PacWest Bank, or, alternatively, SoCal Bank and SoCal Bancorp knew that a breach or disruption of the economic relationship between each of the Raided Employees and PacWest Bank was certain or substantially certain to occur as a result of the actions of their agents and representatives, including Rainer, Hernandez and Smithson.

148.    As a result of the acts of SoCal Bank and SoCal Bancorp, there was an actual breach or disruption of the economic relationship each of the Raided Employees had with PacWest Bank.

149.    The breach or disruption of the economic relationship each of the Raided Employees had with PacWest Bank has resulted in injury and damage to PacWest Bank, in that PacWest Bank has lost the services and skill of the Raided Employees, and in many cases the benefit of the advantageous business relationships these Raided Employees had with both actual and potential clients. Additionally, the speed and number of disruptions and lost employees has

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

created chaos within PacWest Bank, and has led to a loss of business opportunities and employee morale.

150.    In engaging in its acts of intentional interference with prospective economic advantage, SoCal Bank and SoCal Bancorp improperly used confidential and proprietary information belonging to PacWest Bank. Specifically, Hernandez, Smithson and Rainer, on behalf of SoCal Bank and SoCal Bancorp intentionally and improperly used confidential and proprietary information they learned through Hernandez' employment as a Regional Vice President with PacWest Bank, Smithson's employment as a Senior Vice President, Regional Manager at PacWest Bank or Rainer's work as a consultant for PacWest pursuant to the Agreement, or obtained from the PacWest Bank employees they induced to resign, including but not limited to salary, benefits and bonus information or data, and the terms and conditions of the employment relationships between PacWest Bank and its employees and the history of job performance, career goals and aspirations of those employees. This is information that Rainer had agreed to hold as confidential in a fiduciary capacity in the Agreement and not divulge. This is also information Hernandez and Smithson had agreed in the Stock Award Agreements they would hold as confidential in a fiduciary capacity in the Agreement and not divulge. Using this confidential and proprietary information Rainer, Hernandez and Smithson were able to provide SoCal Bank with a selective list of PacWest Bank's employees who, in their judgment, possessed both the ability and personal characteristics desirable in an employee, together with the salary and bonuses PacWest Bank was paying the employee and a suggestion as to the salary SoCal Bank should offer to be successful in recruitment.

151.    SoCal Bank and SoCal Bancorp illegally induced Rainer to breach his Agreement. The Agreement was made expressly for the benefit of PacWest Bank as a third party beneficiary in that the client and employee relationships which Rainer was obligated to foster, promote and preserve were the business and employee relationships of PacWest Bank.

152.    After being informed of the terms of his Agreement at least in the LOI, SoCal Bank and SoCal Bancorp agreed to indemnify Rainer for any of the consequences of his acts of breach of contract or tortious interference, thereby illegally and wrongfully inducing him to breach his

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

Agreement in the ways and by the acts set forth above. This illegal inducement of Rainer to breach his Agreement gave Rainer a "green light" to engage in acts of intentional interference with prospective economic advantage for his and SoCal Bank's benefit, and directly resulted in SoCal Bank and SoCal Bancorp's acts of intentional interference with prospective economic advantage.

153.    SoCal Bank and SoCal Bancorp illegally induced Hernandez to breach his Stock Award Agreements. The Stock Award Agreements were made expressly for the benefit of PacWest Bank as a third party beneficiary in that the client and employee relationships which were protected by the Restrictive Covenants the business and employee relationships of PacWest Bank.

154.    On information and belief, after being informed of the terms of his Stock Award Agreements, SoCal Bank and SoCal Bancorp agreed to indemnify Hernandez for any of the consequences of his acts of breach of contract or tortious interference, thereby illegally and wrongfully inducing him to breach his Stock Award Agreements in the ways and by the acts set forth above. This illegal inducement of Hernandez to breach his Stock Award Agreements gave Hernandez a "green light" to engage in acts of intentional interference with prospective economic advantage for his and SoCal Bank's benefit, and directly resulted in SoCal Bank and SoCal Bancorp's acts of intentional interference with prospective economic advantage.

155.    SoCal Bank and SoCal Bancorp illegally induced Smithson to breach her Stock Award Agreements. The Stock Award Agreements were made expressly for the benefit of PacWest Bank as a third party beneficiary in that the client and employee relationships which were protected by the Restrictive Covenants the business and employee relationships of PacWest Bank.

156.    On information and belief, after being informed of the terms of her Stock Award Agreements, SoCal Bank and SoCal Bancorp agreed to indemnify Smithson for any of the consequences of her acts of breach of contract or tortious interference, thereby illegally and wrongfully inducing her to breach her Stock Award Agreements in the ways and by the acts set forth above. This illegal inducement of Smithson to breach her Stock Award Agreements gave Smithson a "green light" to engage in acts of intentional interference with prospective economic

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

advantage for her and SoCal Bank's benefit, and directly resulted in SoCal Bank and SoCal Bancorp's acts of intentional interference with prospective economic advantage.

157.    As a direct and proximate result of the acts of intentional interference with prospective economic advantage by SoCal Bank and SoCal Bancorp, PacWest Bank has suffered damages, in an amount to be proven at trial. PacWest Bank is not aware of the full extent of the Defendants' actions but believes that additional PacWest Bank employees may have been, or will in the future be, solicited by Rainer, Hernandez, Smithson, SoCal Bank, SoCal Bancorp and Does 1-20, to resign and take positions at SoCal Bank. In addition, in engaging in the conduct described above, Rainer, Hernandez, Smithson, SoCal Bank and SoCal Bancorp acted with oppression, fraud or malice, thus entitling Plaintiffs to an award of punitive damages.

**NINTH CAUSE OF ACTION**

**NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

**(Plaintiff PacWest Bank Against Defendants SoCal Bank and SoCal Bancorp**

**and Does 1-20)**

158.    Plaintiffs re-allege and hereby incorporate paragraphs 1 through 157 of this complaint as if fully set forth herein.

159.    Each of the Raided Employees had an economic relationship with PacWest Bank that probably would have resulted in economic benefit to PacWest Bank.

160.    SoCal Bank and SoCal Bancorp, through their agents Rainer, Hernandez, and Smithson, and through information provided by the Raided Employees they had already hired, knew or should have known of the economic relationships the Raided Employees had with PacWest Bank.

161.    SoCal Bank and SoCal Bancorp knew that a breach or disruption of the economic relationship between each of the Raided Employees and PacWest Bank was certain or substantially certain to occur as a result of the actions of their agents and representatives, including Rainer, Hernandez and Smithson, or, alternatively, SoCal Bank and SoCal Bancorp should have known that a breach or disruption of the economic relationship between each of the Raided Employees and PacWest Bank was certain or substantially certain to occur as a result of the

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1  actions of their agents and representatives, including Rainer, Hernandez and Smithson, if they

2  acted without reasonable care.

3         162.    SoCal Bank and SoCal Bancorp failed to act with reasonable care.

4         163.    In engaging in its acts of negligent interference with prospective economic

5  advantage, SoCal Bank and SoCal Bancorp engaged in wrongful conduct by improperly using

6  confidential and proprietary information belonging to PacWest Bank as alleged above.

7  Specifically, Hernandez, Smithson and Rainer, on behalf of SoCal Bank and SoCal Bancorp

8  intentionally and improperly used confidential and proprietary information they learned through

9  Hernandez' employment as a Regional Vice President with PacWest, Smithson's employment as a

10  Senior Vice President, Regional Manager at PacWest Bank or Rainer's work as a consultant for

11  PacWest pursuant to the Agreement, or obtained from the PacWest Bank employees they induced

12  to resign, including but not limited to salary, benefits and bonus information or data, and the terms

13  and conditions of the employment relationships between PacWest Bank and its employees and the

14  history of job performance, career goals and aspirations of those employees. This is information

15  that Rainer had agreed to hold as confidential in a fiduciary capacity in the Agreement and not

16  divulge. This is also information Hernandez and Smithson had agreed in the Stock Award

17  Agreements they would hold as confidential in a fiduciary capacity in the Agreement and not

18  divulge. Using this confidential and proprietary information Rainer, Hernandez and Smithson

19  were able to provide SoCal Bank with a selective list of PacWest Bank's employees who, in their

20  judgment, possessed both the ability and personal characteristics desirable in an employee,

21  together with the salary and bonuses PacWest Bank was paying the employee and a suggestion as

22  to the salary SoCal Bank should offer to be successful in recruitment.

23         164.    SoCal Bank and SoCal Bancorp illegally induced Rainer to breach his Agreement.

24  After being informed of the terms of his Agreement at least in the LOI, SoCal Bank and SoCal

25  Bancorp agreed to indemnify Rainer for any of the consequences of his acts of breach of contract

26  or tortious interference, thereby illegally and wrongfully inducing him to breach his Agreement in

27  the ways and by the acts set forth above. This illegal inducement of Rainer to breach his

28  Agreement gave Rainer a "green light" to engage in acts of intentional interference with

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

prospective economic advantage for his and SoCal Bank's benefit, and directly resulted in the interference with PacWest Bank's prospective economic advantage. SoCal Bank and SoCal Bancorp knew that a breach or disruption of the economic relationship between each of the Raided Employees and PacWest Bank was certain or substantially certain to occur as a result of their inducement of Rainer to breach his Agreement, or, alternatively, SoCal Bank and SoCal Bancorp should have known that a breach or disruption of the economic relationship between each of the Raided Employees and PacWest Bank was certain or substantially certain to occur as a result of their inducement of Rainer to breach his Agreement if they acted without reasonable care.

165. SoCal Bank and SoCal Bancorp illegally induced Hernandez to breach his Stock Award Agreements. On information and belief, after being informed of the terms of his Stock Award Agreements, SoCal Bank and SoCal Bancorp agreed to indemnify Hernandez for any of the consequences of his acts of breach of contract or tortious interference, thereby illegally and wrongfully inducing him to breach his Stock Award Agreements in the ways and by the acts set forth above. This illegal inducement of Hernandez to breach his Stock Award Agreements gave Hernandez a "green light" to engage in acts of intentional interference with prospective economic advantage for his and SoCal Bank's benefit, and directly resulted in the interference with PacWest Bank's prospective economic advantage. SoCal Bank and SoCal Bancorp knew that a breach or disruption of the economic relationship between each of the Raided Employees and PacWest Bank was certain or substantially certain to occur as a result of their inducement of Hernandez to breach his Stock Award Agreements, or, alternatively, SoCal Bank and SoCal Bancorp should have known that a breach or disruption of the economic relationship between each of the Raided Employees and PacWest Bank was certain or substantially certain to occur as a result of their inducement of Hernandez to breach his Stock Award Agreements if they acted without reasonable care.

166. SoCal Bank and SoCal Bancorp illegally induced Smithson to breach her Stock Award Agreements. On information and belief, after being informed of the terms of her Stock Award Agreements, SoCal Bank and SoCal Bancorp agreed to indemnify Smithson for any of the consequences of her acts of breach of contract or tortious interference, thereby illegally and

42

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT B - 141**

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1   wrongfully inducing her to breach her Stock Award Agreements in the ways and by the acts set

2   forth above. This illegal inducement of Smithson to breach her Stock Award Agreements gave

3   Smithson a "green light" to engage in acts of intentional interference with prospective economic

4   advantage for her and SoCal Bank's benefit, and directly resulted in the interference with PacWest

5   Bank's prospective economic advantage. SoCal Bank and SoCal Bancorp knew that a breach or

6   disruption of the economic relationship between each of the Raided Employees and PacWest Bank

7   was certain or substantially certain to occur as a result of their inducement of Smithson to breach

8   her Stock Award Agreements, or, alternatively, SoCal Bank and SoCal Bancorp should have

9   known that a breach or disruption of the economic relationship between each of the Raided

10  Employees and PacWest Bank was certain or substantially certain to occur as a result of their

11  inducement of Smithson to breach her Stock Award Agreements if they acted without reasonable

12  care.

13      167.    As a result of the acts of SoCal Bank and SoCal Bancorp, there was an actual

14  breach or disruption of the economic relationship each of the Raided Employees had with PacWest

15  Bank.

16      168.    The breach or disruption of the economic relationship each of the Raided

17  Employees had with PacWest Bank has resulted in injury and damage to PacWest Bank, in that

18  PacWest Bank has lost the services and skill of the Raided Employees, and in many cases the

19  benefit of the advantageous business relationships these Raided Employees had with both actual

20  and potential clients. Additionally, the speed and number of disruptions and lost employees has

21  created chaos within PacWest Bank, and has led to a loss of business opportunities and employee

22  morale.

23      169.    As a direct and proximate result of the acts of negligent interference with

24  prospective economic advantage by SoCal Bank and SoCal Bancorp, PacWest Bank has suffered

25  damages, in an amount to be proven at trial. PacWest Bank is not aware of the full extent of the

26  Defendants' actions but believes that additional PacWest Bank employees may have been, or will

27  in the future be, solicited by Rainer, Hernandez, Smithson, SoCal Bank, SoCal Bancorp and Does

28  1-20, to resign and take positions at SoCal Bank.

**TENTH CAUSE OF ACTION**

**INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

**(Plaintiffs PacWest and PacWest Bank Against Defendants SoCal Bank and SoCal Bancorp and Does 1-20)**

170.   Plaintiffs re-allege and hereby incorporate paragraphs 1 through 169 of this complaint as if fully set forth herein.

171.   The Agreement is and was a valid contract between PacWest and Rainer. The Agreement was made expressly for the benefit of PacWest Bank as a third party beneficiary in that the client and employee relationships which Rainer was obligated to foster, promote and preserve were the business and employee relationships of PacWest Bank.

172.   The Stock Award Agreements are valid contracts between PacWest, on the one hand, Hernandez and Smithson, on the other. The Stock Award Agreements were made expressly for the benefit of PacWest Bank as a third party beneficiary in that the client and employee relationships which were protected by the Restrictive Covenants the business and employee relationships of PacWest Bank.

173.   SoCal Bank and SoCal Bancorp were informed by Rainer in writing of the existence of the Agreement and its terms.

174.   On information and belief, SoCal Bank and SoCal Bancorp were informed by Hernandez, as part of his recruitment, of the existence of the Stock Award Agreements and its terms.

175.   On information and belief, SoCal Bank and SoCal Bancorp were informed by Smithson, as part of her recruitment, of the existence of the Stock Award Agreements and its terms.

176.   SoCal Bank and SoCal Bancorp engaged in intentional acts designed to induce a breach or disruption of the contractual relationship between each of Rainer, Hernandez, Smithson and PacWest, including agreeing to fully indemnify Rainer, Hernandez and Smithson against possible claims by PacWest for breach of those contracts, and agreeing to compensate Rainer for the amounts still unpaid to him by PacWest under the Agreement, and on information and belief,

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

agreeing to compensate Hernandez and Smithson for the financial consequences of their breach of the Stock Award Agreements.

177.    As a result of the acts of SoCal Bank and SoCal Bancorp, there was an actual breach or disruption of the contractual relationship between each of Rainer, Hernandez, Smithson and PacWest.

178.    The breach or disruption of the contractual relationship between each of Rainer, Hernandez, Smithson and PacWest has resulted in injury and damage to PacWest Bank, in that PacWest Bank's confidential and proprietary information has been shared with a competitor, PacWest Bank has lost the services and skill of the Raided Employees, and in many cases the benefit of the advantageous business relationships these Raided Employees had with both actual and potential clients, and SoCal Bank and SoCal Bancorp has, as a result of Hernandez', Smithson's and Rainer's breaches of their contracts, been able to illegally solicit and steal customers. Additionally, the speed and number of disruptions and lost employees has created chaos within PacWest Bank, and has led to a loss of business opportunities and employee morale.

179.    As a direct and proximate result of the acts of intentional interference with contractual relations by SoCal Bank and SoCal Bancorp, PacWest Bank has suffered damages, in an amount to be proven at trial. PacWest Bank is not aware of the full extent of the Defendants' actions but believes that additional PacWest Bank employees may have been, or will in the future be, solicited by Rainer, Hernandez, Smithson, SoCal Bank, SoCal Bancorp and Does 1-20, to resign and take positions at SoCal Bank. In addition, in engaging in the conduct described above, SoCal Bank and SoCal Bancorp acted with oppression, fraud or malice, thus entitling Plaintiffs to an award of punitive damages.

## ELEVENTH CAUSE OF ACTION

### INDUCING BREACH OF CONTRACT

### (Plaintiffs PacWest and PacWest Bank Against Defendants SoCal Bank and SoCal Bancorp and Does 1-20)

180.    Plaintiffs re-allege and hereby incorporate paragraphs 1 through 179 of this complaint as if fully set forth herein.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

181.     The Agreement is and was a valid contract between PacWest and Rainer. The Agreement was made expressly for the benefit of PacWest Bank as a third party beneficiary in that the client and employee relationships which Rainer was obligated to foster, promote and preserve were the business and employee relationships of PacWest Bank.

182.     The Stock Award Agreements are valid contracts between PacWest, on the one hand, and Hernandez and Smithson, on the other. The Stock Award Agreements were made expressly for the benefit of PacWest Bank as a third party beneficiary in that the client and employee relationships which were protected by the Restrictive Covenants the business and employee relationships of PacWest Bank.

183.     SoCal Bank and SoCal Bancorp were informed by Rainer in writing of the existence of the Agreement and its terms.

184.     On information and belief, SoCal Bank and SoCal Bancorp were informed by Hernandez, as part of his recruitment, of the existence of the Stock Award Agreements and its terms.

185.     On information and belief, SoCal Bank and SoCal Bancorp were informed by Smithson, as part of her recruitment, of the existence of the Stock Award Agreements and its terms.

186.      SoCal Bank and SoCal Bancorp intended to induce a breach of the contractual relationship between Rainer and PacWest.

187.     SoCal Bank and SoCal Bancorp intended to induce a breach of the contractual relationship between Hernandez and PacWest.

188.     SoCal Bank and SoCal Bancorp intended to induce a breach of the contractual relationship between Smithson and PacWest.

189.     As a result of the acts of SoCal Bank and SoCal Bancorp, there was an actual breach of the contractual relationship between Rainer and PacWest.

190.     As a result of the acts of SoCal Bank and SoCal Bancorp, there was an actual breach of the contractual relationship between Hernandez and PacWest.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

191.    As a result of the acts of SoCal Bank and SoCal Bancorp, there was an actual breach of the contractual relationship between Smithson and PacWest.

192.    Rainer's breach of the Agreement was caused by unjustified or wrongful conduct by SoCal Bank and SoCal Bancorp, including their agreement to fully indemnify Rainer against possible claims by PacWest for breach of that contract, and their agreement to compensate Rainer for the amounts still unpaid to him by PacWest under the Agreement.

193.    Hernandez' breach of the Stock Award Agreements was caused by unjustified or wrongful conduct by SoCal Bank and SoCal Bancorp, including, on information and belief, their agreement to fully indemnify Hernandez against possible claims by PacWest for breach of those contracts, and their agreement to compensate Hernandez for the financial consequences of his breach of the Stock Award Agreements.

194.    Smithson's breach of the Stock Award Agreements was caused by unjustified or wrongful conduct by SoCal Bank and SoCal Bancorp, including, on information and belief, their agreement to fully indemnify Smithson against possible claims by PacWest for breach of those contracts, and their agreement to compensate Smithson for the financial consequences of her breach of the Stock Award Agreements.

195.    The breach of the contractual relationship between each of Rainer, Hernandez, Smithson and PacWest has resulted in injury and damage to PacWest Bank, in that PacWest Bank's confidential and proprietary information has been shared with a competitor, PacWest has lost the services and skill of the Raided Employees, and in many cases the benefit of the advantageous business relationships these Raided Employees had with both actual and potential clients, and SoCal Bank and SoCal Bancorp has, as a result of Hernandez', Smithson's and Rainer's breaches of their contracts, been able to illegally solicit and steal customers. Additionally, the speed and number of disruptions and lost employees has created chaos within PacWest Bank, and has led to a loss of business opportunities and employee morale.

196.    As a direct and proximate result of the acts of intentional interference with contractual relations by SoCal Bank and SoCal Bancorp, PacWest Bank has suffered damages, in an amount to be proven at trial. PacWest Bank is not aware of the full extent of the Defendants'

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

47

1 actions but believes that additional PacWest Bank employees may have been, or will in the future

2 be, solicited by Rainer, Hernandez, Smithson, SoCal Bank, SoCal Bancorp and Does 1-20, to

3 resign and take positions at SoCal Bank. In addition, in engaging in the conduct described above,

4 SoCal Bank and SoCal Bancorp acted with oppression, fraud or malice, thus entitling Plaintiffs to

5 an award of punitive damages.

6 <u>**TWELFTH CAUSE OF ACTION**</u>

7 **BREACH OF FIDUCIARY DUTY**

8 **(Plaintiffs PacWest and PacWest Bank Against Defendants Rainer and Does 1-20)**

9 197. Plaintiffs re-allege and hereby incorporate paragraphs 1 through 196 of this

10 complaint as if fully set forth herein.

11 198. Rainer owed a general duty of loyalty to PacWest, and its subsidiary PacWest

12 Bank. This included a duty to refrain from taking action on behalf of, or otherwise assisting,

13 Plaintiffs' competitors, and not to use or communicate Plaintiffs' confidential information for his

14 own purposes or for those of a third party. This duty of loyalty was the result of Rainer's activities

15 in acting on Plaintiffs' behalf to facilitate customer outreach, including (1) brokering introductions

16 and fostering business relationships between legacy clients and PacWest Bank, (2) acting as an

17 "ambassador" for Plaintiffs in meeting with clients and other parties at the request of Plaintiffs, (3)

18 acting on Plaintiffs' behalf to preserve business and employee relationships and promote

19 continuity and retaining key personnel, (4) acting on Plaintiffs' behalf to develop new business

20 development opportunities to attract and retain new clients, and (5) helping to promote the

21 reputation of Plaintiffs to key merchant bank markets.

22 199. In the Agreement Rainer agreed that he would hold in a fiduciary capacity for the

23 benefit of PacWest "all trade secrets and confidential information, knowledge or data relating to

24 [PacWest] and its subsidiaries (including [CUB]) and their businesses and investments, which will

25 have been obtained by you during your employment with [CUB] prior to the Effective Date and

26 during your consulting with [PacWest] after the Effective Date and which are not generally

27 available public knowledge (other than by acts by you in violation of this agreement."

28

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

200.    Rainer breached his duty of loyalty by doing the acts described above, including but not limited to, soliciting PacWest Bank employees and clients to leave PacWest Bank and go to a competitor, SoCal Bank.

201.    Rainer breached his fiduciary duty with respect to Plaintiffs' confidential information, knowledge and data by doing the acts described above, including but not limited to, on information and belief, using PacWest and PacWest Bank's confidential and proprietary busines information and providing it to a competitor of PacWest. In particular, Rainer provided to SoCal Bank salary, benefits and bonus information or data, and the terms and conditions of the employment relationships between PacWest Bank and its employees and the history of job performance, career goals and aspirations of those employees. This is information that Rainer had agreed to hold as confidential in a fiduciary capacity in the Agreement and not divulge. Using this confidential and proprietary information Rainer was able to provide SoCal Bank with a selective list of PacWest Bank's employees who, in his judgment, possessed both the ability and personal characteristics desirable in an employee, together with the salary and bonuses PacWest Bank was paying the employee and a suggestion as to the salary SoCal Bank should offer to be successful in recruitment.

202.    As a direct and proximate result of Rainer's breaches, Plaintiffs have suffered damages, in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the Defendants' actions, but believe that thus far Rainer, and Does 1-20, solicited and induced at least 30 PacWest Bank employees to resign and take positions at SoCal Bank. Furthermore, Plaintiffs are informed and believe, and thereon allege, that Rainer unjustly received prior consulting fees while in breach of the Agreement and should therefore be required to return the ill-gotten compensation.

### THIRTEENTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY

**(Plaintiffs PacWest and PacWest Bank Against Defendants Hernandez and Does 1-20)**

203.    Plaintiffs re-allege and hereby incorporate paragraphs 1 through 202 of this complaint as if fully set forth herein.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

204.    Hernandez owed a general duty of loyalty to PacWest, and its subsidiary PacWest Bank as a result of his position as an officer of PacWest Bank. This included a duty to refrain from taking action on behalf of, or otherwise assisting, Plaintiffs' competitors, and not to use or communicate Plaintiffs' confidential information for his own purposes or for those of a third party.

205.    In the Stock Award Agreements Hernandez agreed that "[d]uring your employment and thereafter, [Hernandez] shall hold in a fiduciary capacity for the benefit of [PacWest] all trade secrets and Confidential Information relating to [PacWest] and its businesses and investments, which will have been obtained by you during your employment with [PacWest] and which are not generally available public knowledge (other than by acts by you in violation of this Agreement)."

206.    Hernandez breached his duty of loyalty by doing the acts described above, including but not limited to, soliciting PacWest Bank employees and clients to leave PacWest Bank and go to a competitor, SoCal Bank.

207.    Hernandez breached his fiduciary duty with respect to Plaintiffs' confidential information, knowledge and data by doing the acts described above, including but not limited to, on information and belief, using PacWest and PacWest Bank's confidential and proprietary busines information and providing it to a competitor of PacWest. In particular, Hernandez provided to SoCal Bank salary, benefits and bonus information or data, and the terms and conditions of the employment relationships between PacWest Bank and its employees and the history of job performance, career goals and aspirations of those employees. This is information Hernandez had agreed in the Stock Award Agreements he would hold as confidential in a fiduciary capacity in the Agreement and not divulge. Using this confidential and proprietary information Hernandez was able to provide SoCal Bank with a selective list of PacWest Bank's employees who, in his judgment, possessed both the ability and personal characteristics desirable in an employee, together with the salary and bonuses PacWest Bank was paying the employee and a suggestion as to the salary SoCal Bank should offer to be successful in recruitment.

208.    As a direct and proximate result of Hernandez' breaches, Plaintiffs have suffered damages, in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the Defendants' actions, but believe that thus far Hernandez, Rainer and Smithson, and Does 1-20,

solicited and induced at least 30 PacWest Bank employees to resign and take positions at SoCal Bank.

## FOURTEENTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY

**(Plaintiffs PacWest and PacWest Bank Against Defendants Smithson and Does 1-20)**

209.    Plaintiffs re-allege and hereby incorporate paragraphs 1 through 208 of this complaint as if fully set forth herein.

210.    Smithson owed a general duty of loyalty to PacWest, and its subsidiary PacWest Bank as a result of her position as an officer of PacWest Bank. This included a duty to refrain from taking action on behalf of, or otherwise assisting, Plaintiffs' competitors, and not to use or communicate Plaintiffs' confidential information for her own purposes or for those of a third party.

211.    In the Stock Award Agreements Smithson agreed that "[d]uring your employment and thereafter, [Smithson] shall hold in a fiduciary capacity for the benefit of [PacWest] all trade secrets and Confidential Information relating to [PacWest] and its businesses and investments, which will have been obtained by you during your employment with [PacWest] and which are not generally available public knowledge (other than by acts by you in violation of this Agreement)."

212.    Smithson breached her duty of loyalty by doing the acts described above, including but not limited to, soliciting PacWest Bank employees and clients to leave PacWest Bank and go to a competitor, SoCal Bank.

213.    Smithson breached her fiduciary duty with respect to Plaintiffs' confidential information, knowledge and data by doing the acts described above, including but not limited to, on information and belief, using PacWest and PacWest Bank's confidential and proprietary busines information and providing it to a competitor of PacWest. In particular, Smithson provided to SoCal Bank salary, benefits and bonus information or data, and the terms and conditions of the employment relationships between PacWest Bank and its employees and the history of job performance, career goals and aspirations of those employees. This is information Smithson had agreed in the Stock Award Agreements she would hold as confidential in a fiduciary capacity in

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1   the Agreement and not divulge. Using this confidential and proprietary information Smithson was

2   able to provide SoCal Bank with a selective list of PacWest Bank's employees who, in her

3   judgment, possessed both the ability and personal characteristics desirable in an employee,

4   together with the salary and bonuses PacWest Bank was paying the employee and a suggestion as

5   to the salary SoCal Bank should offer to be successful in recruitment.

6        214.   As a direct and proximate result of Smithson's breaches, Plaintiffs have suffered

7   damages, in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the

8   Defendants' actions, but believe that thus far Rainer, Hernandez and Smithson, and Does 1-20,

9   solicited and induced at least 30 PacWest Bank employees to resign and take positions at SoCal

10   Bank.

### FIFTEENTH CAUSE OF ACTION

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### (Plaintiffs PacWest and PacWest Bank Against Defendants SoCal Bank and SoCal Bancorp and Does 1-20)

15        215.   Plaintiffs re-allege and hereby incorporate paragraphs 1 through 214 of this

16   complaint as if fully set forth herein.

17        216.   SoCal Bank and SoCal Bancorp aided and abetted Rainer's breaches of his duty of

18   loyalty owed to Plaintiffs.

19        217.   Specifically, SoCal Bank and SoCal Bancorp knew that Rainer, who it was hiring

20   as the Executive Chairman of its board of directors of SoCal Bank, was engaging in, or intended to

21   engage in, his acts which breached his duty of loyalty to Plaintiffs for the benefit of SoCal Bank

22   and SoCal Bancorp.

23        218.   SoCal Bank and SoCal Bancorp gave substantial assistance or encouragement to

24   Rainer in his breaching of his duty of loyalty owed to Plaintiffs. SoCal Bank and SoCal Bancorp

25   worked with Rainer during the pendency of the Agreement to identify and solicit the Raided

26   Employees, negotiated terms, made offers and hired the Raided Employees to positions at SoCal

27   Bank. Other representatives of SoCal Bank and SoCal Bancorp, including Hernandez, Smithson

28   and other newly hired Raided Employees, assisted Rainer in identifying and soliciting the Raided

1  Employees. After being informed of the terms of his Agreement at least in the LOI, SoCal Bank
2  and SoCal Bancorp agreed to indemnify Rainer for any of the consequences of his acts of breach
3  of contract or tortious interference, thereby illegally and wrongfully inducing him to breach his
4  Agreement in the ways and by the acts set forth above. This illegal inducement of Rainer to breach
5  his Agreement gave Rainer a "green light" to engage in acts of intentional interference with
6  prospective economic advantage for his and SoCal Bank's benefit, and directly resulted in SoCal
7  Bank and SoCal Bancorp's acts of intentional interference with prospective economic advantage.

8    219.   SoCal Bank and SoCal Bancorp aided and abetted Rainer's breaches of his
9  fiduciary duty owed to Plaintiffs with respect to Plaintiffs' confidential information, and gave
10  substantial assistance or encouragement to Rainer in his breaching of his fiduciary duty owed to
11  Plaintiffs with respect to Plaintiffs' confidential information. SoCal Bank and SoCal Bancorp
12  received and used Plaintiffs' confidential information in determining which PacWest employees to
13  solicit, and in determining how much to offer each employee in salary, bonus and other benefits.
14  On information and belief, SoCal Bank and SoCal Bancorp also received and used Plaintiffs'
15  confidential information in determining which PacWest customers to solicit, and in determining
16  what deal terms and other incentives to provide them to transfer their business from PacWest Bank
17  to SoCal Bank.

18    220.   SoCal Bank and SoCal Bancorp aided and abetted Hernandez' breaches of his duty
19  of loyalty owed to Plaintiffs.

20    221.   Specifically, SoCal Bank and SoCal Bancorp knew that Hernandez, who it was
21  hiring as its Chief Banking Officer, was engaging in, or intended to engage in, his acts which
22  breached his duty of loyalty to Plaintiffs for the benefit of SoCal Bank and SoCal Bancorp. On
23  information and belief, while still serving as a Regional Vice President of PacWest Bank,
24  Hernandez negotiated a job position with SoCal Bank and solicited other PacWest Bank
25  employees to join him and in doing so violated the terms of the Stock Award Agreements. On
26  information and belief, after being informed of the terms of his Stock Award Agreements, SoCal
27  Bank and SoCal Bancorp agreed to indemnify Hernandez for any of the consequences of his acts
28  of breach of contract or tortious interference, thereby illegally and wrongfully inducing him to

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES**

breach his Stock Award Agreements in the ways and by the acts set forth above. This illegal inducement of Hernandez to breach his Stock Award Agreements gave Hernandez a "green light" to engage in acts of intentional interference with prospective economic advantage for his and SoCal Bank's benefit, and directly resulted in SoCal Bank and SoCal Bancorp's acts of intentional interference with prospective economic advantage. SoCal Bank and SoCal Bancorp worked with Hernandez to identify and solicit the Raided Employees, negotiated terms, made offers and hired the Raided Employees to positions at SoCal Bank.

222.    SoCal Bank and SoCal Bancorp aided and abetted Hernandez' breaches of his fiduciary duty owed to Plaintiffs with respect to Plaintiffs' confidential information and gave substantial assistance or encouragement to Hernandez in his breaching of his fiduciary duty owed to Plaintiffs with respect to Plaintiffs' confidential information. SoCal Bank and SoCal Bancorp received and used Plaintiffs' confidential information in determining which PacWest employees to solicit, and in determining how much to offer each employee in salary, bonus and other benefits. On information and belief, SoCal Bank and SoCal Bancorp also received and used Plaintiffs' confidential information in determining which PacWest customers to solicit, and in determining what deal terms and other incentives to provide them to transfer their business from PacWest Bank to SoCal Bank.

223.    SoCal Bank and SoCal Bancorp aided and abetted Smithson's breaches of her duty of loyalty owed to Plaintiffs.

224.    Specifically, SoCal Bank and SoCal Bancorp knew that Smithson, who it was hiring as an Executive Vice President, Regional Manager, was engaging in, or intended to engage in, her acts which breached her duty of loyalty to Plaintiffs for the benefit of SoCal Bank and SoCal Bancorp. On information and belief, while still serving as an Executive Vice President, Regional Manager of PacWest Bank, Smithson negotiated a job position with SoCal Bank and solicited other PacWest Bank employees to join her, and in doing so violated the terms of the Stock Award Agreements. On information and belief, after being informed of the terms of her Stock Award Agreements, SoCal Bank and SoCal Bancorp agreed to indemnify Smithson for any of the consequences of her acts of breach of contract or tortious interference, thereby illegally and

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1  wrongfully inducing her to breach her Stock Award Agreements in the ways and by the acts set

2  forth above. This illegal inducement of Smithson to breach her Stock Award Agreements gave

3  Smithson a "green light" to engage in acts of intentional interference with prospective economic

4  advantage for her and SoCal Bank's benefit, and directly resulted in SoCal Bank and SoCal

5  Bancorp's acts of intentional interference with prospective economic advantage. SoCal Bank and

6  SoCal Bancorp worked with Smithson to identify and solicit the Raided Employees, negotiated

7  terms, made offers and hired the Raided Employees to positions at SoCal Bank.

8       225.    SoCal Bank and SoCal Bancorp aided and abetted Smithson's breaches of her

9  fiduciary duty owed to Plaintiffs with respect to Plaintiffs' confidential information and gave

10  substantial assistance or encouragement to Smithson in her breaching of her fiduciary duty owed

11  to Plaintiffs with respect to Plaintiffs' confidential information. SoCal Bank and SoCal Bancorp

12  received and used Plaintiffs' confidential information in determining which PacWest employees to

13  solicit, and in determining how much to offer each employee in salary, bonus and other benefits.

14  On information and belief, SoCal Bank and SoCal Bancorp also received and used Plaintiffs'

15  confidential information in determining which PacWest customers to solicit, and in determining

16  what deal terms and other incentives to provide them to transfer their business from PacWest Bank

17  to SoCal Bank.

18       226.    The conduct of SoCal Bank and SoCal Bancorp was a substantial factor in causing

19  the harm to Plaintiffs caused by Rainer's, Hernandez' and Smithson's acts which breached their

20  duties of loyalty to Plaintiffs. Without the active participation of SoCal Bank and SoCal Bancorp,

21  Rainer, Hernandez and Smithson would not have been able to offer job positions at SoCal Bank to

22  the Raided Employees and the deal terms and other incentives to solicit PacWest clients to move

23  their business to SoCal Bank.

24       227.    The conduct of SoCal Bank and SoCal Bancorp was a substantial factor in causing

25  the harm to Plaintiffs caused by Rainer's, Hernandez' and Smithson's acts which breached their

26  fiduciary duties with respect to Plaintiffs' confidential information. Without the active

27  participation of SoCal Bank and SoCal Bancorp Rainer, Hernandez and Smithson would not have

28  been able to offer job positions at SoCal Bank to the Raided Employees and the deal terms and

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

other incentives to solicit PacWest clients to move their business to SoCal Bank. SoCal Bank and SoCal Bancorp received and used Plaintiffs' confidential information in determining which PacWest employees to solicit, and in determining how much to offer each employee in salary, bonus and other benefits. On information and belief, SoCal Bank and SoCal Bancorp also received and used Plaintiffs' confidential information in determining which PacWest customers to solicit, and in determining what deal terms and other incentives to provide them to transfer their business from PacWest Bank to SoCal Bank.

228.    SoCal Bank and SoCal Bancorp and Rainer engaged in a conspiracy to breach Rainer's duty of loyalty to Plaintiffs. SoCal Bank and SoCal Bancorp were aware that Rainer planned and intended to engage in these tortious activities and agreed with Rainer to engage in a systematic plan to raid PacWest Bank's employees and clients. SoCal Bank and SoCal Bancorp were aware of Rainer's obligations under the Agreement and agreed with Rainer to delay the announcement of his hiring and the beginning of the resignations of the Raided Employees until after October 20, 2020, and to proceed with the plan regardless of his obligations under the Agreement.

229.    SoCal Bank and SoCal Bancorp and Hernandez engaged in a conspiracy to breach Hernandez' duty of loyalty to Plaintiffs. SoCal Bank and SoCal Bancorp were aware that Hernandez planned and intended to engage in these tortious activities and agreed with Hernandez to engage in a systematic plan to raid PacWest Bank's employees and clients. SoCal Bank and SoCal Bancorp were aware of Hernandez' obligations under the Stock Award Agreements and agreed to proceed with the plan regardless of his obligations under the Stock Award Agreements.

230.    SoCal Bank and SoCal Bancorp and Smithson engaged in a conspiracy to breach Smithson's duty of loyalty to Plaintiffs. SoCal Bank and SoCal Bancorp were aware that Smithson planned and intended to engage in these tortious activities and agreed with Smithson to engage in a systematic plan to raid PacWest Bank's employees and clients. SoCal Bank and SoCal Bancorp were aware of Smithson's obligations under the Stock Award Agreements and agreed to proceed with the plan regardless of her obligations under the Stock Award Agreements.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

56

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT B - 155**

231.     SoCal Bank and SoCal Bancorp and Rainer engaged in a conspiracy to breach Rainer's fiduciary duty with respect to Plaintiffs' confidential information. SoCal Bank and SoCal Bancorp received and agreed with Rainer to use Plaintiffs' confidential information in determining which PacWest employees to solicit, and in determining how much to offer each employee in salary, bonus and other benefits. On information and belief, SoCal Bank and SoCal Bancorp also received and agreed with Rainer to use Plaintiffs' confidential information in determining which PacWest customers to solicit, and in determining what deal terms and other incentives to provide them to transfer their business from PacWest Bank to SoCal Bank.

232.     SoCal Bank and SoCal Bancorp and Hernandez engaged in a conspiracy to breach Hernandez' fiduciary duty with respect to Plaintiffs' confidential information. SoCal Bank and SoCal Bancorp received and agreed with Hernandez to use Plaintiffs' confidential information in determining which PacWest employees to solicit, and in determining how much to offer each employee in salary, bonus and other benefits. On information and belief, SoCal Bank and SoCal Bancorp also received and agreed with Hernandez to use Plaintiffs' confidential information in determining which PacWest customers to solicit, and in determining what deal terms and other incentives to provide them to transfer their business from PacWest Bank to SoCal Bank.

233.     SoCal Bank and SoCal Bancorp and Smithson engaged in a conspiracy to breach Smithson's fiduciary duty with respect to Plaintiffs' confidential information. SoCal Bank and SoCal Bancorp received and agreed with Smithson to use Plaintiffs' confidential information in determining which PacWest employees to solicit, and in determining how much to offer each employee in salary, bonus and other benefits. On information and belief, SoCal Bank and SoCal Bancorp also received and agreed with Smithson to use Plaintiffs' confidential information in determining which PacWest customers to solicit, and in determining what deal terms and other incentives to provide them to transfer their business from PacWest Bank to SoCal Bank.

234.     As a direct and proximate result of the aiding and abetting by SoCal Bank and SoCal Bancorp of Rainer's, Hernandez' and Smithson's breaches of their fiduciary duties, Plaintiffs have suffered damages, in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the Defendants' actions but believes that additional PacWest Bank employees may

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

have been, or will in the future be, solicited by Rainer, SoCal Bank, SoCal Bancorp and Does 1-20, to resign and take positions at SoCal Bank.

### SIXTEENTH CAUSE OF ACTION

**COMMON LAW UNFAIR COMPETITION AND VIOLATION OF CALIFORNIA**

**BUSINESS AND PROFESSIONS CODE SECTION 17200 ET SEQ.**

**(Plaintiffs PacWest and PacWest Bank Against Defendants Rainer,**

**Hernandez. Smithson, SoCal Bank, SoCal Bancorp and Does 1-20)**

235.     Plaintiffs re-allege and hereby incorporate paragraphs 1 through 234 of this complaint as if fully set forth herein.

236.     The breach or disruption of the economic relationship each of the Raided Employees had with PacWest Bank has resulted in economic injury and damage to PacWest Bank, in that PacWest Bank has lost the services and skill of the Raided Employees, and in many cases the benefit of the advantageous business relationships these Raided Employees had with both actual and potential clients. Additionally, the speed and number of disruptions and lost employees has created chaos within PacWest Bank, and has led to a loss of business opportunities and employee morale.

237.     The interference by Defendants with PacWest Bank's relationships with its employees and customers is ongoing and an injunction is necessary to stop the interference and prevent further injury to Plaintiffs. Discovery has confirmed that Defendants continue unabated in their efforts to wrongfully solicit PacWest Bank employees and customers, and the number of PacWest Bank customers transferring their business to SoCal Bank as a result Defendants' illegal acts continues to grow.

238.     Plaintiffs' economic injury was and is the direct and proximate result of the unlawful acts of unfair competition by SoCal Bank, SoCal Bancorp, Rainer, Hernandez and Smithson set forth above.

239.     As a result of the unlawful acts of unfair competition by SoCal Bank, SoCal Bancorp, Rainer, Hernandez and Smithson, Plaintiffs are entitled to an injunction to prevent further damage to, and interference and disruption of, their business, and restitution in the form of

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1  a return of the monies paid to Rainer under the Agreement, and Hernandez and Smithson pursuant

2  to their employment agreements and Stock Award Agreements with PacWest Bank.

3  **<u>PRAYER FOR RELIEF</u>**

4  WHEREFORE, Plaintiffs pray for relief as follows:

5  1.      For injunctive relief to prohibit Defendants' illegal conduct;

6  2.      For the return of past consulting fees unjustly received by Rainer approximately in

7  the amount of at least $135,000.00, but in an exact amount to be proven at trial;

8  3.      For the return of past salary and bonuses and stock unjustly received by Hernandez

9  in an amount to be determined at trial;

10  4.      For the return of past salary and bonuses and stock unjustly received by Smithson

11  in an amount to be determined at trial;

12  5.      For general damages, for both past and future economic loss, in amount to be

13  proven at trial, in excess of $15 million;

14  6.      For punitive damages in an amount to be determined at trial;

15  7.      For all costs of suit incurred herein; and

16  8.      For such other and further relief as this Court may deem proper.

17

18  DATED: October 21, 2021          BAUTE CROCHETIERE HARTLEY & VELKEI LLP

19

20  By: _____

21  David P. Crochetiere
    Attorneys for Plaintiff/Cross-Defendant

22  PACWEST BANCORP, Plaintiff PACIFIC
    WESTERN BANK and Cross-Defendant

23  JOHN M. EGGEMEYER

24

25

26

27

28

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

332718.3

59

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT B - 158**

1

## DEMAND FOR JURY TRIAL

2          Plaintiffs PACWEST BANCORP and PACIFIC WESTERN BANK hereby demand a trial

3   by jury on all issues so triable.

4

5   DATED: October 21, 2021               BAUTE CROCHETIERE HARTLEY & VELKEI LLP

6

7                                    By:   _____
                                           David P. Crochetiere
8                                          Attorneys for Plaintiff/Cross-Defendant
                                           PACWEST BANCORP, Plaintiff PACIFIC
9                                          WESTERN BANK and Cross-Defendant
                                           JOHN M. EGGEMEYER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

# EXHIBIT 1

EXECUTION COPY
CONFIDENTIAL



PacWest Bancorp

May 25, 2017

David I. Rainer
(at the Address on file with the Company)

Re:   Amended and Restated Consulting Agreement

Dear David:

As you know, PacWest Bancorp (the "*Parent*") and CU Bancorp (the "*Company*") entered into an Agreement and Plan of Merger on April 5, 2017 (the "*Merger Agreement*"), pursuant to which the Company will merge with and into the Parent (the "*Merger*"). Parent also entered into a consulting arrangement with you on April 5, 2017 to confirm the agreements that Parent and you reached regarding the specific terms and conditions of your retention as a consultant to Parent following the closing of the Merger (the "*Consulting Agreement*"). Parent and you now desire to amend certain aspects of the Consulting Agreement, and the purpose of this letter agreement is to set forth the specific terms and conditions of your retention as a consultant to Parent as so amended. This letter agreement amends and restates in its entirety the Consulting Agreement and becomes effective as of, and is conditioned upon the occurrence of, the closing of the Merger (the "*Effective Date*"), and if the Merger Agreement is terminated pursuant to its terms then this letter will terminate and be of no force or effect.

1.   **Purpose of Engagement**

Upon the terms and subject to the conditions of this letter, you agree to serve as a consultant to Parent and its subsidiaries. As a consultant, you agree to perform the services set forth on the attached Exhibit A (the "*Services*"). You agree to perform the Services faithfully and diligently for Parent as set forth in this letter. In addition, without limiting in any way your obligations under this Section 1, in accordance with Section 409A of the Internal Revenue Code of 1986, as amended ("the Code"), Parent and you confirm that it is currently anticipated that your duties as a consultant would decrease to no more than 20% of the average level of services performed by you during your last three years of employment with the Company.

2.   **Term**

The term of your consulting arrangement will commence on the Effective Date and end on the 65th month anniversary of the Effective Date (the "*Term*"), unless it is sooner terminated, as provided in this letter. Parent and you are under no obligation to continue this

engagement beyond the Term.  Additionally, Parent and you may terminate the Term before its scheduled expiration as provided in Section 6.

**3.   Fees**

During the Term, you will receive an annual retainer of $550,000, payable in substantially equal monthly installments on the first business day of every month (the "*Consulting Fee*").  In addition, during the Term, Parent will reimburse actual out-of-pocket expenses reasonably incurred by you in connection with the Services, subject to Parent's reimbursement policy as in effect from time to time, and provide you with office space at its Beverly Hills headquarters.

**4.   Restrictions**

You acknowledge that you hold equity in the Company and, as a result of the Merger, you will receive a direct and substantial economic benefit from the Merger.  As an inducement to Parent entering into the Merger Agreement and to consummate the Merger, to protect Parent's legitimate interest in the goodwill and other assets associated with the business of the Company, and in consideration of the benefits to be received by you therefrom, you and Parent acknowledge and agree that it is your intention that the covenants in this Section 4 be valid, legal and enforceable including, without limitation and to the extent applicable, through qualification under §16601 of the California Business and Professions Code as an exception to the restrictions set forth in §16600 of the California Business and Professions Code.

Without the written consent of Parent, you agree not to, directly or indirectly, represent, become employed by, perform services for, consult to, or advise in any manner or have any material interest in any Competitive Enterprise from the Effective Date until the third anniversary of the Effective Date (the "*Restricted Period*").  A "*Competitive Enterprise*" means (1) any banking organization that competes anywhere within the Company's "footprint" (i.e., where the Company or any of its subsidiaries regularly conducted business prior to the Effective Time) with any of the business activities engaged in by the Company or any of its subsidiaries at any time prior to the Effective Date or (2) any entity or business attempting to acquire an interest in a banking organization described in clause (1).  Ownership directly or indirectly (including, without limitation, by being a member of a group within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended (the "*Exchange Act*")) of not more than 1% of the outstanding stock of any publicly traded company will not be a violation of this Section 4.

In addition, during the Restricted Period, you will not, in any manner, directly or indirectly (without the prior written consent of Parent): (i) Solicit any Client to transact business with a Competitive Enterprise or to reduce or refrain from doing any business with Parent or any of its subsidiaries (including the Company), (ii) interfere with or damage any relationship between Parent, Pacific Western Bank or the Company, on the one hand, and a Client, on the other hand, or (iii) Solicit anyone who is an employee of Parent or any of its subsidiaries (or who, to your knowledge, was an employee of Parent or any of its subsidiaries within the prior 90 days) to resign from Parent or any of its subsidiaries (including the Company) or to apply for or accept employment with any other Competitive Enterprise.

For purposes of this letter, a "*Client*" means any client of the Company or any of its subsidiaries to whom you, in your capacity as an executive officer of the Company, provided services, or for whom you, in your capacity as an executive officer of the Company, transacted business, or any client or prospective client who, to your knowledge, was solicited by the Company or whose identity became known to you in connection with your relationship with the Company or any of its subsidiaries, and "*Solicit*" means any direct or indirect communication of any kind that in any way invites, advises, encourages or requests any person to take or refrain from taking any action.

The terms and provisions of this Section 4 are intended to be separate and divisible provisions and if, for any reason, any one or more of them is held to be invalid or unenforceable, neither the validity nor the enforceability of any other provision of this Section 4 or this letter will thereby be affected.  The parties acknowledge that the potential restrictions on your future employment imposed by this Section 4 are reasonable in both duration and geographic scope and in all other respects.  If for any reason any court of competent jurisdiction  finds any provisions of this Section 4 to be unreasonable in duration or geographic scope or otherwise, you and Parent agree that the restrictions and prohibitions contained herein will be effective to the fullest extent allowed under applicable law in such jurisdiction.

You acknowledge that your Services are of a specific, unique and extraordinary character and that your breach or threatened breach of the provisions set forth in this Section 4 will cause irreparable injury to Parent for which monetary damages alone will not provide an adequate remedy.  Accordingly, in addition to any rights or remedies Parent may have available to it under this letter or otherwise, Parent also will be entitled to an injunction to be issued by any court of competent jurisdiction, restraining you from committing or continuing any violation of this Section 4.   You agree that no bond will need to be posted for Parent to receive such an injunction, no proof of economic loss or monetary damages will be required and that remedies at law would be inadequate.  In the event that you breach this Section 4, Parent's obligation to make or provide any further payments under this letter with cease, and you will forfeit any amounts which otherwise would have been payable to you.

**5.**     **Confidentiality.**

During the Term and thereafter, you will hold in a fiduciary capacity for the benefit of Parent all trade secrets and confidential information, knowledge or data relating to Parent and its subsidiaries (including the Company) and their businesses and investments, which will have been obtained by you during your employment with the Company prior to the Effective Date and during your consulting with Parent after the Effective Date and which are not generally available public knowledge (other than by acts by you in violation of this agreement).  Except as may be required or appropriate in connection with your carrying out of your duties under this agreement, you will not, without the prior written consent of Parent or as may otherwise be required by law or any legal process, any statutory obligation or order of any court or statutory tribunal of competent jurisdiction, or as is necessary in connection with any adversarial proceeding against Parent (in which case you will use your reasonable best efforts to cooperate with Parent in its obtaining of a protective order against disclosure by a court of competent jurisdiction),

**EXHIBIT B - 163**

communicate or divulge any such trade secrets, information, knowledge or data to anyone other than Parent and those designated by Parent or on behalf of Parent in the furtherance of its business or to perform duties hereunder.

Notwithstanding anything to the contrary in this agreement or otherwise, nothing will limit your rights under applicable law to provide truthful information to any governmental entity or to file a charge with or participate in an investigation conducted by any governmental entity.

You are hereby notified that the immunity provisions contained in Section 1833 of Title 18 of the United States Code provide that an individual cannot be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that is made (1) in confidence to federal, state or local government officials, either directly or indirectly, or to an attorney, and is solely for the purpose of reporting or investigating a suspected violation of the law, (2) under seal in a complaint or other document filed in a lawsuit or other proceeding, or (3) to your attorney in connection with a lawsuit for retaliation for reporting a suspected violation of law (and the trade secret may be used in the court proceedings for such lawsuit) as long as any document containing the trade secret is filed under seal and the trade secret is not disclosed except pursuant to court order.

6.   **Termination**

Parent may only terminate the Term for Cause by written notice to you, which notice may be effective immediately unless otherwise provided herein.  For purposes of this letter, "Cause" means (i) your falsification of Parent documents or records; (ii) your intentional and improper use or disclosure of Parent's confidential or proprietary information; (iii) any action by you which was intended to and has a significant detrimental effect on Parent's reputation or business; (iv) your willful failure to perform any reasonable assigned duties after written notice from Parent, and a reasonable opportunity to cure, such willful failure; (v) your material breach of any written agreement between you and Parent, including this letter agreement and the restrictive covenants herein; or (vi) your conviction (including any plea of guilty or nolo contendere) for theft, dishonesty, or of any criminal act which impairs your ability to perform your duties with the Company.  For terminations arising under subparagraph (iv) above, you shall have thirty (30) days following receipt of a written notice to cure such grounds for Cause prior to a termination for Cause becoming effective pursuant to subparagraph 4.

You may terminate the Term for any reason before its scheduled expiration by written notice to Parent, which notice may be effective immediately.

No part of the Consulting Fee will be payable to you for any period following the date of termination (x) by Parent for Cause, (y) by you for any reason or (z) due to your death or disability.  In the event of an early termination of the Term by Parent without Cause, Parent shall continue to pay you the Consulting Fee through the remainder of the Term as provided in Section 3 above.

In the event of any early termination of the Term for any reason, your obligations under Section 4 will continue until the end of the Restricted Period and your obligations under Section 5 will continue pursuant to their terms.

7.   **Independent Contractor**

You agree that you are performing the Services as an independent contractor and not as an employee of Parent. You will be responsible for the payment of all applicable taxes levied or based upon the Consulting Fee and for all non-reimbursable expenses attributable to the rendering of Services. In addition, you will not be eligible to participate in any vacation, group medical or life insurance, disability, profit sharing or retirement benefits, or any other fringe benefits or benefit plans offered by Parent to its employees. Nothing in this letter will be deemed to constitute a partnership or joint venture between Parent and you, nor will anything in this letter be deemed to constitute Parent or you as the agent of the other. During the Term, neither you nor Parent will be or become liable to or bound by any representation, act or omission whatsoever of the other.

8.   **Miscellaneous**

This letter agreement will not be assignable by you. This letter agreement will be assignable by Parent only to an acquirer of all or substantially all of the assets of Parent, provided such acquirer promptly assumes all of the obligations hereunder of Parent in a writing delivered to you and otherwise complies with the provisions hereof with regard to such assumption.

The validity, interpretation, construction and performance of this letter agreement will be governed by the laws of the State of California without regard to its conflicts of law principles.

If any provision of this letter is found by any court of competent jurisdiction to be illegal, invalid or unenforceable for any reason, then (i) the provision will be amended automatically to the minimum extent necessary to cure the illegality or invalidity and permit enforcement and (ii) the remainder of this letter will not be affected. This letter constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous representations, proposals, discussions, and communications, whether oral or in writing with respect to the subject matter hereof. This letter may be modified only in a writing signed by you and Parent.

Any notices given under this letter (1) by Parent to you will be in writing and will be given by hand delivery or by registered or certified mail, return receipt requested, postage prepaid, addressed to you at your address listed above or (2) by you to Parent will be in writing and will be given by hand delivery or by registered or certified mail, return receipt requested, postage prepaid, addressed to the General Counsel of Parent at Parent's corporate headquarters.

\*             \*             \*

**EXHIBIT B - 165**

To confirm the foregoing terms are acceptable to you, please execute and return the copy of this letter, which is enclosed for your convenience.

Very truly yours,

PacWest Bancorp

Kori L. Ogrosky
EVP, General Counsel & Corporate Secretary

Accepted and Agreed:

David I. Rainer

**Exhibit A**

The following will constitute the Services to be performed:

1. Assist with transition issues relating to the merger. Such activities may include attending meetings, presentations and communications.

2. Provide strategic advice and counsel to Parent on matters for which you have personal knowledge. Such guidance may include specific account and client history, new market development, portfolio retention strategies and broadening financial services.

3. Facilitate customer outreach, including brokering introductions and fostering business relationships between legacy clients and the acquiring organization.

4. Act as an ambassador to Parent and be available to meet with, and be involved with, clients and counterparties, at the request of Parent, where Parent believes your personal knowledge, attendance and participation could be beneficial.

5. Preserve business and employee relationships to mitigate disruption and anxiety associated with the transaction and change. This includes promoting continuity and retaining key personnel.

6. Perform new business development opportunities to attract and retain new clients. As a leader in the industry, help promote the reputation of Parent to key merchant banking markets.

7. Perform such other services as the parties may mutually agree upon from time to time during the term of the agreement.

68

**EXHIBIT B - 167**

# EXHIBIT 2

**PACWEST BANCORP**
**STOCK INCENTIVE PLAN**
**NOTICE OF STOCK AWARD GRANT**

This Notice of Stock Award Grant is part of the Stock Award Agreement between Grantee and the Company dated **05/14/2019**   and is of no force and effect until the Stock Award Agreement is signed by Grantee and the Company's representative, this Notice of Stock Award Grant is signed by Grantee.

You have been granted the following Stock Award:

| | |
|---|---|
| Name of Grantee: | **RICH   HERNANDEZ** |
| Total Number of Shares Granted: ("Granted Stock") | **3,483** |
| Type of Stock Award: | Restricted Stock Award |
| Date of Grant: | **05/14/2019** |
| Vesting Schedule: | The Granted Stock shall vest in full over 4 years. The first one-fourth of the Granted Stock shall vest on the date the Grantee completes one year of continuous Service after the Vesting Commencement Date. An additional one-fourth of the Granted Stock shall vest on the date the Grantee completes each year of continuous Service thereafter until Grantee is 100% vested in the Restricted Stock on the 4th year anniversary of the Vesting Commencement Date. |
| Vesting Commencement Date: | The date that is the last day of the month in which the Grant is made. |

Please sign below to acknowledge the terms and conditions of this Stock Award.

**ACKNOWLEDGED BY GRANTEE:**

By:        **Signed Electronically**

Name:    **RICH   HERNANDEZ**

**70**

**EXHIBIT B - 169**

**PACWEST BANCORP**
**STOCK INCENTIVE PLAN**
**STOCK AWARD AGREEMENT**

1. *Definitions*. Unless otherwise defined herein, the terms defined in the PacWest Bancorp 2017 Stock Incentive Plan, as amended (the "Plan") shall have the same defined meanings in this Stock Award Agreement ("Agreement") and the Notice of Stock Award Grant attached hereto as Appendix A.

2. *Grant of Stock Award*. Pursuant to the terms and conditions set forth in the Notice of Stock Award Grant, this Agreement, and the Plan, PacWest Bancorp (the "Company") grants to the grantee named in the Notice of Stock Award Grant ("Grantee") on the date of grant set forth in the Notice of Stock Award Grant ("Date of Grant") the number of Shares set forth in the Notice of Stock Award Grant. This Stock Award is intended to be a Restricted Stock Award or a Performance Stock Award, as provided in the Notice of Stock Award Grant.

3. *Vesting*. The Grantee shall vest in the Granted Stock in accordance with the vesting schedule provided for in the Notice of Stock Award Grant; provided, however, that the Grantee shall cease vesting in the Granted Stock on the Grantee's Termination Date or the date on which the Compensation Committee of the Company's Board of Directors (the "Administrator") determines that the performance goals, if any, provided for in the Notice of Stock Award Grant were not satisfied during the designated period of time. Notwithstanding the foregoing, upon the occurrence of a Vesting Event, the Grantee shall become 100% vested in those shares of Granted Stock that are outstanding on the date of the Vesting Event.

4. *Risk of Forfeiture*.

    (a) *General Rule*. The Granted Stock shall initially be subject to a Risk of Forfeiture. The Shares subject to a Risk of Forfeiture shall be referred to herein as "Restricted Shares".

    (b) *Lapse of Risk of Forfeiture*. The Risk of Forfeiture shall lapse as the Grantee vests in the Granted Stock.

    (c) *Forfeiture of Granted Stock*. The Restricted Shares shall automatically be forfeited and immediately returned to the Company on the Grantee's Termination Date or the date on which the Administrator determines that the performance goals, if any, provided for in the Notice of Stock Award Grant were not satisfied during the designated period of time.

    (d) *Additional Shares or Substituted Securities*. In the event of a stock split, reverse stock split, stock dividend, recapitalization, combination or reclassification of the Common Stock or any other increase or decrease in the number of issued and outstanding Shares effected without receipt of consideration by the Company, any new, substituted or additional securities or other property (including money paid other than as an ordinary cash dividend) which are by reason of such transaction distributed with respect to any Restricted Shares or into which such Restricted Shares thereby become convertible shall immediately be subject to a Risk of Forfeiture, which Risk of Forfeiture shall lapse at the same time and in the same manner as the Risk of Forfeiture to which the corresponding Restricted Share is subject.

    (e) *Escrow*. Upon issuance, the stock certificates for Granted Stock shall be deposited in escrow with the Company to be held in accordance with the provisions of this Agreement. Any new, substituted or additional securities or other property described in Subsection (d) above shall immediately be delivered to the Company to be held in escrow, but only to the extent the

shares of Granted Stock are at the time Restricted Shares. All regular cash dividends on Restricted Shares (or other securities at the time held in escrow) shall be paid directly to the Grantee and shall not be held in escrow (such distributions may, however, be delivered to an address at the Company for delivery to the Grantee). Restricted Shares, together with any other assets or securities held in escrow hereunder, shall be (i) surrendered to the Company for cancellation upon forfeiture of the Restricted Shares; or (ii) released to the Grantee upon the Grantee's request to the Administrator on or after the date the shares of Granted Stock are no longer Restricted Shares. Grantee agrees not to make a request to the Company's transfer agent for delivery of any share certificates representing any shares of Granted Stock so long as such shares are Restricted Shares.

5. *Rights as a Stockholder*. The Grantee shall have the rights of a stockholder with respect to the dividends paid by the Company. Grantee shall not be entitled to vote any unvested shares of Granted Stock. Upon the vesting of any portion of the Stock Award, the Grantee shall have the voting rights with respect to any such vested shares of Granted Stock.

6. *Non-transferability of Stock Award*. Except as otherwise provided for in the Plan, this Stock Award may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent and distribution and may be exercised, during the lifetime of the Grantee, only by the Grantee. If the Grantee transfers all or part of this Stock Award pursuant to the previous sentence, then the terms of this Agreement, the Plan and the Notice of Stock Award shall apply to the transferee to the same extent as to the Grantee.

7. *Regulatory Compliance*. The issuance of Common Stock pursuant to this Agreement shall be subject to full compliance with all then applicable requirements of law and the requirements of any stock exchange or interdealer quotation system upon which the Common Stock may be listed or traded.

8. *Modification and Termination*. The rights of the Grantee are subject to modification and termination in certain events, as provided in the Plan.

9. *Withholding Tax*. The Company's obligation to deliver Shares or remove any restrictive legends upon vesting of such Shares under the Plan shall be subject to the satisfaction of all applicable federal, state and local income and employment tax withholding requirements. The Grantee shall pay to the Company an amount equal to the withholding amount (or the Company may withhold such amount from the Grantee's salary) in cash or, to the extent permitted under Section 402 of the Sarbanes-Oxley Act of 2002 and the regulations adopted pursuant thereto, with Shares (including previously vested Granted Stock) with an aggregate fair market value equal to the withholding amount calculated using the maximum statutory withholding amount permitted to be withheld under applicable tax rules.

10. *Nondisclosure*. Grantee acknowledges that the grant and terms of this Stock Award are confidential and may not be disclosed by Grantee to any other person, including other employees of the Company and other participants in the Plan, without the express written consent of the Company's Chief Executive Officer. Notwithstanding the foregoing, the Grantee may disclose the grant and terms of this Stock Award to the Grantee's family member, financial advisor, and attorney and as may be required by law or regulation. Any breach of this provision will be deemed to be a material breach of this Agreement.

11. *Governing Law*. This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of California without regard to principles of conflict of laws.

**EXHIBIT B - 171**

12. *Successors*. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their legal representatives, heirs, and permitted transferees, successors and assigns.

13. *Plan*. This Agreement and the Notice of Stock Award Grant are subject to all of the terms and provisions of the Plan, receipt of a copy of which is hereby acknowledged by the Grantee. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Administrator upon any questions arising under the Plan, this Agreement, and the Notice of Stock Award Grant.

14. *Rights to Future Employment*. This Stock Award does not confer upon the Grantee any right to continue in the Service of the Company or any Affiliate, nor does it limit the right of the Company to terminate the Service of the Grantee at any time.

15. *Restrictive Covenants.*  The Grantee hereby agrees to be bound by the restrictive covenants set forth in **Annex A**.

16. *Entire Agreement*. The Notice of Stock Award Grant, this Agreement, and the Plan constitute the entire contract between the parties hereto with regard to the subject matter hereof. They supersede any other agreements, representations or understandings (whether oral or written and whether express or implied) between the parties which relate to the subject matter hereof.


By your signature and the signature of the Company's representative below, you and the Company agree that this Stock Award is granted under and governed by the terms and conditions of this Agreement and the Plan and the Notice of Stock Award Grant, both of which are attached and incorporated herein by reference. This Stock Award is of no force and effect until this Agreement is signed by you and the Company's representative, the Notice of Stock Award Grant is signed by you.


**GRANTEE:**                                            **PACWEST BANCORP**

By: **Signed Electronically**            By:  _Rebecca Cordes_
       Name:                                                   Rebecca H. Cordes
                                                                      *Exec. Vice President, Human Resources*

## ANNEX A
## RESTRICTIVE COVENANTS

The Restrictive Covenants set forth in this Annex A to the Restricted Stock Award Agreement (the "Agreement") limit the ability of the Grantee to engage in certain practices during and following employment with the Company and is an integral part of the Agreement, without which the Company would not have granted the opportunity to earn the Restricted Stock Award.

1.    Confidential Information.  During your employment and thereafter, you shall hold in a fiduciary capacity for the benefit of the Company all trade secrets and Confidential Information relating to the Company and its businesses and investments, which will have been obtained by you during your employment by the Company and which is not generally available public knowledge (other than by acts by you in violation of this Agreement). Except as may be required or appropriate in connection with your carrying out your duties as an employee, you will not, without the prior written consent of the Company or as may otherwise be required by law or any legal process, any statutory obligation or order of any court or statutory tribunal of competent jurisdiction, or as is necessary in connection with any adversarial proceeding against the Company (in which case you will use your reasonable best efforts in cooperating with the Company in obtaining a protective order against disclosure by a court of competent jurisdiction), communicate or divulge any such trade secrets or Confidential Information to anyone other than the Company and those designated by the Company or on behalf of the Company in the furtherance of its business or to perform duties hereunder.  Notwithstanding anything to the contrary in this Agreement or otherwise, nothing shall limit your rights under applicable law to provide truthful information to any governmental entity or to file a charge with or participate in an investigation conducted by any governmental entity. You are hereby notified that the immunity provisions in Section 1833 of title 18 of the United States Code provide that an individual cannot be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that is made (1) in confidence to federal, state or local government officials, either directly or indirectly, or to an attorney, and is solely for the purpose of reporting or investigating a suspected violation of the law, (2) under seal in a complaint or other document filed in a lawsuit or other proceeding, or (3) to your attorney in connection with a lawsuit for retaliation for reporting a suspected violation of law (and the trade secret may be used in the court proceedings for such lawsuit) as long as any document containing the trade secret is filed under seal and the trade secret is not disclosed except pursuant to court order.

2.    Non-Solicitation of Employees.  You agree that during your employment, and for a six month period following the termination of your employment for any reason, you will not take any action, directly or indirectly (without the prior written consent of the Company), that causes or could reasonably be expected to cause any person who is then an employee of the Company or its Affiliates to resign from the Company or its Affiliates or to apply for or accept employment with any other business or enterprise.

3.    Non-Solicitation of Customers.  You agree that during your employment, and for a six month period following the termination of your employment for any reason, you will not, in any manner, directly or indirectly (without the prior written consent of the Company): (1) take any action that causes or could reasonably be expected to cause any customer or prospective customer of the Company or its Affiliates to whom you provided services or with whom you otherwise had contact to become a customer of or transact any business with a Competitive Business or reduce or refrain from doing any business with the Company or its Affiliates, (2) transact business with any customer or prospective customer that would cause you to be a Competitive Business, or (3) interfere with or damage any relationship between the Company and a customer or prospective customer.

4.      Reasonableness of Covenant.  You agree that the covenants contained herein are reasonable and necessary to protect the confidentiality of the customer lists, the terms, conditions and nature of customer relationships, and other trade secrets and Confidential Information concerning the Company and its Affiliates, acquired by you and to avoid actual or apparent conflicts of interest.

5.      Validity.   The terms and provisions of this Annex A are intended to be separate and divisible provisions and if, for any reason, any one or more of them is held to be invalid or unenforceable, neither the validity nor the enforceability of any other provision set forth herein thereby be affected.  If for any reason any court of competent jurisdiction will find any provisions of this Annex A unreasonable in duration or geographic scope or otherwise, you and the Company agree that the restrictions and prohibitions contained herein will be effective to the fullest extent allowed under applicable law in such jurisdiction

6.      Injunctive Relief.   Without limiting any remedies available to the Company, you acknowledge and agree that a breach of the covenants contained in Sections 1 through 3 of this Annex A will result in injury to the Company and its Affiliates for which there is no adequate remedy at law and that it will not be possible to measure damages for such injuries precisely.  Therefore, you agree that, in the event of such a breach or threat thereof, the Company will be entitled to seek a temporary restraining order and a preliminary and permanent injunction, without bond or other security, restraining you from engaging in activities prohibited by Sections 1 through 3 of this Annex A or such other relief as may be required specifically to enforce any of the covenants in Sections 1 through 3 of this Annex A.

7.      Definitions.  For purposes of these covenants, the following terms will have the following meanings:

(a)      "Competitive Business" means any business enterprise that either (i) engages in any activity that competes with the business of the Company or its Affiliates or (ii) holds a 5% or greater equity, voting or profit participation interest in any enterprise that engages in such a competitive activity.

(b)      "Confidential Information" means any information concerning the business or affairs of the Company or any of its Affiliates which is not generally known to the public and includes, but is not limited to, any file, document, book, account, list (including without limitation customer lists), process, patent, specification, drawing, design, computer program or file, computer disk, method of operation, recommendation, report, plan, survey, data, manual, strategy, financial data, client information or data (including the terms and conditions of any business relationships between clients and the Company or its Affiliates), or contract which comes to your knowledge in the course of your employment or which is generated by you in the course of performing your obligations to the Company whether alone or with others.

**JEG7FJ7J**

**05/20/2019 12:48 PM U.S. Eastern Standard Time**

**ACCEPTED**

**75**

**EXHIBIT B - 174**

# EXHIBIT 3

**PACWEST BANCORP**
**STOCK INCENTIVE PLAN**
**NOTICE OF STOCK AWARD GRANT**

This Notice of Stock Award Grant is part of the Stock Award Agreement between Grantee and the Company dated **05/12/2020**   and is of no force and effect until the Stock Award Agreement is signed by Grantee and the Company's representative, this Notice of Stock Award Grant is signed by Grantee.

You have been granted the following Stock Award:

| | |
|---|---|
| Name of Grantee: | **RICH  HERNANDEZ** |
| Total Number of Shares Granted: ("Granted Stock") | **3,900** |
| Type of Stock Award: | Restricted Stock Award |
| Date of Grant: | **05/12/2020** |
| Vesting Schedule: | The Granted Stock shall vest in full over 4 years. The first one-fourth of the Granted Stock shall vest on the date the Grantee completes one year of continuous Service after the Vesting Commencement Date. An additional one-fourth of the Granted Stock shall vest on the date the Grantee completes each year of continuous Service thereafter until Grantee is 100% vested in the Restricted Stock on the 4th year anniversary of the Vesting Commencement Date. |
| Vesting Commencement Date: | The date that is the last day of the month in which the Grant is made. |

Please sign below to acknowledge the terms and conditions of this Stock Award.

**ACKNOWLEDGED BY GRANTEE:**

By:          **Signed Electronically**

Name:       **RICH  HERNANDEZ**

**PACWEST BANCORP**
**STOCK INCENTIVE PLAN**
**STOCK AWARD AGREEMENT**

1. *Definitions*. Unless otherwise defined herein, the terms defined in the PacWest Bancorp 2017 Stock Incentive Plan, as amended (the "Plan") shall have the same defined meanings in this Stock Award Agreement ("Agreement") and the Notice of Stock Award Grant attached hereto as Appendix A.

2. *Grant of Stock Award*. Pursuant to the terms and conditions set forth in the Notice of Stock Award Grant, this Agreement, and the Plan, PacWest Bancorp (the "Company") grants to the grantee named in the Notice of Stock Award Grant ("Grantee") on the date of grant set forth in the Notice of Stock Award Grant ("Date of Grant") the number of Shares set forth in the Notice of Stock Award Grant. This Stock Award is intended to be a Restricted Stock Award or a Performance Stock Award, as provided in the Notice of Stock Award Grant.

3. *Vesting*. The Grantee shall vest in the Granted Stock in accordance with the vesting schedule provided for in the Notice of Stock Award Grant; provided, however, that the Grantee shall cease vesting in the Granted Stock on the Grantee's Termination Date or the date on which the Compensation Committee of the Company's Board of Directors (the "Administrator") determines that the performance goals, if any, provided for in the Notice of Stock Award Grant were not satisfied during the designated period of time. Notwithstanding the foregoing, upon the occurrence of a Vesting Event, the Grantee shall become 100% vested in those shares of Granted Stock that are outstanding on the date of the Vesting Event.

4. *Risk of Forfeiture*.

(a) *General Rule*. The Granted Stock shall initially be subject to a Risk of Forfeiture. The Shares subject to a Risk of Forfeiture shall be referred to herein as "Restricted Shares".

(b) *Lapse of Risk of Forfeiture*. The Risk of Forfeiture shall lapse as the Grantee vests in the Granted Stock.

(c) *Forfeiture of Granted Stock*. The Restricted Shares shall automatically be forfeited and immediately returned to the Company on the Grantee's Termination Date or the date on which the Administrator determines that the performance goals, if any, provided for in the Notice of Stock Award Grant were not satisfied during the designated period of time.

(d) *Additional Shares or Substituted Securities*. In the event of a stock split, reverse stock split, stock dividend, recapitalization, combination or reclassification of the Common Stock or any other increase or decrease in the number of issued and outstanding Shares effected without receipt of consideration by the Company, any new, substituted or additional securities or other property (including money paid other than as an ordinary cash dividend) which are by reason of such transaction distributed with respect to any Restricted Shares or into which such Restricted Shares thereby become convertible shall immediately be subject to a Risk of Forfeiture, which Risk of Forfeiture shall lapse at the same time and in the same manner as the Risk of Forfeiture to which the corresponding Restricted Share is subject.

(e) *Escrow*. Upon issuance, the stock certificates for Granted Stock shall be deposited in escrow with the Company to be held in accordance with the provisions of this Agreement. Any new, substituted or additional securities or other property described in Subsection (d) above shall immediately be delivered to the Company to be held in escrow, but only to the extent the

**EXHIBIT B - 177**

shares of Granted Stock are at the time Restricted Shares. All regular cash dividends on Restricted Shares (or other securities at the time held in escrow) shall be paid directly to the Grantee and shall not be held in escrow (such distributions may, however, be delivered to an address at the Company for delivery to the Grantee). Restricted Shares, together with any other assets or securities held in escrow hereunder, shall be (i) surrendered to the Company for cancellation upon forfeiture of the Restricted Shares; or (ii) released to the Grantee upon the Grantee's request to the Administrator on or after the date the shares of Granted Stock are no longer Restricted Shares. Grantee agrees not to make a request to the Company's transfer agent for delivery of any share certificates representing any shares of Granted Stock so long as such shares are Restricted Shares.

5. *Rights as a Stockholder*. The Grantee shall have the rights of a stockholder with respect to the dividends paid by the Company. Grantee shall not be entitled to vote any unvested shares of Granted Stock. Upon the vesting of any portion of the Stock Award, the Grantee shall have the voting rights with respect to any such vested shares of Granted Stock.

6. *Non-transferability of Stock Award*. Except as otherwise provided for in the Plan, this Stock Award may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent and distribution and may be exercised, during the lifetime of the Grantee, only by the Grantee. If the Grantee transfers all or part of this Stock Award pursuant to the previous sentence, then the terms of this Agreement, the Plan and the Notice of Stock Award shall apply to the transferee to the same extent as to the Grantee.

7. *Regulatory Compliance*. The issuance of Common Stock pursuant to this Agreement shall be subject to full compliance with all then applicable requirements of law and the requirements of any stock exchange or interdealer quotation system upon which the Common Stock may be listed or traded.

8. *Modification and Termination*. The rights of the Grantee are subject to modification and termination in certain events, as provided in the Plan.

9. *Withholding Tax*. The Company's obligation to deliver Shares or remove any restrictive legends upon vesting of such Shares under the Plan shall be subject to the satisfaction of all applicable federal, state and local income and employment tax withholding requirements. The Grantee shall pay to the Company an amount equal to the withholding amount (or the Company may withhold such amount from the Grantee's salary) in cash or, to the extent permitted under Section 402 of the Sarbanes-Oxley Act of 2002 and the regulations adopted pursuant thereto, with Shares (including previously vested Granted Stock) with an aggregate fair market value equal to the withholding amount calculated using the maximum statutory withholding amount permitted to be withheld under applicable tax rules.

10. *Nondisclosure*. Grantee acknowledges that the grant and terms of this Stock Award are confidential and may not be disclosed by Grantee to any other person, including other employees of the Company and other participants in the Plan, without the express written consent of the Company's Chief Executive Officer. Notwithstanding the foregoing, the Grantee may disclose the grant and terms of this Stock Award to the Grantee's family member, financial advisor, and attorney and as may be required by law or regulation. Any breach of this provision will be deemed to be a material breach of this Agreement.

11. *Governing Law*. This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of California without regard to principles of conflict of laws.

**EXHIBIT B - 178**

12. *Successors*. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their legal representatives, heirs, and permitted transferees, successors and assigns.

13. *Plan*. This Agreement and the Notice of Stock Award Grant are subject to all of the terms and provisions of the Plan, receipt of a copy of which is hereby acknowledged by the Grantee. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Administrator upon any questions arising under the Plan, this Agreement, and the Notice of Stock Award Grant.

14. *Rights to Future Employment*. This Stock Award does not confer upon the Grantee any right to continue in the Service of the Company or any Affiliate, nor does it limit the right of the Company to terminate the Service of the Grantee at any time.

15. *Restrictive Covenants.* The Grantee hereby agrees to be bound by the restrictive covenants set forth in **Annex A**.

16. *Entire Agreement*. The Notice of Stock Award Grant, this Agreement, and the Plan constitute the entire contract between the parties hereto with regard to the subject matter hereof. They supersede any other agreements, representations or understandings (whether oral or written and whether express or implied) between the parties which relate to the subject matter hereof.


By your signature and the signature of the Company's representative below, you and the Company agree that this Stock Award is granted under and governed by the terms and conditions of this Agreement and the Plan and the Notice of Stock Award Grant, both of which are attached and incorporated herein by reference. This Stock Award is of no force and effect until this Agreement is signed by you and the Company's representative, the Notice of Stock Award Grant is signed by you.


**GRANTEE:**                                      **PACWEST BANCORP**

By:  **Signed Electronically**          By:  *Rebecca Cordes*
         Name:                                           Rebecca H. Cordes
                                                         *Exec. Vice President, Human Resources*

**ANNEX A**
**RESTRICTIVE COVENANTS**

The Restrictive Covenants set forth in this Annex A to the Restricted Stock Award Agreement (the "Agreement") limit the ability of the Grantee to engage in certain practices during and following employment with the Company and is an integral part of the Agreement, without which the Company would not have granted the opportunity to earn the Restricted Stock Award.

1.      <u>Confidential Information</u>.  During your employment and thereafter, you shall hold in a fiduciary capacity for the benefit of the Company all trade secrets and Confidential Information relating to the Company and its businesses and investments, which will have been obtained by you during your employment by the Company and which is not generally available public knowledge (other than by acts by you in violation of this Agreement). Except as may be required or appropriate in connection with your carrying out your duties as an employee, you will not, without the prior written consent of the Company or as may otherwise be required by law or any legal process, any statutory obligation or order of any court or statutory tribunal of competent jurisdiction, or as is necessary in connection with any adversarial proceeding against the Company (in which case you will use your reasonable best efforts in cooperating with the Company in obtaining a protective order against disclosure by a court of competent jurisdiction), communicate or divulge any such trade secrets or Confidential Information to anyone other than the Company and those designated by the Company or on behalf of the Company in the furtherance of its business or to perform duties hereunder.  Notwithstanding anything to the contrary in this Agreement or otherwise, nothing shall limit your rights under applicable law to provide truthful information to any governmental entity or to file a charge with or participate in an investigation conducted by any governmental entity. You are hereby notified that the immunity provisions in Section 1833 of title 18 of the United States Code provide that an individual cannot be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that is made (1) in confidence to federal, state or local government officials, either directly or indirectly, or to an attorney, and is solely for the purpose of reporting or investigating a suspected violation of the law, (2) under seal in a complaint or other document filed in a lawsuit or other proceeding, or (3) to your attorney in connection with a lawsuit for retaliation for reporting a suspected violation of law (and the trade secret may be used in the court proceedings for such lawsuit) as long as any document containing the trade secret is filed under seal and the trade secret is not disclosed except pursuant to court order.

2.      <u>Non-Solicitation of Employees</u>.  You agree that during your employment, and for a six month period following the termination of your employment for any reason, you will not take any action, directly or indirectly (without the prior written consent of the Company), that causes or could reasonably be expected to cause any person who is then an employee of the Company or its Affiliates to resign from the Company or its Affiliates or to apply for or accept employment with any other business or enterprise.

3.      <u>Non-Solicitation of Customers</u>.  You agree that during your employment, and for a six month period following the termination of your employment for any reason, you will not, in any manner, directly or indirectly (without the prior written consent of the Company): (1) take any action that causes or could reasonably be expected to cause any customer or prospective customer of the Company or its Affiliates to whom you provided services or with whom you otherwise had contact to become a customer of or transact any business with a Competitive Business or reduce or refrain from doing any business with the Company or its Affiliates, (2) transact business with any customer or prospective customer that would cause you to be a Competitive Business, or (3) interfere with or damage any relationship between the Company and a customer or prospective customer.

4.       Reasonableness of Covenant.  You agree that the covenants contained herein are reasonable and necessary to protect the confidentiality of the customer lists, the terms, conditions and nature of customer relationships, and other trade secrets and Confidential Information concerning the Company and its Affiliates, acquired by you and to avoid actual or apparent conflicts of interest.

5.       Validity.   The terms and provisions of this Annex A are intended to be separate and divisible provisions and if, for any reason, any one or more of them is held to be invalid or unenforceable, neither the validity nor the enforceability of any other provision set forth herein thereby be affected.  If for any reason any court of competent jurisdiction will find any provisions of this Annex A unreasonable in duration or geographic scope or otherwise, you and the Company agree that the restrictions and prohibitions contained herein will be effective to the fullest extent allowed under applicable law in such jurisdiction

6.       Injunctive Relief.   Without limiting any remedies available to the Company, you acknowledge and agree that a breach of the covenants contained in Sections 1 through 3 of this Annex A will result in injury to the Company and its Affiliates for which there is no adequate remedy at law and that it will not be possible to measure damages for such injuries precisely.  Therefore, you agree that, in the event of such a breach or threat thereof, the Company will be entitled to seek a temporary restraining order and a preliminary and permanent injunction, without bond or other security, restraining you from engaging in activities prohibited by Sections 1 through 3 of this Annex A or such other relief as may be required specifically to enforce any of the covenants in Sections 1 through 3 of this Annex A.

7.       Definitions.   For purposes of these covenants, the following terms will have the following meanings:

(a)       "Competitive Business" means any business enterprise that either (i) engages in any activity that competes with the business of the Company or its Affiliates or (ii) holds a 5% or greater equity, voting or profit participation interest in any enterprise that engages in such a competitive activity.

(b)       "Confidential Information" means any information concerning the business or affairs of the Company or any of its Affiliates which is not generally known to the public and includes, but is not limited to, any file, document, book, account, list (including without limitation customer lists), process, patent, specification, drawing, design, computer program or file, computer disk, method of operation, recommendation, report, plan, survey, data, manual, strategy, financial data, client information or data (including the terms and conditions of any business relationships between clients and the Company or its Affiliates), or contract which comes to your knowledge in the course of your employment or which is generated by you in the course of performing your obligations to the Company whether alone or with others.

**KEBAQYR0**

**05/15/2020 06:05 PM U.S. Eastern Standard Time**

**ACCEPTED**

# EXHIBIT 4

**PACWEST BANCORP**
**STOCK INCENTIVE PLAN**
**NOTICE OF STOCK AWARD GRANT**

This Notice of Stock Award Grant is part of the Stock Award Agreement between Grantee and the Company dated **05/14/2019**   and is of no force and effect until the Stock Award Agreement is signed by Grantee and the Company's representative, this Notice of Stock Award Grant is signed by Grantee.

You have been granted the following Stock Award:

| | |
|---|---|
| Name of Grantee: | **DIANA REMINGTON  SMITHSON** |
| Total Number of Shares Granted: ("Granted Stock") | **2,013** |
| Type of Stock Award: | Restricted Stock Award |
| Date of Grant: | **05/14/2019** |
| Vesting Schedule: | The Granted Stock shall vest in full over 4 years. The first one-fourth of the Granted Stock shall vest on the date the Grantee completes one year of continuous Service after the Vesting Commencement Date. An additional one-fourth of the Granted Stock shall vest on the date the Grantee completes each year of continuous Service thereafter until Grantee is 100% vested in the Restricted Stock on the 4th year anniversary of the Vesting Commencement Date. |
| Vesting Commencement Date: | The date that is the last day of the month in which the Grant is made. |

Please sign below to acknowledge the terms and conditions of this Stock Award.

**ACKNOWLEDGED BY GRANTEE:**

By:      **Signed Electronically**

Name:      **DIANA REMINGTON  SMITHSON**

**PACWEST BANCORP**
**STOCK INCENTIVE PLAN**
**STOCK AWARD AGREEMENT**

1. *Definitions*. Unless otherwise defined herein, the terms defined in the PacWest Bancorp 2017 Stock Incentive Plan, as amended (the "Plan") shall have the same defined meanings in this Stock Award Agreement ("Agreement") and the Notice of Stock Award Grant attached hereto as Appendix A.

2. *Grant of Stock Award*. Pursuant to the terms and conditions set forth in the Notice of Stock Award Grant, this Agreement, and the Plan, PacWest Bancorp (the "Company") grants to the grantee named in the Notice of Stock Award Grant ("Grantee") on the date of grant set forth in the Notice of Stock Award Grant ("Date of Grant") the number of Shares set forth in the Notice of Stock Award Grant. This Stock Award is intended to be a Restricted Stock Award or a Performance Stock Award, as provided in the Notice of Stock Award Grant.

3. *Vesting*. The Grantee shall vest in the Granted Stock in accordance with the vesting schedule provided for in the Notice of Stock Award Grant; provided, however, that the Grantee shall cease vesting in the Granted Stock on the Grantee's Termination Date or the date on which the Compensation Committee of the Company's Board of Directors (the "Administrator") determines that the performance goals, if any, provided for in the Notice of Stock Award Grant were not satisfied during the designated period of time. Notwithstanding the foregoing, upon the occurrence of a Vesting Event, the Grantee shall become 100% vested in those shares of Granted Stock that are outstanding on the date of the Vesting Event.

4. *Risk of Forfeiture*.

   (a) *General Rule*. The Granted Stock shall initially be subject to a Risk of Forfeiture. The Shares subject to a Risk of Forfeiture shall be referred to herein as "Restricted Shares".

   (b) *Lapse of Risk of Forfeiture*. The Risk of Forfeiture shall lapse as the Grantee vests in the Granted Stock.

   (c) *Forfeiture of Granted Stock*. The Restricted Shares shall automatically be forfeited and immediately returned to the Company on the Grantee's Termination Date or the date on which the Administrator determines that the performance goals, if any, provided for in the Notice of Stock Award Grant were not satisfied during the designated period of time.

   (d) *Additional Shares or Substituted Securities*. In the event of a stock split, reverse stock split, stock dividend, recapitalization, combination or reclassification of the Common Stock or any other increase or decrease in the number of issued and outstanding Shares effected without receipt of consideration by the Company, any new, substituted or additional securities or other property (including money paid other than as an ordinary cash dividend) which are by reason of such transaction distributed with respect to any Restricted Shares or into which such Restricted Shares thereby become convertible shall immediately be subject to a Risk of Forfeiture, which Risk of Forfeiture shall lapse at the same time and in the same manner as the Risk of Forfeiture to which the corresponding Restricted Share is subject.

   (e) *Escrow*. Upon issuance, the stock certificates for Granted Stock shall be deposited in escrow with the Company to be held in accordance with the provisions of this Agreement. Any new, substituted or additional securities or other property described in Subsection (d) above shall immediately be delivered to the Company to be held in escrow, but only to the extent the

shares of Granted Stock are at the time Restricted Shares. All regular cash dividends on Restricted Shares (or other securities at the time held in escrow) shall be paid directly to the Grantee and shall not be held in escrow (such distributions may, however, be delivered to an address at the Company for delivery to the Grantee). Restricted Shares, together with any other assets or securities held in escrow hereunder, shall be (i) surrendered to the Company for cancellation upon forfeiture of the Restricted Shares; or (ii) released to the Grantee upon the Grantee's request to the Administrator on or after the date the shares of Granted Stock are no longer Restricted Shares. Grantee agrees not to make a request to the Company's transfer agent for delivery of any share certificates representing any shares of Granted Stock so long as such shares are Restricted Shares.

5. *Rights as a Stockholder*. The Grantee shall have the rights of a stockholder with respect to the dividends paid by the Company. Grantee shall not be entitled to vote any unvested shares of Granted Stock. Upon the vesting of any portion of the Stock Award, the Grantee shall have the voting rights with respect to any such vested shares of Granted Stock.

6. *Non-transferability of Stock Award*. Except as otherwise provided for in the Plan, this Stock Award may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent and distribution and may be exercised, during the lifetime of the Grantee, only by the Grantee. If the Grantee transfers all or part of this Stock Award pursuant to the previous sentence, then the terms of this Agreement, the Plan and the Notice of Stock Award shall apply to the transferee to the same extent as to the Grantee.

7. *Regulatory Compliance*. The issuance of Common Stock pursuant to this Agreement shall be subject to full compliance with all then applicable requirements of law and the requirements of any stock exchange or interdealer quotation system upon which the Common Stock may be listed or traded.

8. *Modification and Termination*. The rights of the Grantee are subject to modification and termination in certain events, as provided in the Plan.

9. *Withholding Tax*. The Company's obligation to deliver Shares or remove any restrictive legends upon vesting of such Shares under the Plan shall be subject to the satisfaction of all applicable federal, state and local income and employment tax withholding requirements. The Grantee shall pay to the Company an amount equal to the withholding amount (or the Company may withhold such amount from the Grantee's salary) in cash or, to the extent permitted under Section 402 of the Sarbanes-Oxley Act of 2002 and the regulations adopted pursuant thereto, with Shares (including previously vested Granted Stock) with an aggregate fair market value equal to the withholding amount calculated using the maximum statutory withholding amount permitted to be withheld under applicable tax rules.

10. *Nondisclosure*. Grantee acknowledges that the grant and terms of this Stock Award are confidential and may not be disclosed by Grantee to any other person, including other employees of the Company and other participants in the Plan, without the express written consent of the Company's Chief Executive Officer. Notwithstanding the foregoing, the Grantee may disclose the grant and terms of this Stock Award to the Grantee's family member, financial advisor, and attorney and as may be required by law or regulation. Any breach of this provision will be deemed to be a material breach of this Agreement.

11. *Governing Law*. This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of California without regard to principles of conflict of laws.

12. *Successors*. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their legal representatives, heirs, and permitted transferees, successors and assigns.

13. *Plan*. This Agreement and the Notice of Stock Award Grant are subject to all of the terms and provisions of the Plan, receipt of a copy of which is hereby acknowledged by the Grantee. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Administrator upon any questions arising under the Plan, this Agreement, and the Notice of Stock Award Grant.

14. *Rights to Future Employment*. This Stock Award does not confer upon the Grantee any right to continue in the Service of the Company or any Affiliate, nor does it limit the right of the Company to terminate the Service of the Grantee at any time.

15. *Restrictive Covenants.* The Grantee hereby agrees to be bound by the restrictive covenants set forth in **Annex A**.

16. *Entire Agreement*. The Notice of Stock Award Grant, this Agreement, and the Plan constitute the entire contract between the parties hereto with regard to the subject matter hereof. They supersede any other agreements, representations or understandings (whether oral or written and whether express or implied) between the parties which relate to the subject matter hereof.

By your signature and the signature of the Company's representative below, you and the Company agree that this Stock Award is granted under and governed by the terms and conditions of this Agreement and the Plan and the Notice of Stock Award Grant, both of which are attached and incorporated herein by reference. This Stock Award is of no force and effect until this Agreement is signed by you and the Company's representative, the Notice of Stock Award Grant is signed by you.

**GRANTEE:**                                              **PACWEST BANCORP**

By: **Signed Electronically**                  By: *Rebecca Cordes*
     Name:                                                Rebecca H. Cordes
                                                                        *Exec. Vice President, Human Resources*

## ANNEX A
## RESTRICTIVE COVENANTS

The Restrictive Covenants set forth in this Annex A to the Restricted Stock Award Agreement (the "Agreement") limit the ability of the Grantee to engage in certain practices during and following employment with the Company and is an integral part of the Agreement, without which the Company would not have granted the opportunity to earn the Restricted Stock Award.

1.   Confidential Information.   During your employment and thereafter, you shall hold in a fiduciary capacity for the benefit of the Company all trade secrets and Confidential Information relating to the Company and its businesses and investments, which will have been obtained by you during your employment by the Company and which is not generally available public knowledge (other than by acts by you in violation of this Agreement). Except as may be required or appropriate in connection with your carrying out your duties as an employee, you will not, without the prior written consent of the Company or as may otherwise be required by law or any legal process, any statutory obligation or order of any court or statutory tribunal of competent jurisdiction, or as is necessary in connection with any adversarial proceeding against the Company (in which case you will use your reasonable best efforts in cooperating with the Company in obtaining a protective order against disclosure by a court of competent jurisdiction), communicate or divulge any such trade secrets or Confidential Information to anyone other than the Company and those designated by the Company or on behalf of the Company in the furtherance of its business or to perform duties hereunder.  Notwithstanding anything to the contrary in this Agreement or otherwise, nothing shall limit your rights under applicable law to provide truthful information to any governmental entity or to file a charge with or participate in an investigation conducted by any governmental entity. You are hereby notified that the immunity provisions in Section 1833 of title 18 of the United States Code provide that an individual cannot be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that is made (1) in confidence to federal, state or local government officials, either directly or indirectly, or to an attorney, and is solely for the purpose of reporting or investigating a suspected violation of the law, (2) under seal in a complaint or other document filed in a lawsuit or other proceeding, or (3) to your attorney in connection with a lawsuit for retaliation for reporting a suspected violation of law (and the trade secret may be used in the court proceedings for such lawsuit) as long as any document containing the trade secret is filed under seal and the trade secret is not disclosed except pursuant to court order.

2.   Non-Solicitation of Employees.   You agree that during your employment, and for a six month period following the termination of your employment for any reason, you will not take any action, directly or indirectly (without the prior written consent of the Company), that causes or could reasonably be expected to cause any person who is then an employee of the Company or its Affiliates to resign from the Company or its Affiliates or to apply for or accept employment with any other business or enterprise.

3.   Non-Solicitation of Customers.   You agree that during your employment, and for a six month period following the termination of your employment for any reason, you will not, in any manner, directly or indirectly (without the prior written consent of the Company): (1) take any action that causes or could reasonably be expected to cause any customer or prospective customer of the Company or its Affiliates to whom you provided services or with whom you otherwise had contact to become a customer of or transact any business with a Competitive Business or reduce or refrain from doing any business with the Company or its Affiliates, (2) transact business with any customer or prospective customer that would cause you to be a Competitive Business, or (3) interfere with or damage any relationship between the Company and a customer or prospective customer.

4.      Reasonableness of Covenant.  You agree that the covenants contained herein are reasonable and necessary to protect the confidentiality of the customer lists, the terms, conditions and nature of customer relationships, and other trade secrets and Confidential Information concerning the Company and its Affiliates, acquired by you and to avoid actual or apparent conflicts of interest.

5.      Validity.   The terms and provisions of this Annex A are intended to be separate and divisible provisions and if, for any reason, any one or more of them is held to be invalid or unenforceable, neither the validity nor the enforceability of any other provision set forth herein thereby be affected.  If for any reason any court of competent jurisdiction will find any provisions of this Annex A unreasonable in duration or geographic scope or otherwise, you and the Company agree that the restrictions and prohibitions contained herein will be effective to the fullest extent allowed under applicable law in such jurisdiction

6.      Injunctive Relief.   Without limiting any remedies available to the Company, you acknowledge and agree that a breach of the covenants contained in Sections 1 through 3 of this Annex A will result in injury to the Company and its Affiliates for which there is no adequate remedy at law and that it will not be possible to measure damages for such injuries precisely.  Therefore, you agree that, in the event of such a breach or threat thereof, the Company will be entitled to seek a temporary restraining order and a preliminary and permanent injunction, without bond or other security, restraining you from engaging in activities prohibited by Sections 1 through 3 of this Annex A or such other relief as may be required specifically to enforce any of the covenants in Sections 1 through 3 of this Annex A.

7.      Definitions.   For purposes of these covenants, the following terms will have the following meanings:

(a)      "Competitive Business" means any business enterprise that either (i) engages in any activity that competes with the business of the Company or its Affiliates or (ii) holds a 5% or greater equity, voting or profit participation interest in any enterprise that engages in such a competitive activity.

(b)      "Confidential Information" means any information concerning the business or affairs of the Company or any of its Affiliates which is not generally known to the public and includes, but is not limited to, any file, document, book, account, list (including without limitation customer lists), process, patent, specification, drawing, design, computer program or file, computer disk, method of operation, recommendation, report, plan, survey, data, manual, strategy, financial data, client information or data (including the terms and conditions of any business relationships between clients and the Company or its Affiliates), or contract which comes to your knowledge in the course of your employment or which is generated by you in the course of performing your obligations to the Company whether alone or with others.

**JEI9MVAA**

**05/22/2019 04:18 PM U.S. Eastern Standard Time**

**ACCEPTED**

**EXHIBIT B - 188**

# EXHIBIT 5

**PACWEST BANCORP**
**STOCK INCENTIVE PLAN**
**NOTICE OF STOCK AWARD GRANT**

This Notice of Stock Award Grant is part of the Stock Award Agreement between Grantee and the Company dated **05/12/2020**   and is of no force and effect until the Stock Award Agreement is signed by Grantee and the Company's representative, this Notice of Stock Award Grant is signed by Grantee.

You have been granted the following Stock Award:

| | |
|---|---|
| Name of Grantee: | **DIANA REMINGTON  SMITHSON** |
| Total Number of Shares Granted: ("Granted Stock") | **2,254** |
| Type of Stock Award: | Restricted Stock Award |
| Date of Grant: | **05/12/2020** |
| Vesting Schedule: | The Granted Stock shall vest in full over 4 years. The first one-fourth of the Granted Stock shall vest on the date the Grantee completes one year of continuous Service after the Vesting Commencement Date. An additional one-fourth of the Granted Stock shall vest on the date the Grantee completes each year of continuous Service thereafter until Grantee is 100% vested in the Restricted Stock on the 4th year anniversary of the Vesting Commencement Date. |
| Vesting Commencement Date: | The date that is the last day of the month in which the Grant is made. |

Please sign below to acknowledge the terms and conditions of this Stock Award.

**ACKNOWLEDGED BY GRANTEE:**

By:    **Signed Electronically**

Name:   **DIANA REMINGTON  SMITHSON**

**EXHIBIT B - 190**

**PACWEST BANCORP**
**STOCK INCENTIVE PLAN**
**STOCK AWARD AGREEMENT**

1. *Definitions*. Unless otherwise defined herein, the terms defined in the PacWest Bancorp 2017 Stock Incentive Plan, as amended (the "Plan") shall have the same defined meanings in this Stock Award Agreement ("Agreement") and the Notice of Stock Award Grant attached hereto as Appendix A.

2. *Grant of Stock Award*. Pursuant to the terms and conditions set forth in the Notice of Stock Award Grant, this Agreement, and the Plan, PacWest Bancorp (the "Company") grants to the grantee named in the Notice of Stock Award Grant ("Grantee") on the date of grant set forth in the Notice of Stock Award Grant ("Date of Grant") the number of Shares set forth in the Notice of Stock Award Grant. This Stock Award is intended to be a Restricted Stock Award or a Performance Stock Award, as provided in the Notice of Stock Award Grant.

3. *Vesting*. The Grantee shall vest in the Granted Stock in accordance with the vesting schedule provided for in the Notice of Stock Award Grant; provided, however, that the Grantee shall cease vesting in the Granted Stock on the Grantee's Termination Date or the date on which the Compensation Committee of the Company's Board of Directors (the "Administrator") determines that the performance goals, if any, provided for in the Notice of Stock Award Grant were not satisfied during the designated period of time. Notwithstanding the foregoing, upon the occurrence of a Vesting Event, the Grantee shall become 100% vested in those shares of Granted Stock that are outstanding on the date of the Vesting Event.

4. *Risk of Forfeiture*.

    (a) *General Rule*. The Granted Stock shall initially be subject to a Risk of Forfeiture. The Shares subject to a Risk of Forfeiture shall be referred to herein as "Restricted Shares".

    (b) *Lapse of Risk of Forfeiture*. The Risk of Forfeiture shall lapse as the Grantee vests in the Granted Stock.

    (c) *Forfeiture of Granted Stock*. The Restricted Shares shall automatically be forfeited and immediately returned to the Company on the Grantee's Termination Date or the date on which the Administrator determines that the performance goals, if any, provided for in the Notice of Stock Award Grant were not satisfied during the designated period of time.

    (d) *Additional Shares or Substituted Securities*. In the event of a stock split, reverse stock split, stock dividend, recapitalization, combination or reclassification of the Common Stock or any other increase or decrease in the number of issued and outstanding Shares effected without receipt of consideration by the Company, any new, substituted or additional securities or other property (including money paid other than as an ordinary cash dividend) which are by reason of such transaction distributed with respect to any Restricted Shares or into which such Restricted Shares thereby become convertible shall immediately be subject to a Risk of Forfeiture, which Risk of Forfeiture shall lapse at the same time and in the same manner as the Risk of Forfeiture to which the corresponding Restricted Share is subject.

    (e) *Escrow*. Upon issuance, the stock certificates for Granted Stock shall be deposited in escrow with the Company to be held in accordance with the provisions of this Agreement. Any new, substituted or additional securities or other property described in Subsection (d) above shall immediately be delivered to the Company to be held in escrow, but only to the extent the

shares of Granted Stock are at the time Restricted Shares. All regular cash dividends on Restricted Shares (or other securities at the time held in escrow) shall be paid directly to the Grantee and shall not be held in escrow (such distributions may, however, be delivered to an address at the Company for delivery to the Grantee). Restricted Shares, together with any other assets or securities held in escrow hereunder, shall be (i) surrendered to the Company for cancellation upon forfeiture of the Restricted Shares; or (ii) released to the Grantee upon the Grantee's request to the Administrator on or after the date the shares of Granted Stock are no longer Restricted Shares. Grantee agrees not to make a request to the Company's transfer agent for delivery of any share certificates representing any shares of Granted Stock so long as such shares are Restricted Shares.

5. *Rights as a Stockholder*. The Grantee shall have the rights of a stockholder with respect to the dividends paid by the Company. Grantee shall not be entitled to vote any unvested shares of Granted Stock. Upon the vesting of any portion of the Stock Award, the Grantee shall have the voting rights with respect to any such vested shares of Granted Stock.

6. *Non-transferability of Stock Award*. Except as otherwise provided for in the Plan, this Stock Award may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent and distribution and may be exercised, during the lifetime of the Grantee, only by the Grantee. If the Grantee transfers all or part of this Stock Award pursuant to the previous sentence, then the terms of this Agreement, the Plan and the Notice of Stock Award shall apply to the transferee to the same extent as to the Grantee.

7. *Regulatory Compliance*. The issuance of Common Stock pursuant to this Agreement shall be subject to full compliance with all then applicable requirements of law and the requirements of any stock exchange or interdealer quotation system upon which the Common Stock may be listed or traded.

8. *Modification and Termination*. The rights of the Grantee are subject to modification and termination in certain events, as provided in the Plan.

9. *Withholding Tax*. The Company's obligation to deliver Shares or remove any restrictive legends upon vesting of such Shares under the Plan shall be subject to the satisfaction of all applicable federal, state and local income and employment tax withholding requirements. The Grantee shall pay to the Company an amount equal to the withholding amount (or the Company may withhold such amount from the Grantee's salary) in cash or, to the extent permitted under Section 402 of the Sarbanes-Oxley Act of 2002 and the regulations adopted pursuant thereto, with Shares (including previously vested Granted Stock) with an aggregate fair market value equal to the withholding amount calculated using the maximum statutory withholding amount permitted to be withheld under applicable tax rules.

10. *Nondisclosure*. Grantee acknowledges that the grant and terms of this Stock Award are confidential and may not be disclosed by Grantee to any other person, including other employees of the Company and other participants in the Plan, without the express written consent of the Company's Chief Executive Officer. Notwithstanding the foregoing, the Grantee may disclose the grant and terms of this Stock Award to the Grantee's family member, financial advisor, and attorney and as may be required by law or regulation. Any breach of this provision will be deemed to be a material breach of this Agreement.

11. *Governing Law*. This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of California without regard to principles of conflict of laws.

12. *Successors*. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their legal representatives, heirs, and permitted transferees, successors and assigns.

13. *Plan*. This Agreement and the Notice of Stock Award Grant are subject to all of the terms and provisions of the Plan, receipt of a copy of which is hereby acknowledged by the Grantee. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Administrator upon any questions arising under the Plan, this Agreement, and the Notice of Stock Award Grant.

14. *Rights to Future Employment*. This Stock Award does not confer upon the Grantee any right to continue in the Service of the Company or any Affiliate, nor does it limit the right of the Company to terminate the Service of the Grantee at any time.

15. *Restrictive Covenants.* The Grantee hereby agrees to be bound by the restrictive covenants set forth in **Annex A**.

16. *Entire Agreement*. The Notice of Stock Award Grant, this Agreement, and the Plan constitute the entire contract between the parties hereto with regard to the subject matter hereof. They supersede any other agreements, representations or understandings (whether oral or written and whether express or implied) between the parties which relate to the subject matter hereof.

By your signature and the signature of the Company's representative below, you and the Company agree that this Stock Award is granted under and governed by the terms and conditions of this Agreement and the Plan and the Notice of Stock Award Grant, both of which are attached and incorporated herein by reference. This Stock Award is of no force and effect until this Agreement is signed by you and the Company's representative, the Notice of Stock Award Grant is signed by you.

**GRANTEE:**                                         **PACWEST BANCORP**

By:  **Signed Electronically**          By:  *Rebecca Cordes*
    Name:                                         Rebecca H. Cordes
                                          *Exec. Vice President, Human Resources*

## ANNEX A
## RESTRICTIVE COVENANTS

The Restrictive Covenants set forth in this Annex A to the Restricted Stock Award Agreement (the "Agreement") limit the ability of the Grantee to engage in certain practices during and following employment with the Company and is an integral part of the Agreement, without which the Company would not have granted the opportunity to earn the Restricted Stock Award.

1.     Confidential Information.  During your employment and thereafter, you shall hold in a fiduciary capacity for the benefit of the Company all trade secrets and Confidential Information relating to the Company and its businesses and investments, which will have been obtained by you during your employment by the Company and which is not generally available public knowledge (other than by acts by you in violation of this Agreement). Except as may be required or appropriate in connection with your carrying out your duties as an employee, you will not, without the prior written consent of the Company or as may otherwise be required by law or any legal process, any statutory obligation or order of any court or statutory tribunal of competent jurisdiction, or as is necessary in connection with any adversarial proceeding against the Company (in which case you will use your reasonable best efforts in cooperating with the Company in obtaining a protective order against disclosure by a court of competent jurisdiction), communicate or divulge any such trade secrets or Confidential Information to anyone other than the Company and those designated by the Company or on behalf of the Company in the furtherance of its business or to perform duties hereunder.  Notwithstanding anything to the contrary in this Agreement or otherwise, nothing shall limit your rights under applicable law to provide truthful information to any governmental entity or to file a charge with or participate in an investigation conducted by any governmental entity. You are hereby notified that the immunity provisions in Section 1833 of title 18 of the United States Code provide that an individual cannot be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that is made (1) in confidence to federal, state or local government officials, either directly or indirectly, or to an attorney, and is solely for the purpose of reporting or investigating a suspected violation of the law, (2) under seal in a complaint or other document filed in a lawsuit or other proceeding, or (3) to your attorney in connection with a lawsuit for retaliation for reporting a suspected violation of law (and the trade secret may be used in the court proceedings for such lawsuit) as long as any document containing the trade secret is filed under seal and the trade secret is not disclosed except pursuant to court order.

2.     Non-Solicitation of Employees.  You agree that during your employment, and for a six month period following the termination of your employment for any reason, you will not take any action, directly or indirectly (without the prior written consent of the Company), that causes or could reasonably be expected to cause any person who is then an employee of the Company or its Affiliates to resign from the Company or its Affiliates or to apply for or accept employment with any other business or enterprise.

3.     Non-Solicitation of Customers.  You agree that during your employment, and for a six month period following the termination of your employment for any reason, you will not, in any manner, directly or indirectly (without the prior written consent of the Company): (1) take any action that causes or could reasonably be expected to cause any customer or prospective customer of the Company or its Affiliates to whom you provided services or with whom you otherwise had contact to become a customer of or transact any business with a Competitive Business or reduce or refrain from doing any business with the Company or its Affiliates, (2) transact business with any customer or prospective customer that would cause you to be a Competitive Business, or (3) interfere with or damage any relationship between the Company and a customer or prospective customer.

4.     <u>Reasonableness of Covenant</u>.  You agree that the covenants contained herein are reasonable and necessary to protect the confidentiality of the customer lists, the terms, conditions and nature of customer relationships, and other trade secrets and Confidential Information concerning the Company and its Affiliates, acquired by you and to avoid actual or apparent conflicts of interest.

5.     <u>Validity</u>.  The terms and provisions of this Annex A are intended to be separate and divisible provisions and if, for any reason, any one or more of them is held to be invalid or unenforceable, neither the validity nor the enforceability of any other provision set forth herein thereby be affected.  If for any reason any court of competent jurisdiction will find any provisions of this Annex A unreasonable in duration or geographic scope or otherwise, you and the Company agree that the restrictions and prohibitions contained herein will be effective to the fullest extent allowed under applicable law in such jurisdiction

6.     <u>Injunctive Relief</u>.  Without limiting any remedies available to the Company, you acknowledge and agree that a breach of the covenants contained in Sections 1 through 3 of this Annex A will result in injury to the Company and its Affiliates for which there is no adequate remedy at law and that it will not be possible to measure damages for such injuries precisely.  Therefore, you agree that, in the event of such a breach or threat thereof, the Company will be entitled to seek a temporary restraining order and a preliminary and permanent injunction, without bond or other security, restraining you from engaging in activities prohibited by Sections 1 through 3 of this Annex A or such other relief as may be required specifically to enforce any of the covenants in Sections 1 through 3 of this Annex A.

7.     <u>Definitions</u>.  For purposes of these covenants, the following terms will have the following meanings:

(a)     "<u>Competitive Business</u>" means any business enterprise that either (i) engages in any activity that competes with the business of the Company or its Affiliates or (ii) holds a 5% or greater equity, voting or profit participation interest in any enterprise that engages in such a competitive activity.

(b)     "<u>Confidential Information</u>" means any information concerning the business or affairs of the Company or any of its Affiliates which is not generally known to the public and includes, but is not limited to, any file, document, book, account, list (including without limitation customer lists), process, patent, specification, drawing, design, computer program or file, computer disk, method of operation, recommendation, report, plan, survey, data, manual, strategy, financial data, client information or data (including the terms and conditions of any business relationships between clients and the Company or its Affiliates), or contract which comes to your knowledge in the course of your employment or which is generated by you in the course of performing your obligations to the Company whether alone or with others.

**KEC8JVGA**

**05/16/2020 02:36 PM U.S. Eastern Standard Time**

**ACCEPTED**

**<u>PROOF OF SERVICE</u>**

*PacWest Bancorp v. David I. Rainer*
**Case No. 20STCV46002 [2296.4]**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 777 South Figueroa Street, Suite 3800, Los Angeles, CA 90017.

On October 21, 2021, I served true copies of the foregoing document described as **PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES** and **SUMMONS to Second Amended Complaint** on the interested parties in this action as follows:

| | |
|---|---|
| Bert H. Deixler, Esq.<br>Nary Kim, Esq.<br>Nicholas F. Daum, Esq.<br>KENDALL BRILL & KELLY LLP<br>10100 Santa Monica Blvd., Suite 1725<br>Los Angeles, California 90067<br>Telephone: (310) 556-2700<br>Facsimile: (310) 556-2705<br>E-mail(s): bdeixler@kbkfirm.com;<br>nkim@kbkfirm.com; crossi@kbkfirm.com;<br>ndaum@kbkfirm.com | Attorneys for Defendant/Cross-Complainant<br>DAVID I. RAINER |
| Brent Caslin, Esq.<br>Alexander M. Smith, Esq.<br>Madeline P. Skitzki, Esq.<br>Elizabeth Avunjian, Esq.<br>Chris Ward<br>Christal Oropeza<br>JENNER & BLOCK LLP<br>633 West 5th Street, Suite 3300<br>Los Angeles, CA 90071<br>Telephone: (213) 239-5100<br>Email: bcaslin@jenner.com; asmith@jenner.com;<br>mskitzki@jenner.com; eavunjian@jenner.com;<br>cward@jenner.com; COropeza@jenner.com;<br>eacedo@kbkfirm.com | Attorneys for Defendants<br>BANK OF SOUTHERN CALIFORNIA,<br>N.A. and SOUTHERN CALIFORNIA<br>BANCORP |

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused copies of the document to be sent from e-mail address hwells@bautelaw.com to the persons at the e-mail addresses listed in the Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on October 21, 2021, at Los Angeles, California.

_____
Holly Wells

332718.3

97

**PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT B - 196**

EXHIBIT C

EXHIBIT C - 197

**FILED**
Superior Court of California
County of Los Angeles

04/01/2022

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ E. Avena _____ Deputy

1 **BAUTE CROCHETIERE & HARTLEY LLP**
MARK D. BAUTE (State Bar No. 127329)
2 mbaute@bautelaw.com
DAVID P. CROCHETIERE (State Bar No. 115582)
3 dcrochetiere@bautelaw.com
MONIQUE ALONSO
4 malonso@bautelaw.com (State Bar No. 127078)
BRYAN D. ROTH (State Bar No. 299906)
5 broth@bautelaw.com
777 South Figueroa Street, Suite 3800
6 Los Angeles, California 90017
Telephone: (213) 630-5000
7 Facsimile: (213) 683-1225

8 Attorneys for Plaintiff/Cross-Defendant
PACWEST BANCORP, Plaintiff PACIFIC
9 WESTERN BANK and Cross-Defendant
JOHN M. EGGEMEYER

10

11 **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

12

13 PACWEST BANCORP, a Delaware
corporation; PACIFIC WESTERN BANK, a
14 California State Chartered Bank,

15           Plaintiffs,

16     v.

17 DAVID I. RAINER, an Individual; BANK OF
SOUTHERN CALIFORNIA, N.A., a United
18 States Corporation; SOUTHERN
CALIFORNIA BANCORP, a United States
19 Corporation; RICHARD HERNANDEZ, an
Individual; DIANA REMINGTON
20 SMITHSON, an Individual; and DOES 1-20,
Inclusive,

21

22           Defendants.

23 DAVID I. RAINER, an individual,

24           Cross-Complainant,

25     v.

26 PACWEST BANCORP, a Delaware
corporation; JOHN M. EGGEMEYER, an
27 individual; and DOES 1-20, inclusive,

28           Cross-Defendants.

Case No. 20STCV46002

Assigned for All Purposes to:
Hon. Richard J. Burdge, Jr., Dept. 37

**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

**DEMAND FOR JURY TRIAL**

FAC Filed: April 9, 2021
FACC Filed: May 6, 2021

Trial Date: November 15, 2022

344176.3

**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

Electronically Received 04/01/2022 04:07 PM

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

**EXHIBIT C - 198**

1          Plaintiffs PACWEST BANCORP ("PacWest") and PACIFIC WESTERN BANK

2 ("PacWest Bank") (collectively, "Plaintiffs") complain and allege against Defendants DAVID I.

3 RAINER, BANK OF SOUTHERN CALIFORNIA, N.A., SOUTHERN CALIFORNIA

4 BANCORP, RICHARD HERNANDEZ and DIANA REMINGTON SMITHSON (collectively,

5 "Defendants") as follows:

6                      **INTRODUCTION**

7       1.   This complaint arises out of the systematic and illegal raiding of the employees and

8 clients of PacWest Bank, a wholly-owned subsidiary of PacWest, orchestrated by David I. Rainer

9 ("Rainer"). Rainer is a former executive of CU Bancorp ("CUB"), which was acquired by

10 PacWest in 2017. Rainer was aided and abetted in this wholesale assault on PacWest Bank by his

11 new employer and PacWest Bank's direct competitor, Bank of Southern California, N.A. ("SoCal

12 Bank") and its holding company, Southern California Bancorp ("SoCal Bancorp"); former

13 PacWest Bank Executive Vice President,[1] Richard Hernandez, aka Rich Hernandez

14 ("Hernandez"); and Diana Remington Smithson, aka Danni Remington ("Smithson"), a former

15 Senior Vice President, Regional Manager, who joined Rainer at SoCal Bank.  To date, as a result

16 of the illegal raiding plan orchestrated by Rainer, implemented by Hernandez and Smithson, and

17 actively supported by SoCal Bank and SoCal Bancorp, 30 PacWest Bank employees, including

18 key executives and client relationship personnel, have left PacWest Bank to join Rainer,

19 Hernandez and Smithson at SoCal Bank, bringing with them millions of dollars in client deposits

20 and loans.

21       2.   Rainer's behavior, and his violations of both the law and industry norms, is made all

22 the more appalling because during the very time that Rainer was planning and executing this

23 illegal raiding, he was every month accepting money from PacWest to serve as a consultant to and

24

25 ───────────────

[1]   Following the sad and unexpected passing of Casey "Joe" Cecala, President of PacWest

26 Bank's Los Angeles Region, Hernandez was offered the late Mr. Cecala's position starting
November 1, 2020. At one point Hernandez held himself out as having served as "Regional

27 President" for PacWest Bank.  He did not.  Not one day.  Hernandez's last day worked with
PacWest was October 23, 2020.  In the weeks and months prior to his separation date, and

28 afterward as alleged herein, he instead engaged in wrongful acts against Plaintiffs.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

344176.3                 2

**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT C - 199**

"ambassador" for the very bank he was plotting to raid. As part of CUB's merger with PacWest in April 2017, Rainer and PacWest entered into a consulting agreement, which was later amended and restated on May 25, 2017 (the "Agreement"). In exchange for an annual fee of $550,000, paid monthly, Rainer agreed to serve as consultant to PacWest and its subsidiaries, including PacWest Bank. For the first three years of the Agreement (referred to as the "Restricted Period") Rainer was prohibited from soliciting any employee of PacWest or its subsidiaries to resign or to apply for, or accept employment with, any competitive enterprise. Rainer was separately required, from the effective date of the Agreement through May 2022 to, among other things, foster and grow PacWest's business, attract and retain new clients, and help preserve business and employee relationships and retain key personnel.

3.     Both Hernandez and Smithson, before and at the time they left PacWest Bank, and during the period they participated in Rainer's, SoCal Bank's and SoCal Bancorp's illegal raiding plan, were subject to restrictive covenants contained in the Stock Incentive Plan Stock Award Agreements each signed in 2019 and 2020 ("Stock Award Agreements"). These covenants required that during their employment, and for a six month period following the termination of their employment for any reason, Hernandez and Smithson would not take any action directly or indirectly to 1) cause any employees of PacWest or its affiliates to resign, apply or accept employment with any other business or enterprise, or 2) cause any customer or prospective customer of PacWest or its affiliates to become a customer of, or transact any business with, a competitive business, or reduce or refrain from doing any business with PacWest or its affiliates. By actively participating in Rainer's scheme before and after their resignations, and by directly soliciting PacWest Bank's employees and customers after they resigned from PacWest Bank, Hernandez and Smithson directly violated their Stock Award Agreements.

4.     On November 5, 2020, while still bound by the terms of the Agreement and while still receiving $45,833 a month for providing consulting services to PacWest and its subsidiaries, including PacWest Bank, Rainer and SoCal Bank announced that Rainer had taken a position as Executive Chairman of the Board of Directors of SoCal Bank, a PacWest Bank competitor.  Four days later, on November 9, a flurry of numerous PacWest Bank employees tendered their

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1  resignations, resignations PacWest later learned Hernandez had coordinated while still employed
2  at PacWest.  This flurry of departures marked the beginning of a mass exodus of PacWest Bank
3  personnel, and in some instances, their corresponding client accounts. These departing employees
4  were the very PacWest Bank executives, managers and employees, and client relationships, Rainer
5  was contractually bound to help PacWest preserve.

6      5.   Rainer planned to breach the Agreement well in advance, keeping his plan secret so as
7  to continue to unjustly receive compensation under the Agreement for as long as possible. Rainer
8  waited until after the Restricted Period expired on October 20, 2020, to publicly announce his new
9  position at SoCal Bank, and the resignations of the PacWest Bank employees he, Hernandez,
10  SoCal Bank and SoCal Bancorp had solicited behind the scenes began.

11      6.   Rainer's plan coalesced months before the November 5 announcement, with the
12  knowledge and cooperation of his soon-to-be employers, SoCal Bank, and SoCal Bancorp. While
13  still well within the Restricted Period, in August 2020 Rainer laid out in detail his scheme --
14  dubbed "Project Slingshot" -- to the SoCal Bank Board of Directors (the "Board").  At that time
15  Rainer also demanded that "as a condition to the implementation of the Plan" SoCal Bank
16  indemnify and hold him harmless from any and all actions that PacWest might take relating to the
17  Agreement. The Board enthusiastically agreed. The necessary approvals and coverage having been
18  obtained, Rainer then advised the Board that he anticipated SoCal Bank could have in place a set
19  of "Definitive Documents" that would provide for Rainer and "my management candidates to be
20  hired and the Bank and Company boards to be reconstituted, as provided herein, on or about
21  October 21, 2020," literally the day after the expiration of the Restricted Period.

22      7.   Rainer's breach of the Agreement disentitles him to any of the fees he previously
23  received under the Agreement. Rainer should be required to return the ill-gotten compensation he
24  received as PacWest's "ambassador" while actively causing harm to PacWest.  Hernandez and
25  Smithson are liable for their brazen disregard of their obligations under the Stock Award
26  Agreements while accepting the benefits, for breach of the fiduciary duties they owed PacWest
27  Bank as a Regional Vice President and Senior Vice President, Regional Manager, and for their
28  active participation in Rainer's scheme. SoCal Bank and SoCal Bancorp are liable for their own

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

role in Rainer's scheme, and for conspiring with Rainer and aiding and abetting Rainer's, Hernandez' and Smithson's theft of trade secrets, various breaches of their fiduciary duties owed to PacWest, their inducement of Rainer, Hernandez and Smithson to breach their contracts, their intentional and negligent interference with prospective economic advantage and contractual relations, and for unfair competition.

## THE PARTIES, JURISDICTION AND VENUE

8.  Plaintiff PacWest is a corporation organized and existing under the laws of Delaware with its principal place of business in Los Angeles County, California. It is the holding company for PacWest Bank.

9.  Plaintiff PacWest Bank is a California state-chartered bank organized and existing under the laws of California, with its principal place of business in Los Angeles County, California.

10. Defendant Rainer is an individual with his residence and principal place of business in Los Angeles County, California.

11. Defendant SoCal Bank is a corporation organized and existing under the laws of the United States with its principal place of business in San Diego, California.

12. Defendant SoCal Bancorp is a corporation organized and existing under the laws of California with its principal place of business in San Diego, California.

13. Defendant Hernandez is an individual with his residence and principal place of business in Los Angeles County, California.

14. Defendant Smithson is an individual with her residence and principal place of business in Orange County, California.

15. The actions giving rise to this complaint took place within the County of Los Angeles, California. The Agreement and Stock Award Agreements at issue were entered into, performed and breached within the County of Los Angeles, California.

16. Plaintiffs are unaware of the true names and capacities of the defendants sued herein under the fictitious names DOE 1 – DOE 20, inclusive. Plaintiffs will seek leave to amend to state the true names and capacities of such defendants when such information is ascertained.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

17. Plaintiffs are informed and believe, and thereon allege, that, at all times relevant, each of the defendants was and is the agent, servant and employee of each of the other defendants, and all of the things alleged to have been done by each defendant were done in the capacity of and as agent of the other defendants.

**GENERAL ALLEGATIONS**

**PacWest Merges with CUB**

18. PacWest Bank operates a regional banking business with 72 full-service branches in California. PacWest Bank provides commercial banking services, including real estate, construction, and commercial loans to small and medium-sized businesses.

19. CUB was founded in 2005 in Los Angeles, California. Prior to the merger between PacWest and CUB, Rainer was the Chairman and Chief Executive Officer of CUB. He accumulated 275,000 shares of CUB stock.

20. In or about the beginning of 2017, PacWest's Chief Executive Officer and Director, Matthew P. Wagner ("Wagner"), learned of Rainer's alleged desire to retire from the banking industry with one final cash-out liquidity event through the sale or merger of CUB.

21. Initially, Wagner was not interested in a PacWest merger or acquisition of CUB. Wagner was familiar with Rainer's history of raiding key personnel from his former employers after he left, including Rainer poaching employees from an Encino-based bank called California United Bank in the late 1990s when Wagner hired Rainer to run the Santa Monica branch of Western Bancorp, where Wagner was the President and CEO.

22. However, in their initial meeting, and in their subsequent conversations, Rainer reassured Wagner that he had no intention of starting or joining a competing bank, that he and his entire team were nearing retirement and that they wanted to land at PacWest Bank as their final destination in the banking industry. Rainer also represented to Wagner that the biggest reason for his cashing out and his planned retirement was that he needed to step away from his professional life to focus on his family. In reliance on these representations, PacWest began negotiations with Rainer and CUB.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

344176.3

6

**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

EXHIBIT C - 203

23. On October 20, 2017, PacWest merged with CUB. Rainer was to receive a payment in the amount of $4,748,247.00.

**Rainer's Consulting Agreement**

24. PacWest and Rainer agreed to a five-year payment structure, with a three non-compete period (the "Restricted Period") and a five-year consulting period.

25. On April 5, 2017, Rainer signed a consulting agreement. The consulting agreement was amended and restated on May 25, 2017, as the Agreement. By its terms, Rainer was to provide the specific consulting services set out in Exhibit A of the Agreement for 65 months from the effective date, or roughly through October 2022.

26. Payments to Rainer under the Agreement were contingent on his cooperation and compliance with the terms of the Agreement.

27. Exhibit A to the Agreement requires that Rainer perform the following services:

1) Assist with transition issues relating to the merger. Such activities may include attending meetings, presentations and communications.

2) Provide strategic advice and counsel to [PacWest] on matters for which you have personal knowledge. Such guidance may include specific account and client history, new market development, portfolio retention strategies and broadening financial services.

3) Facilitate customer outreach, including brokering introductions and fostering business relationships between legacy clients and the acquiring organization.

4) Act as an ambassador to [PacWest] and be available to meet with, and be involved with, clients and counterparties, at the request of [PacWest], where [PacWest] believes your personal knowledge, attendance and participation could be beneficial.

5) Preserve business and employee relationships to mitigate disruption and anxiety associated with the transaction and change. This includes promoting continuity and retaining key personnel.

6) Perform new business development opportunities to attract and retain new clients. As a leader in the industry, help promote the reputation of [PacWest] to key merchant bank markets.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1       7)  Perform such other services as the parties may mutually agree upon from time to

2    time during the term of the agreement.

3       28. In exchange for performing the above services, PacWest paid Rainer a yearly

4    consulting fee of $550,000, in roughly equal installments on a monthly basis.

5       29. Until November 5, 2020, Rainer provided regular monthly reports to PacWest on his

6    consulting work under the Agreement.

7    **Rainer, Hernandez and Smithson Raid PacWest Employees and Clients**

8       30. On November 5, 2020, SoCal Bancorp announced that it had named Rainer Executive

9    Chairman of the Board of Directors of SoCal Bank.

10       31. Almost immediately following the November 5, 2020, announcement, a number of key

11    personnel resigned from their positions at PacWest Bank. Behind the scenes and with the

12    knowledge and aid of SoCal Bank, Hernandez assisted in facilitating and coordinating these

13    departures. The number of departing employees has since grown to 30, and encompasses

14    personnel in all aspects of banking, largely at the executive, and relationship and portfolio

15    management levels, including operations, customer service, business development and loans.

16       32. . Plaintiffs are informed and believe that each of the following PacWest Bank

17    employees accepted positions at SoCal Bank:

18       33. Andrea Cunha left her position as a Loan Processor at PacWest Bank and joined SoCal

19    Bank.

20       34. Rodrigo Perez left his position as a Branch Operations Manager at PacWest Bank and

21    joined SoCal Bank.

22       35. Mouzone Boulden left her position as a Senior Financial Services Representative at

23    PacWest Bank and joined SoCal Bank.

24       36. Jonathan Schumacher left his position as a Branch Operations Specialist at PacWest

25    Bank and joined SoCal Bank.

26       37. Linda Aghajanian left her position as a Real Estate Collateral Analyst at PacWest Bank

27    and joined SoCal Bank.

28

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

38. Olivia Aceves left her position as a Loan Processor at PacWest Bank and joined SoCal Bank.

39. Gladys Gonzalez left her position as a Senior Loan Processor at PacWest Bank and joined SoCal Bank.

40. Stephanie Johnson left her position as a Senior Loan Processor at PacWest Bank and joined SoCal Bank.

41. Sean Walden left his position as a Vice President, Portfolio Manager at PacWest Bank and joined SoCal Bank.

42. Laurie Kasper left her position as a Vice President, Relationship Manager at PacWest Bank and joined SoCal Bank.

43. Robel Neway left his position as a Vice President, Relationship Manager at PacWest Bank and joined SoCal Bank.

44. Greg Spencer left his position as a Vice President, Relationship Manager at PacWest Bank and joined SoCal Bank.

45. Megan Newville left her position as an Assistant Vice President, Portfolio Manager at PacWest Bank and joined SoCal Bank.

46. Smithson left her position as a Senior Vice President, Regional Manager at PacWest Bank and joined SoCal Bank.

47. Claudia Castillo left her position as an Assistant Vice President, Senior Loan Processor at PacWest Bank and joined SoCal Bank.

48. Maureen Boggs left her position as a Senior Vice President, Relationship Manager at PacWest Bank and joined SoCal Bank.

49. Richard Bontempi left his position as a Senior Vice President, Relationship Manager at PacWest Bank and joined SoCal Bank.

50. Shelley Gibson left her position as a Senior Vice President, Relationship Manager at PacWest Bank and joined SoCal Bank

51. Jonathan Perez left his position as a Senior Vice President, Relationship Manager at PacWest Bank and joined SoCal Bank.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

344176.3

9

**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT C - 206**

52. Daniel Quick left his position as a Senior Vice President, Relationship Manager at PacWest Bank and joined SoCal Bank.

53. Don Williams left his position as a Senior Vice President, Real Estate at PacWest Bank and joined SoCal Bank.

54. William Sloan left his position as an Executive Vice President, Regional Manager at PacWest Bank and joined SoCal Bank.

55. Hernandez left his position as a Regional Vice President at PacWest Bank and joined SoCal Bank.

56. Jordan Cole left his position as a Senior Financial Services Representative at PacWest Bank and joined SoCal Bank.

57. Andranik Dertsakyan left his position at PacWest Bank and joined SoCal Bank.

58. Marvin Contreras left his position as a Senior Teller at PacWest Bank and joined SoCal Bank.

59. Kevin Guardado left his position as a Credit Analyst at PacWest Bank and joined SoCal Bank.

60. Michelle Henry left her position as a Vice President, Portfolio Manager at PacWest Bank and joined SoCal Bank.

61. Erez Hahn left his position at PacWest Bank and joined SoCal Bank.

62. Aroutian "Eric" Kirakosian left his position as an Assistant Branch Manager at PacWest Bank and joined SoCal Bank.

63. In addition to the above listed employees who left PacWest Bank, other current PacWest Bank employees were solicited by Rainer and/or other representatives of SoCal Bank and declined an offer to join SoCal Bank.

64. Stephen Cobb, a Senior Utility Representative for a PacWest Bank region, was solicited to join SoCal Bank.

65. Ashley Duran, a Branch Operations Manager for PacWest Bank, was solicited to join SoCal Bank.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

66. Steve Corona, an Executive Vice President Regional Manager for PacWest Bank, was solicited to join SoCal Bank.

67. Arthur Bergman, a Senior Vice President Regional Manager for PacWest Bank, was solicited to join SoCal Bank.

68. Brian Ishida, an Executive Vice President Regional Manager for PacWest Bank, was solicited to join SoCal Bank.

69. Kim Defenderfer, an Executive Vice President for PacWest Bank, was solicited to join SoCal Bank.

70. Morgan Ritzer, an Assistant Branch Operations Manager for PacWest Bank, was solicited to join SoCal Bank.

71. Matt Giroux, a Branch Operations Manager for PacWest Bank, was solicited to join SoCal Bank.

72. Before and after he resigned from PacWest Bank, Hernandez was actively involved in recruiting PacWest Bank employees to join SoCal Bank. Among other things, Hernandez in many cases was the point person at SoCal Bank that PacWest Bank employees were told to contact, on Hernandez' private cell phone number, after they had been solicited by other employees to move to SoCal Bank. Hernandez arranged for offer letters from SoCal Bank for these PacWest Bank employees. He instructed the departing PacWest Bank employees to all tender their resignations on a date selected by Hernandez, which they did.

73. Before and after he resigned from PacWest Bank, and during the period he participated in the illegal raiding plan, Hernandez was subject to the restrictive covenants contained in the Stock Award Agreements.

74. Before and after she resigned from PacWest Bank, Smithson was actively involved in recruiting PacWest Bank employees to join SoCal Bank and in soliciting PacWest Bank clients to transfer their business to SoCal Bank. Among other things, Smithson successfully solicited former PacWest Bank employee Stephanie Johnson to leave PacWest Bank and join SoCal Bank. Within weeks of joining SoCal Bank Smithson also solicited a number of PacWest Bank clients to

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

11

**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT C - 208**

1  transfer their business to SoCal Bank, and encouraged Johnson to do the same, coordinating with

2  Johnson which PacWest Bank clients to contact.

3     75. Before and at the time she left PacWest Bank and during the period she participated in

4  the illegal raiding plan, Smithson was subject to the restrictive covenants contained in the Stock

5  Award Agreements.

6  **Project Slingshot**

7     76. In the months prior to the public announcement of his position at SoCal Bank, Rainer,

8  with the assistance and knowledge of SoCal Bancorp and SoCal Bank, had been communicating

9  with PacWest Bank executives, managers and employees in an attempt to persuade them to resign

10  their positions with PacWest Bank and take positions at SoCal Bank.  On August 18, 2020, while

11  Rainer was still within the Restricted Period, Rainer sent a letter, characterized as a Letter of

12  Interest ("LOI"), to the Board in which he described a "new strategic plan", dubbed "Project

13  Slingshot", he proposed for SoCal Bank. Rainer told the Boards that "[A]s an integral part of the

14  Plan, a number of those highly skilled former CUB professionals *will be joining* the BSC

15  management team and the Boards of the Bank and the Company." (Emphasis added.) Rainer

16  specifically brought his Agreement with PacWest to the attention of the Boards and demanded that

17  "… as a condition to the implementation of the Plan, BSC will indemnify and hold me harmless

18  from any and all actions that PacWest may take relating to the consulting agreement, including but

19  not limited to guaranteeing the payment to me of the Retainer and paying all reasonable costs and

20  expenses incurred by me to defend any claims that PacWest may make relating to the consulting

21  agreement."

22     77. The "Retainer" referred to by Rainer is the amount PacWest was to pay Rainer under

23  the Agreement for his promised services to, among other things, foster and grow PacWest's

24  business, attract and retain new clients, and help preserve business and employee relationships and

25  retain key personnel.

26     78. Rainer made clear in the LOI that, as of August 18, 2020, he already had recruited and

27  had in place candidates for the positions of Chief Credit Officer, Chief Operating Officer, Director

28  of Operations and Chief Risk Officer. He told the Boards that he could not include their names in

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1   the LOI "[t]o protect their privacy and current employment positions." In the LOI Rainer also told

2   the Board he anticipated that SoCal Bank would have in place, with the necessary Board approval

3   having already been obtained, a set of "Definitive Documents" that would provide for him and

4   "my management candidates to be hired and the Bank and Company boards to be reconstituted, as

5   provided herein, on or about October 21, 2020," upon the expiration of the Restricted Period.

6          79. In August 2020, and perhaps earlier, thus within the Restricted Period, Rainer also

7   presented SoCal Bank with a deck of slides labelled "strictly private and confidential" for the

8   "Project Slingshot" plan which, the presentation stated, was designed to "attract key high-level

9   executives and top business development officers" to SoCal Bank. Rainer boasted in the materials

10  of his "proven ability to attract top talent in the market" and told the SoCal Bank Board of

11  Directors that his plan would involve the Bank hiring 60 new employees "at the end of 2020 and

12  beginning of 2021." The Project Slingshot materials identified "a series of meetings with BCAL's

13  [SoCal Bank] CEO and President" in which Rainer discussed his plan prior to the creation of the

14  August 2020 presentation.

15  **Defendants Raid PacWest Bank's Clients**

16         80. In addition to raiding key employees, Rainer, Hernandez, Smithson and/or SoCal Bank

17  and SoCal Bancorp, have solicited numerous clients of PacWest Bank to transfer deposits to

18  SoCal Bank and/or pay off mortgages and commercial loans held by PacWest Bank in order to

19  take the business to SoCal Bank.

20         81. Since November 5, 2020, over $65 million in client deposits associated with the

21  personnel who resigned have been transferred out of PacWest Bank.

22         82. Since November 5, 2020, over $114 million in mortgages and/or commercial loans that

23  were former CUB notes have been paid off.

24                              **FIRST CAUSE OF ACTION**

25                         **FOR BREACH OF WRITTEN CONTRACT**

26   **(Plaintiffs PacWest and PacWest Bank Against Defendants Rainer and Does 1-20)**

27         83. Plaintiffs re-allege and hereby incorporate paragraphs 1 through 82 of this complaint as

28  if fully set forth herein.

344176.3                                    13

84. The Agreement between PacWest and Rainer is a valid, enforceable contract. The Agreement is attached hereto as Exhibit 1 and incorporated herewith.

85. The Agreement was made expressly for the benefit of PacWest Bank as a third-party beneficiary in that the client and employee relationships that Rainer was obligated to foster, promote and preserve were the business and employee relationships of PacWest Bank.

86. Rainer wrongfully violated Agreement in at least the following ways:

(a)    on information and belief, by soliciting employees of PacWest Bank during the Restricted Period, including but not limited to Hernandez, to apply for or accept employment at SoCal Bank, which under the terms of the Agreement, was a "Competitive Enterprise;"

(b)    by inducing, during and/or after the Restricted Period, at least 30 PacWest Bank employees, including a number of executive relationship managers, portfolio managers, regional managers and loan processors, to leave their positions at PacWest Bank and to take positions at a competing bank, SoCal Bank, actions which were intended to and did have a significant detrimental effect on PacWest's business;

(c)    on information and belief, by disclosing to SoCal Bank and SoCal Bancorp confidential and proprietary information he learned through his consulting relationship with PacWest and/or obtained from the PacWest Bank employees he induced to resign, and by intentionally and improperly using that confidential and proprietary information to solicit existing or potential PacWest Bank clients to terminate their relationships with PacWest Bank and enter into business relationships with SoCal Bank;

(d)    by willfully failing to perform his assigned duties under the Agreement; and

(e)    by purposefully creating an environment of anxiety and destabilization at PacWest Bank as a result of mass resignations and loss of client relationships.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

14

**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT C - 211**

87. PacWest performed all of its obligations under the Agreement other than those obligations that were excused due to Rainer's breach, and all of the conditions required for Rainer's performance have occurred.

88. As a direct and proximate result of Rainer's breaches, Plaintiffs have suffered damages in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the Defendants' actions, but believe that thus far Rainer, and Does 1-20, have solicited and induced at least 30 PacWest Bank employees to resign and take positions at SoCal Bank, and further have solicited and induced numerous clients to transfer their business from PacWest Bank to SoCal Bank. Furthermore, Plaintiffs are informed and believe, and thereon allege, that Rainer unjustly received prior consulting fees while in breach of the Agreement and should therefore be required to return such compensation.

## SECOND CAUSE OF ACTION

### FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Plaintiffs PacWest and PacWest Bank Against Defendants Rainer and Does 1-20)

89. Plaintiffs re-allege and hereby incorporate paragraphs 1 through 88 of this complaint as if fully set forth herein.

90. The law imposed an obligation on Rainer to act in good faith towards PacWest, and to refrain from actions which would deprive PacWest of the benefits of the Agreement.

91. The Agreement was made expressly for the benefit of PacWest Bank as a third-party beneficiary in that the client and employee relationships which Rainer was obligated to foster, promote and preserve were the business and employee relationships of PacWest Bank. Accordingly, the law imposes an obligation on Rainer to act in good faith towards PacWest Bank, and to refrain from actions which deprive PacWest Bank of the benefits of the Agreement.

92. Rainer breached the implied covenant of good faith and fair dealing, and unfairly interfered with Plaintiffs' rights to receive the benefits of the Agreement, which included, among other things, Rainer's assistance in retaining key personnel and client relationships, in at least the following ways:

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 636-5000 • Fax (213) 683-1225

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1      (a)   by not faithfully and diligently performing the services he agreed to perform

2              during the period of the consulting agreement;

3      (b)   by competing and/or preparing to compete with PacWest Bank during the

4              Restricted Period and therefore not devoting his full attention and loyalty to

5              PacWest Bank;

6      (c)   by engaging the help of other former PacWest Bank executives, including,

7              but not limited to, Hernandez and Smithson, to induce and solicit PacWest

8              customers and employees to leave PacWest Bank and join SoCal Bank on

9              Rainer's behalf and/or on behalf of Rainer's new employer, SoCal Bank;

10             and

11     (d)   by failing to disclose to PacWest Bank that he would be taking a position at

12             a competing bank at the conclusion of the Restricted Period and by

13             pretending that he intended to continue to act as a consultant/ambassador

14             for PacWest Bank while simultaneously using confidential and proprietary

15             information entrusted to him to sabotage the value/goodwill of PacWest.

16   93. As a direct and proximate result of Rainer's breaches, Plaintiffs have suffered damages

17   in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the Defendants'

18   actions, but believe that thus far Rainer, Hernandez, Smithson and Does 1-20, have solicited and

19   induced at least 30 PacWest Bank employees to resign and take positions at SoCal Bank.

20   Furthermore, Plaintiffs are informed and believe, and thereon allege, that Rainer unjustly received

21   prior consulting fees while in breach of the Agreement and should therefore be required to return

22   such compensation.

23   ### THIRD CAUSE OF ACTION

24   **FOR BREACH OF WRITTEN CONTRACT**

25   **(Plaintiffs PacWest and PacWest Bank Against Defendants Hernandez and Does 1-20)**

26   94. Plaintiffs re-allege and hereby incorporate paragraphs 1 through 93 of this complaint as

27   if fully set forth herein.

28

95. The Stock Award Agreements were made expressly for the benefit of PacWest Bank as a third-party beneficiary in that the client and employee relationships that were protected by the restrictive covenants therein applied to the business and employee relationships of PacWest Bank.

96. The Stock Award Agreements between PacWest and Hernandez are valid, enforceable contracts. The Hernandez Stock Award Agreements are attached hereto as Exhibits 2 and 3 and are incorporated herewith.

97. Before and after the time he left PacWest Bank and during the period he participated in Rainer's and SoCal Bank's illegal raiding plan, Hernandez, was subject to the restrictive covenants contained in the Stock Award Agreements. As set forth in "Annex A Restrictive Covenants" to the Stock Award Agreements, Hernandez agreed, that in exchange for being granted a number of shares in PacWest:

(a) that during his employment, and for a six-month period following the termination of his employment for any reason, Hernandez would not "take any action, directly or indirectly (without prior written consent of the Company), that causes or could reasonably be expected to cause any person who is then an employee of the Company [defined as PacWest] or its Affiliates to resign from the Company or its Affiliates or to apply for or accept employment with any other business or enterprise;"

(b) that during his employment, and for a six-month period following the termination of his employment for any reason, Hernandez would not "in any manner, directly or indirectly (without prior written consent of the Company): (1) take any action that causes or could reasonably be expected to cause any customer or prospective customer of the Company or its Affiliates to whom [Hernandez] provided services or with whom [Hernandez] otherwise had contact to become a customer of or transact any business with a Competitive Business or reduce or refrain from doing any business with the Company or its Affiliates, (2) transact business with any customer or prospective customer that would cause you to be a Competitive

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

Business, or (3) interfere with or damage any relationship between the Company and a customer or prospective customer;"

(c) that "[d]uring [his] employment and thereafter, [Hernandez] shall hold in a fiduciary capacity for the benefit of [PacWest] all trade secrets and Confidential Information relating to [PacWest] and its businesses and investments, which will have been obtained by you during your employment with [PacWest] and which are not generally available public knowledge (other than by acts by you in violation of this Agreement);"

(d) that the covenants contained in Annex A "are reasonable and necessary to protect the confidentiality of the customer lists, the terms, conditions and nature of customer relationships, and other trade secrets and Confidential Information concerning the Company and its Affiliates, acquired by [Hernandez] and to avoid actual or apparent conflicts of interest;" and

(e) that "a breach of the covenants contained in Sections 1 through 3 of this Annex A will result in injury to the Company and its Affiliates for which there is no adequate remedy at law and that it will not be possible to measure damages for such injuries precisely."

98. Annex A to the Stock Award Agreements defines a "Competitive Business" as "any business enterprise that either (i) engages in any activity that competes with the business of the Company or its Affiliates or (ii) holds a 5% or greater equity, voting or profit participation interest in any enterprise that engages in such a competitive activity." Under this definition each of SoCal Bank and SoCal Bancorp is a "Competitive Business".

99. Annex A to the Stock Award Agreements defines "Confidential Information" as "any information concerning the business or affairs of the Company or any of its Affiliates which is not generally known to the public and includes, but is not limited to, any file, document, book, account, list (including without limitation customer lists), process, patent, specification, drawing, design, computer program or file, computer disk, method of operation, recommendation, report, plan, survey, data, manual, strategy, financial data, client information or data (including the terms

344176.3
18
PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES

**EXHIBIT C - 215**

1   and conditions of any business relationships between clients and the Company or its Affiliates), or

2   contract which comes to [Hernandez'] knowledge in the course of [Hernandez'] employment or

3   which is generated by [Hernandez] in the course of performing [Hernandez'] obligations to the

4   Company whether alone or with others."

5       100.    The Stock Award Agreements were made expressly for the benefit of PacWest

6   Bank as a third-party beneficiary in that the client and employee relationships with which

7   Hernandez agreed he would not interfere were the business and employee relationships of

8   PacWest Bank.

9       101.    Hernandez breached the Stock Award Agreements in at least the following ways:

10      (a)    by before and after he left PacWest Bank actively participating in the

11             inducement of at least 30 PacWest Bank employees, including a number of

12             executive relationship managers, portfolio managers, regional managers and

13             loan processors, to leave their positions at PacWest Bank and to take

14             positions at a competing bank, SoCal Bank, actions which were intended to

15             and did have a significant detrimental effect on PacWest's business.

16             Hernandez, among other things, acted as the point person for PacWest

17             employees who were solicited by SoCal Bank, obtained offers from SoCal

18             Bank for these employees, discussed employment terms with them and

19             coordinated the dates of the resignations of these employees;

20      (b)    on information and belief, by taking actions that have caused or could

21             reasonably be expected to cause customers or prospective customers of

22             PacWest Bank to whom he provided services or with whom he had contact

23             to become customers of SoCal Bank, or reduce or refrain from doing

24             business with PacWest Bank, and/or by interfering with or damaging

25             relationships between PacWest Bank and its customer or prospective

26             customers;

27      (c)    on information and belief, by intentionally and improperly using

28             confidential and proprietary information he learned through his employment

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

**EXHIBIT C - 216**

with PacWest or obtained from the PacWest Bank employees he induced to resign, including but not limited to salary, benefits and bonus information or data, and the terms and conditions of the employment relationships between PacWest Bank and its employees and the history of job performance, career goals and aspirations of those employees, to solicit PacWest Bank employees to resign from PacWest Bank and join SoCal Bank. Hernandez was able, as a result of the confidential and proprietary information he possessed, to provide SoCal Bank with a selective list of PacWest Bank's employees who, in his judgment, possessed both the ability and personal characteristics desirable in an employee, together with the salary PacWest Bank was paying the employee and a suggestion as to the salary SoCal Bank should offer to be successful in recruitment;

(d)     on information and belief, by actively competing against PacWest by intentionally and improperly using confidential and proprietary information he learned through his employment with PacWest or obtained from the PacWest Bank employees he induced to resign, including but not limited to client information or data, including the terms and conditions of the business relationships between clients and PacWest Bank and the clients' needs and preferences, to solicit existing or potential PacWest Bank clients to terminate their relationships with PacWest Bank and enter into business relationships with SoCal Bank.

102.     PacWest performed all of its obligations under the Stock Award Agreements other than those obligations that were excused due to Hernandez' breach, and all of the conditions required for Hernandez' performance have occurred.

103.     As a direct and proximate result of Hernandez' breaches, Plaintiffs have suffered damages in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the Defendants' actions, but believe that thus far Rainer, Hernandez, Smithson and Does 1-20, have solicited and induced at least 30 PacWest Bank employees to resign and take positions at SoCal

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1  Bank, and further have solicited and induced numerous clients to transfer their business from

2  PacWest Bank to SoCal Bank.

3  **FOURTH CAUSE OF ACTION**

4  **FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

5  **(Plaintiffs PacWest and PacWest Bank Against Defendants Hernandez and Does 1-20)**

6  104.   Plaintiffs re-allege and hereby incorporate paragraphs 1 through 103 of this

7  complaint as if fully set forth herein.

8  105.   The law imposed an obligation on Hernandez to act in good faith towards PacWest,

9  and to refrain from actions which would deprive PacWest of the benefits of the Stock Award

10  Agreements.

11  106.   The Stock Award Agreements were made expressly for the benefit of PacWest

12  Bank as a third-party beneficiary in that the client and employee relationships with which

13  Hernandez agreed he would not interfere were the business and employee relationships of

14  PacWest Bank. Accordingly, the law imposes an obligation on Hernandez to act in good faith

15  towards PacWest Bank, and to refrain from actions which deprive PacWest Bank of the benefits of

16  the Stock Award Agreements.

17  107.   Hernandez breached the implied covenant of good faith and fair dealing, and

18  unfairly interfered with Plaintiffs' rights to receive the benefits of the Stock Award Agreements,

19  which included, among other things, Hernandez' agreement to protect the confidentiality of the

20  employee salary and bonus information, the identity of key employees, including relationship

21  managers, customer lists, the terms, conditions and nature of customer relationships, and other

22  Confidential Information, as defined in the Stock Award Agreements, concerning PacWest and

23  PacWest Bank acquired by him and avoid actual or apparent conflicts of interest, in at least the

24  following ways:

25  (a)   by before and after he left PacWest Bank actively participating in the

26  inducement of at least 30 PacWest Bank employees, including a number of

27  executive relationship managers, portfolio managers, regional managers and

28  loan processors, to leave their positions at PacWest Bank and to take

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

positions at a competing bank, SoCal Bank, actions which were intended to and did have a significant detrimental effect on PacWest's business. Hernandez, among other things, acted as the point person for PacWest employees who were solicited by SoCal Bank, obtained offers from SoCal Bank for these employees, discussed employment terms with them and coordinated the dates of the resignations of these employees;

(b) on information and belief, by taking actions that have caused or could reasonably be expected to cause customers or prospective customers of PacWest Bank to whom he provided services or with whom he had contact to become customers of SoCal Bank, or reduce or refrain from doing business with PacWest Bank, and/or by interfering with or damaging relationships between PacWest Bank and customers or prospective customers;

(c) on information and belief, by intentionally and improperly using confidential and proprietary information he learned through his employment with PacWest or obtained from the PacWest Bank employees he induced to resign, including but not limited to salary, benefits and bonus information or data, and the terms and conditions of the employment relationships between PacWest Bank and its employees and the history of job performance, career goals and aspirations of those employees, to solicit PacWest Bank employees to resign from PacWest Bank and join SoCal Bank. Hernandez was able as a result of the confidential and proprietary information he possessed, to provide SoCal bank with a selective list of PacWest Bank's employees who, in his judgment, possessed both the ability and personal characteristics desirable in an employee, together with the salary PacWest Bank was paying the employee and a suggestion as to the salary SoCal Bank should offer to be successful in recruitment;

344176.3

22

**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT C - 219**

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

(d)     on information and belief, by actively competing against PacWest by intentionally and improperly using confidential and proprietary information he learned through his employment with PacWest or obtained from the PacWest Bank employees he induced to resign, including but not limited to client information or data, including the terms and conditions of the business relationships between clients and PacWest Bank, to solicit existing or potential PacWest Bank clients to terminate their relationships with PacWest Bank and enter into business relationships with SoCal Bank.

108.    As a direct and proximate result of Hernandez' breaches, Plaintiffs have suffered damages in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the Defendants' actions, but believe that thus far Rainer, Hernandez, Smithson and Does 1-20, have solicited and induced at least 30 PacWest Bank employees to resign and take positions at SoCal Bank.

## FIFTH CAUSE OF ACTION

### FOR BREACH OF WRITTEN CONTRACT

**(Plaintiffs PacWest and PacWest Bank Against Defendants Smithson and Does 1-20)**

109.    Plaintiffs re-allege and hereby incorporate paragraphs 1 through 108 of this complaint as if fully set forth herein.

110.    The Stock Award Agreements were made expressly for the benefit of PacWest Bank as a third-party beneficiary in that the client and employee relationships which were protected by the Restrictive Covenants the business and employee relationships of PacWest Bank.

111.    The Stock Award Agreements between PacWest and Smithson are valid, enforceable contracts. The Smithson Stock Award Agreements are attached hereto as Exhibits 4 and 5 and are incorporated herewith.

112.    Smithson, before and after she left PacWest Bank and during the period she participated in Rainer's and SoCal Bank's illegal raiding plan, was subject to the Restrictive Covenants contained in the Stock Award Agreements. In the Stock Award Agreements Smithson agreed that in exchange for being granted a number of shares in PacWest:

(a)    that during her employment, and for a six-month period following the termination of her employment for any reason, Smithson would not, "take any action, directly or indirectly (without prior written consent of the Company), that causes or could reasonably be expected to cause any person who is then an employee of the Company [defined as PacWest] or its Affiliates to resign from the Company or its Affiliates or to apply for or accept employment with any other business or enterprise;"

(b)    that during her employment, and for a six-month period following the termination of her employment for any reason, Smithson would not "in any manner, directly or indirectly (without prior written consent of the Company): (1) take any action that causes or could reasonably be expected to cause any customer or prospective customer of the Company or its Affiliates to whom [Smithson] provided services or with whom [Smithson] otherwise had contact to become a customer of or transact any business with a Competitive Business or reduce or refrain from doing any business with the Company or its Affiliates, (2) transact business with any customer or prospective customer that would cause you to be a Competitive Business, or (3) interfere with or damage any relationship between the Company and a customer or prospective customer;"

(c)    that "[d]uring your employment and thereafter, [Smithson] shall hold in a fiduciary capacity for the benefit of [PacWest] all trade secrets and Confidential Information relating to [PacWest] and its businesses and investments, which will have been obtained by you during your employment with [PacWest] and which are not generally available public knowledge (other than by acts by you in violation of this Agreement);"

(d)    that the covenants contained in Annex A "are reasonable and necessary to protect the confidentiality of the customer lists, the terms, conditions and nature of customer relationships, and other trade secrets and Confidential

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

Information concerning the Company and its Affiliates, acquired by [Smithson] and to avoid actual or apparent conflicts of interest;" and

(e) that "a breach of the covenants contained in Sections 1 through 3 of this Annex A will result in injury to the Company and its Affiliates for which there is no adequate remedy at law and that it will not be possible to measure damages for such injuries precisely."

113. Annex A to the Stock Award Agreements defined a "Competitive Business" as "any business enterprise that either (i) engages in any activity that competes with the business of the Company or its Affiliates or (ii) holds a 5% or greater equity, voting or profit participation interest in any enterprise that engages in such a competitive activity." Under this definition each of SoCal Bank and SoCal Bancorp is a "Competitive Business".

114. Annex A to the Stock Award Agreements defined "Confidential Information" as "any information concerning the business or affairs of the Company or any of its Affiliates which is not generally known to the public and includes, but is not limited to, any file, document, book, account, list (including without limitation customer lists), process, patent, specification, drawing, design, computer program or file, computer disk, method of operation, recommendation, report, plan, survey, data, manual, strategy, financial data, client information or data (including the terms and conditions of any business relationships between clients and the Company or its Affiliates), or contract which comes to [Smithson's] knowledge in the course of [Smithson's] employment or which is generated by [Smithson] in the course of performing [Smithson's] obligations to the Company whether alone or with others."

115. The Stock Award Agreements were made expressly for the benefit of PacWest Bank as a third-party beneficiary in that the client and employee relationships with which Smithson agreed she would not interfere were the business and employee relationships of PacWest Bank.

116. Smithson breached the Stock Award Agreements in at least the following ways:

(a) by before and after she left PacWest Bank actively participating in the inducement of at least 30 PacWest Bank employees, including a number of

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

344176.3

25

**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT C - 222**

executive relationship managers, portfolio managers, regional managers and loan processors, to leave their positions at PacWest Bank and to take positions at a competing bank, SoCal Bank, actions which were intended to and did have a significant detrimental effect on PacWest's business; Smithson, among other things, successfully solicited former PacWest Bank employee Stephanie Johnson to leave PacWest Bank and join SoCal Bank,

(b)   by taking actions that have caused or could reasonably be expected to cause customers or prospective customers of PacWest Bank to whom she provided services or with whom she had contact to become customers of SoCal Bank, to reduce or refrain from doing business with PacWest Bank, and/or by interfering with or damaging relationships between PacWest Bank and a customer or prospective customer;

(c)   on information and belief, by intentionally and improperly using confidential and proprietary information she learned through her employment with PacWest or obtained from the PacWest Bank employees she induced to resign, including but not limited to salary, benefits and bonus information or data, and the terms and conditions of the employment relationships between PacWest Bank and its employees and the history of job performance, career goals and aspirations of those employees, to solicit PacWest Bank employees to resign from PacWest Bank and join SoCal Bank. Smithson was able, as a result of the confidential and proprietary information she possessed, to identify for SoCal Bank the PacWest Bank's employees who, in her judgment, possessed both the ability and personal characteristics desirable in an employee, together with the salary PacWest Bank was paying the employee and a suggestion as to the salary SoCal Bank should offer to be successful in recruitment; and

(d)   on information and belief, by actively competing against PacWest by intentionally and improperly using confidential and proprietary information

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1 she learned through her employment with PacWest or obtained from the
2 PacWest Bank employees she induced to resign, including but not limited to
3 client information or data, including the terms and conditions of the
4 business relationships between clients and PacWest Bank and the clients'
5 needs and preferences, to solicit existing or potential PacWest Bank clients
6 to terminate their relationships with PacWest Bank and enter into business
7 relationships with SoCal Bank.

8   117.   PacWest performed all of its obligations under the Stock Award Agreements other
9 than those obligations that were excused due to Smithson's breaches, and all of the conditions
10 required for Smithson's performance have occurred.

11   118.   As a direct and proximate result of Smithson's breaches, Plaintiffs have suffered
12 damages in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the
13 Defendants' actions, but believe that thus far Rainer, Hernandez, Smithson and Does 1-20, have
14 solicited and induced at least 30 PacWest Bank employees to resign and take positions at SoCal
15 Bank, and further have solicited and induced numerous clients to transfer their business from
16 PacWest Bank to SoCal Bank.

17   **SIXTH CAUSE OF ACTION**
18 **FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
19   **(Plaintiffs PacWest and PacWest Bank Against Defendants Smithson and Does 1-20)**

20   119.   Plaintiffs re-allege and hereby incorporate paragraphs 1 through 118 of this
21 complaint as if fully set forth herein.

22   120.   The law imposed an obligation on Smithson to act in good faith towards PacWest,
23 and to refrain from actions that would deprive PacWest of the benefits of the Stock Award
24 Agreements.

25   121.   The Stock Award Agreements were made expressly for the benefit of PacWest
26 Bank as a third-party beneficiary in that the client and employee relationships with which
27 Smithson agreed she would not interfere were the business and employee relationships of PacWest
28 Bank. Accordingly, the law imposed an obligation on Smithson to act in good faith towards

344176.3
27
**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT C - 224**

PacWest Bank, and to refrain from actions that would deprive PacWest Bank of the benefits of the Stock Award Agreements.

122.   Smithson breached the implied covenant of good faith and fair dealing, and unfairly interfered with Plaintiffs' rights to receive the benefits of the Stock Award Agreements, which included, among other things, Smithson's agreement to protect the confidentiality of the employee salary and bonus information, the identity of key employees, including relationship managers, customer lists, the terms, conditions and nature of customer relationships, and other Confidential Information, as defined in the Stock Award Agreements, concerning PacWest and PacWest Bank acquired by her and avoid actual or apparent conflicts of interest, in at least the following ways:

(a)   by before and after she left PacWest Bank actively participating in the inducement of at least 30 PacWest Bank employees, including a number of executive relationship managers, portfolio managers, regional managers and loan processors, to leave their positions at PacWest Bank and to take positions at a competing bank, SoCal Bank, actions which were intended to and did have a significant detrimental effect on PacWest's business; Smithson, among other things, successfully solicited former PacWest Bank employee Stephanie Johnson to leave PacWest Bank and join SoCal Bank,

(b)   by taking actions that have caused or could reasonably be expected to cause customers or prospective customers of PacWest Bank to whom she provided services or with whom she had contact to become customers of SoCal Bank, or reduce or refrain from doing business with PacWest Bank, and/or by interfering with or damaging relationships between PacWest Bank and customer or prospective customers;

(c)   on information and belief, by intentionally and improperly using confidential and proprietary information she learned through her employment with PacWest or obtained from the PacWest Bank employees she induced to resign, including but not limited to salary, benefits and bonus information or data, and the terms and conditions of the employment

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

relationships between PacWest Bank and its employees and the history of job performance, career goals and aspirations of those employees, to solicit PacWest Bank employees to resign from PacWest Bank and join SoCal Bank. Smithson was able, as a result of the confidential and proprietary information she possessed, to identify for SoCal Bank the PacWest Bank's employees who, in her judgment, possessed both the ability and personal characteristics desirable in an employee, together with the salary PacWest Bank was paying the employee and a suggestion as to the salary SoCal Bank should offer to be successful in recruitment; and

(d)     on information and belief, by actively competing against PacWest by intentionally and improperly using confidential and proprietary information she learned through her employment with PacWest or obtained from the PacWest Bank employees she induced to resign, including but not limited to client information or data, including the terms and conditions of the business relationships between clients and PacWest Bank, to solicit existing or potential PacWest Bank clients to terminate their relationships with PacWest Bank and enter into business relationships with SoCal Bank.

123.     As a direct and proximate result of Smithson's breaches, Plaintiffs have suffered damages in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the Defendants' actions, but believe that thus far Rainer, Hernandez, Smithson and Does 1-20, solicited and induced at least 30 PacWest Bank employees to resign and take positions at SoCal Bank.

### SEVENTH CAUSE OF ACTION

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (Plaintiff PacWest Bank Against Defendants Rainer, Hernandez, Smithson, SoCal Bank, SoCal Bancorp and Does 1-20)

124.     Plaintiffs re-allege and hereby incorporate paragraphs 1 through 122 of this complaint as if fully set forth herein.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

125.     Each of the employees listed above who were solicited by Rainer, Hernandez, Smithson, SoCal Bank and SoCal Bancorp to leave PacWest Bank and join SoCal Bank ("Raided Employees") had an economic relationship with PacWest Bank that probably would have resulted in a future economic benefit to PacWest Bank.

126.     Rainer, Hernandez, Smithson, SoCal Bank and SoCal Bancorp knew of the economic relationships the Raided Employees had with PacWest Bank.

127.     Rainer, Hernandez, Smithson, SoCal Bank and SoCal Bancorp engaged in intentional acts designed to induce a breach or disruption of the economic relationship between each of the Raided Employees and PacWest Bank, or, alternatively, Rainer, Hernandez, Smithson, SoCal Bank and SoCal Bancorp knew that a breach or disruption of the economic relationship between each of the Raided Employees and PacWest Bank was certain or substantially certain to occur as a result of their actions.

128.     As a result of the actions by Rainer, Hernandez, Smithson, SoCal Bank and SoCal Bancorp there was an actual breach or disruption of the economic relationship each of the Raided Employees had with PacWest Bank. The breach or disruption of the economic relationship each of the Raided Employees had with PacWest Bank has resulted in injury and damage to PacWest Bank, in that PacWest Bank has lost the services and skill of the Raided Employees, and in many cases the benefit of the advantageous business relationships these Raided Employees had with both actual and potential clients. Additionally, the speed and number of disruptions and lost employees has created chaos within PacWest Bank and has led to a loss of business opportunities and employee morale.

129.     In engaging in his acts of intentional interference with prospective economic advantage, Rainer breached his obligations under the Agreement, and breached his fiduciary duty to PacWest.

130.     In engaging in his acts of intentional interference with prospective economic advantage, Hernandez breached his obligations under the Stock Award Agreements, and breached his fiduciary duty to PacWest,

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

131.    In engaging in her acts of intentional interference with prospective economic advantage, Smithson breached her obligations under the Stock Award Agreements and breached her fiduciary duty to PacWest

132.    In engaging in its acts of intentional interference with prospective economic advantage, SoCal Bank and SoCal Bancorp illegally induced Rainer to breach his Agreement. The Agreement was made expressly for the benefit of PacWest Bank as a third-party beneficiary in that the client and employee relationships that Rainer was contractually obligated to foster, promote and preserve were the business and employee relationships of PacWest Bank. After being informed of the terms of Rainer's Agreement through at least the LOI, SoCal Bank and SoCal Bancorp agreed to indemnify Rainer for any of the consequences of his acts of breach of contract or tortious interference, thereby illegally and wrongfully inducing him to breach his Agreement in the ways and by the acts alleged above. This illegal inducement of Rainer to breach his Agreement gave Rainer a "green light" to engage in acts of intentional interference with prospective economic advantage for his and SoCal Bank's benefit, and directly resulted in SoCal Bank and SoCal Bancorp's acts of intentional interference with prospective economic advantage.

133.    In engaging in its acts of intentional interference with prospective economic advantage, SoCal Bank and SoCal Bancorp illegally induced Hernandez and Smithson to breach their Stock Award Agreements. The Stock Award Agreements were made expressly for the benefit of PacWest Bank as a third-party beneficiary in that the client and employee relationships which were protected by the restrictive covenants therein were the business and employee relationships of PacWest Bank. On information and belief, after being informed of the terms of their Stock Award Agreements, SoCal Bank and SoCal Bancorp agreed to indemnify Hernandez and Smithson for any of the consequences of their acts of breach of contract or tortious interference, thereby illegally and wrongfully inducing them to breach their Stock Award Agreements in the ways and by the acts alleged above. This illegal inducement of Hernandez and Smithson to breach their Stock Award Agreements gave Hernandez and Smithson a "green light" to engage in acts of intentional interference with prospective economic advantage for their and SoCal Bank's benefit,

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1  and directly resulted in SoCal Bank and SoCal Bancorp's acts of intentional interference with

2  prospective economic advantage.

3       134.  SoCal Bank and SoCal Bancorp also aided and abetted the acts of intentional

4  interference with economic advantage by Rainer, Hernandez and Smithson. Specifically, SoCal

5  Bank and SoCal Bancorp knew that Rainer, who they were hiring as the Executive Chairman of

6  the SoCal Bank Board of Directors , Hernandez, who they were hiring as SoCal Bank's Chief

7  Banking Officer, and Smithson, who they were hiring as SoCal Bank's Executive Vice President,

8  Regional Manager, were engaging in, or intended to engage in, their acts of intentional

9  interference with the economic relationships between each of the Raided Employees and PacWest

10  Bank for the benefit of SoCal Bank and SoCal Bancorp.

11       135.  The conduct of SoCal Bank and SoCal Bancorp was a substantial factor in causing

12  the harm to PacWest Bank caused by Rainer's, Hernandez' and Smithson's acts of intentional

13  interference with the economic relationships between each of the Raided Employees and PacWest

14  Bank. Without the active participation of SoCal Bank and SoCal Bancorp, Rainer, Hernandez and

15  Smithson would not have been able to offer job positions at SoCal Bank to the Raided Employees,

16  and without the financial incentives and indemnifications offered by SoCal Bank and SoCal

17  Bancorp to Rainer, Hernandez and Smithson they would not have been willing and able to engage

18  in the illegal acts of intentional interference.

19       136.  Defendants further engaged in a conspiracy to induce a breach or disruption of the

20  economic relationship between each of the Raided Employees and PacWest Bank. SoCal Bank

21  and SoCal Bancorp were aware that Rainer, Hernandez and Smithson planned and intended to

22  engage in these tortious activities and agreed with Rainer, Hernandez and Smithson to engage in a

23  systematic plan to raid PacWest Bank's employees and clients.

24       137.  As a direct and proximate result of the acts of intentional interference with

25  prospective economic advantage by Defendants, PacWest Bank has suffered damages in an

26  amount to be proven at trial. PacWest Bank is not aware of the full extent of the Defendants'

27  actions but believes that additional PacWest Bank employees may have been, or will in the future

28  be, solicited by Defendants and Does 1-20, to resign and take positions at SoCal Bank. In addition,

344176.3

32

**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT C - 229**

in engaging in the conduct described above, Defendants, and each of them, acted with oppression, fraud or malice, entitling Plaintiffs to an award of punitive damages.

## EIGHTH CAUSE OF ACTION

### NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

**(Plaintiff PacWest Bank Against Defendants SoCal Bank and SoCal Bancorp and Does 1-20)**

138.    Plaintiffs re-allege and hereby incorporate paragraphs 1 through 137 of this complaint as if fully set forth herein.

139.    Each of the Raided Employees had an economic relationship with PacWest Bank that probably would have resulted in economic benefit to PacWest Bank.

140.    SoCal Bank and SoCal Bancorp knew or should have known of the economic relationships the Raided Employees had with PacWest Bank.

141.    SoCal Bank and SoCal Bancorp knew that a breach or disruption of the economic relationship between each of the Raided Employees, on the one hand, and PacWest Bank, on the other hand, was certain or substantially certain to occur as a result of the actions of their agents and representatives, including Rainer, Hernandez and Smithson. Alternatively, SoCal Bank and SoCal Bancorp should have known that a breach or disruption of the economic relationship between each of the Raided Employees, on the one hand, and PacWest Bank, on the other hand, was certain or substantially certain to occur as a result of the actions of their agents and representatives, including Rainer, Hernandez and Smithson, if they acted without reasonable care.

142.    SoCal Bank and SoCal Bancorp failed to act with reasonable care.

143.    By engaging in its acts of negligent interference with prospective economic advantage, SoCal Bank and SoCal Bancorp engaged in wrongful conduct by illegally inducing Rainer to breach his Agreement, and by illegally inducing Hernandez and Smithson to breach their Stock Award Agreements. This illegal inducement to breach their Agreements gave Rainer, Hernandez and Smithson a "green light" to engage in acts of intentional interference with prospective economic advantage for their and SoCal Bank's benefit, and directly resulted in the interference with PacWest Bank's prospective economic advantage. SoCal Bank and SoCal

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

Bancorp knew that a breach or disruption of the economic relationship between each of the Raided Employees, on the one hand, and PacWest Bank, on the other hand, was certain or substantially certain to occur as a result of their inducement of Rainer, Hernandez and Smithson to breach their own agreements. Alternatively, SoCal Bank and SoCal Bancorp should have known that a breach or disruption of the economic relationship between each of the Raided Employees, on the one hand, and PacWest Bank, on the other hand, was certain or substantially certain to occur as a result of their inducement of Rainer, Hernandez and Smithson to breach their own agreements if they acted without reasonable care.

144. As a result of the acts of SoCal Bank and SoCal Bancorp, there was an actual breach or disruption of the economic relationship each of the Raided Employees had with PacWest Bank.

145. The breach or disruption of the economic relationship each of the Raided Employees had with PacWest Bank has resulted in injury and damage to PacWest Bank, in that PacWest Bank has lost the services and skill of the Raided Employees, and in many cases the benefit of the advantageous business relationships these Raided Employees had with both actual and potential clients. Additionally, the speed and number of disruptions and lost employees has created chaos within PacWest Bank and has led to a loss of business opportunities and a decline in employee morale that negatively impacts the business of PacWest Bank.

146. As a direct and proximate result of the acts of negligent interference with prospective economic advantage by SoCal Bank and SoCal Bancorp, PacWest Bank has suffered damages in an amount to be proven at trial. PacWest Bank is not aware of the full extent of the Defendants' actions but believes that additional PacWest Bank employees may have been, or will in the future be, solicited by Defendants and Does 1-20 to resign and take positions at SoCal Bank.

# NINTH CAUSE OF ACTION

## VIOLATION OF CALIFORNIA UNIFORM TRADE SECRETS ACT –

## CIVIL CODE SECTION 3426 ET. SEQ.

**(Plaintiff PacWest Bank Against Defendants Rainer, Hernandez, Smithson,**

**SoCal Bank, SoCal Bancorp and Does 1-20)**

147.   Plaintiffs re-allege and hereby incorporate paragraphs 1 through 146 of this complaint as if fully set forth herein.

148.   PacWest Bank owns and possesses certain confidential, proprietary, and trade secret information (the "Confidential Information") including: (1) customer lists, including customer names and key contact information, pricing, profit margins, pricing concessions, marketing strategy and concessions, payment terms, loan and deposit terms, maturity and other dates,  interest rates, customer needs, specialized requirements, preferences and future plans, loan and deposit history, and available credit, and (2) employee information, including names, contact information, employment terms, compensation including salary, bonuses and stock grants, and other incentives, titles and promotion history, qualifications, experience, business generation track record, compensation and promotion expectation, book of business, client contacts, education, accomplishments, capabilities and productivity, and level of employee involvement in specific client relationships.

149.   The Confidential Information has actual or potential independent economic value from not being generally known to the public or other persons who could obtain economic value from their disclosure or use. It is, and was at the time of Defendants' misappropriation, a trade secret.

150.   PacWest Bank has undertaken efforts that are reasonable under the circumstances to maintain the secrecy of the trade secrets at issue. These efforts include, but are not limited to, the use of passwords and encryption to protect data on its computers, servers, and information repositories, the maintenance of a Code of Conduct that emphasizes all employees' duties to maintain the secrecy of PacWest Bank's confidential information, and the use of confidentiality

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1    agreements and non-disclosure agreements to require vendors, partners, contractors, and

2    employees to maintain the secrecy of PacWest's confidential information.

3        151.    Defendants knew or should have known under the circumstances that the

4    information misappropriated by Defendants were trade secrets.

5        152.    Defendants misappropriated and threaten to further misappropriate trade secrets at

6    least by acquiring trade secrets with knowledge of or reason to know that said trade secrets were

7    acquired by improper means, and Defendants are using and threatening to use the trade secrets

8    acquired by improper means without PacWest Bank's knowledge or consent. For example,

9    Defendants have used PacWest's trade secret information to contact and solicit PacWest Bank's

10   employees and clients as alleged above.

11       153.    As a direct and proximate result of Defendants' conduct, PacWest Bank is

12   threatened with injury and has been injured in an amount to be proven at trial. PacWest Bank has

13   also incurred, and will continue to incur, additional damages, costs and expenses, including

14   attorneys' fees, as a result of Defendants' misappropriation.  Defendants' acquisition, use and

15   disclosure of PacWest Bank's trade secrets was a substantial factor in causing the harm to

16   PacWest Bank.

17       154.    As a further proximate result of the misappropriation and use of PacWest Bank's

18   trade secrets, Defendants were unjustly enriched. Defendants' acquisition, use and disclosure of

19   PacWest Bank's trade secrets was a substantial factor in causing Defendants to be unjustly

20   enriched.

21       155.    The aforementioned acts of Defendants were willful, malicious and fraudulent.

22   PacWest Bank is therefore entitled to exemplary damages under California Civil Code §

23   3426.3(c).

24       156.    Defendants' conduct constitutes transgressions of a continuing nature for which

25   PacWest Bank has no adequate remedy at law. Unless and until enjoined and restrained by order

26   of this Court, Defendants will continue to retain and use PacWest Bank's trade secret information

27   to enrich themselves and divert business from PacWest Bank. Pursuant to California Civil Code §

28   3426.2, PacWest Bank is entitled to an injunction against the misappropriation and continued

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

344176.3

36

**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT C - 233**

1  threatened misappropriation of trade secrets as alleged herein and further asks the Court to restrain

2  Defendants from using all trade secret information misappropriated from PacWest Bank.

3       157.    Pursuant to California Civil Code § 3426.4 and related law, PacWest Bank is

4  entitled to an award of attorneys' fees for Defendants' misappropriation of trade secrets.

5                        **TENTH CAUSE OF ACTION**

6           **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

7           **(Plaintiffs PacWest and PacWest Bank Against Defendants SoCal Bank and**

8                        **SoCal Bancorp and Does 1-20)**

9       158.    Plaintiffs re-allege and hereby incorporate paragraphs 1 through 157 of this

10  complaint as if fully set forth herein.

11      159.    The Agreement is and was a valid contract between PacWest and Rainer. The

12  Agreement was made expressly for the benefit of PacWest Bank as a third party beneficiary in that

13  the client and employee relationships which Rainer was obligated to foster, promote and preserve

14  were the business and employee relationships of PacWest Bank.

15      160.    The Stock Award Agreements are valid contracts between PacWest, on the one

16  hand, and Hernandez and Smithson, on the other. The Stock Award Agreements were made

17  expressly for the benefit of PacWest Bank as a third party beneficiary in that the client and

18  employee relationships which were protected by the Restrictive Covenants the business and

19  employee relationships of PacWest Bank.

20      161.    SoCal Bank and SoCal Bancorp were informed by Rainer in writing of the

21  existence of the Agreement and its terms.

22      162.    On information and belief, SoCal Bank and SoCal Bancorp were informed by

23  Hernandez, as part of his recruitment, of the existence of the Stock Award Agreements and its

24  terms.

25      163.    On information and belief, SoCal Bank and SoCal Bancorp were informed by

26  Smithson, as part of her recruitment, of the existence of the Stock Award Agreements and its

27  terms.

28

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

344176.3

37

**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT C - 234**

1  164.   SoCal Bank and SoCal Bancorp engaged in intentional acts designed to induce a

2  breach or disruption of the contractual relationship between each of Rainer, Hernandez, Smithson

3  and PacWest, including agreeing to fully indemnify Rainer, Hernandez and Smithson against

4  possible claims by PacWest for breach of those contracts, and agreeing to compensate Rainer for

5  the amounts still unpaid to him by PacWest under the Agreement, and on information and belief,

6  agreeing to compensate Hernandez and Smithson for the financial consequences of their breach of

7  the Stock Award Agreements.

8  165.   As a result of the acts of SoCal Bank and SoCal Bancorp, there was an actual

9  breach or disruption of the contractual relationship between each of Rainer, Hernandez, Smithson

10  and PacWest.

11  166.   The breach or disruption of the contractual relationship between each of Rainer,

12  Hernandez, Smithson and PacWest has resulted in injury and damage to PacWest Bank, in that

13  PacWest Bank's confidential and proprietary information has been shared with a competitor,

14  PacWest Bank has lost the services and skill of the Raided Employees, and in many cases the

15  benefit of the advantageous business relationships these Raided Employees had with both actual

16  and potential clients, and SoCal Bank and SoCal Bancorp has, as a result of Hernandez',

17  Smithson's and Rainer's breaches of their contracts, been able to illegally solicit and steal

18  customers. Additionally, the speed and number of disruptions and lost employees has created

19  chaos within PacWest Bank, and has led to a loss of business opportunities and employee morale.

20  167.   As a direct and proximate result of the acts of intentional interference with

21  contractual relations by SoCal Bank and SoCal Bancorp, PacWest Bank has suffered damages, in

22  an amount to be proven at trial. PacWest Bank is not aware of the full extent of the Defendants'

23  actions but believes that additional PacWest Bank employees may have been, or will in the future

24  be, solicited by Rainer, Hernandez, Smithson, SoCal Bank, SoCal Bancorp and Does 1-20, to

25  resign and take positions at SoCal Bank. In addition, in engaging in the conduct described above,

26  SoCal Bank and SoCal Bancorp acted with oppression, fraud or malice, thus entitling Plaintiffs to

27  an award of punitive damages.

28

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

**ELEVENTH CAUSE OF ACTION**

**INDUCING BREACH OF CONTRACT**

**(Plaintiffs PacWest and PacWest Bank Against Defendants SoCal Bank and**

**SoCal Bancorp and Does 1-20)**

168.    Plaintiffs re-allege and hereby incorporate paragraphs 1 through 167 of this complaint as if fully set forth herein.

169.    The Agreement is and was a valid contract between PacWest and Rainer. The Agreement was made expressly for the benefit of PacWest Bank as a third party beneficiary in that the client and employee relationships which Rainer was obligated to foster, promote and preserve were the business and employee relationships of PacWest Bank.

170.    The Stock Award Agreements are valid contracts between PacWest, on the one hand, and Hernandez and Smithson, on the other. The Stock Award Agreements were made expressly for the benefit of PacWest Bank as a third party beneficiary in that the client and employee relationships which were protected by the Restrictive Covenants the business and employee relationships of PacWest Bank.

171.    SoCal Bank and SoCal Bancorp were informed by Rainer in writing of the existence of the Agreement and its terms.

172.    On information and belief, SoCal Bank and SoCal Bancorp were informed by Hernandez, as part of his recruitment, of the existence of the Stock Award Agreements and its terms.

173.    On information and belief, SoCal Bank and SoCal Bancorp were informed by Smithson, as part of her recruitment, of the existence of the Stock Award Agreements and its terms.

174.    SoCal Bank and SoCal Bancorp intended to induce a breach of the contractual relationship between Rainer and PacWest.

175.    SoCal Bank and SoCal Bancorp intended to induce a breach of the contractual relationship between Hernandez and PacWest.

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT C - 236**

176.    SoCal Bank and SoCal Bancorp intended to induce a breach of the contractual relationship between Smithson and PacWest.

177.    As a result of the acts of SoCal Bank and SoCal Bancorp, there was an actual breach of the contractual relationship between Rainer and PacWest.

178.    As a result of the acts of SoCal Bank and SoCal Bancorp, there was an actual breach of the contractual relationship between Hernandez and PacWest.

179.    As a result of the acts of SoCal Bank and SoCal Bancorp, there was an actual breach of the contractual relationship between Smithson and PacWest.

180.    Rainer's breach of the Agreement was caused by unjustified or wrongful conduct by SoCal Bank and SoCal Bancorp, including their agreement to fully indemnify Rainer against possible claims by PacWest for breach of that contract, and their agreement to compensate Rainer for the amounts still unpaid to him by PacWest under the Agreement.

181.    Hernandez' breach of the Stock Award Agreements was caused by unjustified or wrongful conduct by SoCal Bank and SoCal Bancorp, including, on information and belief, their agreement to fully indemnify Hernandez against possible claims by PacWest for breach of those contracts, and their agreement to compensate Hernandez for the financial consequences of his breach of the Stock Award Agreements.

182.    Smithson's breach of the Stock Award Agreements was caused by unjustified or wrongful conduct by SoCal Bank and SoCal Bancorp, including, on information and belief, their agreement to fully indemnify Smithson against possible claims by PacWest for breach of those contracts, and their agreement to compensate Smithson for the financial consequences of her breach of the Stock Award Agreements.

183.    The breach of the contractual relationship between each of Rainer, Hernandez, Smithson and PacWest has resulted in injury and damage to PacWest Bank, in that PacWest Bank's confidential and proprietary information has been shared with a competitor, PacWest has lost the services and skill of the Raided Employees, and in many cases the benefit of the advantageous business relationships these Raided Employees had with both actual and potential clients, and SoCal Bank and SoCal Bancorp has, as a result of Hernandez', Smithson's and

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1    Rainer's breaches of their contracts, been able to illegally solicit and steal customers. Additionally,

2    the speed and number of disruptions and lost employees has created chaos within PacWest Bank,

3    and has led to a loss of business opportunities and employee morale.

4         184.    As a direct and proximate result of the acts of intentional interference with

5    contractual relations by SoCal Bank and SoCal Bancorp, PacWest Bank has suffered damages, in

6    an amount to be proven at trial. PacWest Bank is not aware of the full extent of the Defendants'

7    actions but believes that additional PacWest Bank employees may have been, or will in the future

8    be, solicited by Rainer, Hernandez, Smithson, SoCal Bank, SoCal Bancorp and Does 1-20, to

9    resign and take positions at SoCal Bank. In addition, in engaging in the conduct described above,

10   SoCal Bank and SoCal Bancorp acted with oppression, fraud or malice, thus entitling Plaintiffs to

11   an award of punitive damages.

### TWELFTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY

### (Plaintiffs PacWest and PacWest Bank Against Defendants Rainer and Does 1-20)

15        185.    Plaintiffs re-allege and hereby incorporate paragraphs 1 through 184 of this

16   complaint as if fully set forth herein.

17        186.    Rainer owed a general duty of loyalty to PacWest, and its subsidiary PacWest

18   Bank. This included a duty to refrain from taking action on behalf of, or otherwise assisting,

19   Plaintiffs' competitors. This duty of loyalty was the result of Rainer's activities in acting on

20   Plaintiffs' behalf as a consultant to facilitate customer outreach, retain key personnel, and develop

21   new business development opportunities to attract and retain new clients.

22        187.    Rainer breached his duty of loyalty by doing the acts described above, including

23   but not limited to, soliciting PacWest Bank employees and clients to leave PacWest Bank and go

24   to a competitor, SoCal Bank.

25        188.    As a direct and proximate result of Rainer's breaches, Plaintiffs have suffered

26   damages in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the

27   Defendants' actions, but believe that thus far Rainer, Hernandez, Smithson, and Does 1-20,

28   solicited and induced at least 30 PacWest Bank employees to resign and take positions at SoCal

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

**EXHIBIT C - 238**

1  Bank. Furthermore, Plaintiffs are informed and believe, and thereon allege, that Rainer unjustly

2  received prior consulting fees while in breach of the Agreement and should therefore be required

3  to return the ill-gotten compensation.

4  **THIRTEENTH CAUSE OF ACTION**

5  **BREACH OF FIDUCIARY DUTY**

6  **(Plaintiffs PacWest and PacWest Bank Against Defendants Hernandez and Does 1-20)**

7  189.  Plaintiffs re-allege and hereby incorporate paragraphs 1 through 188 of this

8  complaint as if fully set forth herein.

9  190.  Hernandez owed a general duty of loyalty to PacWest, and its subsidiary PacWest

10  Bank as a result of his position as an officer of PacWest Bank. This included a duty to refrain from

11  taking action on behalf of, or otherwise assisting, Plaintiffs' competitors, and not to use or

12  communicate Plaintiffs' confidential and proprietary information for his own purposes or for those

13  of a third party.

14  191.  Hernandez breached his duty of loyalty by doing the acts described above,

15  including but not limited to, soliciting PacWest Bank employees and clients to leave PacWest

16  Bank and go to a competitor, SoCal Bank.

17  192.  As a direct and proximate result of Hernandez' breaches, Plaintiffs have suffered

18  damages in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the

19  Defendants' actions, but believe that thus far Hernandez, Rainer, Smithson, and Does 1-20,

20  solicited and induced at least 30 PacWest Bank employees to resign and take positions at SoCal

21  Bank.

22  **FOURTEENTH CAUSE OF ACTION**

23  **BREACH OF FIDUCIARY DUTY**

24  **(Plaintiffs PacWest and PacWest Bank Against Defendants Smithson and Does 1-20)**

25  193.  Plaintiffs re-allege and hereby incorporate paragraphs 1 through 192 of this

26  complaint as if fully set forth herein.

27  194.  Smithson owed a general duty of loyalty to PacWest, and its subsidiary PacWest

28  Bank as a result of her position as an officer of PacWest Bank. This included a duty to refrain

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

344176.3

42

**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT C - 239**

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1  from taking action on behalf of, or otherwise assisting, Plaintiffs' competitors, and not to use or

2  communicate Plaintiffs' confidential and proprietary information for her own purposes or for those

3  of a third party.

4      195.    Smithson breached her duty of loyalty by doing the acts described above, including

5  but not limited to, soliciting PacWest Bank employees and clients to leave PacWest Bank and go

6  to a competitor, SoCal Bank.

7      196.    As a direct and proximate result of Smithson's breaches, Plaintiffs have suffered

8  damages, in an amount to be proven at trial. Plaintiffs are not aware of the full extent of the

9  Defendants' actions, but believe that thus far Rainer, Hernandez, Smithson and Does 1-20,

10  solicited and induced at least 30 PacWest Bank employees to resign and take positions at SoCal

11  Bank.

12  **FIFTEENTH CAUSE OF ACTION**

13  **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

14  **(Plaintiffs PacWest and PacWest Bank Against Defendants SoCal Bank and**

15  **SoCal Bancorp and Does 1-20)**

16      197.    Plaintiffs re-allege and hereby incorporate paragraphs 1 through 196 of this

17  complaint as if fully set forth herein.

18      198.    SoCal Bank and SoCal Bancorp aided and abetted Rainer's breaches of his duty of

19  loyalty owed to Plaintiffs. Specifically, SoCal Bank and SoCal Bancorp knew that Rainer, who it

20  intended to and did hire as the Executive Chairman of SoCal Bank's Board of Directors , was

21  engaging in, or intended to engage in, his acts which breached his duty of loyalty to Plaintiffs for

22  the benefit of SoCal Bank and SoCal Bancorp.

23      199.    SoCal Bank and SoCal Bancorp gave substantial assistance or encouragement to

24  Rainer in breaching of his duty of loyalty to Plaintiffs. SoCal Bank and SoCal Bancorp worked

25  with Rainer during the term of the Agreement to identify and solicit the Raided Employees, and

26  negotiated terms, made offers and hired the Raided Employees to positions at SoCal Bank. Other

27  representatives of SoCal Bank and SoCal Bancorp, including Hernandez, Smithson and other

28  newly hired Raided Employees, assisted Rainer in identifying and soliciting the Raided

1   Employees. After being informed of the terms of his Agreement through at least the LOI, SoCal

2   Bank and SoCal Bancorp agreed to indemnify Rainer for any consequences of his acts of breach of

3   contract or tortious interference, thereby illegally and wrongfully inducing him to breach his

4   Agreement in the ways and by the acts set forth above.

5       200.   SoCal Bank and SoCal Bancorp aided and abetted Hernandez' breaches of his duty

6   of loyalty owed to Plaintiffs. Specifically, SoCal Bank and SoCal Bancorp knew that Hernandez,

7   who it intended to and did hire as its Chief Banking Officer, was engaging in, or intended to

8   engage in, acts which breached his duty of loyalty to Plaintiffs for the benefit of SoCal Bank and

9   SoCal Bancorp.

10       201.   SoCal Bank and SoCal Bancorp gave substantial assistance or encouragement to

11   Hernandez in breaching of his duty of loyalty to Plaintiffs. On information and belief, while still

12   serving as a Regional Vice President of PacWest Bank, Hernandez negotiated a job position with

13   SoCal Bank and solicited other PacWest Bank employees to join him and in so doing violated the

14   terms of the Stock Award Agreements. On information and belief, after being informed of the

15   terms of his Stock Award Agreements, SoCal Bank and SoCal Bancorp agreed to indemnify

16   Hernandez for any consequences of his acts of breach of contract or tortious interference, thereby

17   illegally and wrongfully inducing him to breach his Stock Award Agreements in the ways and by

18   the acts set forth above.

19       202.   SoCal Bank and SoCal Bancorp aided and abetted Smithson's breaches of her duty

20   of loyalty to Plaintiffs. Specifically, SoCal Bank and SoCal Bancorp knew that Smithson, who it

21   intended to and did hire as an Executive Vice President, Regional Manager, was engaging in, or

22   intended to engage in, acts that breached her duty of loyalty to Plaintiffs for the benefit of SoCal

23   Bank and SoCal Bancorp.

24       203.   SoCal Bank and SoCal Bancorp gave substantial assistance or encouragement to

25   Smithson in breaching of her duty of loyalty to Plaintiffs. On information and belief, while still

26   serving as an Executive Vice President, Regional Manager of PacWest Bank, Smithson negotiated

27   a job position with SoCal Bank and solicited other PacWest Bank employees to join her, and in

28   doing so violated the terms of the Stock Award Agreements. On information and belief, after

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 636-5000 • Fax (213) 683-1225

344176.3

44

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1   being informed of the terms of her Stock Award Agreements, SoCal Bank and SoCal Bancorp

2   agreed to indemnify Smithson for the consequences of her acts of breach of contract or tortious

3   interference, thereby illegally and wrongfully inducing her to breach her Stock Award Agreements

4   in the ways and by the acts set forth above.

5       204.    The conduct of SoCal Bank and SoCal Bancorp was a substantial factor in causing

6   the harm to Plaintiffs which resulted from by Rainer's, Hernandez' and Smithson's acts that

7   breached their duties of loyalty to Plaintiffs. Without the active participation of SoCal Bank and

8   SoCal Bancorp, Rainer, Hernandez and Smithson would not have been able to offer job positions

9   at SoCal Bank to the Raided Employees and the deal terms and other incentives to solicit PacWest

10   clients to move their business to SoCal Bank.

11      205.    Defendants engaged in a conspiracy to breach the duty of loyalty owed to Plaintiffs

12   by Rainer, Hernandez and Smithson. SoCal Bank and SoCal Bancorp were aware that Rainer,

13   Hernandez and Smithson planned and intended to engage in these tortious activities and agreed

14   with Rainer, Hernandez and Smithson to engage in a systematic plan to raid PacWest Bank's

15   employees and clients. SoCal Bank and SoCal Bancorp were aware of Rainer's obligations under

16   the Agreement and agreed with Rainer to delay the announcement of his hiring and the beginning

17   of the resignations of the Raided Employees until after October 20, 2020, and to proceed with the

18   plan regardless of his obligations under the Agreement. SoCal Bank and SoCal Bancorp were

19   aware of Hernandez' and Smithson's obligations under the respective Stock Award Agreements

20   and agreed to proceed with the plan regardless of each if their obligations under the Stock Award

21   Agreements. SoCal Bank and SoCal Bancorp were aware of Smithson's obligations under the

22   Stock Award Agreements and agreed to proceed with the plan regardless of her obligations under

23   the Stock Award Agreements.

24      206.    As a direct and proximate result of the aiding and abetting by SoCal Bank and

25   SoCal Bancorp of Rainer's, Hernandez' and Smithson's breaches of their fiduciary duties,

26   Plaintiffs have suffered damages in an amount to be proven at trial. Plaintiffs are not aware of the

27   full extent of the Defendants' actions but believes that additional PacWest Bank employees may

28

344176.3

45

**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT C - 242**

have been, or will in the future be, solicited by Rainer, SoCal Bank, SoCal Bancorp and Does 1-20, to resign and take positions at SoCal Bank.

## SIXTEENTH CAUSE OF ACTION

### COMMON LAW UNFAIR COMPETITION AND VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200 ET SEQ.

**(Plaintiffs PacWest and PacWest Bank Against Defendants Rainer, Hernandez. Smithson, SoCal Bank, SoCal Bancorp and Does 1-20)**

207.     Plaintiffs re-allege and hereby incorporate paragraphs 1 through 206 of this complaint as if fully set forth herein.

208.     The breach or disruption of the economic relationship each of the Raided Employees had with PacWest Bank has resulted in economic injury and damage to PacWest Bank, in that PacWest Bank has lost the services and skill of the Raided Employees, and in many cases the benefit of the advantageous business relationships these Raided Employees had with both actual and potential clients. Additionally, the speed and number of disruptions and lost employees has created chaos within PacWest Bank, and has led to a loss of business opportunities and employee morale.

209.     The interference by Defendants with PacWest Bank's relationships with its employees and customers is ongoing and an injunction is necessary to stop the interference and prevent further injury to Plaintiffs. Discovery has confirmed that Defendants continue unabated in their efforts to wrongfully solicit PacWest Bank employees and customers, and the number of PacWest Bank customers transferring their business to SoCal Bank as a result Defendants' illegal acts continues to grow.

210.     Plaintiffs' economic injury was and is the direct and proximate result of the unlawful acts of unfair competition by SoCal Bank, SoCal Bancorp, Rainer, Hernandez and Smithson set forth above.

211.     As a result of the unlawful acts of unfair competition by SoCal Bank, SoCal Bancorp, Rainer, Hernandez and Smithson, Plaintiffs are entitled to an injunction to prevent further damage to, and interference and disruption of, their business, and restitution in the form of

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

1  a return of the monies paid to Rainer under the Agreement, and Hernandez and Smithson pursuant

2  to their employment agreements and Stock Award Agreements with PacWest Bank.

3  **PRAYER FOR RELIEF**

4    WHEREFORE, Plaintiffs pray for relief as follows:

5    1.    For injunctive relief to prohibit Defendants' illegal conduct;

6    2.    For the return of past consulting fees unjustly received by Rainer approximately in

7  the amount of at least $135,000.00, but in an exact amount to be proven at trial;

8    3.    For the return of past salary and bonuses and stock unjustly received by Hernandez

9  in an amount to be determined at trial;

10   4.    For the return of past salary and bonuses and stock unjustly received by Smithson

11 in an amount to be determined at trial;

12   5.    For general damages, for both past and future economic loss, in amount to be

13 proven at trial, in excess of $15 million;

14   6.    For punitive damages in an amount to be determined at trial;

15   7.    For all attorneys' fees and costs of suit incurred herein; and

16   8.    For such other and further relief as this Court may deem proper.

17

18 DATED: April 1, 2022                BAUTE CROCHETIERE HARTLEY & VELKEI LLP

19

20

21 By: _____

22    David P. Crochetiere
     Attorneys for Plaintiff/Cross-Defendant
23    PACWEST BANCORP, Plaintiff PACIFIC
     WESTERN BANK and Cross-Defendant
24    JOHN M. EGGEMEYER

25

26

27

28

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

344176.3

47

**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT C - 244**

1

## **DEMAND FOR JURY TRIAL**

2       Plaintiffs PACWEST BANCORP and PACIFIC WESTERN BANK hereby demand a trial

3   by jury on all issues so triable.

4

5   DATED: April 1, 2022                    BAUTE CROCHETIERE HARTLEY & VELKEI LLP

6

7                                    By: _____

8                                        David P. Crochetiere
                                         Attorneys for Plaintiff/Cross-Defendant
9                                        PACWEST BANCORP, Plaintiff PACIFIC
                                         WESTERN BANK and Cross-Defendant
10                                       JOHN M. EGGEMEYER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAUTE CROCHETIERE & HARTLEY LLP
777 South Figueroa Street, Suite 3800
Los Angeles, CA 90017
Tel (213) 630-5000 • Fax (213) 683-1225

# EXHIBIT 1

EXECUTION COPY
CONFIDENTIAL



**PacWest Bancorp**

May 25, 2017

David I. Rainer
(at the Address on file with the Company)

Re:    <u>Amended and Restated Consulting Agreement</u>

Dear David:

As you know, PacWest Bancorp (the "*Parent*") and CU Bancorp (the "*Company*") entered into an Agreement and Plan of Merger on April 5, 2017 (the "*Merger Agreement*"), pursuant to which the Company will merge with and into the Parent (the "*Merger*"). Parent also entered into a consulting arrangement with you on April 5, 2017 to confirm the agreements that Parent and you reached regarding the specific terms and conditions of your retention as a consultant to Parent following the closing of the Merger (the "*Consulting Agreement*"). Parent and you now desire to amend certain aspects of the Consulting Agreement, and the purpose of this letter agreement is to set forth the specific terms and conditions of your retention as a consultant to Parent as so amended. This letter agreement amends and restates in its entirety the Consulting Agreement and becomes effective as of, and is conditioned upon the occurrence of, the closing of the Merger (the "*Effective Date*"), and if the Merger Agreement is terminated pursuant to its terms then this letter will terminate and be of no force or effect.

1.  **Purpose of Engagement**

Upon the terms and subject to the conditions of this letter, you agree to serve as a consultant to Parent and its subsidiaries. As a consultant, you agree to perform the services set forth on the attached Exhibit A (the "*Services*"). You agree to perform the Services faithfully and diligently for Parent as set forth in this letter. In addition, without limiting in any way your obligations under this Section 1, in accordance with Section 409A of the Internal Revenue Code of 1986, as amended ("the Code"), Parent and you confirm that it is currently anticipated that your duties as a consultant would decrease to no more than 20% of the average level of services performed by you during your last three years of employment with the Company.

2.  **Term**

The term of your consulting arrangement will commence on the Effective Date and end on the 65th month anniversary of the Effective Date (the "*Term*"), unless it is sooner terminated, as provided in this letter. Parent and you are under no obligation to continue this

engagement beyond the Term.  Additionally, Parent and you may terminate the Term before its scheduled expiration as provided in Section 6.

**3.   Fees**

During the Term, you will receive an annual retainer of $550,000, payable in substantially equal monthly installments on the first business day of every month (the "*Consulting Fee*").  In addition, during the Term, Parent will reimburse actual out-of-pocket expenses reasonably incurred by you in connection with the Services, subject to Parent's reimbursement policy as in effect from time to time, and provide you with office space at its Beverly Hills headquarters.

**4.   Restrictions**

You acknowledge that you hold equity in the Company and, as a result of the Merger, you will receive a direct and substantial economic benefit from the Merger.  As an inducement to Parent entering into the Merger Agreement and to consummate the Merger, to protect Parent's legitimate interest in the goodwill and other assets associated with the business of the Company, and in consideration of the benefits to be received by you therefrom, you and Parent acknowledge and agree that it is your intention that the covenants in this Section 4 be valid, legal and enforceable including, without limitation and to the extent applicable, through qualification under §16601 of the California Business and Professions Code as an exception to the restrictions set forth in §16600 of the California Business and Professions Code.

Without the written consent of Parent, you agree not to, directly or indirectly, represent, become employed by, perform services for, consult to, or advise in any manner or have any material interest in any Competitive Enterprise from the Effective Date until the third anniversary of the Effective Date (the "*Restricted Period*").  A "*Competitive Enterprise*" means (1) any banking organization that competes anywhere within the Company's "footprint" (i.e., where the Company or any of its subsidiaries regularly conducted business prior to the Effective Time) with any of the business activities engaged in by the Company or any of its subsidiaries at any time prior to the Effective Date or (2) any entity or business attempting to acquire an interest in a banking organization described in clause (1).  Ownership directly or indirectly (including, without limitation, by being a member of a group within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended (the "*Exchange Act*")) of not more than 1% of the outstanding stock of any publicly traded company will not be a violation of this Section 4.

In addition, during the Restricted Period, you will not, in any manner, directly or indirectly (without the prior written consent of Parent): (i) Solicit any Client to transact business with a Competitive Enterprise or to reduce or refrain from doing any business with Parent or any of its subsidiaries (including the Company), (ii) interfere with or damage any relationship between Parent, Pacific Western Bank or the Company, on the one hand, and a Client, on the other hand, or (iii) Solicit anyone who is an employee of Parent or any of its subsidiaries (or who, to your knowledge, was an employee of Parent or any of its subsidiaries within the prior 90 days) to resign from Parent or any of its subsidiaries (including the Company) or to apply for or accept employment with any other Competitive Enterprise.

For purposes of this letter, a "*Client*" means any client of the Company or any of its subsidiaries to whom you, in your capacity as an executive officer of the Company, provided services, or for whom you, in your capacity as an executive officer of the Company, transacted business, or any client or prospective client who, to your knowledge, was solicited by the Company or whose identity became known to you in connection with your relationship with the Company or any of its subsidiaries, and "*Solicit*" means any direct or indirect communication of any kind that in any way invites, advises, encourages or requests any person to take or refrain from taking any action.

The terms and provisions of this Section 4 are intended to be separate and divisible provisions and if, for any reason, any one or more of them is held to be invalid or unenforceable, neither the validity nor the enforceability of any other provision of this Section 4 or this letter will thereby be affected. The parties acknowledge that the potential restrictions on your future employment imposed by this Section 4 are reasonable in both duration and geographic scope and in all other respects. If for any reason any court of competent jurisdiction finds any provisions of this Section 4 to be unreasonable in duration or geographic scope or otherwise, you and Parent agree that the restrictions and prohibitions contained herein will be effective to the fullest extent allowed under applicable law in such jurisdiction.

You acknowledge that your Services are of a specific, unique and extraordinary character and that your breach or threatened breach of the provisions set forth in this Section 4 will cause irreparable injury to Parent for which monetary damages alone will not provide an adequate remedy. Accordingly, in addition to any rights or remedies Parent may have available to it under this letter or otherwise, Parent also will be entitled to an injunction to be issued by any court of competent jurisdiction, restraining you from committing or continuing any violation of this Section 4. You agree that no bond will need to be posted for Parent to receive such an injunction, no proof of economic loss or monetary damages will be required and that remedies at law would be inadequate. In the event that you breach this Section 4, Parent's obligation to make or provide any further payments under this letter with cease, and you will forfeit any amounts which otherwise would have been payable to you.

5.    **Confidentiality.**

During the Term and thereafter, you will hold in a fiduciary capacity for the benefit of Parent all trade secrets and confidential information, knowledge or data relating to Parent and its subsidiaries (including the Company) and their businesses and investments, which will have been obtained by you during your employment with the Company prior to the Effective Date and during your consulting with Parent after the Effective Date and which are not generally available public knowledge (other than by acts by you in violation of this agreement). Except as may be required or appropriate in connection with your carrying out of your duties under this agreement, you will not, without the prior written consent of Parent or as may otherwise be required by law or any legal process, any statutory obligation or order of any court or statutory tribunal of competent jurisdiction, or as is necessary in connection with any adversarial proceeding against Parent (in which case you will use your reasonable best efforts to cooperate with Parent in its obtaining of a protective order against disclosure by a court of competent jurisdiction),

communicate or divulge any such trade secrets, information, knowledge or data to anyone other than Parent and those designated by Parent or on behalf of Parent in the furtherance of its business or to perform duties hereunder.

Notwithstanding anything to the contrary in this agreement or otherwise, nothing will limit your rights under applicable law to provide truthful information to any governmental entity or to file a charge with or participate in an investigation conducted by any governmental entity.

You are hereby notified that the immunity provisions contained in Section 1833 of Title 18 of the United States Code provide that an individual cannot be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that is made (1) in confidence to federal, state or local government officials, either directly or indirectly, or to an attorney, and is solely for the purpose of reporting or investigating a suspected violation of the law, (2) under seal in a complaint or other document filed in a lawsuit or other proceeding, or (3) to your attorney in connection with a lawsuit for retaliation for reporting a suspected violation of law (and the trade secret may be used in the court proceedings for such lawsuit) as long as any document containing the trade secret is filed under seal and the trade secret is not disclosed except pursuant to court order.

**6.    Termination**

Parent may only terminate the Term for Cause by written notice to you, which notice may be effective immediately unless otherwise provided herein.  For purposes of this letter, "Cause" means (i) your falsification of Parent documents or records; (ii) your intentional and improper use or disclosure of Parent's confidential or proprietary information; (iii) any action by you which was intended to and has a significant detrimental effect on Parent's reputation or business; (iv) your willful failure to perform any reasonable assigned duties after written notice from Parent, and a reasonable opportunity to cure, such willful failure; (v) your material breach of any written agreement between you and Parent, including this letter agreement and the restrictive covenants herein; or (vi) your conviction (including any plea of guilty or nolo contendere) for theft, dishonesty, or of any criminal act which impairs your ability to perform your duties with the Company.  For terminations arising under subparagraph (iv) above, you shall have thirty (30) days following receipt of a written notice to cure such grounds for Cause prior to a termination for Cause becoming effective pursuant to subparagraph 4.

You may terminate the Term for any reason before its scheduled expiration by written notice to Parent, which notice may be effective immediately.

No part of the Consulting Fee will be payable to you for any period following the date of termination (x) by Parent for Cause, (y) by you for any reason or (z) due to your death or disability.  In the event of an early termination of the Term by Parent without Cause, Parent shall continue to pay you the Consulting Fee through the remainder of the Term as provided in Section 3 above.

In the event of any early termination of the Term for any reason, your obligations under Section 4 will continue until the end of the Restricted Period and your obligations under Section 5 will continue pursuant to their terms.

5404 Wisconsin Avenue, 2nd Floor, Chevy Chase, MD 20815     (301) 841-2700
www.pacwestbancorp.com

**7.      Independent Contractor**

You agree that you are performing the Services as an independent contractor and not as an employee of Parent.  You will be responsible for the payment of all applicable taxes levied or based upon the Consulting Fee and for all non-reimbursable expenses attributable to the rendering of Services.  In addition, you will not be eligible to participate in any vacation, group medical or life insurance, disability, profit sharing or retirement benefits, or any other fringe benefits or benefit plans offered by Parent to its employees.  Nothing in this letter will be deemed to constitute a partnership or joint venture between Parent and you, nor will anything in this letter be deemed to constitute Parent or you as the agent of the other.  During the Term, neither you nor Parent will be or become liable to or bound by any representation, act or omission whatsoever of the other.

**8.      Miscellaneous**

This letter agreement will not be assignable by you. This letter agreement will be assignable by Parent only to an acquirer of all or substantially all of the assets of Parent, provided such acquirer promptly assumes all of the obligations hereunder of Parent in a writing delivered to you and otherwise complies with the provisions hereof with regard to such assumption.

The validity, interpretation, construction and performance of this letter agreement will be governed by the laws of the State of California without regard to its conflicts of law principles.

If any provision of this letter is found by any court of competent jurisdiction to be illegal, invalid or unenforceable for any reason, then (i) the provision will be amended automatically to the minimum extent necessary to cure the illegality or invalidity and permit enforcement and (ii) the remainder of this letter will not be affected.  This letter constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous representations, proposals, discussions, and communications, whether oral or in writing with respect to the subject matter hereof.  This letter may be modified only in a writing signed by you and  Parent.

Any notices given under this letter (1) by Parent to you will be in writing and will be given by hand delivery or by registered or certified mail, return receipt requested, postage prepaid, addressed to you at your address listed above or (2) by you to Parent will be in writing and will be given by hand delivery or by registered or certified mail, return receipt requested, postage prepaid, addressed to the General Counsel of Parent at Parent's corporate headquarters.

*                              *                              *

To confirm the foregoing terms are acceptable to you, please execute and return the copy of this letter, which is enclosed for your convenience.

Very truly yours,

PacWest Bancorp

Kori L. Ogrosky
EVP, General Counsel & Corporate Secretary

Accepted and Agreed:

David I. Rainer

**Exhibit A**

The following will constitute the Services to be performed:

1. Assist with transition issues relating to the merger.  Such activities may include attending meetings, presentations and communications.

2. Provide strategic advice and counsel to Parent on matters for which you have personal knowledge.  Such guidance may include specific account and client history, new market development, portfolio retention strategies and broadening financial services.

3. Facilitate customer outreach, including brokering introductions and fostering business relationships between legacy clients and the acquiring organization.

4. Act as an ambassador to Parent and be available to meet with, and be involved with, clients and counterparties, at the request of Parent, where Parent believes your personal knowledge, attendance and participation could be beneficial.

5. Preserve business and employee relationships to mitigate disruption and anxiety associated with the transaction and change.  This includes promoting continuity and retaining key personnel.

6. Perform new business development opportunities to attract and retain new clients.  As a leader in the industry, help promote the reputation of Parent to key merchant banking markets.

7. Perform such other services as the parties may mutually agree upon from time to time during the term of the agreement.

# EXHIBIT 2

**PACWEST BANCORP**
**STOCK INCENTIVE PLAN**
**NOTICE OF STOCK AWARD GRANT**

This Notice of Stock Award Grant is part of the Stock Award Agreement between Grantee and the Company dated **05/14/2019**  and is of no force and effect until the Stock Award Agreement is signed by Grantee and the Company's representative, this Notice of Stock Award Grant is signed by Grantee.

You have been granted the following Stock Award:

| | |
|---|---|
| Name of Grantee: | **RICH  HERNANDEZ** |
| Total Number of Shares Granted: ("Granted Stock") | **3,483** |
| Type of Stock Award: | Restricted Stock Award |
| Date of Grant: | **05/14/2019** |
| Vesting Schedule: | The Granted Stock shall vest in full over 4 years. The first one-fourth of the Granted Stock shall vest on the date the Grantee completes one year of continuous Service after the Vesting Commencement Date. An additional one-fourth of the Granted Stock shall vest on the date the Grantee completes each year of continuous Service thereafter until Grantee is 100% vested in the Restricted Stock on the 4th year anniversary of the Vesting Commencement Date. |
| Vesting Commencement Date: | The date that is the last day of the month in which the Grant is made. |

Please sign below to acknowledge the terms and conditions of this Stock Award.

**ACKNOWLEDGED BY GRANTEE:**

By: **Signed Electronically**

Name: **RICH  HERNANDEZ**

**PACWEST BANCORP**
**STOCK INCENTIVE PLAN**
**STOCK AWARD AGREEMENT**

1. *Definitions*. Unless otherwise defined herein, the terms defined in the PacWest Bancorp 2017 Stock Incentive Plan, as amended (the "Plan") shall have the same defined meanings in this Stock Award Agreement ("Agreement") and the Notice of Stock Award Grant attached hereto as Appendix A.

2. *Grant of Stock Award*. Pursuant to the terms and conditions set forth in the Notice of Stock Award Grant, this Agreement, and the Plan, PacWest Bancorp (the "Company") grants to the grantee named in the Notice of Stock Award Grant ("Grantee") on the date of grant set forth in the Notice of Stock Award Grant ("Date of Grant") the number of Shares set forth in the Notice of Stock Award Grant. This Stock Award is intended to be a Restricted Stock Award or a Performance Stock Award, as provided in the Notice of Stock Award Grant.

3. *Vesting*. The Grantee shall vest in the Granted Stock in accordance with the vesting schedule provided for in the Notice of Stock Award Grant; provided, however, that the Grantee shall cease vesting in the Granted Stock on the Grantee's Termination Date or the date on which the Compensation Committee of the Company's Board of Directors (the "Administrator") determines that the performance goals, if any, provided for in the Notice of Stock Award Grant were not satisfied during the designated period of time. Notwithstanding the foregoing, upon the occurrence of a Vesting Event, the Grantee shall become 100% vested in those shares of Granted Stock that are outstanding on the date of the Vesting Event.

4. *Risk of Forfeiture*.

(a) *General Rule*. The Granted Stock shall initially be subject to a Risk of Forfeiture. The Shares subject to a Risk of Forfeiture shall be referred to herein as "Restricted Shares".

(b) *Lapse of Risk of Forfeiture*. The Risk of Forfeiture shall lapse as the Grantee vests in the Granted Stock.

(c) *Forfeiture of Granted Stock*. The Restricted Shares shall automatically be forfeited and immediately returned to the Company on the Grantee's Termination Date or the date on which the Administrator determines that the performance goals, if any, provided for in the Notice of Stock Award Grant were not satisfied during the designated period of time.

(d) *Additional Shares or Substituted Securities*. In the event of a stock split, reverse stock split, stock dividend, recapitalization, combination or reclassification of the Common Stock or any other increase or decrease in the number of issued and outstanding Shares effected without receipt of consideration by the Company, any new, substituted or additional securities or other property (including money paid other than as an ordinary cash dividend) which are by reason of such transaction distributed with respect to any Restricted Shares or into which such Restricted Shares thereby become convertible shall immediately be subject to a Risk of Forfeiture, which Risk of Forfeiture shall lapse at the same time and in the same manner as the Risk of Forfeiture to which the corresponding Restricted Share is subject.

(e) *Escrow*. Upon issuance, the stock certificates for Granted Stock shall be deposited in escrow with the Company to be held in accordance with the provisions of this Agreement. Any new, substituted or additional securities or other property described in Subsection (d) above shall immediately be delivered to the Company to be held in escrow, but only to the extent the

shares of Granted Stock are at the time Restricted Shares. All regular cash dividends on Restricted Shares (or other securities at the time held in escrow) shall be paid directly to the Grantee and shall not be held in escrow (such distributions may, however, be delivered to an address at the Company for delivery to the Grantee). Restricted Shares, together with any other assets or securities held in escrow hereunder, shall be (i) surrendered to the Company for cancellation upon forfeiture of the Restricted Shares; or (ii) released to the Grantee upon the Grantee's request to the Administrator on or after the date the shares of Granted Stock are no longer Restricted Shares. Grantee agrees not to make a request to the Company's transfer agent for delivery of any share certificates representing any shares of Granted Stock so long as such shares are Restricted Shares.

5. *Rights as a Stockholder*. The Grantee shall have the rights of a stockholder with respect to the dividends paid by the Company. Grantee shall not be entitled to vote any unvested shares of Granted Stock. Upon the vesting of any portion of the Stock Award, the Grantee shall have the voting rights with respect to any such vested shares of Granted Stock.

6. *Non-transferability of Stock Award*. Except as otherwise provided for in the Plan, this Stock Award may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent and distribution and may be exercised, during the lifetime of the Grantee, only by the Grantee. If the Grantee transfers all or part of this Stock Award pursuant to the previous sentence, then the terms of this Agreement, the Plan and the Notice of Stock Award shall apply to the transferee to the same extent as to the Grantee.

7. *Regulatory Compliance*. The issuance of Common Stock pursuant to this Agreement shall be subject to full compliance with all then applicable requirements of law and the requirements of any stock exchange or interdealer quotation system upon which the Common Stock may be listed or traded.

8. *Modification and Termination*. The rights of the Grantee are subject to modification and termination in certain events, as provided in the Plan.

9. *Withholding Tax*. The Company's obligation to deliver Shares or remove any restrictive legends upon vesting of such Shares under the Plan shall be subject to the satisfaction of all applicable federal, state and local income and employment tax withholding requirements. The Grantee shall pay to the Company an amount equal to the withholding amount (or the Company may withhold such amount from the Grantee's salary) in cash or, to the extent permitted under Section 402 of the Sarbanes-Oxley Act of 2002 and the regulations adopted pursuant thereto, with Shares (including previously vested Granted Stock) with an aggregate fair market value equal to the withholding amount calculated using the maximum statutory withholding amount permitted to be withheld under applicable tax rules.

10. *Nondisclosure*. Grantee acknowledges that the grant and terms of this Stock Award are confidential and may not be disclosed by Grantee to any other person, including other employees of the Company and other participants in the Plan, without the express written consent of the Company's Chief Executive Officer. Notwithstanding the foregoing, the Grantee may disclose the grant and terms of this Stock Award to the Grantee's family member, financial advisor, and attorney and as may be required by law or regulation. Any breach of this provision will be deemed to be a material breach of this Agreement.

11. *Governing Law*. This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of California without regard to principles of conflict of laws.

12. *Successors*. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their legal representatives, heirs, and permitted transferees, successors and assigns.

13. *Plan*. This Agreement and the Notice of Stock Award Grant are subject to all of the terms and provisions of the Plan, receipt of a copy of which is hereby acknowledged by the Grantee. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Administrator upon any questions arising under the Plan, this Agreement, and the Notice of Stock Award Grant.

14. *Rights to Future Employment*. This Stock Award does not confer upon the Grantee any right to continue in the Service of the Company or any Affiliate, nor does it limit the right of the Company to terminate the Service of the Grantee at any time.

15. *Restrictive Covenants.*  The Grantee hereby agrees to be bound by the restrictive covenants set forth in **Annex A**.

16. *Entire Agreement*. The Notice of Stock Award Grant, this Agreement, and the Plan constitute the entire contract between the parties hereto with regard to the subject matter hereof. They supersede any other agreements, representations or understandings (whether oral or written and whether express or implied) between the parties which relate to the subject matter hereof.


By your signature and the signature of the Company's representative below, you and the Company agree that this Stock Award is granted under and governed by the terms and conditions of this Agreement and the Plan and the Notice of Stock Award Grant, both of which are attached and incorporated herein by reference. This Stock Award is of no force and effect until this Agreement is signed by you and the Company's representative, the Notice of Stock Award Grant is signed by you.


**GRANTEE:**                                          **PACWEST BANCORP**

By:  **Signed Electronically**          By:  *Rebecca Cordes*
     Name:                                    Rebecca H. Cordes
                              *Exec. Vice President, Human Resources*

# ANNEX A
## RESTRICTIVE COVENANTS

The Restrictive Covenants set forth in this Annex A to the Restricted Stock Award Agreement (the "Agreement") limit the ability of the Grantee to engage in certain practices during and following employment with the Company and is an integral part of the Agreement, without which the Company would not have granted the opportunity to earn the Restricted Stock Award.

1.  <u>Confidential Information</u>.  During your employment and thereafter, you shall hold in a fiduciary capacity for the benefit of the Company all trade secrets and Confidential Information relating to the Company and its businesses and investments, which will have been obtained by you during your employment by the Company and which is not generally available public knowledge (other than by acts by you in violation of this Agreement). Except as may be required or appropriate in connection with your carrying out your duties as an employee, you will not, without the prior written consent of the Company or as may otherwise be required by law or any legal process, any statutory obligation or order of any court or statutory tribunal of competent jurisdiction, or as is necessary in connection with any adversarial proceeding against the Company (in which case you will use your reasonable best efforts in cooperating with the Company in obtaining a protective order against disclosure by a court of competent jurisdiction), communicate or divulge any such trade secrets or Confidential Information to anyone other than the Company and those designated by the Company or on behalf of the Company in the furtherance of its business or to perform duties hereunder.  Notwithstanding anything to the contrary in this Agreement or otherwise, nothing shall limit your rights under applicable law to provide truthful information to any governmental entity or to file a charge with or participate in an investigation conducted by any governmental entity. You are hereby notified that the immunity provisions in Section 1833 of title 18 of the United States Code provide that an individual cannot be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that is made (1) in confidence to federal, state or local government officials, either directly or indirectly, or to an attorney, and is solely for the purpose of reporting or investigating a suspected violation of the law, (2) under seal in a complaint or other document filed in a lawsuit or other proceeding, or (3) to your attorney in connection with a lawsuit for retaliation for reporting a suspected violation of law (and the trade secret may be used in the court proceedings for such lawsuit) as long as any document containing the trade secret is filed under seal and the trade secret is not disclosed except pursuant to court order.

2.  <u>Non-Solicitation of Employees</u>.  You agree that during your employment, and for a six month period following the termination of your employment for any reason, you will not take any action, directly or indirectly (without the prior written consent of the Company), that causes or could reasonably be expected to cause any person who is then an employee of the Company or its Affiliates to resign from the Company or its Affiliates or to apply for or accept employment with any other business or enterprise.

3.  <u>Non-Solicitation of Customers</u>.  You agree that during your employment, and for a six month period following the termination of your employment for any reason, you will not, in any manner, directly or indirectly (without the prior written consent of the Company): (1) take any action that causes or could reasonably be expected to cause any customer or prospective customer of the Company or its Affiliates to whom you provided services or with whom you otherwise had contact to become a customer of or transact any business with a Competitive Business or reduce or refrain from doing any business with the Company or its Affiliates, (2) transact business with any customer or prospective customer that would cause you to be a Competitive Business, or (3) interfere with or damage any relationship between the Company and a customer or prospective customer.

4.    <u>Reasonableness of Covenant</u>.  You agree that the covenants contained herein are reasonable and necessary to protect the confidentiality of the customer lists, the terms, conditions and nature of customer relationships, and other trade secrets and Confidential Information concerning the Company and its Affiliates, acquired by you and to avoid actual or apparent conflicts of interest.

5.    <u>Validity</u>.   The terms and provisions of this Annex A are intended to be separate and divisible provisions and if, for any reason, any one or more of them is held to be invalid or unenforceable, neither the validity nor the enforceability of any other provision set forth herein thereby be affected.  If for any reason any court of competent jurisdiction will find any provisions of this Annex A unreasonable in duration or geographic scope or otherwise, you and the Company agree that the restrictions and prohibitions contained herein will be effective to the fullest extent allowed under applicable law in such jurisdiction

6.    <u>Injunctive Relief</u>.   Without limiting any remedies available to the Company, you acknowledge and agree that a breach of the covenants contained in Sections 1 through 3 of this Annex A will result in injury to the Company and its Affiliates for which there is no adequate remedy at law and that it will not be possible to measure damages for such injuries precisely.  Therefore, you agree that, in the event of such a breach or threat thereof, the Company will be entitled to seek a temporary restraining order and a preliminary and permanent injunction, without bond or other security, restraining you from engaging in activities prohibited by Sections 1 through 3 of this Annex A or such other relief as may be required specifically to enforce any of the covenants in Sections 1 through 3 of this Annex A.

7.    <u>Definitions</u>.  For purposes of these covenants, the following terms will have the following meanings:

(a)    "<u>Competitive Business</u>" means any business enterprise that either (i) engages in any activity that competes with the business of the Company or its Affiliates or (ii) holds a 5% or greater equity, voting or profit participation interest in any enterprise that engages in such a competitive activity.

(b)    "<u>Confidential Information</u>" means any information concerning the business or affairs of the Company or any of its Affiliates which is not generally known to the public and includes, but is not limited to, any file, document, book, account, list (including without limitation customer lists), process, patent, specification, drawing, design, computer program or file, computer disk, method of operation, recommendation, report, plan, survey, data, manual, strategy, financial data, client information or data (including the terms and conditions of any business relationships between clients and the Company or its Affiliates), or contract which comes to your knowledge in the course of your employment or which is generated by you in the course of performing your obligations to the Company whether alone or with others.

**JEG7FJ7J**

**05/20/2019 12:48 PM U.S. Eastern Standard Time**

**ACCEPTED**

# EXHIBIT 3

**PACWEST BANCORP**
**STOCK INCENTIVE PLAN**
**NOTICE OF STOCK AWARD GRANT**

This Notice of Stock Award Grant is part of the Stock Award Agreement between Grantee and the Company dated **05/12/2020**   and is of no force and effect until the Stock Award Agreement is signed by Grantee and the Company's representative, this Notice of Stock Award Grant is signed by Grantee.

You have been granted the following Stock Award:

| | |
|---|---|
| Name of Grantee: | **RICH   HERNANDEZ** |
| Total Number of Shares Granted: ("Granted Stock") | **3,900** |
| Type of Stock Award: | Restricted Stock Award |
| Date of Grant: | **05/12/2020** |
| Vesting Schedule: | The Granted Stock shall vest in full over 4 years. The first one-fourth of the Granted Stock shall vest on the date the Grantee completes one year of continuous Service after the Vesting Commencement Date. An additional one-fourth of the Granted Stock shall vest on the date the Grantee completes each year of continuous Service thereafter until Grantee is 100% vested in the Restricted Stock on the 4th year anniversary of the Vesting Commencement Date. |
| Vesting Commencement Date: | The date that is the last day of the month in which the Grant is made. |

Please sign below to acknowledge the terms and conditions of this Stock Award.

**ACKNOWLEDGED BY GRANTEE:**

By: 	**Signed Electronically**

Name: 	**RICH   HERNANDEZ**

PACWEST BANCORP
STOCK INCENTIVE PLAN
STOCK AWARD AGREEMENT

1. *Definitions*. Unless otherwise defined herein, the terms defined in the PacWest Bancorp 2017 Stock Incentive Plan, as amended (the "Plan") shall have the same defined meanings in this Stock Award Agreement ("Agreement") and the Notice of Stock Award Grant attached hereto as Appendix A.

2. *Grant of Stock Award*. Pursuant to the terms and conditions set forth in the Notice of Stock Award Grant, this Agreement, and the Plan, PacWest Bancorp (the "Company") grants to the grantee named in the Notice of Stock Award Grant ("Grantee") on the date of grant set forth in the Notice of Stock Award Grant ("Date of Grant") the number of Shares set forth in the Notice of Stock Award Grant. This Stock Award is intended to be a Restricted Stock Award or a Performance Stock Award, as provided in the Notice of Stock Award Grant.

3. *Vesting*. The Grantee shall vest in the Granted Stock in accordance with the vesting schedule provided for in the Notice of Stock Award Grant; provided, however, that the Grantee shall cease vesting in the Granted Stock on the Grantee's Termination Date or the date on which the Compensation Committee of the Company's Board of Directors (the "Administrator") determines that the performance goals, if any, provided for in the Notice of Stock Award Grant were not satisfied during the designated period of time. Notwithstanding the foregoing, upon the occurrence of a Vesting Event, the Grantee shall become 100% vested in those shares of Granted Stock that are outstanding on the date of the Vesting Event.

4. *Risk of Forfeiture*.

(a) *General Rule*. The Granted Stock shall initially be subject to a Risk of Forfeiture. The Shares subject to a Risk of Forfeiture shall be referred to herein as "Restricted Shares".

(b) *Lapse of Risk of Forfeiture*. The Risk of Forfeiture shall lapse as the Grantee vests in the Granted Stock.

(c) *Forfeiture of Granted Stock*. The Restricted Shares shall automatically be forfeited and immediately returned to the Company on the Grantee's Termination Date or the date on which the Administrator determines that the performance goals, if any, provided for in the Notice of Stock Award Grant were not satisfied during the designated period of time.

(d) *Additional Shares or Substituted Securities*. In the event of a stock split, reverse stock split, stock dividend, recapitalization, combination or reclassification of the Common Stock or any other increase or decrease in the number of issued and outstanding Shares effected without receipt of consideration by the Company, any new, substituted or additional securities or other property (including money paid other than as an ordinary cash dividend) which are by reason of such transaction distributed with respect to any Restricted Shares or into which such Restricted Shares thereby become convertible shall immediately be subject to a Risk of Forfeiture, which Risk of Forfeiture shall lapse at the same time and in the same manner as the Risk of Forfeiture to which the corresponding Restricted Share is subject.

(e) *Escrow*. Upon issuance, the stock certificates for Granted Stock shall be deposited in escrow with the Company to be held in accordance with the provisions of this Agreement. Any new, substituted or additional securities or other property described in Subsection (d) above shall immediately be delivered to the Company to be held in escrow, but only to the extent the

shares of Granted Stock are at the time Restricted Shares. All regular cash dividends on Restricted Shares (or other securities at the time held in escrow) shall be paid directly to the Grantee and shall not be held in escrow (such distributions may, however, be delivered to an address at the Company for delivery to the Grantee). Restricted Shares, together with any other assets or securities held in escrow hereunder, shall be (i) surrendered to the Company for cancellation upon forfeiture of the Restricted Shares; or (ii) released to the Grantee upon the Grantee's request to the Administrator on or after the date the shares of Granted Stock are no longer Restricted Shares. Grantee agrees not to make a request to the Company's transfer agent for delivery of any share certificates representing any shares of Granted Stock so long as such shares are Restricted Shares.

5. *Rights as a Stockholder*. The Grantee shall have the rights of a stockholder with respect to the dividends paid by the Company. Grantee shall not be entitled to vote any unvested shares of Granted Stock. Upon the vesting of any portion of the Stock Award, the Grantee shall have the voting rights with respect to any such vested shares of Granted Stock.

6. *Non-transferability of Stock Award*. Except as otherwise provided for in the Plan, this Stock Award may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent and distribution and may be exercised, during the lifetime of the Grantee, only by the Grantee. If the Grantee transfers all or part of this Stock Award pursuant to the previous sentence, then the terms of this Agreement, the Plan and the Notice of Stock Award shall apply to the transferee to the same extent as to the Grantee.

7. *Regulatory Compliance*. The issuance of Common Stock pursuant to this Agreement shall be subject to full compliance with all then applicable requirements of law and the requirements of any stock exchange or interdealer quotation system upon which the Common Stock may be listed or traded.

8. *Modification and Termination*. The rights of the Grantee are subject to modification and termination in certain events, as provided in the Plan.

9. *Withholding Tax*. The Company's obligation to deliver Shares or remove any restrictive legends upon vesting of such Shares under the Plan shall be subject to the satisfaction of all applicable federal, state and local income and employment tax withholding requirements. The Grantee shall pay to the Company an amount equal to the withholding amount (or the Company may withhold such amount from the Grantee's salary) in cash or, to the extent permitted under Section 402 of the Sarbanes-Oxley Act of 2002 and the regulations adopted pursuant thereto, with Shares (including previously vested Granted Stock) with an aggregate fair market value equal to the withholding amount calculated using the maximum statutory withholding amount permitted to be withheld under applicable tax rules.

10. *Nondisclosure*. Grantee acknowledges that the grant and terms of this Stock Award are confidential and may not be disclosed by Grantee to any other person, including other employees of the Company and other participants in the Plan, without the express written consent of the Company's Chief Executive Officer. Notwithstanding the foregoing, the Grantee may disclose the grant and terms of this Stock Award to the Grantee's family member, financial advisor, and attorney and as may be required by law or regulation. Any breach of this provision will be deemed to be a material breach of this Agreement.

11. *Governing Law*. This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of California without regard to principles of conflict of laws.

12. *Successors*. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their legal representatives, heirs, and permitted transferees, successors and assigns.

13. *Plan*. This Agreement and the Notice of Stock Award Grant are subject to all of the terms and provisions of the Plan, receipt of a copy of which is hereby acknowledged by the Grantee. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Administrator upon any questions arising under the Plan, this Agreement, and the Notice of Stock Award Grant.

14. *Rights to Future Employment*. This Stock Award does not confer upon the Grantee any right to continue in the Service of the Company or any Affiliate, nor does it limit the right of the Company to terminate the Service of the Grantee at any time.

15. *Restrictive Covenants.*  The Grantee hereby agrees to be bound by the restrictive covenants set forth in **Annex A**.

16. *Entire Agreement*. The Notice of Stock Award Grant, this Agreement, and the Plan constitute the entire contract between the parties hereto with regard to the subject matter hereof. They supersede any other agreements, representations or understandings (whether oral or written and whether express or implied) between the parties which relate to the subject matter hereof.

By your signature and the signature of the Company's representative below, you and the Company agree that this Stock Award is granted under and governed by the terms and conditions of this Agreement and the Plan and the Notice of Stock Award Grant, both of which are attached and incorporated herein by reference. This Stock Award is of no force and effect until this Agreement is signed by you and the Company's representative, the Notice of Stock Award Grant is signed by you.

**GRANTEE:**

By:  **Signed Electronically**
    Name:

**PACWEST BANCORP**

By:

Rebecca H. Cordes
*Exec. Vice President, Human Resources*

## ANNEX A
## RESTRICTIVE COVENANTS

The Restrictive Covenants set forth in this Annex A to the Restricted Stock Award Agreement (the "Agreement") limit the ability of the Grantee to engage in certain practices during and following employment with the Company and is an integral part of the Agreement, without which the Company would not have granted the opportunity to earn the Restricted Stock Award.

1.    <u>Confidential Information</u>.  During your employment and thereafter, you shall hold in a fiduciary capacity for the benefit of the Company all trade secrets and Confidential Information relating to the Company and its businesses and investments, which will have been obtained by you during your employment by the Company and which is not generally available public knowledge (other than by acts by you in violation of this Agreement). Except as may be required or appropriate in connection with your carrying out your duties as an employee, you will not, without the prior written consent of the Company or as may otherwise be required by law or any legal process, any statutory obligation or order of any court or statutory tribunal of competent jurisdiction, or as is necessary in connection with any adversarial proceeding against the Company (in which case you will use your reasonable best efforts in cooperating with the Company in obtaining a protective order against disclosure by a court of competent jurisdiction), communicate or divulge any such trade secrets or Confidential Information to anyone other than the Company and those designated by the Company or on behalf of the Company in the furtherance of its business or to perform duties hereunder.  Notwithstanding anything to the contrary in this Agreement or otherwise, nothing shall limit your rights under applicable law to provide truthful information to any governmental entity or to file a charge with or participate in an investigation conducted by any governmental entity. You are hereby notified that the immunity provisions in Section 1833 of title 18 of the United States Code provide that an individual cannot be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that is made (1) in confidence to federal, state or local government officials, either directly or indirectly, or to an attorney, and is solely for the purpose of reporting or investigating a suspected violation of the law, (2) under seal in a complaint or other document filed in a lawsuit or other proceeding, or (3) to your attorney in connection with a lawsuit for retaliation for reporting a suspected violation of law (and the trade secret may be used in the court proceedings for such lawsuit) as long as any document containing the trade secret is filed under seal and the trade secret is not disclosed except pursuant to court order.

2.    <u>Non-Solicitation of Employees</u>.  You agree that during your employment, and for a six month period following the termination of your employment for any reason, you will not take any action, directly or indirectly (without the prior written consent of the Company), that causes or could reasonably be expected to cause any person who is then an employee of the Company or its Affiliates to resign from the Company or its Affiliates or to apply for or accept employment with any other business or enterprise.

3.    <u>Non-Solicitation of Customers</u>.  You agree that during your employment, and for a six month period following the termination of your employment for any reason, you will not, in any manner, directly or indirectly (without the prior written consent of the Company): (1) take any action that causes or could reasonably be expected to cause any customer or prospective customer of the Company or its Affiliates to whom you provided services or with whom you otherwise had contact to become a customer of or transact any business with a Competitive Business or reduce or refrain from doing any business with the Company or its Affiliates, (2) transact business with any customer or prospective customer that would cause you to be a Competitive Business, or (3) interfere with or damage any relationship between the Company and a customer or prospective customer.

4.     <u>Reasonableness of Covenant</u>.  You agree that the covenants contained herein are reasonable and necessary to protect the confidentiality of the customer lists, the terms, conditions and nature of customer relationships, and other trade secrets and Confidential Information concerning the Company and its Affiliates, acquired by you and to avoid actual or apparent conflicts of interest.

5.     <u>Validity</u>.   The terms and provisions of this Annex A are intended to be separate and divisible provisions and if, for any reason, any one or more of them is held to be invalid or unenforceable, neither the validity nor the enforceability of any other provision set forth herein thereby be affected.  If for any reason any court of competent jurisdiction will find any provisions of this Annex A unreasonable in duration or geographic scope or otherwise, you and the Company agree that the restrictions and prohibitions contained herein will be effective to the fullest extent allowed under applicable law in such jurisdiction

6.     <u>Injunctive Relief</u>.   Without limiting any remedies available to the Company, you acknowledge and agree that a breach of the covenants contained in Sections 1 through 3 of this Annex A will result in injury to the Company and its Affiliates for which there is no adequate remedy at law and that it will not be possible to measure damages for such injuries precisely.  Therefore, you agree that, in the event of such a breach or threat thereof, the Company will be entitled to seek a temporary restraining order and a preliminary and permanent injunction, without bond or other security, restraining you from engaging in activities prohibited by Sections 1 through 3 of this Annex A or such other relief as may be required specifically to enforce any of the covenants in Sections 1 through 3 of this Annex A.

7.     <u>Definitions</u>.  For purposes of these covenants, the following terms will have the following meanings:

(a)     "<u>Competitive Business</u>" means any business enterprise that either (i) engages in any activity that competes with the business of the Company or its Affiliates or (ii) holds a 5% or greater equity, voting or profit participation interest in any enterprise that engages in such a competitive activity.

(b)     "<u>Confidential Information</u>" means any information concerning the business or affairs of the Company or any of its Affiliates which is not generally known to the public and includes, but is not limited to, any file, document, book, account, list (including without limitation customer lists), process, patent, specification, drawing, design, computer program or file, computer disk, method of operation, recommendation, report, plan, survey, data, manual, strategy, financial data, client information or data (including the terms and conditions of any business relationships between clients and the Company or its Affiliates), or contract which comes to your knowledge in the course of your employment or which is generated by you in the course of performing your obligations to the Company whether alone or with others.

**KEBAQYR0**

**05/15/2020 06:05 PM U.S. Eastern Standard Time**

**ACCEPTED**

# EXHIBIT 4

**PACWEST BANCORP**
**STOCK INCENTIVE PLAN**
**NOTICE OF STOCK AWARD GRANT**

This Notice of Stock Award Grant is part of the Stock Award Agreement between Grantee and the Company dated **05/14/2019**  and is of no force and effect until the Stock Award Agreement is signed by Grantee and the Company's representative, this Notice of Stock Award Grant is signed by Grantee.

You have been granted the following Stock Award:

| | |
|---|---|
| Name of Grantee: | **DIANA REMINGTON  SMITHSON** |
| Total Number of Shares Granted: ("Granted Stock") | **2,013** |
| Type of Stock Award: | Restricted Stock Award |
| Date of Grant: | **05/14/2019** |
| Vesting Schedule: | The Granted Stock shall vest in full over 4 years. The first one-fourth of the Granted Stock shall vest on the date the Grantee completes one year of continuous Service after the Vesting Commencement Date. An additional one-fourth of the Granted Stock shall vest on the date the Grantee completes each year of continuous Service thereafter until Grantee is 100% vested in the Restricted Stock on the 4th year anniversary of the Vesting Commencement Date. |
| Vesting Commencement Date: | The date that is the last day of the month in which the Grant is made. |

Please sign below to acknowledge the terms and conditions of this Stock Award.

**ACKNOWLEDGED BY GRANTEE:**

By:      **Signed Electronically**

Name:   **DIANA REMINGTON  SMITHSON**

**PACWEST BANCORP**
**STOCK INCENTIVE PLAN**
**STOCK AWARD AGREEMENT**

1. *Definitions*. Unless otherwise defined herein, the terms defined in the PacWest Bancorp 2017 Stock Incentive Plan, as amended (the "Plan") shall have the same defined meanings in this Stock Award Agreement ("Agreement") and the Notice of Stock Award Grant attached hereto as Appendix A.

2. *Grant of Stock Award*. Pursuant to the terms and conditions set forth in the Notice of Stock Award Grant, this Agreement, and the Plan, PacWest Bancorp (the "Company") grants to the grantee named in the Notice of Stock Award Grant ("Grantee") on the date of grant set forth in the Notice of Stock Award Grant ("Date of Grant") the number of Shares set forth in the Notice of Stock Award Grant. This Stock Award is intended to be a Restricted Stock Award or a Performance Stock Award, as provided in the Notice of Stock Award Grant.

3. *Vesting*. The Grantee shall vest in the Granted Stock in accordance with the vesting schedule provided for in the Notice of Stock Award Grant; provided, however, that the Grantee shall cease vesting in the Granted Stock on the Grantee's Termination Date or the date on which the Compensation Committee of the Company's Board of Directors (the "Administrator") determines that the performance goals, if any, provided for in the Notice of Stock Award Grant were not satisfied during the designated period of time. Notwithstanding the foregoing, upon the occurrence of a Vesting Event, the Grantee shall become 100% vested in those shares of Granted Stock that are outstanding on the date of the Vesting Event.

4. *Risk of Forfeiture*.

(a) *General Rule*. The Granted Stock shall initially be subject to a Risk of Forfeiture. The Shares subject to a Risk of Forfeiture shall be referred to herein as "Restricted Shares".

(b) *Lapse of Risk of Forfeiture*. The Risk of Forfeiture shall lapse as the Grantee vests in the Granted Stock.

(c) *Forfeiture of Granted Stock*. The Restricted Shares shall automatically be forfeited and immediately returned to the Company on the Grantee's Termination Date or the date on which the Administrator determines that the performance goals, if any, provided for in the Notice of Stock Award Grant were not satisfied during the designated period of time.

(d) *Additional Shares or Substituted Securities*. In the event of a stock split, reverse stock split, stock dividend, recapitalization, combination or reclassification of the Common Stock or any other increase or decrease in the number of issued and outstanding Shares effected without receipt of consideration by the Company, any new, substituted or additional securities or other property (including money paid other than as an ordinary cash dividend) which are by reason of such transaction distributed with respect to any Restricted Shares or into which such Restricted Shares thereby become convertible shall immediately be subject to a Risk of Forfeiture, which Risk of Forfeiture shall lapse at the same time and in the same manner as the Risk of Forfeiture to which the corresponding Restricted Share is subject.

(e) *Escrow*. Upon issuance, the stock certificates for Granted Stock shall be deposited in escrow with the Company to be held in accordance with the provisions of this Agreement. Any new, substituted or additional securities or other property described in Subsection (d) above shall immediately be delivered to the Company to be held in escrow, but only to the extent the

shares of Granted Stock are at the time Restricted Shares. All regular cash dividends on Restricted Shares (or other securities at the time held in escrow) shall be paid directly to the Grantee and shall not be held in escrow (such distributions may, however, be delivered to an address at the Company for delivery to the Grantee). Restricted Shares, together with any other assets or securities held in escrow hereunder, shall be (i) surrendered to the Company for cancellation upon forfeiture of the Restricted Shares; or (ii) released to the Grantee upon the Grantee's request to the Administrator on or after the date the shares of Granted Stock are no longer Restricted Shares. Grantee agrees not to make a request to the Company's transfer agent for delivery of any share certificates representing any shares of Granted Stock so long as such shares are Restricted Shares.

5. *Rights as a Stockholder*. The Grantee shall have the rights of a stockholder with respect to the dividends paid by the Company. Grantee shall not be entitled to vote any unvested shares of Granted Stock. Upon the vesting of any portion of the Stock Award, the Grantee shall have the voting rights with respect to any such vested shares of Granted Stock.

6. *Non-transferability of Stock Award*. Except as otherwise provided for in the Plan, this Stock Award may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent and distribution and may be exercised, during the lifetime of the Grantee, only by the Grantee. If the Grantee transfers all or part of this Stock Award pursuant to the previous sentence, then the terms of this Agreement, the Plan and the Notice of Stock Award shall apply to the transferee to the same extent as to the Grantee.

7. *Regulatory Compliance*. The issuance of Common Stock pursuant to this Agreement shall be subject to full compliance with all then applicable requirements of law and the requirements of any stock exchange or interdealer quotation system upon which the Common Stock may be listed or traded.

8. *Modification and Termination*. The rights of the Grantee are subject to modification and termination in certain events, as provided in the Plan.

9. *Withholding Tax*. The Company's obligation to deliver Shares or remove any restrictive legends upon vesting of such Shares under the Plan shall be subject to the satisfaction of all applicable federal, state and local income and employment tax withholding requirements. The Grantee shall pay to the Company an amount equal to the withholding amount (or the Company may withhold such amount from the Grantee's salary) in cash or, to the extent permitted under Section 402 of the Sarbanes-Oxley Act of 2002 and the regulations adopted pursuant thereto, with Shares (including previously vested Granted Stock) with an aggregate fair market value equal to the withholding amount calculated using the maximum statutory withholding amount permitted to be withheld under applicable tax rules.

10. *Nondisclosure*. Grantee acknowledges that the grant and terms of this Stock Award are confidential and may not be disclosed by Grantee to any other person, including other employees of the Company and other participants in the Plan, without the express written consent of the Company's Chief Executive Officer. Notwithstanding the foregoing, the Grantee may disclose the grant and terms of this Stock Award to the Grantee's family member, financial advisor, and attorney and as may be required by law or regulation. Any breach of this provision will be deemed to be a material breach of this Agreement.

11. *Governing Law*. This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of California without regard to principles of conflict of laws.

12. *Successors*. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their legal representatives, heirs, and permitted transferees, successors and assigns.

13. *Plan*. This Agreement and the Notice of Stock Award Grant are subject to all of the terms and provisions of the Plan, receipt of a copy of which is hereby acknowledged by the Grantee. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Administrator upon any questions arising under the Plan, this Agreement, and the Notice of Stock Award Grant.

14. *Rights to Future Employment*. This Stock Award does not confer upon the Grantee any right to continue in the Service of the Company or any Affiliate, nor does it limit the right of the Company to terminate the Service of the Grantee at any time.

15. *Restrictive Covenants.* The Grantee hereby agrees to be bound by the restrictive covenants set forth in **Annex A**.

16. *Entire Agreement*. The Notice of Stock Award Grant, this Agreement, and the Plan constitute the entire contract between the parties hereto with regard to the subject matter hereof. They supersede any other agreements, representations or understandings (whether oral or written and whether express or implied) between the parties which relate to the subject matter hereof.

By your signature and the signature of the Company's representative below, you and the Company agree that this Stock Award is granted under and governed by the terms and conditions of this Agreement and the Plan and the Notice of Stock Award Grant, both of which are attached and incorporated herein by reference. This Stock Award is of no force and effect until this Agreement is signed by you and the Company's representative, the Notice of Stock Award Grant is signed by you.

**GRANTEE:**                                                        **PACWEST BANCORP**

By:  **Signed Electronically**                   By:  *Rebecca Cordes*
        Name:                                                          Rebecca H. Cordes
                                                                              *Exec. Vice President, Human Resources*

## ANNEX A
## RESTRICTIVE COVENANTS

The Restrictive Covenants set forth in this Annex A to the Restricted Stock Award Agreement (the "Agreement") limit the ability of the Grantee to engage in certain practices during and following employment with the Company and is an integral part of the Agreement, without which the Company would not have granted the opportunity to earn the Restricted Stock Award.

1.      Confidential Information.  During your employment and thereafter, you shall hold in a fiduciary capacity for the benefit of the Company all trade secrets and Confidential Information relating to the Company and its businesses and investments, which will have been obtained by you during your employment by the Company and which is not generally available public knowledge (other than by acts by you in violation of this Agreement). Except as may be required or appropriate in connection with your carrying out your duties as an employee, you will not, without the prior written consent of the Company or as may otherwise be required by law or any legal process, any statutory obligation or order of any court or statutory tribunal of competent jurisdiction, or as is necessary in connection with any adversarial proceeding against the Company (in which case you will use your reasonable best efforts in cooperating with the Company in obtaining a protective order against disclosure by a court of competent jurisdiction), communicate or divulge any such trade secrets or Confidential Information to anyone other than the Company and those designated by the Company or on behalf of the Company in the furtherance of its business or to perform duties hereunder.  Notwithstanding anything to the contrary in this Agreement or otherwise, nothing shall limit your rights under applicable law to provide truthful information to any governmental entity or to file a charge with or participate in an investigation conducted by any governmental entity. You are hereby notified that the immunity provisions in Section 1833 of title 18 of the United States Code provide that an individual cannot be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that is made (1) in confidence to federal, state or local government officials, either directly or indirectly, or to an attorney, and is solely for the purpose of reporting or investigating a suspected violation of the law, (2) under seal in a complaint or other document filed in a lawsuit or other proceeding, or (3) to your attorney in connection with a lawsuit for retaliation for reporting a suspected violation of law (and the trade secret may be used in the court proceedings for such lawsuit) as long as any document containing the trade secret is filed under seal and the trade secret is not disclosed except pursuant to court order.

2.      Non-Solicitation of Employees.  You agree that during your employment, and for a six month period following the termination of your employment for any reason, you will not take any action, directly or indirectly (without the prior written consent of the Company), that causes or could reasonably be expected to cause any person who is then an employee of the Company or its Affiliates to resign from the Company or its Affiliates or to apply for or accept employment with any other business or enterprise.

3.      Non-Solicitation of Customers.  You agree that during your employment, and for a six month period following the termination of your employment for any reason, you will not, in any manner, directly or indirectly (without the prior written consent of the Company): (1) take any action that causes or could reasonably be expected to cause any customer or prospective customer of the Company or its Affiliates to whom you provided services or with whom you otherwise had contact to become a customer of or transact any business with a Competitive Business or reduce or refrain from doing any business with the Company or its Affiliates, (2) transact business with any customer or prospective customer that would cause you to be a Competitive Business, or (3) interfere with or damage any relationship between the Company and a customer or prospective customer.

4.     <u>Reasonableness of Covenant</u>.  You agree that the covenants contained herein are reasonable and necessary to protect the confidentiality of the customer lists, the terms, conditions and nature of customer relationships, and other trade secrets and Confidential Information concerning the Company and its Affiliates, acquired by you and to avoid actual or apparent conflicts of interest.

5.     <u>Validity</u>.   The terms and provisions of this Annex A are intended to be separate and divisible provisions and if, for any reason, any one or more of them is held to be invalid or unenforceable, neither the validity nor the enforceability of any other provision set forth herein thereby be affected.  If for any reason any court of competent jurisdiction will find any provisions of this Annex A unreasonable in duration or geographic scope or otherwise, you and the Company agree that the restrictions and prohibitions contained herein will be effective to the fullest extent allowed under applicable law in such jurisdiction

6.     <u>Injunctive Relief</u>.   Without limiting any remedies available to the Company, you acknowledge and agree that a breach of the covenants contained in Sections 1 through 3 of this Annex A will result in injury to the Company and its Affiliates for which there is no adequate remedy at law and that it will not be possible to measure damages for such injuries precisely.  Therefore, you agree that, in the event of such a breach or threat thereof, the Company will be entitled to seek a temporary restraining order and a preliminary and permanent injunction, without bond or other security, restraining you from engaging in activities prohibited by Sections 1 through 3 of this Annex A or such other relief as may be required specifically to enforce any of the covenants in Sections 1 through 3 of this Annex A.

7.     <u>Definitions</u>.  For purposes of these covenants, the following terms will have the following meanings:

(a)     "<u>Competitive Business</u>" means any business enterprise that either (i) engages in any activity that competes with the business of the Company or its Affiliates or (ii) holds a 5% or greater equity, voting or profit participation interest in any enterprise that engages in such a competitive activity.

(b)     "<u>Confidential Information</u>" means any information concerning the business or affairs of the Company or any of its Affiliates which is not generally known to the public and includes, but is not limited to, any file, document, book, account, list (including without limitation customer lists), process, patent, specification, drawing, design, computer program or file, computer disk, method of operation, recommendation, report, plan, survey, data, manual, strategy, financial data, client information or data (including the terms and conditions of any business relationships between clients and the Company or its Affiliates), or contract which comes to your knowledge in the course of your employment or which is generated by you in the course of performing your obligations to the Company whether alone or with others.

**JEI9MVAA**

**05/22/2019 04:18 PM U.S. Eastern Standard Time**

**ACCEPTED**

# EXHIBIT 5

**PACWEST BANCORP**
**STOCK INCENTIVE PLAN**
**NOTICE OF STOCK AWARD GRANT**

This Notice of Stock Award Grant is part of the Stock Award Agreement between Grantee and the Company dated **05/12/2020**   and is of no force and effect until the Stock Award Agreement is signed by Grantee and the Company's representative, this Notice of Stock Award Grant is signed by Grantee.

You have been granted the following Stock Award:

| | |
|---|---|
| Name of Grantee: | **DIANA REMINGTON  SMITHSON** |
| Total Number of Shares Granted: ("Granted Stock") | **2,254** |
| Type of Stock Award: | Restricted Stock Award |
| Date of Grant: | **05/12/2020** |
| Vesting Schedule: | The Granted Stock shall vest in full over 4 years. The first one-fourth of the Granted Stock shall vest on the date the Grantee completes one year of continuous Service after the Vesting Commencement Date. An additional one-fourth of the Granted Stock shall vest on the date the Grantee completes each year of continuous Service thereafter until Grantee is 100% vested in the Restricted Stock on the 4th year anniversary of the Vesting Commencement Date. |
| Vesting Commencement Date: | The date that is the last day of the month in which the Grant is made. |

Please sign below to acknowledge the terms and conditions of this Stock Award.

**ACKNOWLEDGED BY GRANTEE:**

By:        **Signed Electronically**

Name:    **DIANA REMINGTON  SMITHSON**

**PACWEST BANCORP**
**STOCK INCENTIVE PLAN**
**STOCK AWARD AGREEMENT**

1. *Definitions*. Unless otherwise defined herein, the terms defined in the PacWest Bancorp 2017 Stock Incentive Plan, as amended (the "Plan") shall have the same defined meanings in this Stock Award Agreement ("Agreement") and the Notice of Stock Award Grant attached hereto as Appendix A.

2. *Grant of Stock Award*. Pursuant to the terms and conditions set forth in the Notice of Stock Award Grant, this Agreement, and the Plan, PacWest Bancorp (the "Company") grants to the grantee named in the Notice of Stock Award Grant ("Grantee") on the date of grant set forth in the Notice of Stock Award Grant ("Date of Grant") the number of Shares set forth in the Notice of Stock Award Grant. This Stock Award is intended to be a Restricted Stock Award or a Performance Stock Award, as provided in the Notice of Stock Award Grant.

3. *Vesting*. The Grantee shall vest in the Granted Stock in accordance with the vesting schedule provided for in the Notice of Stock Award Grant; provided, however, that the Grantee shall cease vesting in the Granted Stock on the Grantee's Termination Date or the date on which the Compensation Committee of the Company's Board of Directors (the "Administrator") determines that the performance goals, if any, provided for in the Notice of Stock Award Grant were not satisfied during the designated period of time. Notwithstanding the foregoing, upon the occurrence of a Vesting Event, the Grantee shall become 100% vested in those shares of Granted Stock that are outstanding on the date of the Vesting Event.

4. *Risk of Forfeiture*.

    (a) *General Rule*. The Granted Stock shall initially be subject to a Risk of Forfeiture. The Shares subject to a Risk of Forfeiture shall be referred to herein as "Restricted Shares".

    (b) *Lapse of Risk of Forfeiture*. The Risk of Forfeiture shall lapse as the Grantee vests in the Granted Stock.

    (c) *Forfeiture of Granted Stock*. The Restricted Shares shall automatically be forfeited and immediately returned to the Company on the Grantee's Termination Date or the date on which the Administrator determines that the performance goals, if any, provided for in the Notice of Stock Award Grant were not satisfied during the designated period of time.

    (d) *Additional Shares or Substituted Securities*. In the event of a stock split, reverse stock split, stock dividend, recapitalization, combination or reclassification of the Common Stock or any other increase or decrease in the number of issued and outstanding Shares effected without receipt of consideration by the Company, any new, substituted or additional securities or other property (including money paid other than as an ordinary cash dividend) which are by reason of such transaction distributed with respect to any Restricted Shares or into which such Restricted Shares thereby become convertible shall immediately be subject to a Risk of Forfeiture, which Risk of Forfeiture shall lapse at the same time and in the same manner as the Risk of Forfeiture to which the corresponding Restricted Share is subject.

    (e) *Escrow*. Upon issuance, the stock certificates for Granted Stock shall be deposited in escrow with the Company to be held in accordance with the provisions of this Agreement. Any new, substituted or additional securities or other property described in Subsection (d) above shall immediately be delivered to the Company to be held in escrow, but only to the extent the

shares of Granted Stock are at the time Restricted Shares. All regular cash dividends on Restricted Shares (or other securities at the time held in escrow) shall be paid directly to the Grantee and shall not be held in escrow (such distributions may, however, be delivered to an address at the Company for delivery to the Grantee). Restricted Shares, together with any other assets or securities held in escrow hereunder, shall be (i) surrendered to the Company for cancellation upon forfeiture of the Restricted Shares; or (ii) released to the Grantee upon the Grantee's request to the Administrator on or after the date the shares of Granted Stock are no longer Restricted Shares. Grantee agrees not to make a request to the Company's transfer agent for delivery of any share certificates representing any shares of Granted Stock so long as such shares are Restricted Shares.

5. *Rights as a Stockholder*. The Grantee shall have the rights of a stockholder with respect to the dividends paid by the Company. Grantee shall not be entitled to vote any unvested shares of Granted Stock. Upon the vesting of any portion of the Stock Award, the Grantee shall have the voting rights with respect to any such vested shares of Granted Stock.

6. *Non-transferability of Stock Award*. Except as otherwise provided for in the Plan, this Stock Award may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent and distribution and may be exercised, during the lifetime of the Grantee, only by the Grantee. If the Grantee transfers all or part of this Stock Award pursuant to the previous sentence, then the terms of this Agreement, the Plan and the Notice of Stock Award shall apply to the transferee to the same extent as to the Grantee.

7. *Regulatory Compliance*. The issuance of Common Stock pursuant to this Agreement shall be subject to full compliance with all then applicable requirements of law and the requirements of any stock exchange or interdealer quotation system upon which the Common Stock may be listed or traded.

8. *Modification and Termination*. The rights of the Grantee are subject to modification and termination in certain events, as provided in the Plan.

9. *Withholding Tax*. The Company's obligation to deliver Shares or remove any restrictive legends upon vesting of such Shares under the Plan shall be subject to the satisfaction of all applicable federal, state and local income and employment tax withholding requirements. The Grantee shall pay to the Company an amount equal to the withholding amount (or the Company may withhold such amount from the Grantee's salary) in cash or, to the extent permitted under Section 402 of the Sarbanes-Oxley Act of 2002 and the regulations adopted pursuant thereto, with Shares (including previously vested Granted Stock) with an aggregate fair market value equal to the withholding amount calculated using the maximum statutory withholding amount permitted to be withheld under applicable tax rules.

10. *Nondisclosure*. Grantee acknowledges that the grant and terms of this Stock Award are confidential and may not be disclosed by Grantee to any other person, including other employees of the Company and other participants in the Plan, without the express written consent of the Company's Chief Executive Officer. Notwithstanding the foregoing, the Grantee may disclose the grant and terms of this Stock Award to the Grantee's family member, financial advisor, and attorney and as may be required by law or regulation. Any breach of this provision will be deemed to be a material breach of this Agreement.

11. *Governing Law*. This Agreement shall be governed by and interpreted in accordance with the internal laws of the State of California without regard to principles of conflict of laws.

12. *Successors*. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their legal representatives, heirs, and permitted transferees, successors and assigns.

13. *Plan*. This Agreement and the Notice of Stock Award Grant are subject to all of the terms and provisions of the Plan, receipt of a copy of which is hereby acknowledged by the Grantee. The Grantee hereby agrees to accept as binding, conclusive, and final all decisions and interpretations of the Administrator upon any questions arising under the Plan, this Agreement, and the Notice of Stock Award Grant.

14. *Rights to Future Employment*. This Stock Award does not confer upon the Grantee any right to continue in the Service of the Company or any Affiliate, nor does it limit the right of the Company to terminate the Service of the Grantee at any time.

15. *Restrictive Covenants*.  The Grantee hereby agrees to be bound by the restrictive covenants set forth in **Annex A**.

16. *Entire Agreement*. The Notice of Stock Award Grant, this Agreement, and the Plan constitute the entire contract between the parties hereto with regard to the subject matter hereof. They supersede any other agreements, representations or understandings (whether oral or written and whether express or implied) between the parties which relate to the subject matter hereof.

By your signature and the signature of the Company's representative below, you and the Company agree that this Stock Award is granted under and governed by the terms and conditions of this Agreement and the Plan and the Notice of Stock Award Grant, both of which are attached and incorporated herein by reference. This Stock Award is of no force and effect until this Agreement is signed by you and the Company's representative, the Notice of Stock Award Grant is signed by you.

**GRANTEE:**                                                    **PACWEST BANCORP**

By:  **Signed Electronically**                 By:  *Rebecca Cordes*
      Name:                                                           Rebecca H. Cordes
                                                                            *Exec. Vice President, Human Resources*

## ANNEX A
## RESTRICTIVE COVENANTS

The Restrictive Covenants set forth in this Annex A to the Restricted Stock Award Agreement (the "Agreement") limit the ability of the Grantee to engage in certain practices during and following employment with the Company and is an integral part of the Agreement, without which the Company would not have granted the opportunity to earn the Restricted Stock Award.

1.     Confidential Information.  During your employment and thereafter, you shall hold in a fiduciary capacity for the benefit of the Company all trade secrets and Confidential Information relating to the Company and its businesses and investments, which will have been obtained by you during your employment by the Company and which is not generally available public knowledge (other than by acts by you in violation of this Agreement). Except as may be required or appropriate in connection with your carrying out your duties as an employee, you will not, without the prior written consent of the Company or as may otherwise be required by law or any legal process, any statutory obligation or order of any court or statutory tribunal of competent jurisdiction, or as is necessary in connection with any adversarial proceeding against the Company (in which case you will use your reasonable best efforts in cooperating with the Company in obtaining a protective order against disclosure by a court of competent jurisdiction), communicate or divulge any such trade secrets or Confidential Information to anyone other than the Company and those designated by the Company or on behalf of the Company in the furtherance of its business or to perform duties hereunder.  Notwithstanding anything to the contrary in this Agreement or otherwise, nothing shall limit your rights under applicable law to provide truthful information to any governmental entity or to file a charge with or participate in an investigation conducted by any governmental entity. You are hereby notified that the immunity provisions in Section 1833 of title 18 of the United States Code provide that an individual cannot be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that is made (1) in confidence to federal, state or local government officials, either directly or indirectly, or to an attorney, and is solely for the purpose of reporting or investigating a suspected violation of the law, (2) under seal in a complaint or other document filed in a lawsuit or other proceeding, or (3) to your attorney in connection with a lawsuit for retaliation for reporting a suspected violation of law (and the trade secret may be used in the court proceedings for such lawsuit) as long as any document containing the trade secret is filed under seal and the trade secret is not disclosed except pursuant to court order.

2.     Non-Solicitation of Employees.  You agree that during your employment, and for a six month period following the termination of your employment for any reason, you will not take any action, directly or indirectly (without the prior written consent of the Company), that causes or could reasonably be expected to cause any person who is then an employee of the Company or its Affiliates to resign from the Company or its Affiliates or to apply for or accept employment with any other business or enterprise.

3.     Non-Solicitation of Customers.  You agree that during your employment, and for a six month period following the termination of your employment for any reason, you will not, in any manner, directly or indirectly (without the prior written consent of the Company): (1) take any action that causes or could reasonably be expected to cause any customer or prospective customer of the Company or its Affiliates to whom you provided services or with whom you otherwise had contact to become a customer of or transact any business with a Competitive Business or reduce or refrain from doing any business with the Company or its Affiliates, (2) transact business with any customer or prospective customer that would cause you to be a Competitive Business, or (3) interfere with or damage any relationship between the Company and a customer or prospective customer.

4.    <u>Reasonableness of Covenant</u>.  You agree that the covenants contained herein are reasonable and necessary to protect the confidentiality of the customer lists, the terms, conditions and nature of customer relationships, and other trade secrets and Confidential Information concerning the Company and its Affiliates, acquired by you and to avoid actual or apparent conflicts of interest.

5.    <u>Validity</u>.   The terms and provisions of this Annex A are intended to be separate and divisible provisions and if, for any reason, any one or more of them is held to be invalid or unenforceable, neither the validity nor the enforceability of any other provision set forth herein thereby be affected.  If for any reason any court of competent jurisdiction will find any provisions of this Annex A unreasonable in duration or geographic scope or otherwise, you and the Company agree that the restrictions and prohibitions contained herein will be effective to the fullest extent allowed under applicable law in such jurisdiction

6.    <u>Injunctive Relief</u>.   Without limiting any remedies available to the Company, you acknowledge and agree that a breach of the covenants contained in Sections 1 through 3 of this Annex A will result in injury to the Company and its Affiliates for which there is no adequate remedy at law and that it will not be possible to measure damages for such injuries precisely.  Therefore, you agree that, in the event of such a breach or threat thereof, the Company will be entitled to seek a temporary restraining order and a preliminary and permanent injunction, without bond or other security, restraining you from engaging in activities prohibited by Sections 1 through 3 of this Annex A or such other relief as may be required specifically to enforce any of the covenants in Sections 1 through 3 of this Annex A.

7.    <u>Definitions</u>.  For purposes of these covenants, the following terms will have the following meanings:

(a)    "<u>Competitive Business</u>" means any business enterprise that either (i) engages in any activity that competes with the business of the Company or its Affiliates or (ii) holds a 5% or greater equity, voting or profit participation interest in any enterprise that engages in such a competitive activity.

(b)    "<u>Confidential Information</u>" means any information concerning the business or affairs of the Company or any of its Affiliates which is not generally known to the public and includes, but is not limited to, any file, document, book, account, list (including without limitation customer lists), process, patent, specification, drawing, design, computer program or file, computer disk, method of operation, recommendation, report, plan, survey, data, manual, strategy, financial data, client information or data (including the terms and conditions of any business relationships between clients and the Company or its Affiliates), or contract which comes to your knowledge in the course of your employment or which is generated by you in the course of performing your obligations to the Company whether alone or with others.

**KEC8JVGA**

**05/16/2020 02:36 PM U.S. Eastern Standard Time**

**ACCEPTED**

1

## PROOF OF SERVICE

2

*PacWest Bancorp v. David I. Rainer* Case No. 20STCV46002 [2296.4]

3

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

4

At the time of service, I was over 18 years of age and not a party to this action. I am employed

5

in the County of Los Angeles, State of California. My business address is 777 South Figueroa Street, Suite 3800, Los Angeles, CA 90017.

6

On April 1, 2022, I served true copies of the foregoing document described as

7

**PLAINTIFFS' T H I R D AMENDED COMPLAINT FOR DAMAGES** on the interested parties in this action as follows:

8

Bert H. Deixler, Esq.                                    Attorneys for Defendant/Cross-Complainant
Nary Kim, Esq.                                            DAVID I. RAINER

9

Nicholas F. Daum, Esq.

10

KENDALL BRILL & KELLY LLP
10100 Santa Monica Blvd., Suite 1725

11

Los Angeles, California 90067
Telephone: (310) 556-2700

12

Facsimile: (310) 556-2705
E-mail(s): bdeixler@kbkfirm.com;

13

nkim@kbkfirm.com; crossi@kbkfirm.com;
ndaum@kbkfirm.com

14

Brent Caslin, Esq.                                       Attorneys for Defendants

15

Alexander M. Smith, Esq.                                 BANK OF SOUTHERN CALIFORNIA,
Madeline P. Skitzki, Esq.                                N.A. and SOUTHERN CALIFORNIA

16

Elizabeth Avunjian, Esq.                                 BANCORP
Chris Ward

17

Christal Oropeza
JENNER & BLOCK LLP

18

633 West 5th Street, Suite 3300
Los Angeles, CA 90071

19

Telephone: (213) 239-5100
Email: bcaslin@jenner.com; asmith@jenner.com;

20

mskitzki@jenner.com; eavunjian@jenner.com;
cward@jenner.com; COropeza@jenner.com;

21

eacedo@kbkfirm.com

22

☒       **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused copies of the document to be sent from e-mail address igomez@bautelaw.com to the persons at the e-mail addresses

23

listed in the Service List.

24

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on April 1, 2022, at Los Angeles, California.

25

26

27

_____

28

Irma Gomez

344176.3                                    i.

**PLAINTIFFS' THIRD AMENDED COMPLAINT FOR DAMAGES**

**EXHIBIT C - 282**